# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KELLIN JOHNS and JUAN          )
BARRON, Individually and on    )
behalf of all others           )
similarly situated,            )
                               )
          Plaintiffs,          )
                               )
     vs.                       ) No. 3:20-cv-00264-DWD
                               )
PAYCOR, INC.,                  )
                               )
          Defendants.          )


          The deposition of MITRI DAHDALY, called for

examination pursuant to the Rules of Civil Procedure

for the United States District Courts pertaining to

the taking of depositions, taken remotely in the

above-entitled cause via Zoom electronic

videoconferencing platform by Andrew R. Pitts,

Certified Shorthand Reporter, on January 14, 2021, at

the hour of 11:30 a.m. EST.


REPORTED BY:  Andrew R. Pitts, CSR, RPR
LICENSE NO.:  084-4575

## Page 2

```
 1   APPEARANCES:
 2       STEPHAN ZOURAS, LLP, by
             MR. RYAN F. STEPHAN, Esquire
 3       MS. CATHERINE T. MITCHELL, Esquire
             100 North Riverside Plaza
 4           Suite 2150
             Chicago, Illinois  60606
 5           (312) 233-1550
             rstephan@stephanzouras.com
 6
             Representing the Plaintiffs;
 7
         SHOOK, HARDY & BACON L.L.P., by
 8           MR. MATTHEW C. WOLFE, Esquire
             111 South Wacker Drive
 9           Suite 4700
             Chicago, Illinois  60606
10           (312)704-7700
             mwolfe@shb.com
11
             Representing the Defendant.
12
13
     ALSO PRESENT:
14
         MS. ELIZABETH FREDERIC, Paycor In-house Counsel
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1            I N D E X
 2   WITNESS              EXAMINATION
 3   MITRI DAHDALY (via videoconference)
 4       By Mr. Stephan        5
 5       By Mr. Wolfe         142
 6
 7          E X H I B I T S
 8   PLAINTIFFS'           PRESENTED
 9   Exhibit A  Johns/Paycor 1-11       41
10   Exhibit B  Johns/Paycor 19-26      68
11   Exhibit C  Affidavit of Eric Schreimann    88
12   Exhibit D  Johns/Paycor 32-35     102
13   Exhibit E  Johns/Paycor 53-55     118
14   Exhibit F  Johns/Paycor 41-46     126
15   Exhibit G  Johns/Paycor 118-126   129
16
17
18
19
20
21
22
23
24
```

## Page 4

```
 1           (Whereupon, the following
 2         proceedings took place remotely:)
 3       THE REPORTER:  The parties in this
 4   deposition acknowledge that I am not physically
 5   present in the deposition room and that I will be
 6   reporting this deposition remotely pursuant to Federal
 7   Rule of Civil Procedure 29.  They further acknowledge
 8   that in lieu of an oath administered in person, the
 9   witness will verbally declare his testimony under
10   penalty of perjury.
11           The parties and their counsel consent
12   to this arrangement and waive any objections to this
13   manner of reporting.  Please indicate your agreement
14   by stating your name and your agreement on the record,
15   beginning with Plaintiffs' Counsel.
16       MR. STEPHAN:  Thank you, Andrew.
17   Plaintiffs' counsel Ryan Stephan agrees.
18       MR. WOLFE:  Matt Wolfe for Paycor, we agree.
19           (Whereupon, the witness was
20             administered an oath.)
21
22
23
24
```

## Page 5

```
 1           MITRI DAHDALY,
 2   called as a witness herein, having been first
 3   administered an oath, was examined and testified
 4   remotely via videoconference as follows:
 5           EXAMINATION
 6   BY MR. STEPHAN:
 7       Q.  Good morning, Mr. Dahdaly.  Is it okay if
 8   I call you by your first name today?
 9       A.  Sure.
10       Q.  Well, it's nice to meet you.  My name is
11   Ryan Stephan.  I represent the Plaintiffs in this
12   case, Johns v Paycor.
13           Have you ever been deposed before?
14       A.  No, I have not.
15       Q.  Okay.  So let's go over a couple ground
16   rules just so things go as smoothly as possible
17   today.  Okay?
18       A.  Sure.
19       Q.  The first is please try and wait until
20   I finish asking my question before you answer.  That
21   way Andrew, the court reporter, has a clear record of
22   my question and your answer.  Okay?
23       A.  Okay.
24       Q.  Similarly, please do your best to give clear
```

1  verbal responses. The court reporter cannot take
2  down non-verbal responses like head nods. Okay?
3      A.  Okay.
4      Q.  The third is I'm not trying to trick you
5  today or confuse you. If I ask you a question that
6  you do not understand, just ask me to rephrase it,
7  and I'll try and make it clear. Okay.
8      A.  Okay.
9      Q.  And, finally, this is not a marathon by any
10 means today, I hope to get you out of here, but if
11 you need to take a break, just let us know. And as
12 long as a question is not pending, we'll take a
13 break.
14     A.  Okay.
15     Q.  Mitri, can you tell us what you did to
16 prepare for today's deposition?
17     **A.  We reviewed some internal documentation on**
18 **designs for our product and looked at demographics of**
19 **our install base, and that was really what we had**
20 **prepared with some procedural items that counsel had**
21 **highlighted for us as well.**
22     Q.  Okay. When you say we, who are you
23 referring to?
24     **A.  Primarily external counsel and Elizabeth**

Page 6

1  from Paycor.
2      Q.  Okay. So we are talking about external
3  counsel Matt Wolfe and in-house counsel Elizabeth
4  Frederic?
5      **A.  Yes.**
6      Q.  I don't want to know what you said to them
7  or what they said to you, but I am permitted to ask
8  other questions about those meetings. Okay?
9      **A.  Sure.**
10     Q.  When did you first meet to prepare for
11 today's deposition, whether it be in person or
12 remotely?
13     **A.  I believe in December we first met to**
14 **discuss specifics, possibly late November.**
15     Q.  Okay. And who participated in that meeting?
16     **A.  Matt and Elizabeth.**
17     Q.  Okay. Did anyone else attend?
18     **A.  I believe there were -- Siro (phonetic), is**
19 **that his name? I don't recall the other attendees'**
20 **names.**
21     Q.  Were the other attendees lawyers, or were
22 they Paycor employees, or someone else?
23     **A.  I don't know what their official capacity**
24 **was. They work with Matthew.**

Page 7

1      Q.  Okay. Was that meeting done in --
2      **A.  And I believe we have had meetings as well**
3  **with our internal general counsel.**
4      Q.  Okay. And did those meetings with the
5  general counsel take place before this
6  November-December meeting with Mr. Wolfe and
7  Ms. Frederic?
8      **A.  No, they did not.**
9      Q.  Okay. So the first meeting was either in
10 November or December of last year. We've started to
11 discuss that meeting.
12         How long did that meeting take?
13     **A.  30 to 60 minutes.**
14     Q.  Okay. And that was conducted remotely; is
15 that right?
16     **A.  That is correct.**
17     Q.  And currently where are you located?
18     **A.  I am currently in Toronto, Canada.**
19     Q.  Is that where you live?
20     **A.  I actually reside in Philadelphia,**
21 **Pennsylvania.**
22     Q.  Oh, we have a couple of Philadelphians on
23 this call. That is also where Katie is from.
24     **A.  Okay.**

Page 8

1      Q.  We won't hold it against you though.
2      **A.  Not a problem.**
3      Q.  Okay. So this first meeting, did you look
4  at any documents?
5      **A.  No, we did not.**
6      Q.  Okay. Was there a second meeting?
7      **A.  There were multiple meetings.**
8      Q.  Do you remember when the next meeting was?
9      **A.  Probably a week after the first.**
10     Q.  Was that also done remotely?
11     **A.  Yes, all of our meetings were done remotely.**
12     Q.  Were the same people involved in all of the
13 meetings?
14     **A.  Our general counsel did not participate in**
15 **all the meetings. For the remaining meetings, we were**
16 **pretty static in terms of the participants.**
17     Q.  Who is Paycor's general counsel?
18     **A.  She recently started.**
19     THE WITNESS: Elizabeth, can you refresh my
20 memory as to her name?
21     MR. WOLFE: Well, I'll do that. Her name is
22 Alice Geene.
23 BY THE WITNESS:
24     **A.  Alice, that's correct.**

Page 9

1    MR. STEPHAN:  I'm sorry, Matt, how do you
2  spell her last name?
3    MR. WOLFE:  G-E-E-N-E.
4    MR. STEPHAN:  Okay.
5  BY MR. STEPHAN:
6    Q.  And do you know how long Alice has been with
7  Paycor, Mitri?
8    **A.  I want to say three to six months.**
9    Q.  Do you know if she replaced anyone?
10   **A.  She did.**
11   Q.  And who did she replace?
12   **A.  It's been a while.  That position was vacant**
13 **for some time.  I'm sorry, I'm drawing a blank.**
14 **I know she is in Philadelphia as well.**
15   Q.  That's okay.  Do you remember any of the
16 people that held the general counsel position before
17 Alice Geene?
18   **A.  Just the one.  She had been there when**
19 **I started with Paycor in 2018.  I don't know who was**
20 **there prior to her.**
21   Q.  What was her name?
22   **A.  That's who I'm saying.  I don't recall**
23 **Alice's predecessor.**
24   Q.  Okay.  But you remember she was a woman?

1    **A.  Yes, it was a woman.  She was based in**
2  **Philadelphia.**
3    MR. STEPHAN:  Okay.  Elizabeth or Matt, can
4  you guys offer any help on that?
5    MR. WOLFE:  I don't know.
6    MS. FREDERIC:  Yeah, Matt, is it okay if
7  I respond?
8    MR. WOLFE:  Sure.
9    MS. FREDERIC:  The previous general
10 counsel's name is Chris Ducanes.  He was based in
11 Frisco, Texas.  Prior to that was Sally Baraka.
12 That's the general counsel that Mitri was referring to
13 that was based in Philadelphia.  And then the general
14 counsel prior to Sally Baraka was Ed Woodson, who was
15 also based in Frisco, Texas.
16 BY MR. STEPHAN:
17   Q.  Mitri, do you know if Chris Ducanes is still
18 with Paycor?
19   **A.  I do not know.**
20   Q.  Do you know if Sally Baraka is still with
21 Paycor?
22   **A.  She is not.**
23   Q.  How about Ed Woodson?
24   **A.  Do not know that he is with us.**

1    Q.  Okay.  These meetings you participated in to
2  prepare for today, can you give us an approximation
3  of how many total there were?
4    **A.  Five, maybe six.**
5    Q.  And can you tell me approximately how much
6  time you spent collectively in those meetings
7  preparing for today's deposition?
8    **A.  Five to six hours.  And I don't know that it**
9  **was all exclusively preparing for today's deposition.**
10 **I think some of it was researching to the general**
11 **facts around the case.**
12   Q.  Well, what did you do to research the
13 general facts around this case?
14   **A.  Mostly document collection, obtaining as**
15 **much information from a technical perspective as we**
16 **could about the hardware technology that's being used,**
17 **the software that's being used and the design behind**
18 **the software, and then just looking at general counts**
19 **of customers and their distribution across the country**
20 **and what type of technology they use for time**
21 **collection.**
22   Q.  Okay.  And were you the person that led
23 those efforts?
24   **A.  I coordinated those efforts, yes.**

1    Q.  And how did you do that?
2    **A.  I have a group of other product managers**
3  **that work for me, and I have colleagues or peers on**
4  **the engineering side of the organization that**
5  **I requested help from to obtain specific information**
6  **and also coordinate responses from third party vendors**
7  **relative to the third party technology we use.**
8    Q.  Okay.  Can you tell us the names of the
9  product managers that were involved in this research
10 and collection of materials?
11   **A.  Robert Wentworth, David Goodwin.**
12   Q.  Anyone else?
13   **A.  From a product management perspective, those**
14 **were the resources.**
15   Q.  Okay.  And how about others, including
16 colleagues or engineers that were involved in this
17 process?
18   **A.  Pat McCoy.**
19   Q.  Anyone else?
20   **A.  There may have been people that Pat**
21 **delegated work to or had assistance provided to him,**
22 **but again, I wasn't doing the work myself, so I'm not**
23 **sure who he had assist with that research.**
24   Q.  Okay.  And Pat, what is Pat's title?

1     A.  Director product development.
2     Q.  Do you know where he works out of?
3     A.  I believe he's in Frisco, Texas.
4     Q.  Okay.  Can you think of anyone else on the
5  Paycor side that was involved in this research and
6  collection of material?
7     A.  No, that would essentially be the team, the
8  four of us.  As I said, there may have been other
9  engineers that were enlisted by Pat, but I'm not aware
10  of who those are.
11     Q.  Okay.  And did you communicate with these
12  others via e-mail?
13     A.  I communicated verbally as well as by
14  e-mail.
15     Q.  Okay.  Do you have a work e-mail address?
16     A.  I do.
17     Q.  Will you tell us what it is, please.
18     A.  It's mdahdaly@paycor.com.
19     Q.  Thank you.  Okay.  As far as information
20  that they actually collected, can you identify or
21  tell us what documents they were able to collect?
22     A.  We collected multiple user manuals for the
23  various time clocking or data collection devices that
24  Paycor has sold to customers, as well as any

Page 14

1  technology documents that may be related to the
2  technical functions of those devices.  I believe there
3  were some queries that were run to determine how many
4  employees we had on our solution, how many customers
5  use biometrics or finger scanners.
6     We had some, you know, data that we looked
7  at in terms of trying to decipher the number of
8  employees in Illinois, the number of employees in
9  Illinois that may have associated finger scans or at
10  least an approximation of that, and then confirmation
11  of our purging policies and the technical nature of
12  how we purge information from our solution.
13     Q.  Okay.  The queries that you mentioned, do
14  you know who ran those queries?
15     A.  I would assume that somebody within our
16  database administration group would have run those
17  queries.  They would had to have had special
18  privileges to run that.  So while Pat may have created
19  those or had those tasks delegated, most likely a
20  ticket was open for somebody to run those queries.
21     Q.  Okay.  And is there a specific group at
22  Paycor, a database administration group?
23     A.  There are people who are responsible for the
24  care and treating of our structure where the database

Page 15

1  would be part of that care and treating.
2     Q.  Is there a person that is in charge of that
3  group?
4     A.  I don't know who specifically in the
5  engineering organization is responsible for that.
6  Those resources would all eventually, you know, report
7  up and to our CEO.
8     Q.  And who is that?
9     A.  Joe Myer.
10     Q.  Do you know how to spell his last name,
11  Mitri?
12     A.  I believe it's M-Y-E-R.
13     Q.  Do you know how long he's held that
14  position?
15     A.  Roughly a year, maybe a little bit less.
16     Q.  Did he replace anyone?
17     A.  He did.
18     Q.  Who did he replace?
19     A.  Charles Cahill.
20     Q.  Do you know if Mr. Cahill is still with
21  Paycor?
22     A.  He is not.
23     Q.  Okay.  These queries that you mentioned,
24  looking for the number of employees for whom there

Page 16

1  may be a biometric profile or that used biometrics in
2  Illinois, were you able to generate answers?
3     A.  We were able to generate inferences.  And
4  I say inferences because we don't explicitly tie a
5  device to a location in space.  And generally, you
6  know, our customers, especially customers who have
7  multiple locations, we would ship those devices to a
8  corporate headquarters and then they may redistribute
9  those devices across their physical locations or
10  offices.
11     So we looked for either companies who were
12  Illinois based or looked for employees who had
13  Illinois tax withholding.  That being said, due to
14  reciprocity in the tax code, we may have a number of
15  false positives.  So, for example, an Illinois tax --
16  you know, an employee who reports Illinois taxes but
17  works in Wisconsin is completely feasible.
18     So we may have an inaccurate number, we
19  believe it's directional, but because we do not
20  explicitly record where a device is or where a scan
21  occurs, we can't tell you with any, you know, degree
22  of certainty if that number is accurate.
23     Q.  Okay.  And what do the inferences show?
24     A.  I believe the inferences show approximately

Page 17

1  **14,000 total people over the course of a five-year**
2  **period.**
3     Q.  Okay.  14,000 people in Illinois for whom --
4     **A.  14,000 people who pay taxes in Illinois and**
5  **also had a finger scan template.**
6     Q.  Okay.  And was a written report generated as
7  part of these queries?
8     **A.  No.  We got some tabular output in Excel.**
9  **So it's not on what I would call a typical report.**
10  **Just data --**
11     Q.  Was that actually sent to you via e-mail?
12     **A.  It was.**
13     Q.  Do you remember who sent that to you?
14     **A.  I believe it was Pershon (phonetic) --**
15  **I don't recall Pershon's last name.**
16     Q.  First name is Pershon?
17     **A.  Pershon.**
18     Q.  Okay.  And do you know what his title is or
19  where he works, what group?
20     **A.  He is a software developer.  I believe he**
21  **works or reports to Pat or -- I know he's in Pat's**
22  **orb, I should say.  I don't know if he reports**
23  **directly to Pat or if he reports to a manager who**
24  **reports to Pat.**

1     Q.  And these queries that were run against
2  these databases, what databases are we talking about?
3     **A.  Perform Time databases.**
4     Q.  What are those?
5     **A.  Or Perform Suite database.  I should**
6  **rephrase.**
7     Q.  It's okay.  And what are those?
8     **A.  Those are the data storage locations for**
9  **software that is developed by Paycor.  So that would**
10  **encompass payroll time primarily but other HR type**
11  **functions.**
12     Q.  Okay.  And are there names for those
13  databases, or are they just referred to as Perform
14  Suite databases?
15     **A.  Perform Suite databases.  There's probably**
16  **some more technical nomenclature that those are**
17  **referred to, but that's colloquially what we would**
18  **refer to them as.**
19     Q.  Do you know the geographic location of those
20  actual servers that would host those databases?
21     **A.  They are in our data center, which I believe**
22  **is in Cincinnati.  There is a portion of data that is**
23  **stored in Azur, which is a cloud service provided by**
24  **Microsoft.**

1     Q.  And, I'm sorry, what was that?
2     **A.  A cloud storage service that is provided by**
3  **Microsoft, and it's a multi-region setup, so it would**
4  **probably be in a couple of data centers across the**
5  **country.  But it's all within the U.S.**
6     Q.  And do you know where those data centers are
7  located?
8     **A.  I do not know the specifics of where the**
9  **Microsoft data centers are.**
10     Q.  So just to kind of summarize, Paycor hosts
11  some of its own databases in Cincinnati, Ohio in its
12  data center there, correct?
13     **A.  Correct.**
14     Q.  It also hosts some of its data on Microsoft
15  servers located in different parts of the country; is
16  that right?
17     **A.  Correct.**
18     Q.  And would that include the same data that
19  we're talking about here, the employees in Illinois
20  for -- employees that pay taxes in Illinois and
21  whether or not they had a finger scan profile?
22     **A.  So the data for taxation is held within our**
23  **data center.  The data relative to a finger scan**
24  **template is held in Azur.**

1     Q.  I'm sorry, what's -- I don't understand the
2  word that you're saying there.  Held in --
3     **A.  Azur.  It's Micro- -- it's the name of**
4  **Microsoft's that we leverage for cloud compute and**
5  **storage.**
6     Q.  Thank you.  I was not familiar with that.
7  Could you spell it for us?
8     **A.  A-Z-U-R.**
9     Q.  Got it.  And how long has that been the
10  case?
11     **A.  Azur has been leveraged for the better part**
12  **of five or six years.  And specifically for our data**
13  **communication with time collection devices and storage**
14  **of templates, it's always been the case.  So that's**
15  **since 2014.**
16     Q.  Got it.  Do you have a point of contact at
17  Microsoft --
18     **A.  I personally do not --**
19     Q.  -- regarding this information?
20     **A.  I personally do not have a contact person.**
21  **Again, that would be something that our engineering**
22  **organization would maintain, and most likely it's a**
23  **support engineering e-mail or a sales contact rather**
24  **than, you know, anybody specific within Microsoft's**

1    engineering teams.
2        Q.  Okay.  And just going back to these 14,000
3    employees or so that you were able to identify, would
4    you also have home address information for those
5    people?
6        A.  We would have home address information for
7    those people, yes.
8        Q.  Okay.  You would also have other information
9    necessary for tax and payroll --
10       A.  Yes.
11       Q.  -- reporting, like social security numbers?
12       A.  Yes, we would.
13       Q.  So you could find out, for example, for
14   those 14,000 employees if they lived in Illinois, if
15   they worked for a company that was located in
16   Illinois, and if they paid taxes in Illinois?
17       A.  We can determine if they paid taxes in
18   Illinois, we can determine their residency status in
19   it Illinois, and we can most definitely tell if their
20   employer was Illinois-based.
21       Q.  Got it.  As part of that search, were you
22   able to identify how many Illinois clients Paycor
23   has?
24       A.  I believe we did do that.  I believe that

                                        Page 22

1    was submitted in paperwork.  I do not recall the
2    number verbatim off the top of my head.
3        Q.  Would that be part of the Excel database?
4        A.  It would have been --
5        Q.  Or spreadsheet?
6        A.  I'm trying to recall how that information
7    was transited to me.  I believe it was just in e-mail.
8    I don't believe I received a spreadsheet with that
9    information in it.
10       Q.  Okay.  Without holding you to it and
11   without -- you know, I don't really need a specific
12   number, I think that would be hard to do, but could
13   you give us an approximation how many Illinois
14   clients there were --
15       A.  I don't recall the exact number.
16       Q.  Okay.  But you have access to that
17   information; is that right?
18       A.  We do have access to that information.
19       Q.  Okay.  One of the things that you mentioned
20   earlier was you looked into the demographic install
21   base?
22       A.  Yes.
23       Q.  What is that?
24       A.  That is the distribution of our customers

                                        Page 23

1    across the various states within -- well, specifically
2    we looked at in Illinois versus out of Illinois.  We
3    didn't look at state-specific or city-specific
4    information.
5            We really wanted to understand how many
6    customers did we have that were based in Illinois, how
7    many employees did they have, and then we sort of
8    further subdivided that into how many employees were
9    in Illinois employed by anybody, irrespective of
10   whether their organization was Illinois-based or not,
11   and the inverse of that, so how many employees did
12   Illinois-based companies employ, and how many of those
13   employees worked in Illinois versus outside of
14   Illinois.
15       Q.  Okay.  And that's all part of this
16   spreadsheet that you mentioned; is that right?
17       A.  That initial data was just e-mailed to me.
18   I did not have it in a physical spreadsheet.
19       Q.  Okay.  Do you remember who e-mailed that to
20   you?
21       A.  I believe that was also Pershon.
22       Q.  Okay.  Do you still have those e-mails?
23       A.  Yes.
24       Q.  Okay.  Backtracking a little bit here --

                                        Page 24

1        A.  Sure.
2        Q.  We kind of got ahead of ourselves.
3        A.  Sure.
4        Q.  Mitri, could you tell us who you currently
5    work for?
6        A.  Hank Hudepohl.
7        Q.  Okay.  I just meant more generally.  I think
8    we know this --
9        A.  Paycor.
10       Q.  You work for Paycor, correct?
11       A.  I work for Paycor, correct.
12       Q.  And when did you start working for Paycor?
13       A.  August of 2018.
14       Q.  And have you worked for them consistently
15   since --
16       A.  Yes.
17       Q.  And, I'm sorry, you mentioned just a second
18   ago, who was the name you report to?
19       A.  Hank Hudepohl.
20       Q.  And what is Mr. Hudepohl's position?
21       A.  VP product management.
22       Q.  Have you always reported to Hank?
23       A.  No, I have not.
24       Q.  How long have you reported to Hank?

                                        Page 25

1    A.  About a year.
2    Q.  Who did you report to before that?
3    A.  Ryan Bergstrom.
4    Q.  And what was Mr. Bergstrom's title?
5    A.  Chief product officer.
6    Q.  Is he still with Paycor?
7    A.  He is.
8    Q.  Have you reported to anyone else besides
9    Ryan or Hank?
10    A.  I have not.
11    Q.  Is there anyone that reports to you?
12    A.  Yes.
13    Q.  Who is that?
14    A.  David Goodwin, Rob Wentworth, and Dan Ilic.
15    Q.  Who was the second person?
16    A.  Robert Wentworth.
17    Q.  Okay.  Has anyone else reported to you since
18    you started at Paycor?
19    A.  Yes.
20    Q.  Who else?
21    A.  Michelle -- and I do not recall Michelle's
22    name today, her last name.
23    Q.  Okay.  Is Michelle still with Paycor?
24    A.  No, she is not.

Page 26

1    Q.  And has anyone else reported to you besides
2    the four people that you have mentioned?
3    A.  Not at Paycor.
4    Q.  Just briefly, can you tell us what you did
5    before Paycor?
6    A.  Yes.  I worked at ADP.  I was a VP in their
7    product organization responsible for their Workforce
8    Management portfolio globally.
9    Q.  Okay.  And how long did you work at ADP?
10    A.  Just a little under two years.
11    Q.  Does November of 2016 to August of 2018
12    sound about right?
13    A.  Yes.
14    Q.  Okay.  And before ADP, where did you work?
15    A.  I worked for a company by the name of Infor.
16    Q.  And how long did you work at Infor?
17    A.  I worked for a company prior to Infor by the
18    name of Workbrain.  We were acquired by Infor.  So
19    from 2007 until 2016, I was technically employed by
20    Infor, and, of course, I came to Infor through
21    acquisition.  So I had been there since 2004.
22    Q.  Got it.  Would you consider Infor a
23    competitor to Paycor?
24    A.  I would not.

Page 27

1    Q.  What did Infor do?
2    A.  Infor was an ERP or, more specifically, a
3    business enterprise application vendor.  They had
4    somewhere near 70 product lines.  I managed one of
5    those product lines.
6    Q.  Okay.  And what product line was that?
7    A.  Workforce Management.
8    Q.  Same sort of area as when you worked for
9    ADP; is that right?
10    A.  Yes, as well as Paycor.
11    Q.  So would you consider that product line of
12    Infor a competitor to Paycor?
13    A.  I would not.
14    Q.  At either ADP -- let me ask it this way.
15        At ADP, were there any biometric time
16    keeping devices or biometric affiliated biometric
17    software programs?
18    A.  There were devices that could scan a finger.
19        MR. WOLFE:  Ryan, can I have a standing
20    objection on the term "biometric," just that the
21    meaning of biometric identifier and biometric
22    information under the Act is in dispute.  I think that
23    as long as your questions are about what is commonly
24    referred to as biometric technology, we can all

Page 28

1    proceed with that understanding, but that by answering
2    those questions, he is not conceding that use of the
3    term biometric means it's necessarily covered by the
4    Act.
5        MR. STEPHAN:  Yeah, that's fine, Matt.
6        MR. WOLFE:  Thanks, Ryan.
7    BY MR. STEPHAN:
8    Q.  And also at ADP, did you play any role with
9    regards to any partnerships with Kronos?
10    A.  I did.
11    Q.  And can you tell us about that?
12    A.  I managed the partnership with Kronos.
13        MR. WOLFE:  Ryan, he is here as a 30(b)(6).
14    I don't have any problem with him answering some
15    questions about his background, but he is here to talk
16    about Paycor as a 30(b)(6).
17        MR. STEPHAN:  I understand.  I am just going
18    into his background about Workforce.  I'm not going to
19    spend too much more time on this, but I do think it is
20    important background.
21        MR. WOLFE:  Yeah, you can cover background.
22    That's fine.
23        MR. STEPHAN:  I appreciate it.
24

Page 29

Pages 26 to 29

BY MR. STEPHAN:

Q. And just briefly, Mitri, can you tell us what the partnership was between ADP and Kronos?

A. **The partnership was one where we, as ADP, white-labeled Kronos' solution, integrated it into our payroll and HR solutions, and resold it as part of that package. And, of course, as part of that, we sold data collection devices that were manufactured by Kronos.**

Q. Okay. Would those include devices that took a finger scan, for example?

A. **Yes.**

Q. Did you have a primary point of contact at Kronos?

A. **I did.**

Q. Who was that?

A. **Bob Ledbetter.**

Q. And what was his position at Kronos?

A. **He was a channel manager.**

Q. Okay. At Paycor --

A. **Yes.**

Q. -- do you have a written job description?

A. **Yes.**

Q. And could you just give just generally -- I know

we kind of covered some of this, but your primary duties at Paycor?

A. **My primary duties at Paycor are to determine the strategic direction for Paycor products.**

Q. Okay. And which products would that include?

A. **I own our Workforce Management portfolio, which today is comprised of three separate solutions: Perform Time, Time On Demand, and Ready Clock.**

Q. Okay. And Perform Time, what is that?

A. **Perform Time is a collection of features that have been developed by Paycor to track time worked by employees.**

Q. Does that include hardware?

A. **That would include hardware.**

Q. Does it also include software?

A. **Yes, it does.**

Q. And when you reference hardware, does it include biometric time clocks?

A. **It includes time clocks that can take a fingerprint scan or finger scan.**

Q. Can it also take a scan of a hand?

A. **Not for Perform Time.**

Q. Okay. And can you tell us the names of

those clocks that capture finger scans?

A. **We call them the PT 100 and the PT 150.**

Q. Okay. And then the affiliated software, is there a name for that?

A. **There is not.**

Q. Just Perform Time software?

A. **Correct.**

Q. Okay. The next one you mentioned was Time On Demand. What is that?

A. **Time On Demand is a third party Workforce Management solution that we white-label and resell.**

Q. When you say white-label, I think I understand what you mean, but could you explain?

A. **It means that the vendor who developed the software has had all of their branding and trademarks removed from the application and replaced with Paycor-specific branding such that the customer would understand the product to be Paycor's.**

Q. Okay. And the actual provider of those devices is called Time On Demand?

A. **No. Time On Demand is a brand name that's owned by Paycor.**

Q. Okay. How long has it been owned by Paycor?

A. **Since the inception of the product, or the**

inception of the relationship with Attendance On Demand.

Q. Okay.

A. **I don't recall the exact date.**

Q. Okay. And Attendance On Demand, is that a separate company?

A. **Attendance on Demand/Infotronics is the owner of the Attendance On Demand product that we resell as Time On Demand.**

Q. Okay. And how long has Paycor been doing business with Attendance On Demand?

A. **To the best of my recollection, the relationship is five years or six years old.**

Q. Okay. And just so I understand and I'm clear about this, is Paycor a client of Attendance On Demand?

A. **We would be considered a partner of Attendance On Demand, client in the sense that we leverage their service to provide services to our customers, but we would not be the intended end-user of the service.**

Q. Okay. And as part of that relationship, Attendance On Demand provides the actual hardware, the biometric time keeping devices?

| | |
|---|---|
| 1    A.  They do. | 1    A.  Yes, they do. |
| 2    Q.  Are there names for those devices? | 2    Q.  So the relationship is basically that |
| 3    A.  There are. | 3  Attendance On Demand provides these devices to |
| 4    Q.  Do you remember what they are? | 4  Paycor, which Paycor then can white-label and provide |
| 5    A.  **Primarily, they provide us with an HP series** | 5  to its clients, correct? |
| 6  **of devices that number 1000, 2000, 3000, 4000, so** | 6    A.  **Correct.** |
| 7  **forth, just different revisions of the same** | 7    Q.  And then the information that is collected |
| 8  **technology.** | 8  by those devices is then used in conjunction with |
| 9    Q.  Okay.  And do those devices capture | 9  Attendance On Demand's own software? |
| 10  fingerprints or something else? | 10    A.  **That is correct.** |
| 11    A.  **Those devices capture something else.** | 11    Q.  Got it.  So, for example, when we talk about |
| 12    Q.  And what is that? | 12  the 14,000 Illinois individuals you were able to |
| 13    A.  **A hand geometry.** | 13  identify as part of that query, that would not |
| 14    Q.  Okay.  And then are those devices connected | 14  include anyone who used the Attendance On Demand |
| 15  to a particular software program? | 15  product; is that right? |
| 16    A.  **Attendance On Demand, yes.** | 16    A.  **That is correct.** |
| 17    Q.  Okay.  Is there a name for that other than | 17    Q.  Does Paycor have any access to the |
| 18  Attendance On Demand? | 18  Attendance On Demand software or the data contained |
| 19    A.  **That is the name of the product.** | 19  on that program? |
| 20    Q.  Okay.  And does Attendance On Demand | 20    A.  **We do not have access to the data.  We have** |
| 21  maintain that software, or is that something that | 21  **access to the environments that have been provisioned** |
| 22  Paycor does? | 22  **to our customers and can access those environments as** |
| 23    A.  **They maintain that software.** | 23  **if we were the customer when they consent to us** |
| 24    Q.  Attendance On Demand does? | 24  **accessing it.** |
| Page 34 | Page 35 |

| | |
|---|---|
| 1    Q.  Okay.  And how is Paycor able to access | 1  Attendance On Demand? |
| 2  those environments? | 2    A.  **He's a channel manager.** |
| 3    A.  **A URL Web browser.** | 3    Q.  Now, I'm just not familiar with that title. |
| 4    Q.  Okay.  And then I presume there is some sort | 4  Can you tell me what channel managers do? |
| 5  of password or access criteria for Paycor to be able | 5    A.  **Generally, when you sell a product, you have** |
| 6  to actually access that information? | 6  **essentially two means to put your product into market.** |
| 7    A.  **Correct.** | 7  **You have direct sales, meaning that you have your own** |
| 8    Q.  And do you know if there are biometric | 8  **salespeople selling the product, or you can find** |
| 9  profiles contained on that software? | 9  **alternative channels to market, or essentially a** |
| 10    A.  **I wouldn't know where the biometric or the** | 10  **person who would be responsible for building a network** |
| 11  **finger scan templates would be stored.** | 11  **of third parties to sell software on your behalf.** |
| 12    Q.  If you wanted to find out, what would you | 12    Q.  Got it.  And you mentioned that Paycor would |
| 13  do? | 13  have access to the Attendance On Demand software for |
| 14    A.  **We would have to put in a request to** | 14  which Paycor clients authorized it; is that right? |
| 15  **Attendance On Demand.** | 15    A.  **Correct.  Yes.** |
| 16    Q.  Okay.  Is there a person at Attendance On | 16    Q.  And specifically which Paycor employees |
| 17  Demand that you would make that request to? | 17  would have access?  Is there like a client manager or |
| 18    A.  **Yes.** | 18  someone else that would have access to that |
| 19    Q.  Who is that? | 19  information? |
| 20    A.  **Most likely David Riedmer.** | 20    A.  **Yes, there's a group of Paycor** |
| 21    Q.  Could you spell his last name for us, | 21  **representatives as well as implementation staff** |
| 22  please. | 22  **members who would have access at different points in** |
| 23    A.  **I believe it's R-I-E-D-M-E-R.** | 23  **the client's life cycle to that environment.** |
| 24    Q.  And do you know what his position is at | 24    Q.  Okay.  And is there a particular group that |
| Page 36 | Page 37 |

they work at, at Paycor?

A. Services and implementation.

Q. And is there a person that you would consider to be the head of that group?

A. The head of the entire group, yes.

Q. Who is that?

A. I believe it's John Warcop.

Q. Okay. And then the third product you mentioned was Ready Clock; is that right?

A. That is correct.

Q. And what is Ready Clock?

A. Ready Clock is another third party solution that historically Paycor sold prior to 2014. So we stopped selling it in 2014.

Q. Okay. Did the Ready Clock have any sort of biometric functions, if you know?

A. The Ready Clock solution could take a finger template or finger scan.

Q. And was it set up similar to the Attendance On Demand product?

A. It is set up almost identical from a Paycor perspective. Technology under, you know, behind sort of the website, I couldn't tell you. It's not our IP, so -- but it's essentially set up in the same way.

Page 38

---

Ready Clock is a brand name that Paycor owns, and the service is provided by a third party.

Q. Got it. So is the third party Ready Clock, or does it to by a different name?

A. No, Ready Clock is a brand name that Paycor owns. The company that we resold that software from is SwipeClock.

Q. Does Paycor have any current clients that still use the Ready Clock product?

A. Approximately 85 customers.

Q. Are any of them located in Illinois?

A. There are a handful in Illinois.

Q. Okay. If you wanted to find out who those customers are, could you do that?

A. We could.

Q. Okay. One last thing before we move on from your role and your responsibilities.

Since you have been at Paycor, have you had any responsibility for compliance with privacy laws?

A. Indirectly.

Q. What do you mean by that?

A. Meaning that I would be responsible for implementing whatever privacy constraints need to be applied within the context of the solutions that

Page 39

---

I manage, but the definition of what those constraints are would fall under our compliance team.

Q. Okay. And who is the head of that team?

A. Ultimately it reports back up into Ryan Bergstrom, but the product manager that is in charge of compliance is Joe Saur.

Q. Would you spell Joe's last name for us.

A. I believe it's S-A-U-R.

Q. Okay. And what is Joe's title?

A. I believe he is director product management, so he would have the same title as I do.

Q. Okay. Do you know, is Ryan Bergstrom a lawyer?

A. He is not.

Q. How about Joe Saur?

A. I do not believe so.

Q. Okay. So when it comes to compliance, you basically follow to the directives from the compliance team, and you implement them for your certain products; is that accurate?

A. That's correct.

Q. Okay. I want to have you look at a couple of or a handful of documents, Mitri. We're making good progress here. So if you're okay with it, we'll

Page 40

---

just continue along.

A. Sure.

MR. STEPHAN: Okay. Katie, can you please put up Johns/Paycor 0001 through 00011.

MS. MITCHELL: Sure. Give me one second. So, Mitri, I will drop this into the chat box. This particular document is currently labeled for our internal purposes as Exhibit 6, but we're going to disregard that and we will remark it for this deposition as Exhibit A.

(Whereupon, Plaintiffs' Exhibit A was introduced.)

MR. WOLFE: Okay. So, Mitri, please download the document so that you can view it. You should be able to get it from the chat.

THE WITNESS: I'm clicking on the link.

MR. WOLFE: Okay.

MS. MITCHELL: And for the record, this is labeled as Bates No. Johns-Paycor 00000002 through, I believe, 11. 11.

MR. WOLFE: I think it starts at 1, though, Katie. The one that I have, my copy, starts at 1.

MR. STEPHAN: Yeah.

MS. MITCHELL: My apologies. It starts

Page 41

---

Pages 38 to 41

1    at 1.
2        THE WITNESS: So I have the 00001 document
3    open currently.
4    BY MR. STEPHAN:
5        Q.  Yeah, and for purposes of today's dep, can
6    we all agree that we will just go from the last
7    handful of numbers so we don't have to say zero 15
8    times today?
9        A.  Sure.
10        Q.  Thanks.  Mitri, are you familiar with what
11    we have shown you as Exhibit A?
12        A.  Yes.
13        Q.  Can you tell us what it is?
14        A.  It is a document that describes the
15    capabilities of our PT 100 series devices.
16        Q.  Okay.  And is there a purpose to this
17    document?  Can you tell us what it is used for?
18        A.  It's a sheet that we use internally to help
19    our sellers and our support team learn about the
20    device, and it may be a document that we share with
21    clients or prospects.
22        Q.  Okay.  Do you know if it's available online
23    anywhere?
24        A.  I believe it would be within our document

Page 42

1    management solution available online.
2        Q.  Okay.  And would that be available to the
3    public or only customers?
4        A.  It would be customers.
5        Q.  Okay.  And do you know who prepared this
6    document?
7        A.  I would assume that this would come from our
8    marketing team.  They're responsible.  Marketing or
9    marketing communications would prepare these
10    documents.
11        Q.  Okay.  And currently, is there a head of
12    that particular team?
13        A.  There is.
14        Q.  See, when you're the first person to be
15    deposed in the case, you get the benefit of all of
16    these background questions.
17        A.  I'm sure I will, yes.
18        Q.  I'm sorry, did I miss something?  Did you
19    identify the person in charge of marketing?
20        A.  Katy Bunn, I believe.
21        Q.  Katy Burn?
22        A.  Bunn.
23        Q.  Oh, Bunn.  Okay.  And it identifies at the
24    top here two particular clocks:  The PT 100 and the

Page 43

1    PT 100W.  Do you see that?
2        A.  I do.
3        Q.  Okay.  Would that be part of that Perform
4    Time?
5        A.  Correct, that's what the PT would signify is
6    Perform Time.
7        Q.  Got it.  So when we're talking about the
8    three product lines, this would be part of that first
9    product line you mentioned?
10        A.  Correct.
11        Q.  Got it.  And with these particular clocks,
12    does Paycor actually manufacture them?
13        A.  No, we do not.
14        Q.  Do you know who does?
15        A.  A company by the name of ZK Technology.
16        Q.  So does Paycor purchase the clocks from
17    ZK Technology?
18        A.  Yes, we do.
19        Q.  Do you have a point of contact at
20    ZK Technology?
21        A.  Jaimin Sing.
22        Q.  Would you spell that for us, please?
23        A.  J-A-I-M-I-N, and his last name is Sing,
24    S-I-N-G, I believe.

Page 44

1        Q.  Okay.  And I think you may have mentioned
2    this earlier, but how long has Paycor been using
3    these types of clocks?
4        A.  Since 2014, if I'm not mistaken.
5        Q.  Okay.  Before your time?
6        A.  Before my time, correct.
7        Q.  Okay.  By the way, did you replace someone
8    at Paycor?
9        A.  I believe I did.
10        Q.  Do you know who that was?
11        A.  I believe his first name was Jeff.  I do not
12    know his last name.
13        Q.  Do you know if Jeff is still with Paycor?
14        A.  He is not.
15        Q.  Okay.  Okay.  If we look at the first page
16    of this exhibit, it goes through the different parts
17    of this clock.
18        Do you see that?
19        A.  Yes, I do.
20        Q.  And it also talks about Wifi capability.
21        Do you see that?
22        A.  Yes, it does.
23        Q.  And for what purpose do these clocks have
24    Wifi capability?

Page 45

Pages 42 to 45

1      A.  These are installed into businesses.  The
2  business choose where to place these devices, and they
3  choose the means by which they want to connect these
4  devices to a network, and that Wifi is there to
5  facilitate that connectivity.
6      Q.  Got it.  Do you know if these devices would
7  have an IP address?
8      A.  They would most definitely have an IP
9  address.
10     Q.  Would that help tell us where they are
11 located?
12     A.  No.
13     Q.  Why not?
14     A.  Because if I'm on a corporate network -- so,
15 for example, if you log in to Paycor's network in
16 Dallas, because the main switches are in Ohio, to an
17 outside user, you will appear as if you are in Ohio.
18     And similarly, depending on where that
19 network IP address is being issued from will determine
20 where that device shows up in space.  So while a
21 device may be physically in one location, its IP
22 address may be registered virtually anywhere in the
23 world.
24     Q.  So there should be some location associated

Page 46

1  with the IP address, but that may not tell us where
2  the device is actually geographically located?
3      A.  That is absolutely correct.
4      Q.  Got it.  Okay.
5      It talks about a proximity badge reader.
6  What is that?
7      A.  It is a badge that leverages radio
8  frequencies to transmit data.
9      Q.  Okay.  So does that mean that the user could
10 use the badge as long as it is close to the clock and
11 it would read it?
12     A.  That's correct.
13     Q.  And then it also mentions a biometric
14 fingerprint reader here on Page 1 of Exhibit A.
15     Do you see that?
16     A.  Yes.
17     Q.  And what is that?
18     A.  That is a scanner that is capable of looking
19 at a fingerprint and creating measurements or taking
20 measurements.
21     Q.  Okay.  And that would be -- what would that
22 be used for?
23     A.  In place of a proximity badge.  So,
24 essentially, a user needs to be able to identify who

Page 47

1  they are, or we need a means of identifying who a user
2  is because we need to associate the transactions
3  performed at the clock with a specific person so that
4  we can determine when they arrive to work or leave
5  work or stop a specific job and start another job.
6      Then to facilitate that, most clocks will
7  have what is referred to in the industry as a reader.
8  An RF badge reader would be one type of reader, a
9  badge reader would be another type of reader, and
10 there is a collection of different ways that a
11 customer could elect to identify who the person
12 presenting themselves at the clock physically is.
13     Q.  Okay.  But the way for a user to clock in
14 and out on these particular clocks is by using their
15 fingerprint, correct?
16     A.  Not specifically.  That is an elected option
17 from our customers.
18     So if you look at the picture on that
19 Page 1, if you notice where the number 3 is on the
20 hardware clock, on the picture of the clock.
21     Q.  Yes.
22     A.  If you go back and look at the legend, there
23 it actually says there is a proximity badge reader.
24 This device would have no capability of scanning a

Page 48

1  fingerprint.
2      Q.  This particular catalog on Page 1; is that
3  right?
4      A.  That is correct.
5      Q.  Okay.  Now, if we look at Page 2.
6      A.  Yes.
7      Q.  There is a picture of a slightly different
8  clock; is that right?
9      A.  That is correct.
10     Q.  Okay.  And why is it different?
11     A.  So these devices are a module.  Our customer
12 can elect to configure them in the means that suit
13 their business requirements.
14     Q.  Okay.  So a customer could tell Paycor that
15 they actually want the biometric reader installed on
16 its PT 100 or PT 100W clocks; is that right?
17     A.  That's correct, sir.
18     Q.  And there would be a record of that,
19 correct?
20     A.  We would have an order for that, yes.
21     Q.  And on Page 2, if we look at the image of
22 the clock here, could you tell us where we would find
23 that biometric reader?
24     A.  It would be position 5.

Page 49

1  Q.  Got it.  So for a person who is using this
2  particular clock to record their time by clocking in
3  and out, those users would actually use their
4  fingerprint, correct?
5  **A.  Well, on this specific device, they would**
6  **have the ability to choose whether they wanted to use**
7  **a proximity badge or their fingerprint.  And, again,**
8  **that's defined by the customer, not by Paycor.**
9  Q.  Okay.  So one way for the users to clock in
10  and out, if the customer so chooses, is to use his or
11  her fingerprint?
12  **A.  That is correct.**
13  Q.  And for an employee to use his or her
14  fingerprint, do they first have to be enrolled in the
15  clock?
16  **A.  They would have to enroll in the device to**
17  **use a finger scan.**
18  Q.  And are you familiar with that process?
19  **A.  I am.**
20  Q.  What is the enrollment process?
21  **A.  A supervisor or manager or someone**
22  **privileged to enroll employees to create a template**
23  **would go to the physical device with the employee.**
24  **The manager/supervisor/privileged user would validate**

Page 50

1  **themselves on the clock, and the menu options on**
2  **the device will change for that**
3  **supervisor/manager/privileged user such that they**
4  **will have an option to enroll another employee, at**
5  **which point the manager will input what we call a**
6  **badge number.  It is a number that the customer**
7  **assigns to the employee to identify and associate that**
8  **employee with an employee record, at which point once**
9  **the employee has been identified, the manager will**
10  **ask the employee to submit their finger for scanning.**
11  Q.  Okay.  Is there a particular part of their
12  finger that they use for scanning?
13  **A.  It's the central tip of the finger.  And,**
14  **again, depending on customers' requirements,**
15  **customers' configuration, it could be one or more**
16  **fingers.  But it's not the entirety of the finger;**
17  **it's a subset of the finger that the scanner in this**
18  **case looks at.**
19  Q.  And the portion of the finger that is used
20  is actually where the fingerprint is located,
21  correct?
22  **A.  I'm not an expert on fingerprints, but it's**
23  **a subset of the tip of the finger.  And if I look at**
24  **my finger, I can see that I've got what I would**

Page 51

1  **consider to be a fingerprint that goes beyond that.**
2  Q.  Okay.  But this document actually talks
3  about it being a fingerprint reader, correct?
4  **A.  It scans the finger.**
5  Q.  Right, but if we actually look at Page 1 of
6  this Exhibit A, do you see where it talks about a
7  fingerprint?
8  **A.  Yes.**
9  Q.  Okay.  Is there a reason why you don't want
10  to use that word?
11  **A.  That's our marketing terminology.  From a**
12  **technical perspective, it's a finger scan.**
13  Q.  Okay.  And what's the difference?
14  **A.  Colloquially people understand what**
15  **biometric fingerprint means, but from a technical**
16  **perspective, it is not a fingerprint.  We do not**
17  **capture -- we do not believe we capture fingerprints.**
18  **We take the scan of a finger.**
19  Q.  What is the basis for that answer?
20  **A.  A fingerprint is physical.  It can be**
21  **reproduced.  I can physically view it and see it.  And**
22  **what we have is a template that is based on an**
23  **algorithm that uses specific landmarks on the tip of**
24  **the finger to calculate a value that represents a**

Page 52

1  **person.**
2  Q.  How did you gain that understanding?
3  **A.  I've been working with biometrics for**
4  **16 years or what we colloquially call biometrics for**
5  **16 years.  That's always been the distinction that the**
6  **vendors have provided to us.**
7  Q.  Okay.  Has that specifically happened with
8  regards to these devices since you've been a Paycor?
9  **A.  I have worked with the vendors that Paycor**
10  **uses and other organizations in the past.  And the**
11  **reality is that the scanners themselves that these**
12  **vendors supply, there is only a handful of vendors**
13  **that these manufacturers procure those sensors from,**
14  **and all of them, whether -- you know, they will all**
15  **claim the same or inform you that the means by which**
16  **they obtain a finger scan is virtually the same.  It's**
17  **very similar technology across all the vendors.**
18  Q.  And who are those few vendors?
19  **A.  Suprema would be one of them, Lumadime,**
20  **Silk ID probably are the three biggest vendors.  There**
21  **are probably some smaller vendors that produce them,**
22  **but if you go look at the majority of vendors in the**
23  **space, those will be the three vendors that they would**
24  **procure their hardware from.  So even someone like**

Page 53

| | |
|---|---|
| 1   Kronos, you know, procures their scanner from Suprema. | 1   Q.  Okay.  And then for Paycor customers to |
| 2   Q.  Okay.  And moving on to Page 3 of this | 2   access this data, they would actually have to log on |
| 3   document. | 3   to the Paycor website; is that correct? |
| 4   A.  Yes. | 4   **A.  They would log onto the Paycor website to** |
| 5   Q.  Do you see where it talks about connecting | 5   **access the results of an action that took place at the** |
| 6   to the internet? | 6   **clock.  The administrators at a client can log onto a** |
| 7   A.  Yes. | 7   **clock and see a history of transactions that have** |
| 8   Q.  And why is that necessary? | 8   **occurred on the clock as well.** |
| 9   **A.  Because the device is physically in the** | 9   Q.  I'm sorry, I missed that last part.  Can you |
| 10  **hands of the customer, and the data related that is** | 10  say it again? |
| 11  **collected by that device needs to be transmitted back** | 11  **A.  A customer administrator that has physical** |
| 12  **to Paycor, and today, you know, typical for any data** | 12  **access to the device can log in with their account** |
| 13  **transmission to occur over a network connection.** | 13  **information on the clock itself and see a brief** |
| 14  Q.  Okay.  So it connects the clocks to Paycor's | 14  **history of transactions that occurred on the device.** |
| 15  software, correct? | 15  Q.  Okay.  So the actual fingerprint template is |
| 16  **A.  That is correct.** | 16  stored on the device itself and also on the software; |
| 17  Q.  And that software, as we've discussed, is | 17  is that correct? |
| 18  actually hosted by either Paycor or Microsoft, | 18  **A.  The finger template is stored on the device** |
| 19  correct? | 19  **itself, as well as in our software that's hosted on** |
| 20  **A.  Yeah, in this specific case, these devices** | 20  **the Microsoft Azur platform.** |
| 21  **would connect directly to the software that's been** | 21  Q.  Okay.  If we move on to Page 6 of this |
| 22  **developed by Paycor and hosted in Azur.** | 22  exhibit. |
| 23  Q.  Okay.  By Microsoft? | 23  A.  Yes. |
| 24  A.  By Microsoft, yes. | 24  Q.  I think that's talking about what we just |
| Page 54 | Page 55 |

| | |
|---|---|
| 1   discussed, the Paycor.com website; is that right? | 1   **A.  That would be what we would market as** |
| 2   **A.  Page 6, can you clarify what is the title of** | 2   **Perform Time.** |
| 3   **the page?** | 3   Q.  Okay.  So part of that first product line |
| 4   Q.  Sure.  I'm just looking at the bottom left | 4   that we've already discussed? |
| 5   where it says Page 6. | 5   **A.  Correct.** |
| 6   **A.  Yes.  Okay.  I'm on that page.** | 6   Q.  And then within that section, there is an |
| 7   Q.  Under the Enrolling Employees section, do | 7   employee security section; is that right? |
| 8   you see that? | 8   **A.  That would be correct.** |
| 9   **A.  Yes, I do.** | 9   Q.  Okay.  And would the clients have access to |
| 10  Q.  And it looks like it allows clients to log | 10  this information? |
| 11  in through Paycor.com. | 11  **A.  This is client-specific information, yes.** |
| 12  Do you see that? | 12  **Clients are responsible for administering this portion** |
| 13  **A.  That is correct.  I see that now.** | 13  **of the application.** |
| 14  Q.  And then it talks about the enrollment | 14  Q.  And Paycor would also have access to this |
| 15  process? | 15  information? |
| 16  **A.  In this case, it's talking about the** | 16  **A.  We would have access to this information** |
| 17  **proximity badge or RF badge enrollment process.** | 17  **when our clients provide us the rights to access it,** |
| 18  Q.  Got it.  And then it starts with step 1 on | 18  **yes.** |
| 19  Page 6, and if we continue on to Page 7, it goes to | 19  Q.  Okay.  If we then continue on, about |
| 20  step 2. | 20  two-thirds of the way down on this page, there is |
| 21  Do you see that? | 21  like a screen shot. |
| 22  **A.  Yes.** | 22  Do you see that? |
| 23  Q.  Okay.  Step 2 references a time and | 23  A.  Yes. |
| 24  attendance section.  What is that? | 24  Q.  Is that a screen shot of Perform Time? |
| Page 56 | Page 57 |

1    **A.  That is a screen shot from Perform Time,**
2    yes.
3    Q.  If we look on this section, it actually has
4    someone's name there?
5    **A.  William Sneed, yeah.**
6    Q.  Right.
7    Bear with me for one second, Mitri.
8    **A.  No problem.**
9    Q.  I can only say that this pandemic has not
10    been good to my eyesight.
11    If we continue on to the screen shot, you
12    may have to pull it up a little bit.
13    **A.  Sure.**
14    Q.  Do you see there is a section there for
15    fingerprint profiles?
16    **A.  That is correct.**
17    Q.  Can you tell us what that is?
18    **A.  That is a read-only field that will provide**
19    **you with the details regarding the number of templates**
20    **that are stored for this particular employee.**
21    Q.  Okay.  So for this particular person, there
22    are zero templates, correct?
23    **A.  That is correct.**
24    Q.  Does that mean that this particular person

1    did not enroll a fingerprint in the clock?
2    **A.  That would be correct.  That's one way of**
3    **inferring that information.**
4    Q.  And if we found multiple templates, what
5    would that tell us?
6    **A.  That they have registered more than one**
7    **finger for scanning.**
8    Q.  Got it.  And just so we are clear again, the
9    word, the terminology used here on the actual
10    software is "fingerprint," correct?
11    **A.  Correct.**
12    Q.  So was this some of the information that was
13    accessed as part of that query we discussed at the
14    beginning to identify the 14,000-or-so Illinois
15    workers?
16    **A.  This would have been a portion of the**
17    **information that we would have included, yes.**
18    Q.  If we look at the bottom here under the
19    Notes section there, do you see that?
20    **A.  Yes.**
21    Q.  Okay.  And it talks about how a fingerprint
22    can be used to punch simply by walking up to the
23    clock and pressing the register to fingerprint.
24    Do you see that?

1    **A.  Yes.**
2    Q.  That's an accurate statement?
3    **A.  They actually can walk up to the clock and**
4    **have their finger scanned to validate who they are,**
5    **yes.**
6    Q.  And then it talks about two different
7    scenarios:  A one-to-many scenario and a one-to-one
8    scenario, correct.
9    **A.  Correct.**
10    Q.  Can you tell us what the one-to-many is?
11    **A.  The one-to-many essentially allows a person**
12    **to leverage the finger scan to identify who they are**
13    **without providing any other details to the device, and**
14    **that device essentially will look to match their**
15    **template with the templates available to that device.**
16    **So in the case of the device that is in**
17    **question right now, I believe there is the ability to**
18    **have a couple of thousand templates stored physically**
19    **on the device.**
20    Q.  So using --
21    **A.  As an employee, as we noted -- sorry -- an**
22    **employee may have one or more templates.**
23    Q.  Got it.  So using the one-to-many function
24    or feature, the employee's fingerprint template is

1    compared to the other fingerprint templates captured
2    by that device?
3    **A.  That is correct.**
4    Q.  And do you know if that comparison takes
5    place on the device itself, or does it have to take
6    place as part of or in conjunction with the software?
7    **A.  It takes place on that device specifically.**
8    Q.  And then the second method is the one-to-one
9    method; is that right?
10    **A.  That is correct.**
11    Q.  Would you tell us what that is.
12    **A.  With the one-to-one method, you provide a**
13    **piece of information to identify who you are, and then**
14    **we're using the finger scan to confirm that you are**
15    **who you say you are.**
16    **So if you are employee number 1, you submit**
17    **your finger for scanning, the system will go retrieve**
18    **the pre-stored template for employee number 1 and**
19    **compare the completed scan with the template on file**
20    **for employee one, and if they match, then we know you**
21    **are, in fact, employee 1.  If they do not match, then**
22    **we know you are not employee 1, but we are not looking**
23    **to determine who you actually are.**
24    Q.  Okay.  Under both methods -- let me say it a

1    different way.
2        Both methods are being used to identify the
3    particular user, correct?
4        **A.  No.  One method is being used to identify**
5    **the particular user.  The other method is being used**
6    **to validate who you are.**
7        Q.  Okay.  So --
8        **A.  So --**
9        Q.  -- which one is identifying the user?
10       **A.  The first method, what they call**
11   **one-to-many, is used to identify who you are.  The**
12   **one-to-one is used to validate who you are, because if**
13   **you notice, you must first enter your assigned badge**
14   **number.**
15       Q.  Okay.
16       **A.  So that's how we would know who you are is**
17   **based on your badge number.**
18       Q.  Do the customers make the determination on
19   which method to use?
20       **A.  Yes, they do.**
21       Q.  And is there a record of that?
22       **A.  Yes, there is.**
23       Q.  Where would that be?
24       **A.  In the Perform application clock**

Page 62

1    **configuration.**
2        Q.  Is one method more common than another?
3        **A.  Within Paycor's customer base, yes.**
4        Q.  Which one?
5        **A.  Identify, or the one-to-many.**
6        Q.  The one-to-many.
7        **A.  Yes.**
8        Q.  Okay.  And the search you conducted that we
9    discussed earlier regarding the 14,000 employees,
10   would that capture all employees regardless of which
11   method they use, or is it only capturing one method?
12       **A.  We did not want to filter by method used.**
13       Q.  Got it.  Would you consider one method more
14   accurate than another?
15       **A.  I would consider one-to-one being more**
16   **accurate than one-to-many.**
17       Q.  Why is that?
18       **A.  Because I'm not searching for templates that**
19   **may or may not be similar.  I'm actually explicitly**
20   **asking for validation that the finger scan matches the**
21   **finger that had been scanned on file.**
22       Q.  So if that's the case, do you have any
23   reason why most customers select the one-to-many?
24       **A.  Yes.  Convenience.  It's much simpler to do**

Page 63

1    **one action than to train somebody on how to do two**
2    **actions.**
3        Q.  Got it.  Okay.  Moving on to Page 8 of
4    Exhibit A?
5        MR. WOLFE:  Ryan, is this a good point for a
6    break?
7        MR. STEPHAN:  Let me just wrap up this
8    document and then take a break.
9        MR. WOLFE:  Okay.  That's fine.
10   BY MR. STEPHAN:
11       Q.  Mitri, are you there yet?
12       **A.  Yes, I am.**
13       Q.  Okay.  It talks about biometric enrollment.
14   Do you see that there?
15       **A.  Yes, I to.**
16       Q.  And it talks about the procedure for
17   employees to be enrolled in the clock.
18       Do you see that?
19       **A.  Yes, I do.**
20       Q.  Okay.  And it uses the word fingerprint.
21       Do you see that?
22       **A.  I see it.**
23       Q.  Okay.
24       **A.  What line are you looking at specifically?**

Page 64

1        Q.  Well, multiple times.  It says it in the
2    first paragraph.
3        Do you see it there?
4        **A.  Sure.**
5        Q.  And also uses it in the second paragraph?
6        **A.  I see that as well.**
7        Q.  And also uses it in line 7?
8        **A.  Sure.**
9        Q.  And then it also uses it in the image
10   example below on the bottom right.
11       Do you see that?
12       **A.  Sure.**
13       Q.  Okay.  Without going through each of these
14   steps, are you familiar with this process, the
15   enrollment process?
16       **A.  Yes.**
17       Q.  Is there anything inaccurate about the
18   process as described here on Page 8 of Exhibit A?
19       **A.  No.  The finger needs to be placed in a**
20   **specific position on the sensor for the sensor to be**
21   **able to take the measurements it needs.**
22       Q.  Okay.  Going to Page 10, please, and really
23   it's going to be Page 11, but if you look at Page 10,
24   it's the section starting there Managing the Clock?

Page 65

Pages  62  to  65

1    **A.  Sorry, one second.  It's not coming up.**
2    **Page 10.  Yes, Managing the Clock.**
3    Q.  Okay.  And I think that actually starts on
4    Page 11.
5        Do you see that?
6    **A.  That is correct.**
7    Q.  Okay.  So what is this section refusing to?
8    **A.  This section is referring to the**
9    **administration of the device and what privileges a**
10   **specific person would have at that device.**
11   Q.  Got it.
12   **A.  So you'll notice there's multiple roles**
13   **there.  Each role has different sets of capabilities**
14   **that they can perform with the device.**
15   Q.  Okay.  But these options here are all
16   referring to Paycor customers, correct?
17   **A.  That is correct.**
18   Q.  And the Enroller option there, do you see
19   that?
20   **A.  Correct.**
21   Q.  Would that give that person ability to
22   access other workers' fingerprint templates?
23   **A.  No.**
24   Q.  It would allow them to enroll others; is

Page 66

1    that correct?
2    **A.  It would allow them to enroll others,**
3    **correct.**
4    Q.  Okay.  How about the next option, Admin,
5    would that give that person access to other users'
6    fingerprint templates?
7    **A.  It would not give them access to that**
8    **template.**
9    Q.  Would it give them access to a fingerprint
10   profile?
11   **A.  No.**
12   Q.  Would it allow them -- would it permit them
13   to be able to delete a fingerprint profile?
14   **A.  It would allow them to delete a template.**
15   MR. STEPHAN:  Okay.  If now is a good for a
16   break, I'm happy to take one.
17   MR. WOLFE:  Yeah, just like five minutes.
18   MR. STEPHAN:  Sure.  And why don't we take
19   five-ten.  Five goes pretty quick.
20       (Whereupon, a break was taken.)
21   MR. STEPHAN:  We're back on the record.
22       Katie, can you please show Mitri our
23   next exhibit, which will be Johns/Paycor 0 sequence 19
24   through 26.

Page 67

1    MS. MITCHELL:  Just one second, and I'll put
2    it in the chat.  We will mark this as Exhibit 2 -- or
3    B, I'm sorry.
4    THE WITNESS:  Give me a second to download
5    it, please.
6       (Whereupon, Plaintiffs' Exhibit B
7        was introduced.)
8    BY MR. STEPHAN:
9    Q.  Ready, Mitri?
10   **A.  I am.**
11   Q.  Are you familiar with what we are showing
12   you as Exhibit B?
13   **A.  Yes, I am.**
14   Q.  Can you tell us what it is?
15   **A.  It's an updated version of the same document**
16   **that you showed prior.**
17   Q.  And do you know when it was updated?
18   **A.  This would have been updated earlier 2019.**
19   Q.  Okay.  And do you know who would have
20   updated it?
21   **A.  This would have most likely been updated by**
22   **Lyle.**
23   Q.  Who is that?
24   **A.  He works in our marketing department, and**

Page 68

1    **he's responsible for the documentation on perform**
2    **time.**
3    Q.  And what is Lyle's last name?
4    **A.  Starts with a W.  And give me a second, and**
5    **I will tell you.**
6    Q.  Thank you.
7    **A.  Weissinger.**
8    Q.  Great.  So if we look at the bottom half of
9    Page 1 of Exhibit B?
10   **A.  Yes.**
11   Q.  It references three types of clocks:  The PT
12   100F, the PT 100FW, and the PT 150 RF.
13       Do you see that?
14   **A.  Yes, I do.**
15   Q.  And are those are clocks that have biometric
16   fingerprint readers?
17   **A.  No, I do not believe so.**
18   Q.  Why not?
19   **A.  The RF would not be.  It's strictly a badge**
20   **reader -- sorry, radio frequency reader.**
21   Q.  Okay.  Do you know why then underneath those
22   three clocks, it says, "Ethernet clock with proximity
23   badge reader and biometric fingerprint reader"?
24   **A.  Sorry, I was looking at the picture above.**

Page 69

1    Q. It's okay.
2    **A. The picture -- the device pictured in the**
3 **bottom is proximity with biometrics.**
4    Q. Okay. So all three of those clocks, the
5 100F, 100FW, and 150RF all have biometric fingerprint
6 readers?
7    **A. Yes.**
8    Q. Are there any other types of clocks or
9 models that are part of this Perform Time that have
10 biometric fingerprint readers?
11    **A. We recently launched a new device with**
12 **finger scanning abilities.**
13    Q. What is the name of that device?
14    **A. PT 400.**
15    Q. And what was the launched?
16    **A. December 15th.**
17    Q. Okay. And does that have a fingerprint
18 reader just like these other three clocks?
19    **A. It has an option for a finger scanner, yes.**
20    Q. Are there any other differences between that
21 clock and these three?
22    **A. Yes.**
23    Q. What else?
24    **A. The vendor is different, and the scanning**

Page 70

1 technology that is using it is different.
2    Q. Who is the vendor?
3    **A. Grosvenor Technology.**
4    Q. Grosvenor with a G?
5    **A. Yes.**
6    Q. And how is a scanning technology different?
7    **A. It's using capillary vein scanning. So what**
8 **it's actually doing is it's a soft dermal scanner.**
9 **The dermis is what your fingerprint actually resides**
10 **on, and what this is doing is it's actually looking**
11 **for landmarks for your capillary veins underneath your**
12 **finger skin.**
13    Q. Is there a reason why Paycor added this
14 particular type of scanner to its product line?
15    **A. Because that's what the vendor offered by**
16 **default. That's their preferred scanner. The scanner**
17 **that they used was not the primary decision criteria**
18 **for why we selected that device though.**
19    Q. Do you a point of contact at Grosvenor
20 Technologies?
21    **A. Yes.**
22    Q. Who is that?
23    **A. Matthew Smith.**
24    Q. Do you have his e-mail address?

Page 71

1    **A. I can find it, yes.**
2    Q. Okay. The PT 100F device, who is the vendor
3 for that particular device?
4    **A. All of the PT 100, 150 devices are the same**
5 **vendor. It's ZK Technology.**
6    Q. ZK?
7    **A. Yes.**
8    Q. Do you know, are the new clocks, the PT
9 400's, meant to replace the earlier biometric clocks,
10 or are they in addition to those?
11    **A. In addition.**
12    Q. Okay. And does it connect the same way to
13 Paycor software?
14    **A. Yeah, you need an internet connection to**
15 **connect back to Azur.**
16    Q. If we go to Page 3 of this exhibit.
17    **A. Yes.**
18    Q. You will see where it says "Punch in with
19 biometric/fingerprint entry"?
20    **A. Yes.**
21    Q. Okay. And if you actually look at the
22 bottom here, do you see where it says it was updated
23 June 26, 2020?
24    **A. Yes.**

Page 72

1    Q. Do you know, what does that tell us?
2    **A. That's when we introduced this document**
3 **revision.**
4    Q. Okay. Can you tell by looking at this or do
5 you know who made the updates?
6    **A. Not based on that time stamp, no. But as I**
7 **said, this is most likely updated by Lyle.**
8    Q. Lyle? Okay.
9    And here with this particular section, it
10 talks about employees placing their finger on the
11 sensor.
12    Do you see that in step 1?
13    **A. I do.**
14    Q. And that would be the biometric scanner
15 there referenced as number 5?
16    **A. The fingerprint.**
17    Q. Okay. And then step number 2 there, can you
18 tell us what that is an image of?
19    THE REPORTER: I'm sorry. Hold on. I'm
20 getting a lot of feedback there from the witness. Is
21 it possible for the witness to get a little closer to
22 the microphone?
23    THE WITNESS: Yes.
24    THE REPORTER: Okay. That's great. Thank

Page 73

1  you.
2  BY MR. STEPHAN:
3     Q. Step number 2 there, can you tell us what
4  that's an image of?
5     **A. Step number 2 is what is displayed to the**
6  **user when they complete a scan.**
7     Q. Okay. And there is an image of a
8  fingerprint.
9        Do you see that?
10    **A. Yes.**
11    Q. Okay. And then on that image of number 2,
12  it says EC number, and then it has 1.
13        What is that?
14    **A. That would be the badge number.**
15    Q. And then the name would be the user's name,
16  correct?
17    **A. It would be the person's name, correct.**
18    Q. And then Verify, do you see it says
19  one-to-one FP match?
20        What is that?
21    **A. That means there was a one-to-one scan that**
22  **was performed, or a one-to-one comparison, meaning the**
23  **employee would have put in their badge number as 1,**
24  **and so that would have been used to identify the**

Page 74

1  **person who was scanning, and then the physical scan**
2  **that would have occurred would have looked at the scan**
3  **of that finger and compared it to the template that**
4  **was on file for User 1.**
5     Q. Okay. By the way, all of the communication
6  here on this clock -- well, let me ask this.
7        Number 2, step number 2 on Page 3 of
8  Exhibit B --
9     **A. Yes.**
10    Q. -- that we have been talking about, where
11  would that show up on the clock itself?
12    **A. On the screen.**
13    Q. Okay. So if we go back to Page 1, that
14  would be section 4?
15    **A. Yes.**
16    Q. Okay. And who controls the information that
17  is displayed on that screen?
18    **A. The vendor.**
19    Q. Okay. Does Paycor have any ability to
20  control the message on that screen?
21    **A. No. That text is what the vendor provides.**
22    Q. Okay. But if we look at the first page of
23  this exhibit, for example, it says Paycor on there?
24    **A. Correct.**

Page 75

1     Q. So was it the vendor that included that
2  information?
3     **A. We produced this document. Those pictures**
4  **were screen captures from a physical device that we**
5  **have access to, but the text within the page is**
6  **controlled by the vendor.**
7        **I suppose if we ask the vendor to change it,**
8  **they could change it, but that is the default**
9  **nomenclature that they've used. And as you can**
10 **imagine, any change to whatever they provide out of**
11 **the box would be at a charge to us.**
12    Q. Got it. Do you know if that -- the text
13 that is shown be on the main display screen can be
14 edited remotely through the internet, through some
15 remote connection?
16    **A. So text that's displayed is imbedded in the**
17 **program that is running on the device, and like most**
18 **modern devices, the device can download updates to the**
19 **program that it's running on it, no different than**
20 **your phone or computer can automatically download an**
21 **update to an app or an operating system. And I**
22 **suppose that an update to the app or to the operating**
23 **system could have made changes to any aspect of what a**
24 **user would see or interact with on the display.**

Page 76

1     Q. Okay.
2     **A. But we can't make the change discreetly to**
3  **text that's there. We would have to update the entire**
4  **application to do that.**
5     Q. Got it. And you would do that in
6  conjunction with the vendor in this case,
7  ZK Technologies, right?
8     **A. Correct, we would have to contact ZK and**
9  **make a request for change. They would scope the**
10 **change. They would tell us it would cost this much,**
11 **and we would then decide whether we wanted to proceed**
12 **or not.**
13    Q. Are you aware of Paycor looking into that
14 capability at all?
15    **A. We have multiple conversations with vendors**
16 **about potential development, and really, based on the**
17 **business case on a case-by-case basis, we make a**
18 **determination as to whether we will proceed or not.**
19    Q. Okay. Just real quickly, if you could
20 continue looking at or reviewing this section
21 Punching With the Biometric Fingerprint Entry.
22    **A. Yes.**
23    Q. I think it just goes to the -- actually,
24 it's just this page.

Page 77

Pages 74 to 77

1     **A.  Yes.**
2     Q.  Is there anything that you see on here
3     that's inaccurate?
4     **A.  No.  You place your finger on the sensor,**
5     **and then the clock will determine whether that matches**
6     **or does not match the template, and you will either**
7     **get a success or failure message.  So I suppose we're**
8     **not displaying what a failure would look like, but we**
9     **are displaying what a success looks like.**
10    Q.  Okay.
11    **A.  And, I mean, just for clarification, the**
12    **picture that is shown in that step 2, that's a stock**
13    **image.  That is not an image of the physical scan that**
14    **is being conducted.**
15    Q.  Okay.  Mitri, are you familiar with the
16    Illinois Biometric Information Privacy Act?
17    **A.  I have a knowledge of it, yes.**
18    Q.  When did you first learn of it?
19    **A.  2017 maybe.**
20    Q.  Do you remember how you first learned about
21    that statute?
22    **A.  I learned about it at ADP, and I don't**
23    **recall if it was a request from a salesperson or a**
24    **request from compliance.**

Page 78

1     Q.  Okay.  Is it okay if we refer to that
2     statute as BIPA today?
3     **A.  Yes.**
4     Q.  Okay.  And do you remember what the context
5     of that request was?
6     **A.  How, if any, would we support BIPA.**
7     Q.  Okay.  Do you know if that was part of any
8     sort of ongoing litigation at ADP?
9     **A.  I don't believe when I learned about the**
10    **statute -- or the context in which I learned about the**
11    **statute I do not believe was related to litigation,**
12    **but I know that litigation either occurred shortly**
13    **afterwards or had already been in process at that**
14    **time.**
15    Q.  And what do you know about that litigation?
16    **A.  I know that there was some litigation that**
17    **ADP was subject to while I was present there.  I know**
18    **that one of my reports was engaged with compliance and**
19    **internal/external counsel to help, I believe, at the**
20    **time research, what was there and what we were capable**
21    **of doing and what we had available to customers, as**
22    **well as what our existing policies provided to**
23    **customers.**
24    Q.  Okay.  And do you remember anyone

Page 79

1     specifically at ADP that you communicated with about
2     BIPA?
3     **A.  Jim Turtola, or James Turtola.**
4     Q.  And what was his position?
5     **A.  He was a product manager.**
6     Q.  And from your involvement in that process,
7     did you ever -- well, let me ask it this way.
8         Did ADP store biometric profiles similar to
9     how Paycor does?
10    **A.  I would say that the means by which finger**
11    **scan templates are stored is a pretty standard process**
12    **across all vendors, whether it's ADP or Paycor or**
13    **Kronos or Infor, or anybody else for that matter.**
14        **To be frank, with ADP, you know, the vast**
15    **majority of our clients when I was there were**
16    **leveraging Kronos technology for data capture, and we**
17    **would have essentially implemented what Kronos**
18    **provided us.**
19    Q.  Okay.  And when you say that it's a standard
20    process across industries, do you mean that the
21    profile is captured and stored on the device and then
22    also on software?
23    **A.  Yes, it is.**
24    Q.  Okay.  And do you know if that was true with

Page 80

1     regards to ADP?
2     **A.  Yes.**
3     Q.  Was it also true with regards to Kronos?
4     **A.  Yes.  The, I think, key difference with**
5     **Kronos -- and this is, well, I suppose a point of**
6     **contention with Kronos -- is that for the most part,**
7     **Kronos environments for Kronos' direct customers were**
8     **physically hosted within a customer's data center,**
9     **whereas ADP not only provided the software, but also**
10    **provided the hosting capabilities for that software.**
11    Q.  Got it.  So the difference ADP was more
12    similar to Paycor where they actually hosted the
13    data?
14    **A.  Correct.**
15    Q.  And the difference with Kronos was that the
16    clients themselves would host the data?
17    **A.  Correct.**
18    Q.  Do you know if that was true for all of the
19    Kronos data?
20    **A.  For ADP specifically, or more in general for**
21    **Kronos?**
22    Q.  Just generally.
23    **A.  Not specifically.  You know, Kronos offered**
24    **the opportunity for customers to have their data**

Page 81

Pages 78 to 81

1   hosted and managed by Kronos. I know since then,
2   Kronos has also launched cloud-based solutions where
3   Kronos would -- you know, there would be no capability
4   of hosting it privately, be it in your data center or
5   co-located in a third party data center.
6          And at times, even with Kronos customers,
7   could choose where they wanted to place that
8   application. So they could have gone to a CenturyLink
9   or any other hosting provider to host that capability.
10  So it didn't physically have to reside in their data
11  center, but they could choose to deploy it wherever
12  they saw fit.
13     Q. Got it. Okay. So back to your knowledge
14  about BIPA, have you ever read the statute?
15     A. I have not completely read the statute end
16  to end, no.
17     Q. Have you read parts of it?
18     A. I have seen parts of it, yes.
19     Q. How is it that you saw parts of it?
20     A. I have Googled it, read it on the State of
21  Illinois legislative sites. I have read about it in
22  places like Bloomberg's, HR services software, Lexis
23  Nexis, places like that.
24     Q. And do you remember when you first Googled

Page 82

1   it or looked for it online?
2      A. Probably early 2017.
3      Q. And why did you do that?
4      A. Because I had an inquiry from somebody at
5   ADP about BIPA and did not know what it was at the
6   time.
7      Q. Okay. Have you participated in any
8   trainings related to BIPA?
9      A. Not specifically to BIPA. I think, you
10  know, we participate in general privacy data
11  protection, you know, PII type training. This would
12  just be a subset of that data.
13     Q. Have you had any correspondence with anyone
14  at Paycor about BIPA?
15     A. Yes.
16     Q. Who?
17     A. Elizabeth. You know, I've had
18  correspondence with my product team in doing research
19  for this litigation.
20     Q. That would include the people you have
21  mentioned earlier?
22     A. Yes.
23     Q. Is there anyone else that you haven't
24  identified at Paycor that you have discussed BIPA

Page 83

1   with?
2      A. Yeah, I would have discussed it with my
3   managers at various times in terms of progress. The
4   scope is really fairly narrow internally because
5   there's only a few of us who are really privy to
6   what's happening and to different degrees, and there
7   is only a few of us that really have any impact over
8   what our product would do relative to or not do
9   relative to BIPA.
10     Q. Have you exchanged e-mails with some of
11  those people regarding BIPA?
12     A. We have exchanged e-mails, yes.
13     Q. And can you think of who that may include?
14     A. Steve, Ryan, Hank, Elizabeth, Alice, Sally,
15  David, Rob. So, you know, a number of people
16  internally.
17     Q. Okay. Are you aware of any efforts at
18  Paycor to comply with BIPA?
19     A. So we --
20        MR. WOLFE: You can answer that. I just
21  caution you not to reveal attorney-client privileged
22  communications or advice in your answer.
23        THE WITNESS: Sure.
24

Page 84

1   BY THE WITNESS:
2      A. We don't necessarily believe we have any
3   obligation to comply with BIPA for a few different
4   reasons: A, we don't have a relationship with the
5   employee; we are not requiring the employees of our
6   customers to use any device that can scan a finger, a
7   hand, or what have you. That is completely within
8   the, you know, scope of control of our customers.
9          And we provide means for employees to -- or
10  for our customers to exempt employees from that
11  requirement, and we really can't control how or where
12  our why our customers use any portion of our
13  application. And that itself really drives a lot of
14  what our thinking is.
15         Secondarily, we don't believe what the
16  devices that connect to our application are actually
17  capturing are fingerprints.
18  BY MR. STEPHAN:
19     Q. Okay. So I've got five reasons, I think,
20  that you have identified as basis for your statement
21  that Paycor does not have an obligation to comply
22  with BIPA.
23         The first was that Paycor doesn't have a
24  relationship with the -- with their clients'

Page 85

Pages 82 to 85

1  employees; is that right?
2      **A.  That's correct.**
3      Q.  The second is that the decision to use the
4  biometric readers is up to the clients themselves?
5      **A.  That is correct.**
6      Q.  The third is that Paycor provides an
7  exemption option to its clients?
8      **A.  That is correct.**
9      Q.  The fourth is that Paycor can't control how
10  the clocks are actually used by its clients?
11      **A.  Not only can we not control how, but we**
12  **can't control where or when.**
13      Q.  Okay.  And then the fifth is Paycor's belief
14  that the clocks don't capture a fingerprint?
15      **A.  That's correct.**
16      Q.  Okay.  Any other reasons that you are aware
17  of that Paycor doesn't believe it has to comply with
18  the law?
19      **A.  Those are why we believe we are not subject**
20  **to the constraints of BIPA.**
21      Q.  Okay.  Can you think of anything else?
22      **A.  At this time, no.**
23      Q.  Okay.  I think we've established some of
24  this, but with regards to the first point, no

Page 86

1  relationship with the employee, you would agree that
2  Paycor actually processes payroll for those
3  employees, correct?
4      **A.  We process payroll for those customers.**
5      Q.  All right.  And, actually, it either sends
6  paychecks or wires money to those particular
7  employees, correct?
8      **A.  Upon the direction of a customer.**
9      Q.  And Paycor actually has name and contact
10  information, as well as Social Security numbers and
11  things like that, for those particular employees,
12  correct?
13      **A.  We would have that information of who we**
14  **pay, but again, we're not collecting that information;**
15  **that is information that is collected by our customer.**
16      Q.  And stored on Paycor databases, correct?
17      **A.  Yes.**
18      Q.  The second reason is that Paycor doesn't
19  require clients to use biometric readers, but they
20  provide that option, correct?
21      **A.  We provide that option, but it's one of, you**
22  **know, a dozen or so options that customers can elect**
23  **to use.**
24      Q.  Are you aware of any correspondence between

Page 87

1  Paycor and any of its customers regarding BIPA?
2      **A.  I personally have not had any correspondence**
3  **with clients directly about BIPA.**
4      Q.  Are you aware of Paycor corresponding with
5  clients regarding BIPA?
6      **A.  I don't know.**
7      Q.  Okay.  Are you aware that there have been
8  declarations submitted in litigation for at least one
9  Paycor customer claiming that it was Paycor's fault
10  because Paycor collected this information and stored
11  this biometric information?
12      **A.  I am aware of litigation.**
13      Q.  Are you aware that there was litigation
14  between Plaintiffs and Paycor client Club Fitness?
15      **A.  Yes, I am.**
16      Q.  Have you seen the affidavit submitted by the
17  CFO of Club Fitness in that case?
18      **A.  I have not seen his affidavit, no.**
19      MR. STEPHAN:  Could we introduce that
20  exhibit.  I think it's 18 on our list.
21      MS. MITCHELL:  This will be Exhibit C.
22          (Whereupon, Plaintiffs' Exhibit C
23          was introduced.)
24      THE WITNESS:  And I've downloaded it.

Page 88

1  BY MR. STEPHAN:
2      Q.  Okay.  So, Mitri, if you look at Page 1 of
3  this exhibit, you will see it's the affidavit of Eric
4  Schreimann.
5      Do you see that?
6      **A.  Yes.**
7      Q.  And he states that he is the CFO of Club
8  Fitness, actually customer service CF.
9      Do you see that?
10      **A.  Yes, I do.**
11      Q.  And then if you look at the last page, he
12  signed this affidavit under penalties of perjury.
13      Do you see that?
14      **A.  I do.**
15      Q.  And then if we go to Paragraph 7, he talks
16  about Club Fitness contracting with Paycor back in
17  2015.
18      Do you see that?
19      **A.  I'm reading it.  Yes.**
20      Q.  Okay.  And then if we look at -- there's two
21  paragraphs 9.  If we look at the first one, I just
22  wanted you to look at the last sentence there.
23      It says, "Rather, any biometric information
24  that was obtained of any employee was collected,

Page 89

1  stored, used, at all times remained in the possession
2  and control of either Paycor or ADP."
3     Do you see that?
4     A.  I'm reading it.  I see that.
5     Q.  Do you have any basis to dispute that
6  statement?
7     A.  Yes.
8         MR. WOLFE:  Objection to the extent it seeks
9  a legal conclusion.
10        You can answer it.
11        THE WITNESS:  Thank you.
12  BY MR. STEPHAN:
13     Q.  And what is that?
14     A.  We have no way of subjecting an employee of
15  a customer to collect a fingerprint or, for that
16  matter, a finger scan.  We have -- you know, we would
17  receive on behalf of the customer, but we have no way
18  of collecting.
19        Again, we don't have a relationship.
20  I can't physically walk over to every one of the, one,
21  two million employees that Paycor services and ask
22  them to scan their finger on a clock.  So that --
23     Q.  So -- I'm sorry.  I didn't mean to
24  interrupt.

Page 90

1     A.  Yeah, that would have to be conducted by our
2  customer.  And, as I said, you know, we offer this as
3  one option among probably a dozen different options
4  for employees of our customers to clock in and out.
5     Q.  Okay.  I understand.  So your statement is
6  that the initial collection has to be done by the
7  employer or the Paycor customer itself?
8     A.  That is correct.  And the reality is control
9  of the template still resides with the customer.  The
10  customer has the ability to create it, the customer
11  has the ability to delete it, and the customer has the
12  ability to require an employee to create one.  We have
13  no say in any of those activities.
14     Q.  Well, correct me if I'm wrong, but isn't
15  Paycor's software designed to obtain that template
16  from the clocks?
17     A.  The clock would replicate it back to Paycor
18  for storage purposes.
19     Q.  And Paycor itself decided to obtain that
20  data and store it on its servers, correct?
21     A.  We have chosen to do that as a convenience
22  for our customer.  Essentially we use that template
23  for two purposes:  One is in the event of a failure of
24  a device, a customer would be sent a replacement

Page 91

1  device, and to save them the effort of having to
2  re-enroll all of their employees, we can copy those
3  templates back down to the new device so that it would
4  be available for use as soon as it is essentially hung
5  up or within a few minutes of it being hung up on the
6  wall.
7         Additionally, you can imagine a facility
8  that has a very large footprint, like a Club Fitness
9  location may have, where there might be time clocks
10  that are hung in different portions of the facility,
11  and instead of requiring the employee to register
12  themselves on each physical device they would like to
13  use, they would register on one, and then we would
14  replicate those templates for storage on a local
15  device on an as-needed basis.
16        But the customer is in complete control of
17  when a template is created, when a template is
18  completed, and whether an employee has to use a
19  template or not.  Paycor does not control that.
20        And, really, our storage is no different
21  than a safety deposit box that a bank would provide to
22  a customer.
23     Q.  Well, the client didn't decide on that
24  process; that was a process that Paycor decided on,

Page 92

1  correct?
2     A.  That's a process that was designed by Paycor
3  that is a standard approach in the industry.
4     Q.  It's part of the services that Paycor offers
5  and contracts with its customers for?
6     A.  Correct.
7     Q.  And they charge for those services, correct?
8     A.  We charge for our services.  We don't
9  exclusively charge for that service, no.
10     Q.  Okay.  It's part of the package, though,
11  correct?
12     A.  Part of the package.
13     Q.  Going back to earlier testimony about no
14  obligation to comply, the last one I wanted to talk
15  about is Paycor's belief that it doesn't capture a
16  fingerprint.
17     A.  Correct.
18     Q.  And other than what you have testified
19  before regarding how that's sort of commonly known in
20  the industry, is there any other basis for your
21  testimony?
22     A.  Because what is stored is not a capture of a
23  fingerprint; rather, we store a template, and a
24  template is comprised of essentially coordinates for

Page 93

1    landmarks on a subset of a finger, in this case with
2    this device, and then those coordinates are put into
3    an algorithm, and a numeric representation is created.
4         And that's what we store is the numeric
5    representation of a collection of landmarks from a
6    finger.  There is no way to reverse-engineer that back
7    into a fingerprint.  There is essentially no use --
8    I would never even be able to tell you who that
9    template belonged to.  All I can do is -- you know, in
10   isolation, that template, it has no value or meaning.
11   It can't be used for anything.
12        Q.  Well, it's used for clocking in or out?
13        A.  It's used to clock in and out, and what we
14   have done is we have what we call a badge number,
15   which is essentially a numeric value that we assign to
16   an employee, and we store an association between the
17   physical template file and that badge number so that
18   when an employee comes to a device, they can submit
19   their finger for scanning.  The scan takes a
20   measurement.  It processes the calculation, creates a
21   template or creates the output of what is stored in
22   the template, and then looks at the available
23   templates to ensure that those two numbers match.
24        We're not physically matching fingerprints

1    in the sense of looking at every single, you know,
2    groove and line within your finger to figure out
3    whether the two things are photographically identical.
4    There is a false positive rate on these devices
5    that --
6         Q.  What is it?
7         A.  It depends on the device.  I believe that
8    the device that we are using from ZK in the context of
9    this case is somewhere around 1 percent false
10   positive.
11        Q.  It's less than a percent; isn't it?
12        A.  It's approximately a percent.  It could be
13   slightly less.
14        Q.  The template that we're talking about
15   here --
16        A.  Yes.
17        Q.  -- it's all based on the user's fingerprint,
18   correct?
19        A.  It's based on landmarks within their finger.
20        Q.  Okay.  So those landmarks are then converted
21   into a template?
22        A.  Those landmarks, essentially there's -- if
23   you think of it like a map, we have specific
24   coordinates or landmarks that we are looking for on

1    the surface of a portion or subset of the finger, and
2    we can map the geography of those locations, and each
3    of those will have a specific set of coordinates.
4    Those get put into a mathematical calculation where we
5    get a single number out the other end.
6         Q.  So measurements of someone's finger are
7    converted into a numerical template; is that right?
8         A.  We don't measure the whole finger.  We
9    measure --
10        Q.  I didn't say you did, but there's parts of
11   measurements of the finger that are taken and then
12   converted into a numerical template, correct?
13        A.  There are measurements of the surface of the
14   finger or a portion thereof.
15        Q.  And then they are converted into a numerical
16   template, correct?
17        A.  They are converted into a numerical value,
18   yes, which is stored in what we would cal a template.
19        Q.  And that is because that's how computers
20   function, right?
21        A.  No.  You can use other means to compare
22   data.  So, you know, you can do image recognition and
23   physically take a picture of a fingerprint and,
24   leveraging computer vision, compare that to another

1    series of pictures to find a match.  That's not how we
2    operate because we don't physically capture a picture
3    of the fingerprint.  We don't store a fingerprint of
4    the fingerprint.
5         Similarly, you could do that with video
6    technology and computers.  There is a number of
7    different ways.  In fact, you know, you could use a
8    capacitive sensor to look at the resistance that the
9    finger creates relative to an electric current, and
10   everybody has a unique signature of resistance in
11   their finger.  So some of the sensors look at that.
12        Other sensors will look at, like I said
13   before, the capillary veins, basically looking
14   underneath the skin to determine who you are based on,
15   again, landmark points underneath your skin.
16        So there are different techniques to
17   obtaining with some degree of certainty uniqueness,
18   and all of those techniques essentially result in some
19   number, because that's the way this specific
20   technology has been designed.  That's not to say that
21   there aren't other means of performing the same tasks
22   that may be more or less invasive.
23        Q.  Well, these will all be fun topics for the
24   experts in this case.

1    A.  They will be.
2    Q.  The algorithm you mentioned, how does that
3  work?
4    A.  Those are proprietary.  They're a black box
5  to Paycor.  We have not ever seen or inspected the
6  physical algorithms.
7    Q.  Okay.  So do you know how they function?
8    A.  They essentially, as I said, have specific
9  landmarks within the finger tip or portion of the
10  fingerprint that they are looking at.  Those landmark
11  coordinates are stored or passed into an algorithm.
12  That algorithm produces a number that is encrypted out
13  the other end.
14    Q.  Are there any documents that you are aware
15  of that describe that process?
16    A.  I think at a high level, there are documents
17  that describe that process that, I believe, have been
18  submitted as part of this case.  I don't know that
19  they get into the exact sort of trade secrets or IP
20  behind how those algorithms completely work.
21    Q.  Do you remember any of those documents by
22  name or title?
23    A.  I don't remember them by name or title.
24    Q.  Okay.  Going back to my initial question

Page 98

1  about compliance with BIPA.
2    A.  Yes.
3    Q.  Are you aware of any efforts, for example,
4  by anyone at Paycor to communicate with Paycor
5  customers to notify them of BIPA?
6    A.  We have a BIPA policy that is posted as part
7  of our set of policies on our website.
8    Q.  Okay.  Anything else?
9    A.  I'm not aware of anything specific around
10  BIPA communications.
11    Q.  Okay.  Other than having a BIPA policy, are
12  you aware of any other efforts by Paycor to comply
13  with BIPA?
14    A.  I'm not aware of any.
15    Q.  Okay.  What do you know about the Paycor
16  biometric information policy?
17    A.  I know that there's a policy.  I have read
18  the policy in the past.
19    Q.  When did you first learn about it?
20    A.  The general information protection policy?
21  Which policy specifically are you asking about?
22    Q.  I'm talking about the -- I thought you
23  mentioned a biometric information policy.
24    A.  Yes.

Page 99

1    Q.  When did you first learn about that?
2    A.  Shortly after I joined Paycor.  So I joined
3  in August of 2018.  I would say probably by the middle
4  of September, I had learned about that policy.
5    Q.  And how did you learn about it?
6    A.  I want to say that we -- there was some
7  degree of litigation that was occurring when I joined,
8  and I was made privy to that somewhere around the
9  middle of September 2018.  And as part of that, I was
10  informed of the policy and subsequently reviewed the
11  policy at the time.
12    Q.  Do you remember who it was that informed you
13  about the policy?
14    A.  I would assume that it would have been Ryan
15  Bergstrom or Sally.  I don't recall exactly who told
16  me about the policy.
17    Q.  And was this in relation to this lawsuit or
18  another one?
19    A.  I do not believe it was from this
20  litigation.
21    Q.  Do you know which litigation it was related
22  to?
23    A.  I want to say Boyd.
24    Q.  Is Paycor a party in that case?

Page 100

1    A.  I do not know who created that.
2    Q.  Are you aware of any other cases besides
3  this one or Boyd involved with Paycor as a party
4  regarding BIPA?
5    A.  I believe there was one other.
6    Q.  Okay.  So you learned about this policy in
7  some way related to ongoing litigation; is that fair
8  to say?
9    A.  That is correct.
10    Q.  Okay.  Where is the policy kept?
11    A.  On Paycor's website.
12    Q.  Could I access it now?
13    A.  Yes, you could.
14    Q.  Do you know how long it's been on the Paycor
15  website?
16    A.  I believe it was initially posted in the
17  summer of 2017.
18    Q.  How do you know that?
19    A.  Because we have revision histories, and
20  that's what the revision showed us.
21    Q.  Do you know when that policy was first
22  created?
23    A.  I would assume right around the time it was
24  posted.

Page 101

| | |
|---|---|
| 1    Q.  Summer of 2017? | 1    A.  Yes, I've seen this in the past. |
| 2    **A.  Summer of 2017.** | 2    Q.  Okay.  Is this the public policy that you |
| 3    Q.  Okay.  I want you to look at the next | 3    were testifying about? |
| 4    exhibit, which is ending in 32 through 35. | 4    **A.  I believe this is the public policy that was** |
| 5        MS. MITCHELL: Ryan, can you tell me what | 5    **available starting in 2017.** |
| 6    our exhibit number is on that one, 32 to 35? | 6    Q.  Okay.  And if we look at the top, very top, |
| 7        MR. STEPHAN: Number 9, I think. | 7    it says, "Document Name:  Biometric Information |
| 8        MS. MITCHELL: Got it.  Sorry. | 8    Policy." |
| 9        MR. WOLFE:  Mitri, are you doing okay | 9        Do you see that? |
| 10    energy-wise? | 10    **A.  Yes.** |
| 11        THE WITNESS: I'm doing fine. | 11    Q.  And then it's got a document ID number. |
| 12        MR. WOLFE:  Maybe we could go another 20-30 | 12        Do you see that? |
| 13    minutes and then take a break. | 13    **A.  I do.** |
| 14        THE WITNESS: That would be perfect, | 14    Q.  What does that tell us, if anything? |
| 15    actually. | 15    **A.  That tells us that this policy document was** |
| 16        MR. WOLFE:  Great. | 16    **named Biometric Information Policy Act, and the ID** |
| 17        MR. STEPHAN: That sounds good. | 17    **that we would use probably in our document management** |
| 18        MS. MITCHELL:  This will be Exhibit D, as in | 18    **system, I assume.** |
| 19    dog. | 19    Q.  And then the primary department says the |
| 20        (Whereupon, Plaintiffs' Exhibit D | 20    legal department. |
| 21        was introduced.) | 21        Is that in-house counsel? |
| 22        THE WITNESS: Okay.  I have that up. | 22    **A.  I would assume so, yes.** |
| 23    BY MR. STEPHAN: | 23    Q.  And that would be currently led by Alice; is |
| 24    Q.  Mitri, are you familiar with Exhibit D? | 24    that correct? |
| Page 102 | Page 103 |

| | |
|---|---|
| 1    **A.  That is correct.** | 1    Q.  -- it says, "The storage of biometric |
| 2    Q.  Okay.  At the time, do you know who was in | 2    information." |
| 3    charge of the legal department? | 3        Do you see that? |
| 4    **A.  I believe Sally was, but I don't know what** | 4    **A.  Sure.** |
| 5    **her start and end date were from -- you know, with** | 5    Q.  And would you agree that Paycor stores user |
| 6    **Paycor.** | 6    biometric information? |
| 7    Q.  And then it's got Policy Owner, and it says | 7    **A.  No.** |
| 8    General Counsel. | 8    Q.  Why not? |
| 9        That would have been Sally or whoever held | 9    **A.  As I said, I don't believe what we store is** |
| 10    that role at the time? | 10    **construed as biometric information.** |
| 11    **A.  That is correct.** | 11    Q.  Okay.  Well, if we go to Page 2 here. |
| 12    Q.  Okay.  If we go through it, the first | 12    **A.  Yes.** |
| 13    section describes the purpose of the policy. | 13    Q.  Under section 5, it talks about Definitions. |
| 14        Do you see that? | 14        Do you see that? |
| 15    **A.  Purpose, yes.** | 15    **A.  I see that.** |
| 16    Q.  Was this document or this policy actually | 16    Q.  Do you see it says, "Biometric information |
| 17    shared with Paycor customers? | 17    is any information regardless of how it is captured, |
| 18    **A.  I believe it would have been shared with** | 18    converted, stored, or shared based on an individual's |
| 19    **Paycor customers.  Our terms of service would have** | 19    retina or iris scan, fingerprint, voice print, or |
| 20    **reflected all of the various policies that we have in** | 20    scan of hand or face geometry used to identify an |
| 21    **terms of service.** | 21    individual." |
| 22    Q.  Okay.  And then if we look under section 2, | 22        Do you see that there? |
| 23    Policy -- | 23    **A.  Yeah, I see that.** |
| 24    **A.  Yes.** | 24    Q.  Do you know where that definition came from? |
| Page 104 | Page 105 |

1    **A. This definition predates my employment with**
2    **Paycor.**
3    Q. Okay. So you don't know; is that right?
4    **A. I don't know how it was termed as to what**
5    **constitutes biometric information.**
6    Q. Okay. If we look at the next paragraph
7    under Definition, do you see it says, "Biometric
8    templates are digitally converted representations of
9    geometry measurements of the hand or fingerprint.
10   For the purpose of this policy, biometric templates
11   are considered biometric information."
12      Do you see that?
13   **A. I see that.**
14   Q. We have already talked about the fact that
15   Paycor collects biometric templates, correct?
16   **A. We collect the template based on a scan,**
17   **yes.**
18   Q. Okay. And this policy, Paycor's own policy,
19   defines biometric information as including those
20   templates.
21      Do you see that?
22   **A. Sure.**
23   Q. Okay. So if we go back to Page 1, the
24   Storage of Biometric Information, do you see that

1    there?
2    **A. I see -- are you -- what section of Page 1**
3    **are you referring to?**
4    Q. Section 2, Policy.
5    **A. I see.**
6    Q. And it says Storage of Biometric
7    Information, that's the heading.
8      Do you see it?
9    **A. I do.**
10   Q. And underneath it, it states, "Paycor hosts
11   data for its clients, including clients who use its
12   Perform Time software. When clients use biometric
13   time clocks with this software, biometric templates
14   are stored in time clocks and in the client's Paycor
15   database."
16      Do you see that?
17   **A. I do.**
18   Q. So would you agree that, at least pursuant
19   to Paycor's biometric information policy, they
20   collect and store users' biometric information?
21      MR. WOLFE: Object to the extent it seeks a
22   legal conclusion.
23      You can answer.
24

1    BY THE WITNESS:
2    **A. All I can tell you is that this document**
3    **concludes that what is collected -- or what I can**
4    **infer from this document is what is collected may be**
5    **considered biometrics.**
6    BY MR. STEPHAN:
7    Q. Well, you don't have to infer that; it
8    specifically state that.
9      It says, "Biometric information is collected
10   and hosted on the clocks and also on Paycor's
11   database," correct?
12   **A. Sure, that's what the document says.**
13   Q. Okay. And as you sit here today, do you
14   have any basis to dispute this policy or those
15   statements?
16   **A. As I said, the scan is looking at a portion**
17   **of a fingerprint, not capturing the entire**
18   **fingerprint. Actually, it's not capturing any of the**
19   **fingerprint, but rather it's a numerical**
20   **representation of a specific set of coordinates or**
21   **points on a finger.**
22   Q. I think that's an important point.
23      And have you ever looked at BIPA to see if
24   that's how BIPA defines biometric information?

1    **A. I can only, you know, proceed based on my**
2    **personal interpretation and the interpretation that**
3    **I have been provided by internal/external counsel and**
4    **our compliance team.**
5    Q. Well, I can read for you from the statute.
6    **A. Sure.**
7    Q. BIPA 740 ILCS, Section 14/15, Section 10
8    defines biometric information as any information --
9    and while I'm reading this, if you could look at
10   section 5 of Exhibit D.
11      BIPA defines it as, "Any information,
12   regardless of how it is captured, converted, stored,
13   or shared, based on an individual's biometric
14   identifier used to identify an individual."
15     Okay?
16   **A. Uh-huh.**
17   Q. And when you look at biometric identifier,
18   the statute defines it as, "A retina or iris scan,
19   fingerprint, voiceprint, or scan of hand or face
20   geometry."
21   **A. Sure.**
22   Q. And isn't that exactly what section 5 of
23   Paycor's biometric information policy states?
24   **A. It is very similar. It's not verbatim.**

1    Q.  Okay.  I just want to confirm a couple
2  things on this document.  I won't belabor it.
3        When we talk about the Paycor database,
4  we're talking about the Perform Time database that's
5  either hosted on Paycor databases in Cincinnati or
6  with Microsoft?
7    **A.  That would be correct.**
8    Q.  By the way, the actual clocks themselves,
9  are they sold to the customers, or are they leased?
10   **A.  There's an option for both.**
11   Q.  Okay.  And when they're leased, what happens
12 to the clocks at the end of the relationship?
13   **A.  They would be sent back to Paycor.**
14   Q.  What is Paycor's process for processing
15 those clocks?
16   **A.  Those clocks would essentially be wiped and**
17 **then destroyed.**
18   Q.  And who is responsible for that?
19   **A.  We have a group that manages inventory**
20 **shipping/receiving of those devices.**
21   Q.  And which group is that?
22   **A.  They're in our services team.  I believe the**
23 **employee who is sort of responsible for the team is**
24 **Hewey.  I don't recall Hewey's last name.**

1    Q.  Do you know if there's a record of those
2  clocks that are returned and then processed?
3    **A.  There would be.**
4    Q.  And if you wanted to find out how many
5  clocks in the last five years have been returned and
6  processed, what would you do?
7    **A.  I would put in a request to Hewey, and I'd**
8  **probably put in a why to our billing team,**
9  **because while a termination may be ended with a**
10 **customer, a customer does have the right to acquire**
11 **their leased unit.**
12       **So essentially all -- we have a purchase**
13 **option on our lease where we can have our customers**
14 **purchase them.  So just because a customer that was**
15 **leasing a device has left and no longer uses Paycor's**
16 **services does not mean that they return their clock.**
17 **We can provision a buyout of those devices, in which**
18 **case the customer would retain ownership of that**
19 **device.**
20   Q.  Okay.  If we look at Exhibit D, section 2
21 again, in the middle, it talks about, "Biometric
22 templates can be removed from the client's Paycor
23 database by authorized Paycor system users utilizing
24 Paycor's software."

1        When it talks about authorized Paycor system
2  users, who is that referring to?
3    **A.  Either our client or ourselves.**
4    Q.  Is there a particular group at Paycor that
5  is authorized to do that?
6    **A.  Our services support team primarily.**
7    Q.  Okay.  If we go down a little further, it
8  talks about maintenance and storage of backups and
9  archives.
10       Do you see that?
11   **A.  I do.**
12   Q.  And it talks about backups being made on a
13 daily and weekly basis.
14       Do you see that?
15   **A.  Yes.**
16   Q.  Would that include the fingerprint profile
17 information?
18   **A.  No.**
19   Q.  Why not?
20   **A.  Because it's immaterial to the services we**
21 **provide, and it's not data that we need to be able to**
22 **restore.**
23   Q.  Do you know when BIPA was first enacted as
24 law?

1    **A.  I do not recall.  I know it's been -- I've**
2  **been informed of when it was enacted, but I do not**
3  **recall the exact date.**
4    Q.  That's okay.  It was back at the end of
5  2008.
6    **A.  Okay.**
7    Q.  Are you aware of Paycor having any sort of
8  biometric information policy between 2008 and
9  September of 2017?
10   **A.  I am not aware of one.  I believe we had a**
11 **general policy that spoke about data privacy and**
12 **information protection.**
13   Q.  What was the name of that policy?
14   **A.  I believe it would have been the general**
15 **privacy policy.**
16   Q.  And where could we find that policy?
17   **A.  On the Paycor website.**
18   Q.  Does Paycor use any biometric clocks for its
19 own employees?
20   **A.  No.**
21   Q.  Do you know why?
22   **A.  Most of our staff are salaried, and the few**
23 **that are hourly, we provide them with computers so**
24 **they have the ability to clock in from their desk.  So**

1  there's really no need to go through the extra expense
2  of adding devices for biometrics or, for that matter,
3  physical hardware clocks.
4      Q.  Okay.  If we go down to Page 2, section 8.
5      A.  Page 2, section 8.  Yes.
6      Q.  There is a revision history there.
7          Do you see that?
8      A.  I do.
9      Q.  And the earliest date is August 31, 2017.
10         Do you see that?
11     A.  I see that.
12     Q.  And it identifies Zachary Briggs as the
13  editing party.
14         Do you know who that is?
15     A.  Yes, I do.
16     Q.  Who is that?
17     A.  Zachary is part of our internal legal team.
18     Q.  Is he a lawyer?
19     A.  I believe so.
20     Q.  Okay.  And do you know, he report to Ed
21  Woodson at the time?
22     A.  I would have to -- to be honest, I don't
23  know.  I'm not --
24     Q.  I think we talked about Ed Woodson earlier.

Page 114

Was he GC at some point?
2      A.  I don't know.
3      Q.  Do you know who Ed Woodson is?
4      A.  I do not.
5      Q.  Okay.  It also identifies William Bardgett
6  as the editing party on May 21, 2019.
7          Do you see that?
8      A.  I do see that.
9      Q.  Do you know who William Bardgett is?
10     A.  I do not recall who William is.
11     Q.  And then if we go to the next page, it talks
12  about the publicly available version of the policy.
13         Do you see that?
14     A.  Yes.
15     Q.  And is this the actual policy that's
16  available on the Paycor website?
17     A.  I would have to compare what's in this
18  document to what's on the website to tell you, but
19  I assume that this is either what's currently there or
20  a copy of what would have been there at the time of
21  publishing of this document.
22     Q.  Okay.  If it's publicly available, any
23  reason you can think of why it would be labeled at
24  confidential here?

Page 115

1      A.  All of our internal documentation carries
2  the marker of confidential, most likely because
3  there's an internal associate view and an external
4  view, and the internal view would definitely be
5  confidential.
6      Q.  Okay.  Well -- okay.
7          MR. STEPHAN:  Matt, you know, I don't want
8  to get into a big thing about it, but if this is, you
9  know, publicly available information, you know,
10  I'm not sure this designation gets there.  So if you
11  guys could look at it, that would be helpful.
12         MR. WOLFE:  Sure, we could look at it.  No
13  problem.
14         MR. STEPHAN:  I appreciate it.
15  BY MR. STEPHAN:
16     Q.  Okay.  Going on to section 2 on Addendum A
17  of Exhibit D under the biometric information policy.
18     A.  And are we talking about the item on Page 3?
19     Q.  We are.
20     A.  Thank you.
21     Q.  And specifically if you could look at
22  Storage of Biometric Information.  That first
23  paragraph there states, "Paycor hosts data for its
24  clients, including clients who use its Perform Time

Page 116

software, and clients use biometric time clocks with
2  this software.  Biometric templates are stored in
3  time clocks and in the clients' Paycor database."
4          Do you see that?
5      A.  Yes.
6      Q.  Is there anything that you can think of that
7  is inaccurate about that section?
8      A.  We store a template.  And from a marketing
9  purpose, we call our clocks biometric clocks.  So --
10     Q.  I just want to know, Is there anything
11  inaccurate in that statement?
12     A.  No.  I think I could talk about what
13  constitutes a database or not, but no.
14         MR. STEPHAN:  How about we take a -- what do
15  you guys want, a 30-minute break to grab something to
16  eat, and we can reconvene?
17         MR. WOLFE:  Sure.
18             (Whereupon, a luncheon break was
19             taken.)
20  BY MR. STEPHAN:
21     Q.  Okay.  We're back on the record.  Mitri,
22  I just had a quick question about the biometric
23  information policy.  Can you tell me how to access it
24  on the Paycor website?

Page 117

Pages 114 to 117

| | |
|---|---|
| 1 | **A.  I believe if you go to our privacy policy,** |
| 2 | **there is a link to that at the very bottom of that.** |
| 3 | **And I think the link to the privacy policy is just** |
| 4 | **Paycor.com/privacy-policy.** |
| 5 | Q.  Is there a way to access it off just the |
| 6 | Paycor.com website? |
| 7 | **A.  I don't know what the specific URL is off** |
| 8 | **the Paycor.com website.** |
| 9 | Q.  I'm looking at it now.  It looks like the |
| 10 | very bottom, it says 2021 Paycor, Inc., refer |
| 11 | Paycor," and then there is a privacy policy? |
| 12 | **A.  Yeah.  So if you click on the privacy** |
| 13 | **policy, and you scroll down to the end of the privacy** |
| 14 | **policy under General Contact Information, you will see** |
| 15 | **a link to the Paycor biometric information policy.** |
| 16 | Q.  That is literally the last thing. |
| 17 | MR. STEPHAN: Okay.  So what I'm looking at, |
| 18 | I think, is the same as -- Katy, can you show the |
| 19 | witness Johns/Paycor ending in 53 through 55.  It |
| 20 | should be number 13. |
| 21 | MS. MITCHELL: Okay.  This will be |
| 22 | Exhibit E. |
| 23 | (Whereupon, Plaintiffs' Exhibit E |
| 24 | was introduced.) |

| | |
|---|---|
| 1 | BY MR. STEPHAN: |
| 2 | Q.  So now what I would like to do is look at |
| 3 | Exhibit E and compare it to the online version. |
| 4 | I think they're identical. |
| 5 | **A.  Let me put them side by side, and give me a** |
| 6 | **second, please.** |
| 7 | Q.  Sure. |
| 8 | **A.  I do not believe that they're the same.** |
| 9 | Q.  Can you point out any differences? |
| 10 | **A.  Under Biometric Identifiers, the document** |
| 11 | **that you have, biometric identifiers are finger scans** |
| 12 | **of clients' employees, while the one on the left side** |
| 13 | **specifies face or finger.  I haven't read through the** |
| 14 | **whole document to see if there are others, but that's** |
| 15 | **just cursory look, I can notice that.** |
| 16 | Q.  But generally speaking, they look pretty |
| 17 | similar. |
| 18 | Would you agree with that? |
| 19 | **A.  I would agree that they look similar.** |
| 20 | Q.  Including, if you look at the bottom there, |
| 21 | it looks like those numbers, I'm not sure what those |
| 22 | indicate, but look to be the same, starting with |
| 23 | 1 star equals star 1. |
| 24 | Do you see that? |

| | |
|---|---|
| 1 | **A.  Yeah, I see these numbers that are there.** |
| 2 | Q.  Are you familiar with what that represents? |
| 3 | **A.  I am not familiar with what that represents.** |
| 4 | **I would assume that is, again, some tagging by our** |
| 5 | **document storage system.** |
| 6 | Q.  Okay.  Okay.  So this Exhibit E, just like |
| 7 | the one on the website, includes finger scans as a |
| 8 | biometric identifier, correct? |
| 9 | **A.  That's what the document says.** |
| 10 | Q.  And we already talked about this, but the |
| 11 | biometric clocks used by Paycor collect finger scans, |
| 12 | correct? |
| 13 | **A.  We are collecting finger scans, yes.** |
| 14 | Q.  And then we talked about this a little bit |
| 15 | earlier with the previous exhibit, D I believe, when |
| 16 | we looked at the definition of biometric information. |
| 17 | Do you see that? |
| 18 | **A.  Yes.** |
| 19 | Q.  And similarly on Exhibit E, just like |
| 20 | Exhibit D, Paycor's policy provides that biometric |
| 21 | templates are considered biometric information for |
| 22 | purposes of this policy. |
| 23 | Do you see that? |
| 24 | **A.  Yes.** |

| | |
|---|---|
| 1 | Q.  If we continue on to Page 2 of Exhibit E. |
| 2 | **A.  Yes.** |
| 3 | Q.  Do you see at the bottom there where it |
| 4 | says, "Biometric identifiers are not retained on time |
| 5 | clocks after an employee biometric template is |
| 6 | generated"? |
| 7 | **A.  What paragraph are you looking at?** |
| 8 | Q.  Sure.  It's the very first paragraph. |
| 9 | **A.  "Biometric data is not retained on time** |
| 10 | **clocks after an employee biometric template is** |
| 11 | **generated."  Correct.** |
| 12 | Q.  Right.  So what I am trying to figure out is |
| 13 | when we were talking about before that you were |
| 14 | testified that you didn't think biometric information |
| 15 | was retained, were you really referring to biometric |
| 16 | identifiers? |
| 17 | MR. WOLFE:  Object to the extent it seeks a |
| 18 | legal conclusion. |
| 19 | You can answer. |
| 20 | BY THE WITNESS: |
| 21 | **A.  I don't believe that what we have is a** |
| 22 | **representation of a person's biometric information.** |
| 23 | BY MR. STEPHAN: |
| 24 | Q.  Okay.  Do you understand that there's a |

1  difference between biometric identifiers and
2  biometric information?
3      MR. WOLFE:  Same objection.
4      MR. STEPHAN:  Mitri, I'm sorry, I couldn't
5  hear you.
6  BY THE WITNESS:
7      A.  I'm trying to correlate the distinction
8  between the identifiers and information.
9  BY MR. STEPHAN:
10     Q.  Well, let me just ask it a different way.
11     Do you think there is a difference?
12     A.  Identifiers would be a subset of information
13 that could be considered biometric.
14     Q.  So for purposes of the Paycor policy, what
15 would you consider to be included in biometric
16 identifiers?
17     A.  Biometric identifiers are the physical
18 locations of the individual elements or landmarks that
19 we use on a finger.
20     Q.  So you're talking about the actual
21 fingerprint?
22     A.  It's not a print because we're not
23 physically capturing the entirety of the finger.
24     Q.  Okay.

1      A.  We're looking for specific points of
2  interest on the finger, or the vendors, as it's been
3  described to us, look for specific landmarks on the
4  finger, they take the coordinates of those landmarks,
5  and then run those through an algorithm to generate a
6  template.
7      Q.  Okay.  But you would agree that biometric
8  identifiers include finger scans, correct?
9      A.  A finger scan could have some biometric
10 information in it.
11     Q.  Okay.  But it's a little different from my
12 question.
13     Would you agree that, at least for purposes
14 of the Paycor biometric information policy, biometric
15 identifiers include finger scans?
16     MR. WOLFE:  Object to the extent it seeks a
17 legal conclusion.
18     You can answer.
19 BY THE WITNESS:
20     A.  I believe that's what the document is
21 saying, but --
22 BY MR. STEPHAN:
23     Q.  Okay.  Do you have any reason to disagree
24 with that?

1      A.  As I said, you know, the scan is collecting
2  information about points on a finger.  Whether that is
3  interpreted as a biometric identifier or not, you
4  know, I'm not a lawyer to understand those
5  distinctions.
6      Q.  Okay.  So as you sit here, you don't have
7  any basis to disagree; is that right?
8      A.  I don't have a basis to disagree, I guess,
9  if that's what you would like to hear.
10     Q.  Okay.  And so we have talked about the
11 identifiers now.
12     What do you understand biometric information
13 to include?
14     A.  Any information that I can use to --
15     MR. WOLFE:  Same objection.
16     Go ahead.
17 BY THE WITNESS:
18     A.  It's information that I can use to identify
19 a person based on that information alone.
20 BY MR. STEPHAN:
21     Q.  What do you mean that information alone?
22     A.  Meaning that if I had, for example, a copy
23 of the fingerprint, I would be able to tell whose
24 fingerprint it was.  I could see that fingerprint.

1  I could replicate that fingerprint.  That, to me, is
2  biometric information.
3      What we get out of or put into a template is
4  a hash of numbers that's created based on a scan of
5  the finger, but at no point could we take that and
6  recreate the print from it.  At no point could we do
7  anything other than try and create the template again
8  to see if we can match it with an existing template.
9      So just having the presence of the finger
10 there without the algorithm and that specific scanner,
11 I would have no recourse to know whose it is or what
12 it is exactly.  If you look at the data, you wouldn't
13 be able to tell whether it was originated from a
14 finger, whether it originated from Microsoft Word or
15 Excel or any other process on any other computer.
16     Q.  So would that be included in Paycor's
17 definition of biometric information on Exhibit E?
18     A.  I believe the template that we store would
19 be covered under this document.
20     Q.  As biometric information?
21     A.  I believe that's what the document says.
22     Q.  Okay.  And do you have any basis to disagree
23 with that?
24     A.  Again, it's based on my interpretation of

1    what I understand biometric information to be.
2         Q.  I guess what I am just trying to understand
3    is why you are hesitant to agree with the definition
4    set forth in Paycor's own policy.  Seems like you are
5    reluctant to agree with them.
6         **A.  I didn't write the policy myself.  I have**
7    **skepticism anytime that I am not the one that is the**
8    **author of something.  Without doing additional**
9    **research, I don't know.**
10        Q.  Is there any other reason why you are
11   skeptical of those definitions?
12        **A.  No.**
13        Q.  Are you familiar with a group that would
14   support a privacy@paycore.com e-mail?
15        **A.  I would assume that would go to someone**
16   **within our internal general counsel's team.**
17        Q.  Okay.  If we could look just real briefly at
18   Paycor 41 through 46.
19             MS. MITCHELL:  Sure.  One second.  This will
20   be Exhibit F.
21             (Whereupon, Plaintiffs' Exhibit F
22                 was introduced.)
23   BY MR. STEPHAN:
24        Q.  So, Mitri, just briefly, if you go to Page 2

Page 126

1    of this exhibit.
2         **A.  Yes.**
3         Q.  You see it says there's a section there
4    about "Questions regarding Paycor's privacy practices
5    can be directed to privacy@Paycor.com"?
6         **A.  Yes.**
7         Q.  Do you know if that was ever part of the
8    publicly available policy?
9         **A.  If I'm not mistaken, it is right at the**
10   **bottom of the website as part of the privacy policy.**
11   **There's a link right there above the biometric**
12   **information policy that says e-mail.  I believe if you**
13   **click on that link, it will create an e-mail to that**
14   **address.**
15        Q.  And it's your understanding that those
16   e-mails go to in-house counsel for Paycor?
17        **A.  That is my understanding.**
18        Q.  Do you ever see those e-mails?
19        **A.  I do not personally see those e-mails, no.**
20        Q.  Are you aware of Paycor ever notifying
21   Illinois users, for example the group of 14,000 that
22   you mentioned earlier, in writing of the specific
23   purpose and length of time for which their biometric
24   information was being used?

Page 127

1         **A.  I'm not aware.**
2         Q.  Are you aware of Paycor ever receiving any
3    sort of written release from any of those 14,000
4    people regarding their biometric data?
5         **A.  I'm not aware.**
6         Q.  And I think we covered this, but as far as
7    you can tell, the first time that Paycor had a
8    publicly available biometric policy would have been
9    September of 2017; is that right?
10        **A.  That sounds right.**
11        Q.  Are you aware of Paycor ever getting consent
12   from any of the users, the 14,000 users to have their
13   data stored on third-party databases like the
14   Microsoft database?
15             MR. WOLFE:  Objection to the extent it seeks
16   a legal conclusion, and also to the extent it
17   misstates prior testimony.
18             You can answer.  The court reporter can
19   read it back to you, if necessary.
20   BY THE WITNESS:
21        **A.  We obtain consent from a customer, and the**
22   **customer is who we work with.  We don't have any**
23   **relationship with any end user.**
24

Page 128

1    BY MR. STEPHAN:
2         Q.  Okay.  So there is no consent from any of
3    the 14,000 individuals; is that correct?
4         **A.  I do not believe so.**
5         Q.  Okay.  If we could look at the next exhibit,
6    which, Katy, is the Johns 118 through 126.
7             MS. MITCHELL:  Ryan, I'm sorry, I'm not
8    seeing 118.
9             MR. STEPHAN:  Give me a second.  And the one
10   I'm looking for is the contract.  You don't have it?
11             MS. MITCHELL:  Got it.  Sorry.  This will be
12   Exhibit G.
13             (Whereupon, Plaintiffs' Exhibit G
14                 was introduced.)
15   BY MR. STEPHAN:
16        Q.  Mitri, are you familiar with Exhibit G?
17        **A.  It's a Paycor contract.**
18        Q.  Is there a sort of a standard or a form
19   contract that Paycor uses?
20        **A.  I believe so.**
21        Q.  Does this look like it?
22        **A.  I believe so.**
23        Q.  Okay.  And this contract is between Paycor
24   and Club Fitness, correct?

Page 129

1      A.  This is between Paycor and Club Fitness.
2      Q.  And at the top right, it says, "Prepared by
3  John Ortworth."
4         Do you see that?
5      A.  I see that.
6      Q.  Do you know who that is?
7      A.  I would assume that John is their sales
8  representative.
9      Q.  Can you tell by looking at this document
10  what types of clocks Paycor provided to Club Fitness?
11      A.  Yes.
12      Q.  And how could you tell that?
13      A.  If you look under on the first page, under
14  Club Fitness Monthly Fees, under Services, you will
15  see a PT 100FP Wifi rental.
16      Q.  Great.  And that would be one of the clocks
17  that we looked at earlier on Exhibit A, correct?
18      A.  I believe so.
19      Q.  Okay.  And those clocks have the biometric
20  fingerprint reader, correct?
21      A.  That is correct.
22      Q.  Okay.  So if we look at this, under Form of
23  Client Data, do you see that there?
24      A.  What page am I looking for?

                                        Page 130

1      Q.  I'm sorry.  It's ending with Bates stamp
2  122.
3      A.  Can you repeat that?
4      Q.  Sure.  If you look at the very bottom,
5  there's a bates stamp.  It says Johns_000122.
6      A.  Yes.  122 is what you want me to look for?
7      Q.  If you could.
8      A.  122.  Yes, I see 122 now.
9      Q.  Okay.  And it talks about client data there.
10         Do you see that?
11      A.  Yes, I do.
12      Q.  And that would include some of the data that
13  we talked about before that would be necessary for
14  processing payroll and taxes and that sort of thing?
15      A.  Yes.
16      Q.  And then the next section -- actually, not
17  the next section, same section, if you go down to the
18  last paragraph under the Client Data section there.
19      A.  Yes.
20      Q.  Do you see it says, "Client grants Paycor
21  the right to use client's payroll data for purposes
22  of performing the Paycor services and for purposes of
23  developing and marketing new products and services."
24         Do you see that?

                                        Page 131

1      A.  I do see that, yeah.
2      Q.  Do you know if any of the 14,000 or so users
3  that you have identified in this case had any of
4  their personal data used for marketing purposes?
5      A.  I would not assume they would, but I don't
6  know for certain.  Now, we wouldn't market directly to
7  a client or -- to, sorry, an employee of a client.
8      Q.  What happens at the end of a relationship
9  between Paycor and a customer?  What happens to the
10  data?
11      A.  Portions of the data are returned based on
12  our data retention policy.  I believe it's seven
13  years.  Some portions of the date are purged at
14  termination of the relationship with the client.
15      Q.  What about the biometric templates?  Do you
16  know if those are purged?
17      A.  Biometric templates are purged at the
18  termination of an agreement with a client.
19      Q.  And how long has that been the case?
20      A.  Since the summer of 2018.
21      Q.  And do you know why Paycor started that
22  practice in the summer of 2018?
23      A.  I was not privy to the rationale behind
24  doing that, no.  I assume that overlapped with some

                                        Page 132

1  work that was being done for GRP compliance.  So it
2  may very well have been part of the GRP initiative to
3  purge that data upon termination of the relationship
4  with a client.
5      Q.  Do you know if Paycor had been sued before
6  it started that policy?
7      A.  I do not believe so.
8      Q.  Which group at Paycor is responsible for
9  deleting biometric at that time?
10      A.  It's an automated process.  So upon
11  termination of a client agreement, within 24-72 hours
12  that process will run once we've recorded the
13  termination of that relationship, and then we
14  periodically audit to make sure that the processes are
15  running, we've got monitoring in place to make sure
16  those things are working appropriately.
17         And then at any point in time, a client can
18  call in and ask us to remove specific pieces of data,
19  biometric templates being one of them.
20      Q.  Before that policy, what happened to users'
21  biometric data at the end of a relationship between
22  Paycor and its customers?
23      A.  They would be persisted until such time as
24  we purged them.

                                        Page 133

                              Pages 130 to 133

1    Q.   Okay.  They would be kept; is that right?

2    A.   They would be kept until we would purge the

3    data related to that customer.  Now, as I understand

4    it, when that functionality was added to our

5    capabilities, we retroactively went back and purged

6    all biometric templates for non-active customers and

7    non-active employees.

8    Q.   Okay.  Do you know -- as part of the

9    research you have done in this case, do you know if

10   Paycor had biometric template information for Kellin

11   Johns or Juan Barron?

12   A.   We had a template for each of those people.

13   Kellin Johns' template was associated with a Club

14   Fitness location in Missouri, and Juan, I believe we

15   also had a template for him or her in, I would assume,

16   Illinois.

17   Q.   Okay.  And how are you able to determine

18   that Kellin's template was associated with a Missouri

19   location?

20   A.   Because we have separate databases for --

21   the way that the Club Fitness relationship worked is

22   each facility had its own separate contract with

23   Paycor, and data is not shared between clients.  And

24   the data for which we have a template for Kellin Johns

Page 134

1    was a client that operated one location in Missouri.

2    Q.   Okay.  So would that mean that if Kellin

3    wanted to use a Club Fitness clock in Illinois, it

4    would not register; he would have to enroll in that

5    clock separately?

6    A.   He would have to enroll in that clock

7    separately, but as a prerequisite to that, he would

8    have to have been assigned a badge.  And his record of

9    employment in Illinois was actually as a salaried

10   employee, and generally salaried employees don't get

11   badges because they get paid whether they -- they get

12   paid, right?  Unless they are absent from work, they

13   are going to be paid.

14   Q.   Do you know if that was a practice at Club

15   Fitness?

16   A.   Yes.

17   Q.   How do you know that?

18   A.   Because Kellin Johns in the Illinois

19   location never had a badge number assigned to their

20   user account.

21   Q.   Do you know if he is still clocked in or out

22   as a salaried employee?

23   A.   We do not.  We cannot facilitate a time

24   clock transaction without a badge number.  It's a

Page 135

1    prerequisite.

2    Q.   So why would they have collected his

3    fingerprint?

4    A.   Because he had a separate record of

5    employment at the Missouri location where he was am

6    hourly non-exempt worker, in which case he did have to

7    punch a clock there.

8    Q.   So he would have had a badge for that

9    location?

10   A.   He would have had a badge number assigned to

11   him and a fingerprint template created for a finger

12   scan.

13   Q.   Your testimony is that each of those

14   locations operated separately and distinct from each

15   other and were not in one database?

16   A.   That is correct.  Each location operated

17   under its own contract with Paycor.

18   Q.   Okay.

19   A.   Yes.

20   Q.   And the research also confirmed that Juan

21   Barron did enroll in an Illinois location, he did

22   have a badge at the Illinois location?

23   A.   That is my recollection, yes.

24   Q.   Okay.  Let me ask you -- we are getting

Page 136

1    close.  Just hang tight with me.  We are almost done.

2    A.   Sure.

3    Q.   Do you know if Paycor has ever used a

4    Schlage time clock?

5    A.   Schlage?  No, Paycor has never used a

6    Schlage time clock with Paycor's products.  The

7    Schlage time clock is used with the AOD product

8    provided by Time On Demand/Infotronics.

9    Q.   Got it.  So going back to the start of your

10   deposition today, that would have been, I think, the

11   second product line that you mentioned?

12   A.   Yes.

13   Q.   Okay.  And in that case, any of those

14   biometric templates would be stored on an Attendance

15   On Demand database?

16   A.   That is correct.

17   Q.   That would be accessible to the client, in

18   that case Corcentric and Attendance On Demand?

19   A.   Correct.

20   Q.   Would Paycor be able to access that

21   information?

22   A.   We are not able to access that information.

23   Q.   Okay.  And that Schlage clock, do you know

24   if it has any biometric capabilities?

Page 137

Pages 134 to 137

1  **A.  It is a geometry scanner.**

2  Q.  It's a hand scanner?

3  **A.  Yeah.**

4  Q.  All right.  I am just going to clean up a

5  couple things here about that group of 14,000 that we

6  have talked about.

7  **A.  Sure.**

8  Q.  Would you agree that all of those

9  individuals used a Performance Time biometric clock,

10  or Perform Time?

11  **A.  I would agree that they all would have used**

12  **a clock at least once.  I would not agree that their**

13  **usage was necessarily in Illinois.**

14  Q.  Okay.  So part of that search was to

15  identify people in Illinois?

16  **A.  To the best of our abilities.**

17  Q.  And you did that by looking at the --

18  **A.  As I said -- sorry.  As I said earlier, due**

19  **to reciprocity agreements for taxation, employees**

20  **living in bordering states and working in Illinois, or**

21  **inversely living in Illinois and working in a**

22  **bordering state, may have been captured in that number**

23  **inadvertently.**

24  Q.  Got it.  So we'll try and break it down a

Page 138

---

1  little simpler.

2      Would you agree all 14,000 of those

3  individuals used a Perform Time biometric clock?

4  **A.  Yes.**

5  Q.  And that had a fingerprint scanner feature?

6  **A.  That had a fingerprint scanner, yes.**

7  Q.  And they would have used that over the past

8  five years?

9  **A.  They would have used that over the past five**

10  **years, correct.**

11  Q.  And to be able to use that to clock in and

12  out, they would have first had to enroll in that

13  biometric clock?

14  **A.  That is correct.**

15  Q.  And they would do that by using at least one

16  finger and sometimes more than one finger?

17  **A.  That is correct.**

18  Q.  The Paycor software would then create a

19  biometric template?

20  **A.  No.  The scanner would create a biometric**

21  **template.**

22  Q.  Okay.  And that template was stored for

23  those 14,000 people on the clocks themselves?

24  **A.  The clock at which the scan was taken would**

Page 139

---

1  store that template, yes.

2  Q.  And also on Paycor databases in Ohio?

3  **A.  No, on Azur.**

4  Q.  Okay.  Microsoft databases?

5  **A.  Correct.**

6  Q.  Okay.  You would agree that Paycor did not

7  provide any written notice regarding BIPA to those

8  14,000 people?

9      MR. WOLFE:  Object to the extent it seeks a

10  legal conclusion.

11      Go ahead.

12  BY THE WITNESS:

13  **A.  I do not believe we communicated with those**

14  **14,000 users.  They are -- we don't have a**

15  **relationship with them.**

16  BY MR. STEPHAN:

17  Q.  And are you aware of Paycor obtaining any

18  sort of written consents from any of those 14,000

19  people regarding the use of their biometric

20  information?

21      MR. WOLFE:  Same objection.

22  BY THE WITNESS:

23  **A.  I am not aware.**

24

Page 140

---

1  BY MR. STEPHAN:

2  Q.  Okay.  And Paycor has names and contact

3  information for those 14,000 people?

4  **A.  Yes.**

5  Q.  Okay.  And included in that 14,000 people

6  would be Juan Barron?

7  **A.  Yes, he overlapped in 2016.  So he would be**

8  **the base year for five years removed from today.**

9  Q.  The 14,000 people, would that have included

10  people whose biometric templates were created in the

11  past five years but subsequently deleted?

12  **A.  Yes.**

13      MR. STEPHAN:  Okay.  Why don't we take a

14  two-minute break.  I think I am just about done.

15      MR. WOLFE:  Okay.

16      (Whereupon, a break was taken.)

17  BY MR. STEPHAN:

18  Q.  Yeah, just one or two more things, Mitri.

19  **A.  Sure thing.**

20  Q.  Have you learned of whether or not the case

21  against ADP has been resolved?

22  **A.  I had heard that that was settled.  I don't**

23  **know what the settlement entailed though.**

24  Q.  Do you know if any other vendors have

Page 141

Pages 138 to 141

1   settled BIPA cases?

2     **A.  I don't know.**

3     MR. STEPHAN: Okay. That's all the

4  questions I have. Thank you.

5     THE WITNESS: Thank you.

6     MR. WOLFE: I have just a couple.

7     THE WITNESS: Sure, Matthew.

8          EXAMINATION

9  BY MR. WOLFE:

10    Q.  Mitri, earlier, you testified about a

11  one-to-many identification feature on the time clock.

12     Do you remember that?

13    **A.  Yes.**

14    Q.  When the time clock does a one-to-many

15  identification, is there a universe within which it

16  is identifying the template?

17    **A.  Yes. It will look and compare it to only**

18  **templates stored on that device specifically.**

19  **Generally, the devices, depending on the size of the**

20  **template and the number of fingers enrolled per**

21  **employee, will range anywhere from one to a few**

22  **thousand employees.**

23    Q.  And do the devices have an upper limit on

24  how many templates they can store?

Page 142

1    **A.  Yes. I think at the lowest resolution and**

2  **in single fingerprint per employee, I believe you can**

3  **get up to 10,000 templates on them.**

4    Q.  And in that instance, it would be a lower

5  resolution template?

6    **A.  Yes.**

7     MR. WOLFE: That's all I have.

8     THE WITNESS: Okay.

9     MR. STEPHAN: Mitri, thank you for your

10  timed today. I appreciate it. I think we're done.

11     THE WITNESS: You're welcome. Thank you.

12     THE REPORTER: Thank you, everybody. Are

13  there orders for the transcript?

14     MR. STEPHAN: Yes.

15     MR. WOLFE: Yeah, Andrew. Can I get a mini

16  PDF and a PTX file?

17     THE REPORTER: Sure. Thanks, everybody.

18     FURTHER DEPONENT SAITH NOT.

19     (Whereupon, the deposition was

20       concluded at 2:29 p.m.)

21

22

23

24

Page 143

Page 144

1                      REPORTER'S CERTIFICATE

2

3          I, ANDREW R. PITTS, a Certified Shorthand

4    Reporter, do hereby certify that heretofore, to-wit,

5    on the 14th day of January, 2021, appeared remotely

6    via videoconference, MITRI DAHDALY, in a cause now

7    pending and undetermined In the United States District

8    Court, Northern District of Illinois, Eastern

9    Division, wherein KELLIN JOHNS and JUAN BARRON,

10   Individually and on behalf of all others similarly

11   situated, are the Plaintiffs, and PAYCOR, INC. is the

12   Defendant.

13         I further certify that the said witness was

14   first remotely duly sworn to testify the truth, the

15   whole truth and nothing but the truth in the cause

16   aforesaid; that the testimony then given by said

17   witness was reported stenographically by me in the

18   remote presence of the said witness, and afterwards

19   reduced to typewriting by Computer-Aided

20   Transcription, and the foregoing is a true and correct

21   transcript of the testimony so given by said witness

22   via videoconference as aforesaid.

23         I further certify that the taking of this

24   deposition was pursuant to Notice, and that there were

Page 145

1    present via videoconference at the deposition the

2    attorneys hereinbefore mentioned.

3          I further certify that I am not counsel for nor

4    in any way related to the parties to this suit, nor am

5    I in any way interested in the outcome thereof.

6               IN TESTIMONY WHEREOF:  I have hereunto set

7    my hand and affixed my seal this 2nd day of February,

8    2021.

9

10   _____

     Andrew R. Pitts, CSR, RPR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**A**

**A-Z-U-R** 21:8
**a.m** 1:18
**abilities** 70:12 138:16
**ability** 50:6 60:17 66:21 75:19 91:10,11 91:12 113:24
**able** 14:21 17:2 17:3 22:3,22 35:12 36:1,5 41:15 47:24 65:21 67:13 94:8 112:21 124:23 125:13 134:17 137:20 137:22 139:11
**above-entitled** 1:15
**absent** 135:12
**absolutely** 47:3
**access** 23:16,18 35:17,20,21,22 36:1,5,6 37:13 37:17,18,22 55:2,5,12 57:9 57:14,16,17 66:22 67:5,7,9 76:5 101:12 117:23 118:5 137:20,22
**accessed** 59:13
**accessible** 137:17
**accessing** 35:24
**account** 55:12 135:20
**accurate** 17:22 40:20 60:2 63:14,16
**acknowledge** 4:4,7
**acquire** 111:10
**acquired** 27:18
**acquisition** 27:21
**Act** 28:22 29:4 78:16 103:16

**action** 55:5 64:1
**actions** 64:2
**activities** 91:13
**actual** 19:20 32:19 33:23 55:15 59:9 110:8 115:15 122:20
**added** 71:13 134:4
**Addendum** 116:16
**adding** 114:2
**addition** 72:10 72:11
**additional** 126:8
**Additionally** 92:7
**address** 14:15 22:4,6 46:7,9 46:19,22 47:1 71:24 127:14
**Admin** 67:4
**administered** 4:8,20 5:3
**administering** 57:12
**administration** 15:16,22 66:9
**administrator** 55:11
**administrators** 55:6
**ADP** 27:6,9,14 28:9,14,15 29:8 30:3,4 78:22 79:8,17 80:1,8,12,14 81:1,9,11,20 83:5 90:2 141:21
**advice** 84:22
**affidavit** 3:11 88:16,18 89:3 89:12
**affiliated** 28:16 32:3
**affixed** 145:7
**aforesaid** 144:16

144:22
**ago** 25:18
**agree** 4:18 42:6 87:1 105:5 107:18 119:18 119:19 123:7 123:13 126:3,5 138:8,11,12 139:2 140:6
**agreement** 4:13 4:14 132:18 133:11
**agreements** 138:19
**agrees** 4:17
**ahead** 25:2 124:16 140:11
**algorithm** 52:23 94:3 98:2,11 98:12 123:5 125:10
**algorithms** 98:6 98:20
**Alice** 9:22,24 10:6,17 84:14 103:23
**Alice's** 10:23
**allow** 66:24 67:2 67:12,14
**allows** 56:10 60:11
**alternative** 37:9
**Andrew** 1:16,23 4:16 5:21 143:15 144:3 145:10
**answer** 5:20,22 52:19 84:20,22 90:10 107:23 121:19 123:18 128:18
**answering** 29:1 29:14
**answers** 17:2
**anybody** 21:24 24:9 80:13
**anytime** 126:7
**AOD** 137:7
**apologies** 41:24

**app** 76:21,22
**appear** 46:17
**APPEARAN...** 2:1
**appeared** 144:5
**application** 28:3 32:16 57:13 62:24 77:4 82:8 85:13,16
**applied** 39:24
**appreciate** 29:23 116:14 143:10
**approach** 93:3
**appropriately** 133:16
**approximately** 12:5 17:24 39:10 95:12
**approximation** 12:2 15:10 23:13
**archives** 112:9
**area** 28:8
**arrangement** 4:12
**arrive** 48:4
**as-needed** 92:15
**asking** 5:20 63:20 99:21
**aspect** 76:23
**assign** 94:15
**assigned** 62:13 135:8,19 136:10
**assigns** 51:7
**assist** 13:23
**assistance** 13:21 55:6
**associate** 48:2 51:7 116:3
**associated** 15:9 46:24 134:13 134:18
**association** 94:16
**assume** 15:15 43:7 100:14 101:23 103:18 103:22 115:19

120:4 126:15 130:7 132:5,24 134:15
**attend** 7:17
**attendance** 33:1 33:5,7,8,11,15 33:18,23 34:16 34:18,20,24 35:3,9,14,18 36:15,16 37:1 37:13 38:19 56:24 137:14 137:18
**attendees** 7:21
**attendees'** 7:19
**attorney-client** 84:21
**attorneys** 145:2
**audit** 133:14
**August** 25:13 27:11 100:3 114:9
**author** 126:8
**authorized** 37:14 111:23 112:1,5
**automated** 133:10
**automatically** 76:20
**available** 42:22 43:1,2 60:15 79:21 92:4 94:22 103:5 115:12,16,22 116:9 127:8 128:8
**aware** 14:9 77:13 84:17 86:16 87:24 88:4,7,12,13 98:14 99:3,9 99:12,14 101:2 113:7,10 127:20 128:1,2 128:5,11 140:17,23
**Azur** 19:23 20:24 21:3,11

54:22 55:20
72:15 140:3

**B**

**B** 3:7,10 68:3,6
68:12 69:9
75:8
**back** 22:2 40:4
48:22 54:11
67:21 72:15
75:13 82:13
89:16 91:17
92:3 93:13
94:6 98:24
106:23 110:13
113:4 117:21
128:19 134:5
137:9
**background**
29:15,18,20,21
43:16
**Backtracking**
24:24
**backups** 112:8
112:12
**BACON** 2:7
**badge** 47:5,7,10
47:23 48:8,9
48:23 50:7
51:6 56:17,17
62:13,17 69:19
69:23 74:14,23
94:14,17 135:8
135:19,24
136:8,10,22
**badges** 135:11
**bank** 92:21
**Baraka** 11:11,14
11:20
**Bardgett** 115:5
115:9
**Barron** 1:3
134:11 136:21
141:6 144:9
**base** 6:19 23:21
63:3 141:8
**based** 11:1,10,13
11:15 17:12
24:6 52:22

62:17 73:6
77:16 95:17,19
97:14 105:18
106:16 109:1
109:13 124:19
125:4,24
132:11
**basically** 35:2
40:18 97:13
**basis** 52:19
77:17 85:20
90:5 92:15
93:20 108:14
112:13 124:7,8
125:22
**bates** 41:19
131:1,5
**Bear** 58:7
**beginning** 4:15
59:14
**behalf** 1:4 37:11
90:17 144:10
**belabor** 110:2
**belief** 86:13
93:15
**believe** 7:13,18
8:2 14:3 15:2
16:12 17:19,24
18:14,20 19:21
22:24,24 23:7
23:8 24:21
36:23 38:7
40:8,10,16
41:20 42:24
43:20 44:24
45:9,11 52:17
60:17 69:17
79:9,11,19
85:2,15 86:17
86:19 95:7
98:17 100:19
101:5,16 103:4
104:4,18 105:9
110:22 113:10
113:14 114:19
118:1 119:8
120:15 121:21
123:20 125:18
125:21 127:12

129:4,20,22
130:18 132:12
133:7 134:14
140:13 143:2
**belonged** 94:9
**benefit** 43:15
**Bergstrom** 26:3
40:5,12 100:15
**Bergstrom's**
26:4
**best** 5:24 33:12
138:16
**better** 21:11
**beyond** 52:1
**big** 116:8
**biggest** 53:20
**billing** 111:8
**biometric** 17:1
28:15,16,16,20
28:21,21,24
29:3 31:19
33:24 36:8,10
38:16 47:13
49:15,23 52:15
64:13 69:15,23
70:5,10 72:9
73:14 77:21
78:16 80:8
86:4 87:19
88:11 89:23
99:16,23 103:7
103:16 105:1,6
105:10,16
106:5,7,10,11
106:15,19,24
107:6,12,13,19
107:20 108:9
108:24 109:8
109:13,17,23
111:21 113:8
113:18 116:17
116:22 117:1,2
117:9,22
118:15 119:10
119:11 120:8
120:11,16,20
120:21 121:4,5
121:9,10,14,15
121:22 122:1,2

122:13,15,17
123:7,9,14,14
124:3,12 125:2
125:17,20
126:1 127:11
127:23 128:4,8
130:19 132:15
132:17 133:9
133:19,21
134:6,10
137:14,24
138:9 139:3,13
139:19,20
140:19 141:10
**biometric/fing...**
72:19
**biometrics** 15:5
17:1 53:3,4
70:3 108:5
114:2
**BIPA** 79:2,6
80:2 82:14
83:5,8,9,14,24
84:9,11,18
85:3,22 86:20
88:1,3,5 99:1,5
99:6,10,11,13
101:4 108:23
108:24 109:7
109:11 112:23
140:7 142:1
**bit** 16:15 24:24
58:12 120:14
**black** 98:4
**blank** 10:13
**Bloomberg's**
82:22
**Bob** 30:17
**bordering**
138:20,22
**bottom** 56:4
59:18 65:10
69:8 70:3
72:22 118:2,10
119:20 121:3
127:10 131:4
**box** 41:6 76:11
92:21 98:4
**Boyd** 100:23

101:3
**brand** 32:21
39:1,5
**branding** 32:15
32:17
**break** 6:11,13
64:6,8 67:16
67:20 102:13
117:15,18
138:24 141:14
141:16
**brief** 55:13
**briefly** 27:4 30:2
126:17,24
**Briggs** 114:12
**browser** 36:3
**building** 37:10
**Bunn** 43:20,22
43:23
**Burn** 43:21
**business** 28:3
33:11 46:2
49:13 77:17
**businesses** 46:1
**buyout** 111:17

**C**

**C** 2:8 3:11 88:21
88:22
**Cahill** 16:19,20
**cal** 96:18
**calculate** 52:24
**calculation**
94:20 96:4
**call** 5:8 8:23
18:9 32:2 51:5
53:4 62:10
94:14 117:9
133:18
**called** 1:11 5:2
32:20
**Canada** 8:18
**capabilities**
42:15 66:13
81:10 134:5
137:24
**capability** 45:20
45:24 48:24
77:14 82:3,9

capable 47:18
  79:20
capacitive 97:8
capacity 7:23
capillary 71:7
  71:11 97:13
capture 32:1
  34:9,11 52:17
  52:17 63:10
  80:16 86:14
  93:15,22 97:2
captured 61:1
  80:21 105:17
  109:12 138:22
captures 76:4
capturing 63:11
  85:17 108:17
  108:18 122:23
care 15:24 16:1
carries 116:1
case 5:12 12:11
  12:13 21:10,14
  43:15 51:18
  54:20 56:16
  60:16 63:22
  77:6,17 88:17
  94:1 95:9
  97:24 98:18
  100:24 111:18
  132:3,19 134:9
  136:6 137:13
  137:18 141:20
case-by-case
  77:17
cases 101:2
  142:1
catalog 49:2
CATHERINE
  2:3
cause 1:15 144:6
  144:15
caution 84:21
center 19:21
  20:12,23 81:8
  82:4,5,11
centers 20:4,6,9
central 51:13
CenturyLink
  82:8

CEO 16:7
certain 40:20
  132:6
certainty 17:22
  97:17
CERTIFICA...
  144:1
Certified 1:17
  144:3
certify 144:4,13
  144:23 145:3
CF 89:8
CFO 88:17 89:7
change 51:2
  76:7,8,10 77:2
  77:9,10
changes 76:23
channel 30:19
  37:2,4
channels 37:9
charge 16:2 40:5
  43:19 76:11
  93:7,8,9 104:3
Charles 16:19
chat 41:6,15
  68:2
Chicago 2:4,9
Chief 26:5
choose 46:2,3
  50:6 82:7,11
chooses 50:10
chosen 91:21
Chris 11:10,17
Cincinnati
  19:22 20:11
  110:5
city-specific
  24:3
Civil 1:12 4:7
claim 53:15
claiming 88:9
clarification
  78:11
clarify 56:2
clean 138:4
clear 5:21,24 6:7
  33:15 59:8
click 118:12
  127:13

clicking 41:16
client 33:15,18
  37:17 55:6
  88:14 92:23
  112:3 130:23
  131:9,18,20
  132:7,7,14,18
  133:4,11,17
  135:1 137:17
client's 37:23
  107:14 111:22
  131:21
client-specific
  57:11
clients 22:22
  23:14 35:5
  37:14 39:8
  42:21 56:10
  57:9,12,17
  80:15 81:16
  86:4,7,10
  87:19 88:3,5
  107:11,11,12
  116:24,24
  117:1 134:23
clients' 85:24
  117:3 119:12
clock 31:9 38:9
  38:11,12,15,17
  39:1,3,5,9
  45:17 47:10
  48:3,12,13,20
  48:20 49:8,22
  50:2,9,15 51:1
  55:6,7,8,13
  59:1,23 60:3
  62:24 64:17
  65:24 66:2
  69:22 70:21
  75:6,11 78:5
  90:22 91:4,17
  94:13 111:16
  113:24 135:3,5
  135:6,24 136:7
  137:4,6,7,23
  138:9,12 139:3
  139:11,13,24
  142:11,14
clocked 135:21

clocking 14:23
  50:2 94:12
clocks 31:19,20
  32:1 43:24
  44:11,16 45:3
  45:23 48:6,14
  49:16 54:14
  69:11,15,22
  70:4,8,18 72:8
  72:9 86:10,14
  91:16 92:9
  107:13,14
  108:10 110:8
  110:12,15,16
  111:2,5 113:18
  114:3 117:1,3
  117:9,9 120:11
  121:5,10
  130:10,16,19
  139:23
close 47:10
  137:1
closer 73:21
cloud 19:23 20:2
  21:4
cloud-based
  82:2
Club 88:14,17
  89:7,16 92:8
  129:24 130:1
  130:10,14
  134:13,21
  135:3,14
co-located 82:5
code 17:14
colleagues 13:3
  13:16
collect 14:21
  90:15 106:16
  107:20 120:11
collected 14:20
  14:22 35:7
  54:11 87:15
  88:10 89:24
  108:3,4,9
  136:2
collecting 87:14
  90:18 120:13
  124:1

collection 12:14
  12:21 13:10
  14:6,23 21:13
  30:8 31:11
  48:10 91:6
  94:5
collectively 12:6
collects 106:15
colloquially
  19:17 52:14
  53:4
come 43:7
comes 40:17
  94:18
coming 66:1
common 63:2
commonly 28:23
  93:19
communicate
  14:11 99:4
communicated
  14:13 80:1
  140:13
communication
  21:13 75:5
communicatio...
  43:9 84:22
  99:10
companies
  17:11 24:12
company 22:15
  27:15,17 33:6
  39:6 44:15
compare 61:19
  96:21,24
  115:17 119:3
  142:17
compared 61:1
  75:3
comparison
  61:4 74:22
competitor
  27:23 28:12
complete 74:6
  92:16
completed 61:19
  92:18
completely
  17:17 82:15

85:7 98:20
**compliance**
  39:19 40:2,6
  40:17,19 78:24
  79:18 99:1
  109:4 133:1
**comply** 84:18
  85:3,21 86:17
  93:14 99:12
**comprised** 31:8
  93:24
**compute** 21:4
**computer** 76:20
  96:24 125:15
**Computer-Ai...**
  144:19
**computers**
  96:19 97:6
  113:23
**conceding** 29:2
**concluded**
  143:20
**concludes** 108:3
**conclusion** 90:9
  107:22 121:18
  123:17 128:16
  140:10
**conducted** 8:14
  63:8 78:14
  91:1
**confidential**
  115:24 116:2,5
**configuration**
  51:15 63:1
**configure** 49:12
**confirm** 61:14
  110:1
**confirmation**
  15:10
**confirmed**
  136:20
**confuse** 6:5
**conjunction**
  35:8 61:6 77:6
**connect** 46:3
  54:21 72:12,15
  85:16
**connected** 34:14
**connecting** 54:5

**connection**
  54:13 72:14
  76:15
**connectivity**
  46:5
**connects** 54:14
**consent** 4:11
  35:23 128:11
  128:21 129:2
**consents** 140:18
**consider** 27:22
  28:11 38:4
  52:1 63:13,15
  122:15
**considered**
  33:17 106:11
  108:5 120:21
  122:13
**consistently**
  25:14
**constitutes**
  106:5 117:13
**constraints**
  39:23 40:1
  86:20
**construed**
  105:10
**contact** 21:16,20
  21:23 30:13
  44:19 71:19
  77:8 87:9
  118:14 141:2
**contained** 35:18
  36:9
**contention** 81:6
**context** 39:24
  79:4,10 95:8
**continue** 41:1
  56:19 57:19
  58:11 77:20
  121:1
**contract** 129:10
  129:17,19,23
  134:22 136:17
**contracting**
  89:16
**contracts** 93:5
**control** 75:20
  85:8,11 86:9

86:11,12 90:2
91:8 92:16,19
**controlled** 76:6
**controls** 75:16
**convenience**
  63:24 91:21
**conversations**
  77:15
**converted** 95:20
  96:7,12,15,17
  105:18 106:8
  109:12
**coordinate** 13:6
**coordinated**
  12:24
**coordinates**
  93:24 94:2
  95:24 96:3
  98:11 108:20
  123:4
**copy** 41:22 92:2
  115:20 124:22
**Corcentric**
  137:18
**corporate** 17:8
  46:14
**correct** 8:16
  9:24 20:12,13
  20:17 25:10,11
  32:7 35:5,6,10
  35:16 36:7
  37:15 38:10
  40:21 44:5,10
  45:6 47:3,12
  48:15 49:4,9
  49:17,19 50:4
  50:12 51:21
  52:3 54:15,16
  54:19 55:3,17
  56:13 57:5,8
  58:16,22,23
  59:2,10,11
  60:8,9 61:3,10
  62:3 66:6,16
  66:17,20 67:1
  67:3 74:16,17
  75:24 77:8
  81:14,17 86:2
  86:5,8,15 87:3

87:7,12,16,20
91:8,14,20
93:1,6,7,11,17
95:18 96:12,16
101:9 103:24
104:1,11
106:15 108:11
110:7 120:8,12
121:11 123:8
129:3,24
130:17,20,21
136:16 137:16
137:19 139:10
139:14,17
140:5 144:20
**correlate** 122:7
**correspondence**
  83:13,18 87:24
  88:2
**corresponding**
  88:4
**cost** 77:10
**counsel** 2:14
  4:11,15,17
  6:20,24 7:3,3
  8:3,5 9:14,17
  10:16 11:12,14
  79:19 103:21
  104:8 109:3
  127:16 145:3
**counsel's** 11:10
  126:16
**country** 12:19
  20:5,15
**counts** 12:18
**couple** 5:15 8:22
  20:4 40:22
  60:18 110:1
  138:5 142:6
**course** 18:1
  27:20 30:7
**court** 1:1 5:21
  6:1 128:18
  144:8
**Courts** 1:13
**cover** 29:21
**covered** 29:3
  31:1 125:19
  128:6

**create** 50:22
  91:10,12 125:7
  127:13 139:18
  139:20
**created** 15:18
  92:17 94:3
  101:1,22 125:4
  136:11 141:10
**creates** 94:20,21
  97:9
**creating** 47:19
**criteria** 36:5
  71:17
**CSR** 1:23
  145:10
**current** 39:8
  97:9
**currently** 8:17
  8:18 25:4 41:7
  42:3 43:11
  103:23 115:19
**cursory** 119:15
**customer** 32:17
  35:23 48:11
  49:11,14 50:8
  50:10 51:6
  54:10 55:11
  63:3 87:8,15
  88:9 89:8
  90:15,17 91:2
  91:7,9,10,10
  91:11,22,24
  92:16,22
  111:10,10,14
  111:18 128:21
  128:22 132:9
  134:3
**customer's** 81:8
**customers** 12:19
  14:24 15:4
  17:6,6 23:24
  24:6 33:20
  35:22 39:10,14
  43:3,4 48:17
  55:1 62:18
  63:23 66:16
  79:21,23 81:7
  81:24 82:6
  85:6,8,10,12

87:4,22 88:1
91:4 93:5 99:5
104:17,19
110:9 111:13
133:22 134:6
**customers'**
51:14,15
**cycle** 37:23

**D**

**D** 3:1,12 102:18
102:20,24
109:10 111:20
116:17 120:15
120:20
**Dahdaly** 1:11
3:3 5:1,7 144:6
**daily** 112:13
**Dallas** 46:16
**Dan** 26:14
**data** 14:23 15:6
18:10 19:8,21
19:22 20:4,6,9
20:12,14,18,22
20:23,23 21:12
24:17 30:8
35:18,20 47:8
54:10,12 55:2
80:16 81:8,13
81:16,19,24
82:4,5,10
83:10,12 91:20
96:22 107:11
112:21 113:11
116:23 121:9
125:12 128:4
128:13 130:23
131:9,12,18,21
132:4,10,11,12
133:3,18,21
134:3,23,24
**database** 15:16
15:22,24 19:5
23:3 107:15
108:11 110:3,4
111:23 117:3
117:13 128:14
136:15 137:15
**databases** 19:2,2

19:3,13,14,15
19:20 20:11
87:16 110:5
128:13 134:20
140:2,4
**date** 33:4 104:5
113:3 114:9
132:13
**David** 13:11
26:14 36:20
84:15
**day** 144:5 145:7
**December** 7:13
8:10 70:16
**decide** 77:11
92:23
**decided** 91:19
92:24
**decipher** 15:7
**decision** 71:17
86:3
**declarations**
88:8
**declare** 4:9
**default** 71:16
76:8
**Defendant** 2:11
144:12
**Defendants** 1:8
**defined** 50:8
**defines** 106:19
108:24 109:8
109:11,18
**definitely** 22:19
46:8 116:4
**definition** 40:1
105:24 106:1,7
120:16 125:17
126:3
**definitions**
105:13 126:11
**degree** 17:21
97:17 100:7
**degrees** 84:6
**delegated** 13:21
15:19
**delete** 67:13,14
91:11
**deleted** 141:11

**deleting** 133:9
**Demand** 31:9
32:9,10,20,21
33:2,5,8,9,11
33:16,18,23
34:16,18,20,24
35:3,14,18
36:15,17 37:1
37:13 38:20
137:15,18
**Demand's** 35:9
**Demand/Infot...**
33:7 137:8
**demographic**
23:20
**demographics**
6:18
**dep** 42:5
**department**
68:24 103:19
103:20 104:3
**depending**
46:18 51:14
142:19
**depends** 95:7
**deploy** 82:11
**DEPONENT**
143:18
**deposed** 5:13
43:15
**deposit** 92:21
**deposition** 1:11
4:4,5,6 6:16
7:11 12:7,9
41:10 137:10
143:19 144:24
145:1
**depositions** 1:14
**dermal** 71:8
**dermis** 71:9
**describe** 98:15
98:17
**described** 65:18
123:3
**describes** 42:14
104:13
**description**
30:22
**design** 12:17

**designation**
116:10
**designed** 91:15
93:2 97:20
**designs** 6:18
**desk** 113:24
**destroyed**
110:17
**details** 58:19
60:13
**determination**
62:18 77:18
**determine** 15:3
22:17,18 31:3
46:19 48:4
61:23 78:5
97:14 134:17
**developed** 19:9
31:12 32:14
54:22
**developer** 18:20
**developing**
131:23
**development**
14:1 77:16
**device** 17:5,20
42:20 46:20,21
47:2 48:24
50:5,16,23
51:2 54:9,11
55:12,14,16,18
60:13,14,15,16
60:19 61:2,5,7
66:9,10,14
70:2,11,13
71:18 72:2,3
76:4,17,18
80:21 85:6
91:24 92:1,3
92:12,15 94:2
94:18 95:7,8
111:15,19
142:18
**devices** 14:23
15:2 17:7,9
21:13 28:16,18
30:8,10 32:20
33:24 34:2,6,9
34:11,14 35:3

35:8 42:15
46:2,4,6 49:11
53:8 54:20
72:4 76:18
85:16 95:4
110:20 111:17
114:2 142:19
142:23
**difference** 52:13
81:4,11,15
122:1,11
**differences**
70:20 119:9
**different** 20:15
34:7 37:22
39:4 45:16
48:10 49:7,10
60:6 62:1
66:13 70:24
71:1,6 76:19
84:6 85:3 91:3
92:10,20 97:7
97:16 122:10
123:11
**digitally** 106:8
**direct** 37:7 81:7
**directed** 127:5
**direction** 31:4
87:8
**directional**
17:19
**directives** 40:18
**directly** 18:23
54:21 88:3
132:6
**director** 14:1
40:10
**disagree** 123:23
124:7,8 125:22
**discreetly** 77:2
**discuss** 7:14
8:11
**discussed** 54:17
56:1 57:4
59:13 63:9
83:24 84:2
**display** 76:13,24
**displayed** 74:5
75:17 76:16

displaying 78:8 78:9
dispute 28:22 90:5 108:14
disregard 41:9
distinct 136:14
distinction 53:5 122:7
distinctions 124:5
distribution 12:19 23:24
District 1:1,1,13 144:7,8
Division 1:2 144:9
document 12:14 41:7,14 42:2 42:14,17,20,24 43:6 52:2 54:3 64:8 68:15 73:2 76:3 103:7,11,15,17 104:16 108:2,4 108:12 110:2 115:18,21 119:10,14 120:5,9 123:20 125:19,21 130:9
documentation 6:17 69:1 116:1
documents 9:4 14:21 15:1 40:23 43:10 98:14,16,21
dog 102:19
doing 13:22 33:10 71:8,10 79:21 83:18 102:9,11 126:8 132:24
download 41:14 68:4 76:18,20
downloaded 88:24
dozen 87:22 91:3

drawing 10:13
Drive 2:8
drives 85:13
drop 41:6
Ducanes 11:10 11:17
due 17:13 138:18
duly 144:14
duties 31:2,3

**E**

E 3:1,7,13 118:22,23 119:3 120:6,19 121:1 125:17
e-mail 14:12,14 14:15 18:11 21:23 23:7 71:24 126:14 127:12,13
e-mailed 24:17 24:19
e-mails 24:22 84:10,12 127:16,18,19
earlier 23:20 45:2 63:9 68:18 72:9 83:21 93:13 114:24 120:15 127:22 130:17 138:18 142:10
earliest 114:9
early 83:2
Eastern 1:2 144:8
eat 117:16
EC 74:12
Ed 11:14,23 114:20,24 115:3
edited 76:14
editing 114:13 115:6
effort 92:1
efforts 12:23,24 84:17 99:3,12
either 8:9 17:11

28:14 54:18 78:6 79:12 87:5 90:2 110:5 112:3 115:19
elect 48:11 49:12 87:22
elected 48:16
electric 97:9
electronic 1:15
elements 122:18
Elizabeth 2:14 6:24 7:3,16 9:19 11:3 83:17 84:14
employ 24:12
employed 24:9 27:19
employee 17:16 50:13,23 51:4 51:7,8,8,9,10 57:7 58:20 60:21,22 61:16 61:18,20,21,22 74:23 85:5 87:1 89:24 90:14 91:12 92:11,18 94:16 94:18 110:23 121:5,10 132:7 135:10,22 142:21 143:2
employee's 60:24
employees 7:22 15:4,8,8 16:24 17:12 20:19,20 22:3,14 24:7,8 24:11,13 31:13 37:16 50:22 56:7 63:9,10 64:17 73:10 85:5,9,10 86:1 87:3,7,11 90:21 91:4 92:2 113:19 119:12 134:7 135:10 138:19 142:22

employer 22:20 91:7
employment 106:1 135:9 136:5
enacted 112:23 113:2
encompass 19:10
encrypted 98:12
end-user 33:20
ended 111:9
energy-wise 102:10
engaged 79:18
engineering 13:4 16:5 21:21,23 22:1
engineers 13:16 14:9
enlisted 14:9
enroll 50:16,22 51:4 59:1 66:24 67:2 135:4,6 136:21 139:12
enrolled 50:14 64:17 142:20
Enroller 66:18
Enrolling 56:7
enrollment 50:20 56:14,17 64:13 65:15
ensure 94:23
entailed 141:23
enter 62:13
enterprise 28:3
entire 38:5 77:3 108:17
entirety 51:16 122:23
entry 72:19 77:21
environment 37:23
environments 35:21,22 36:2 81:7
equals 119:23

Eric 3:11 89:3
ERP 28:2
especially 17:6
Esquire 2:2,3,8
essentially 14:7 37:6,9 38:24 47:24 60:11,14 80:17 91:22 92:4 93:24 94:7,15 95:22 97:18 98:8 110:16 111:12
EST 1:18
established 86:23
Ethernet 69:22
event 91:23
eventually 16:6
everybody 97:10 143:12,17
exact 23:15 33:4 98:19 113:3
exactly 100:15 109:22 125:12
examination 1:12 3:2 5:5 142:8
examined 5:3
example 17:15 22:13 30:11 35:11 46:15 65:10 75:23 99:3 124:22 127:21
Excel 18:8 23:3 125:15
exchanged 84:10,12
exclusively 12:9 93:9
exempt 85:10
exemption 86:7
exhibit 3:9,10,11 3:12,13,14,15 41:8,10,11 42:11 45:16 47:14 52:6 55:22 64:4 65:18 67:23

68:2,6,12 69:9
72:16 75:8,23
88:20,21,22
89:3 102:4,6
102:18,20,24
109:10 111:20
116:17 118:22
118:23 119:3
120:6,15,19,20
121:1 125:17
126:20,21
127:1 129:5,12
129:13,16
130:17
**existing** 79:22
125:8
**expense** 114:1
**expert** 51:22
**experts** 97:24
**explain** 32:13
**explicitly** 17:4
17:20 63:19
**extent** 90:8
107:21 121:17
123:16 128:15
128:16 140:9
**external** 6:24
7:2 116:3
**extra** 114:1
**eyesight** 58:10

**F**

**F** 2:2 3:14
126:20,21
**face** 105:20
109:19 119:13
**facilitate** 46:5
48:6 135:23
**facility** 92:7,10
134:22
**fact** 61:21 97:7
106:14
**facts** 12:11,13
**failure** 78:7,8
91:23
**fair** 101:7
**fairly** 84:4
**fall** 40:2
**false** 17:15 95:4

95:9
**familiar** 21:6
37:3 42:10
50:18 65:14
68:11 78:15
102:24 120:2,3
126:13 129:16
**far** 14:19 128:6
**fault** 88:9
**feasible** 17:17
**feature** 60:24
139:5 142:11
**features** 31:11
**February** 145:7
**Federal** 4:6
**feedback** 73:20
**Fees** 130:14
**field** 58:18
**fifth** 86:13
**figure** 95:2
121:12
**file** 61:19 63:21
75:4 94:17
143:16
**filter** 63:12
**finally** 6:9
**find** 22:13 36:12
37:8 39:13
49:22 72:1
97:1 111:4
113:16
**fine** 29:5,22 64:9
102:11
**finger** 15:5,9
18:5 20:21,23
28:18 30:11
31:21 32:1
36:11 38:17,18
50:17 51:10,12
51:13,16,17,19
51:23,24 52:4
52:12,18,24
53:16 55:18
59:7 60:4,12
61:14,17 63:20
63:21 65:19
70:12,19 71:12
73:10 75:3
78:4 80:10

85:6 90:16,22
94:1,6,19 95:2
95:19 96:1,6,8
96:11,14 97:9
97:11 98:9
108:21 119:11
119:13 120:7
120:11,13
122:19,23
123:2,4,8,9,15
124:2 125:5,9
125:14 136:11
139:16,16
**fingerprint**
31:21 47:14,19
48:15 49:1
50:4,7,11,14
51:20 52:1,3,7
52:15,16,20
55:15 58:15
59:1,10,21,23
60:24 61:1
64:20 66:22
67:6,9,13
69:16,23 70:5
70:10,17 71:9
73:16 74:8
77:21 86:14
90:15 93:16,23
94:7 95:17
96:23 97:3,3,4
98:10 105:19
106:9 108:17
108:18,19
109:19 112:16
122:21 124:23
124:24,24
125:1 130:20
136:3,11 139:5
139:6 143:2
**fingerprints**
34:10 51:22
52:17 85:17
94:24
**fingers** 51:16
142:20
**finish** 5:20
**first** 5:2,8,19
7:10,13 8:9 9:3

9:9 18:16
43:14 44:8
45:11,15 50:14
57:3 62:10,13
65:2 75:22
78:18,20 82:24
85:23 86:24
89:21 99:19
100:1 101:21
104:12 112:23
116:22 121:8
128:7 130:13
139:12 144:14
**fit** 82:12
**Fitness** 88:14,17
89:8,16 92:8
129:24 130:1
130:10,14
134:14,21
135:3,15
**five** 12:4,8 21:12
33:13 67:17,19
85:19 111:5
139:8,9 141:8
141:11
**five-ten** 67:19
**five-year** 18:1
**follow** 40:18
**following** 4:1
**follows** 5:4
**footprint** 92:8
**foregoing**
144:20
**form** 129:18
130:22
**forth** 34:7 126:4
**found** 59:4
**four** 14:8 27:2
**fourth** 86:9
**FP** 74:19
**frank** 80:14
**Frederic** 2:14
7:4 8:7 11:6,9
**frequencies** 47:8
**frequency** 69:20
**Frisco** 11:11,15
14:3
**fun** 97:23
**function** 60:23

96:20 98:7
**functionality**
134:4
**functions** 15:2
19:11 38:16
**further** 4:7 24:8
112:7 143:18
144:13,23
145:3

**G**

**G** 3:15 71:4
129:12,13,16
**G-E-E-N-E** 10:3
**gain** 53:2
**GC** 115:1
**Geene** 9:22
10:17
**general** 8:3,5
9:14,17 10:16
11:9,12,13
12:10,13,18
81:20 83:10
99:20 104:8
113:11,14
118:14 126:16
**generally** 17:5
25:7 30:24
37:5 81:22
119:16 135:10
142:19
**generate** 17:2,3
123:5
**generated** 18:6
121:6,11
**geographic**
19:19
**geographically**
47:2
**geography** 96:2
**geometry** 34:13
105:20 106:9
109:20 138:1
**getting** 73:20
128:11 136:24
**give** 5:24 12:2
23:13 30:24
41:5 66:21
67:5,7,9 68:4

69:4 119:5
129:9
**given** 144:16,21
**globally** 27:8
**go** 5:15,16 42:6
48:22 50:23
53:22 61:17
72:16 75:13
89:15 102:12
104:12 105:11
106:23 112:7
114:1,4 115:11
118:1 124:16
126:15,24
127:16 131:17
140:11
**goes** 45:16 52:1
56:19 67:19
77:23
**going** 22:2 29:17
29:18 41:8
65:13,22,23
93:13 98:24
116:16 135:13
137:9 138:4
**good** 5:7 40:24
58:10 64:5
67:15 102:17
**Goodwin** 13:11
26:14
**Googled** 82:20
82:24
**grab** 117:15
**grants** 131:20
**great** 69:8 73:24
102:16 130:16
**groove** 95:2
**Grosvenor** 71:3
71:4,19
**ground** 5:15
**group** 13:2
15:16,21,22
16:3 18:19
37:20,24 38:4
38:5 110:19,21
112:4 126:13
127:21 133:8
138:5
**GRP** 133:1,2

**guess** 124:8
126:2
**guys** 11:4
116:11 117:15

**H**

**H** 3:7
**half** 69:8
**hand** 31:22
34:13 85:7
105:20 106:9
109:19 138:2
145:7
**handful** 39:12
40:23 42:7
53:12
**hands** 54:10
**hang** 137:1
**Hank** 25:6,19,22
25:24 26:9
84:14
**happened** 53:7
133:20
**happening** 84:6
**happens** 110:11
132:8,9
**happy** 67:16
**hard** 23:12
**hardware** 12:16
31:14,15,18
33:23 48:20
53:24 114:3
**HARDY** 2:7
**hash** 125:4
**head** 6:2 23:2
38:4,5 40:3
43:11
**heading** 107:7
**headquarters**
17:8
**hear** 122:5
124:9
**heard** 141:22
**held** 10:16 16:13
20:22,24 21:2
104:9
**help** 11:4 13:5
42:18 46:10
79:19

**helpful** 116:11
**hereinbefore**
145:2
**heretofore** 144:4
**hereunto** 145:6
**hesitant** 126:3
**Hewey** 110:24
111:7
**Hewey's** 110:24
**high** 98:16
**highlighted** 6:21
**historically**
38:13
**histories** 101:19
**history** 55:7,14
114:6
**hold** 9:1 73:19
**holding** 23:10
**home** 22:4,6
**honest** 114:22
**hope** 6:10
**host** 19:20 81:16
82:9
**hosted** 54:18,22
55:19 81:8,12
82:1 108:10
110:5
**hosting** 81:10
82:4,9
**hosts** 20:10,14
107:10 116:23
**hour** 1:18
**hourly** 113:23
136:6
**hours** 12:8
133:11
**HP** 34:5
**HR** 19:10 30:6
82:22
**Hudepohl** 25:6
25:19
**Hudepohl's**
25:20
**hung** 92:4,5,10

**I**

**ID** 53:20 103:11
103:16
**identical** 38:21

95:3 119:4
**identification**
142:11,15
**identified** 51:9
83:24 85:20
132:3
**identifier** 28:21
109:14,17
120:8 124:3
**identifiers**
119:10,11
121:4,16 122:1
122:8,12,16,17
123:8,15
124:11
**identifies** 43:23
114:12 115:5
**identify** 14:20
22:3,22 35:13
43:19 47:24
48:11 51:7
59:14 60:12
61:13 62:2,4
62:11 63:5
74:24 105:20
109:14 124:18
138:15
**identifying** 48:1
62:9 142:16
**ILCS** 109:7
**Ilic** 26:14
**Illinois** 1:1 2:4,9
15:8,9 17:2,12
17:13,15,16
18:3,4 20:19
20:20 22:14,16
22:16,18,19,22
23:13 24:2,2,6
24:9,13,14
35:12 39:11,12
59:14 78:16
82:21 127:21
134:16 135:3,9
135:18 136:21
136:22 138:13
138:15,20,21
144:8
**Illinois-based**
22:20 24:10,12

**image** 49:21
65:9 73:18
74:4,7,11
78:13,13 96:22
**imagine** 76:10
92:7
**imbedded** 76:16
**immaterial**
112:20
**impact** 84:7
**implement**
40:19
**implementation**
37:21 38:2
**implemented**
80:17
**implementing**
39:23
**important** 29:20
108:22
**in-house** 2:14
7:3 103:21
127:16
**inaccurate**
17:18 65:17
78:3 117:7,11
**inadvertently**
138:23
**inception** 32:24
33:1
**include** 20:18
30:10 31:6,14
31:15,16,19
35:14 83:20
84:13 112:16
123:8,15
124:13 131:12
**included** 59:17
76:1 122:15
125:16 141:5,9
**includes** 31:20
120:7
**including** 13:15
106:19 107:11
116:24 119:20
**indicate** 4:13
119:22
**Indirectly** 39:20
**individual**

105:21 109:14
122:18
**individual's**
105:18 109:13
**Individually** 1:3
144:10
**individuals**
35:12 129:3
138:9 139:3
**industries** 80:20
**industry** 48:7
93:3,20
**infer** 108:4,7
**inferences** 17:3
17:4,23,24
**inferring** 59:3
**Infor** 27:15,16
27:17,18,20,20
27:22 28:1,2
28:12 80:13
**inform** 53:15
**information**
12:15 13:5
14:19 15:12
21:19 22:4,6,8
23:6,9,17,18
24:4 28:22
35:7 36:6
37:19 55:13
57:10,11,15,16
59:3,12,17
61:13 75:16
76:2 78:16
87:10,13,14,15
88:10,11 89:23
99:16,20,23
103:7,16 105:2
105:6,10,16,17
106:5,11,19,24
107:7,19,20
108:9,24 109:8
109:8,11,23
112:17 113:8
113:12 116:9
116:17,22
117:23 118:14
118:15 120:16
120:21 121:14
121:22 122:2,8

122:12 123:10
123:14 124:2
124:12,14,18
124:19,21
125:2,17,20
126:1 127:12
127:24 134:10
137:21,22
140:20 141:3
**informed** 100:10
100:12 113:2
**initial** 24:17
91:6 98:24
**initially** 101:16
**initiative** 133:2
**input** 51:5
**inquiry** 83:4
**inspected** 98:5
**install** 6:19
23:20
**installed** 46:1
49:15
**instance** 143:4
**integrated** 30:5
**intended** 33:20
**interact** 76:24
**interest** 123:2
**interested** 145:5
**internal** 6:17 8:3
41:8 114:17
116:1,3,4
126:16
**internal/exter...**
79:19 109:3
**internally** 42:18
84:4,16
**internet** 54:6
72:14 76:14
**interpretation**
109:2,2 125:24
**interpreted**
124:3
**interrupt** 90:24
**introduce** 88:19
**introduced**
41:12 68:7
73:2 88:23
102:21 118:24
126:22 129:14

**invasive** 97:22
**inventory**
110:19
**inverse** 24:11
**inversely** 138:21
**involved** 9:12
13:9,16 14:5
101:3
**involvement**
80:6
**IP** 38:23 46:7,8
46:19,21 47:1
98:19
**iris** 105:19
109:18
**irrespective**
24:9
**isolation** 94:10
**issued** 46:19
**item** 116:18
**items** 6:20

___

**J**
**J-A-I-M-I-N**
44:23
**Jaimin** 44:21
**James** 80:3
**January** 1:17
144:5
**Jeff** 45:11,13
**Jim** 80:3
**job** 30:22 48:5,5
**Joe** 16:9 40:6,15
**Joe's** 40:7,9
**John** 38:7 130:3
130:7
**Johns** 1:3 5:12
129:6 134:11
134:24 135:18
144:9
**Johns'** 134:13
**Johns-Paycor**
41:19
**Johns/Paycor**
3:9,10,12,13
3:14,15 41:4
67:23 118:19
**Johns_000122**
131:5

**joined** 100:2,2,7
**Juan** 1:3 134:11
134:14 136:20
141:6 144:9
**June** 72:23

___

**K**
**Katie** 8:23 41:3
41:22 67:22
**Katy** 43:20,21
118:18 129:6
**keeping** 28:16
33:24
**Kellin** 1:3
134:10,13,24
135:2,18 144:9
**Kellin's** 134:18
**kept** 101:10
134:1,2
**key** 81:4
**kind** 20:10 25:2
31:1
**know** 6:11 7:6
7:23 10:6,9,14
10:19 11:5,17
11:19,20,24
12:8 14:2 15:6
15:14 16:4,6
16:10,13,20
17:6,16,21
18:18,21,22
19:19 20:6,8
21:24 23:11
25:8 30:24
36:8,10,24
38:16,22 40:12
42:22 43:5
44:14 45:10,12
45:13 46:6
53:14 54:1,12
61:4,20,22
62:16 68:17,19
69:21 72:8
73:1,5 76:12
79:7,12,15,16
79:17 80:14,24
81:18,23 82:1
82:3 83:5,10
83:11,17 84:15

85:8 87:22
88:6 90:16
91:2 94:9 95:1
96:22 97:7
98:7,18 99:15
99:17 100:21
101:1,14,18,21
104:2,4,5
105:24 106:3,4
109:1 111:1
112:23 113:1
113:21 114:14
114:20,23
115:2,3,9
116:7,9,9
117:10 118:7
124:1,4 125:11
126:9 127:7
130:6 132:2,6
132:16,21
133:5 134:8,9
135:14,17,21
137:3,23
141:23,24
142:2
**knowledge**
78:17 82:13
**known** 93:19
**Kronos** 29:9,12
30:3,9,14,18
54:1 80:13,16
80:17 81:3,5,6
81:7,15,19,21
81:23 82:1,2,3
82:6
**Kronos'** 30:5
81:7

___

**L**
**L.L.P** 2:7
**labeled** 41:7,19
115:23
**landmark** 97:15
98:10
**landmarks**
52:23 71:11
94:1,5 95:19
95:20,22,24
98:9 122:18

large 92:8
late 7:14
launched 70:11
 70:15 82:2
law 86:18
 112:24
laws 39:19
lawsuit 100:17
lawyer 40:13
 114:18 124:4
lawyers 7:21
learn 42:19
 78:18 99:19
 100:1,5
learned 78:20
 78:22 79:9,10
 100:4 101:6
 141:20
lease 111:13
leased 110:9,11
 111:11
leasing 111:15
leave 48:4
led 12:22 103:23
Ledbetter 30:17
left 56:4 111:15
 119:12
legal 90:9
 103:20 104:3
 107:22 114:17
 121:18 123:17
 128:16 140:10
legend 48:22
legislative 82:21
length 127:23
let's 5:15
level 98:16
leverage 21:4
 33:19 60:12
leveraged 21:11
leverages 47:7
leveraging 80:16
 96:24
Lexis 82:22
LICENSE 1:23
lieu 4:8
life 37:23
limit 142:23
line 28:6,11 44:9

57:3 64:24
65:7 71:14
95:2 137:11
lines 28:4,5 44:8
link 41:16 118:2
 118:3,15
 127:11,13
list 88:20
literally 118:16
litigation 79:8
 79:11,12,15,16
 83:19 88:8,12
 88:13 100:7,20
 100:21 101:7
little 16:15
 24:24 27:10
 58:12 73:21
 112:7 120:14
 123:11 139:1
live 8:19
lived 22:14
living 138:20,21
LLP 2:2
local 92:14
located 8:17
 20:7,15 22:15
 39:11 46:11
 47:2 51:20
location 17:5
 19:19 46:21,24
 92:9 134:14,19
 135:1,19 136:5
 136:9,16,21,22
locations 17:7,9
 19:8 96:2
 122:18 136:14
log 46:15 55:2,4
 55:6,12 56:10
long 6:12 8:12
 10:6 16:13
 21:9 25:24
 27:9,16 28:23
 32:23 33:10
 45:2 47:10
 101:14 132:19
longer 111:15
look 9:3 24:3
 40:22 45:15
 48:18,22 49:5

49:21 51:23
52:5 53:22
58:3 59:18
60:14 65:23
69:8 72:21
75:22 78:8
89:2,11,20,21
89:22 97:8,11
97:12 102:3
103:6 104:22
106:6 109:9,17
111:20 116:11
116:12,21
119:2,15,16,19
119:20,22
123:3 125:12
126:17 129:5
129:21 130:13
130:22 131:4,6
142:17
looked 6:18 15:6
 17:11,12 23:20
 24:2 75:2 83:1
 108:23 120:16
 130:17
looking 12:18
 16:24 47:18
 56:4 61:22
 64:24 69:24
 71:10 73:4
 77:13,20 95:1
 95:24 97:13
 98:10 108:16
 118:9,17 121:7
 123:1 129:10
 130:9,24
 138:17
looks 51:18
 56:10 78:9
 94:22 118:9
 119:21
lot 73:20 85:13
lower 143:4
lowest 143:1
Lumadime
 53:19
luncheon 117:18
Lyle 68:22 73:7
 73:8

Lyle's 69:3
——————
M
M-Y-E-R 16:12
main 46:16
 76:13
maintain 21:22
 34:21,23
maintenance
 112:8
majority 53:22
 80:15
making 40:23
manage 40:1
managed 28:4
 29:12 82:1
management
 13:13 25:21
 27:8 28:7 31:7
 32:11 40:10
 43:1 103:17
manager 18:23
 30:19 37:2,17
 40:5 50:21
 51:5,9 80:5
manager/supe...
 50:24
managers 13:2,9
 37:4 84:3
manages 110:19
Managing 65:24
 66:2
manner 4:13
manuals 14:22
manufacture
 44:12
manufactured
 30:8
manufacturers
 53:13
map 95:23 96:2
marathon 6:9
mark 68:2
marker 116:2
market 37:6,9
 57:1 132:6
marketing 43:8
 43:8,9,19
 52:11 68:24

117:8 131:23
 132:4
match 60:14
 61:20,21 74:19
 78:6 94:23
 97:1 125:8
matches 63:20
 78:5
matching 94:24
material 14:6
materials 13:10
mathematical
 96:4
Matt 4:18 7:3,16
 10:1 11:3,6
 29:5 116:7
matter 80:13
 90:16 114:2
Matthew 2:8
 7:24 71:23
 142:7
McCoy 13:18
mdahdaly@p...
 14:18
mean 32:13
 39:21 47:9
 58:24 78:11
 80:20 90:23
 111:16 124:21
 135:2
meaning 28:21
 37:7 39:22
 74:22 94:10
 124:22
means 6:10 29:3
 32:14 37:6
 46:3 48:1
 49:12 52:15
 53:15 74:21
 80:10 85:9
 96:21 97:21
meant 25:7 72:9
measure 96:8,9
measurement
 94:20
measurements
 47:19,20 65:21
 96:6,11,13
 106:9

**meet** 5:10 7:10
**meeting** 7:15 8:1
  8:6,9,11,12 9:3
  9:6,8
**meetings** 7:8 8:2
  8:4 9:7,11,13
  9:15,15 12:1,6
**members** 37:22
**memory** 9:20
**mentioned**
  15:13 16:23
  23:19 24:16
  25:17 27:2
  32:8 37:12
  38:9 44:9 45:1
  83:21 98:2
  99:23 127:22
  137:11 145:2
**mentions** 47:13
**menu** 51:1
**message** 75:20
  78:7
**met** 7:13
**method** 61:8,9
  61:12 62:4,5
  62:10,19 63:2
  63:11,11,12,13
**methods** 61:24
  62:2
**Michelle** 26:21
  26:23
**Michelle's** 26:21
**Micro-** 21:3
**microphone**
  73:22
**Microsoft** 19:24
  20:3,9,14
  21:17 54:18,23
  54:24 55:20
  110:6 125:14
  128:14 140:4
**Microsoft's** 21:4
  21:24
**middle** 100:3,9
  111:21
**million** 90:21
**mini** 143:15
**minutes** 8:13
  67:17 92:5

102:13
**missed** 55:9
**Missouri** 134:14
  134:18 135:1
  136:5
**misstates** 128:17
**mistaken** 45:4
  127:9
**MITCHELL**
  2:3 41:5,18,24
  68:1 88:21
  102:5,8,18
  118:21 126:19
  129:7,11
**Mitri** 1:11 3:3
  5:1 6:15 10:7
  11:12,17 16:11
  25:4 30:2
  40:23 41:6,13
  42:10 58:7
  64:11 67:22
  68:9 78:15
  89:2 102:9,24
  117:21 122:4
  126:24 129:16
  141:18 142:10
  143:9 144:6
**models** 70:9
**modern** 76:18
**module** 49:11
**money** 87:6
**monitoring**
  133:15
**Monthly** 130:14
**months** 10:8
**morning** 5:7
**move** 39:16
  55:21
**moving** 54:2
  64:3
**multi-region**
  20:3
**multiple** 9:7
  14:22 17:7
  59:4 65:1
  66:12 77:15
**mwolfe@shb....**
  2:10
**Myer** 16:9

**N**

**N** 3:1
**name** 4:14 5:8
  5:10 7:19 9:20
  9:21 10:2,21
  11:10 16:10
  18:15,16 21:3
  25:18 26:22,22
  27:15,18 32:4
  32:21 34:17,19
  36:21 39:1,4,5
  40:7 44:15,23
  45:11,12 58:4
  69:3 70:13
  74:15,15,17
  87:9 98:22,23
  103:7 110:24
  113:13
**named** 103:16
**names** 7:20 13:8
  19:12 31:24
  34:2 141:2
**narrow** 84:4
**nature** 15:11
**near** 28:4
**necessarily** 29:3
  85:2 138:13
**necessary** 22:9
  54:8 128:19
  131:13
**need** 6:11 23:11
  39:23 48:1,2
  72:14 112:21
  114:1
**needs** 47:24
  54:11 65:19,21
**network** 37:10
  46:4,14,15,19
  54:13
**never** 94:8
  135:19 137:5
**new** 70:11 72:8
  92:3 131:23
**Nexis** 82:23
**nice** 5:10
**nods** 6:2
**nomenclature**
  19:16 76:9
**non-active** 134:6

134:7
**non-exempt**
  136:6
**non-verbal** 6:2
**North** 2:3
**Northern** 1:1
  144:8
**noted** 60:21
**Notes** 59:19
**notice** 48:19
  62:13 66:12
  119:15 140:7
  144:24
**notify** 99:5
**notifying** 127:20
**November** 7:14
  8:10 27:11
**November-De...**
  8:6
**number** 15:7,8
  16:24 17:14,18
  17:22 23:2,12
  23:15 34:6
  48:19 51:6,6
  58:19 61:16,18
  62:14,17 73:15
  73:17 74:3,5
  74:11,12,14,23
  75:7,7 84:15
  94:14,17 96:5
  97:6,19 98:12
  102:6,7 103:11
  118:20 135:19
  135:24 136:10
  138:22 142:20
**numbers** 22:11
  42:7 87:10
  94:23 119:21
  120:1 125:4
**numeric** 94:3,4
  94:15
**numerical** 96:7
  96:12,15,17
  108:19

**O**

**oath** 4:8,20 5:3
**Object** 107:21
  121:17 123:16

140:9
**objection** 28:20
  90:8 122:3
  124:15 128:15
  140:21
**objections** 4:12
**obligation** 85:3
  85:21 93:14
**obtain** 13:5
  53:16 91:15,19
  128:21
**obtained** 89:24
**obtaining** 12:14
  97:17 140:17
**occur** 54:13
**occurred** 55:8
  55:14 75:2
  79:12
**occurring** 100:7
**occurs** 17:21
**offer** 11:4 91:2
**offered** 71:15
  81:23
**offers** 93:4
**officer** 26:5
**offices** 17:10
**official** 7:23
**Oh** 8:22 43:23
**Ohio** 20:11
  46:16,17 140:2
**okay** 5:7,15,17
  5:22,23 6:2,3,7
  6:8,14,22 7:2,8
  7:15,17 8:1,4,9
  8:14,24 9:3,6
  10:4,15,24
  11:3,6 12:1,12
  12:22 13:8,15
  13:24 14:4,11
  14:15,19 15:13
  15:21 16:23
  17:23 18:3,6
  18:18 19:7,12
  22:2,8 23:10
  23:16,19 24:15
  24:19,22,24
  25:7 26:17,23
  27:9,14 28:6
  30:10,20 31:5

31:10,24 32:3
32:8,19,23
33:3,5,10,14
33:22 34:9,14
34:17,20 36:1
36:4,16 37:24
38:8,15 39:13
39:16 40:3,9
40:12,17,22,24
41:3,13,17
42:16,22 43:2
43:5,11,23
44:3 45:1,5,7
45:15,15 47:4
47:9,21 48:13
49:5,10,14
50:9 51:11
52:2,9,13 53:7
54:2,14,23
55:1,15,21
56:6,23 57:3,9
57:19 58:21
59:21 61:24
62:7,15 63:8
64:3,9,13,20
64:23 65:13,22
66:3,7,15 67:4
67:15 68:19
69:21 70:1,4
70:17 72:2,12
72:16,21 73:4
73:8,17,24
74:7,11 75:5
75:13,16,19,22
77:1,19 78:10
78:15 79:1,1,4
79:7,24 80:19
80:24 82:13
83:7 84:17
85:19 86:13,16
86:21,23 88:7
89:2,20 91:5
93:10 95:20
98:7,24 99:8
99:11,15 101:6
101:10 102:3,9
102:22 103:2,6
104:2,12,22
105:11 106:3,6

106:18,23
108:13 109:15
110:1,11
111:20 112:7
113:4,6 114:4
114:20 115:5
115:22 116:6,6
116:16 117:21
118:17,21
120:6,6 121:24
122:24 123:7
123:11,23
124:6,10
125:22 126:17
129:2,5,23
130:19,22
131:9 134:1,8
134:17 135:2
136:18,24
137:13,23
138:14 139:22
140:4,6 141:2
141:5,13,15
142:3 143:8
**old** 33:13
**once** 51:8
  133:12 138:12
**one-to-many**
  60:7,10,11,23
  62:11 63:5,6
  63:16,23
  142:11,14
**one-to-one** 60:7
  61:8,12 62:12
  63:15 74:19,21
  74:22
**ongoing** 79:8
  101:7
**online** 42:22
  43:1 83:1
  119:3
**open** 15:20 42:3
**operate** 97:2
**operated** 135:1
  136:14,16
**operating** 76:21
  76:22
**opportunity**
  81:24

**option** 48:16
  51:4 66:18
  67:4 70:19
  86:7 87:20,21
  91:3 110:10
  111:13
**options** 51:1
  66:15 87:22
  91:3
**orb** 18:22
**order** 49:20
**orders** 143:13
**organization**
  13:4 16:5
  21:22 24:10
  27:7
**organizations**
  53:10
**originated**
  125:13,14
**Ortworth** 130:3
**outcome** 145:5
**output** 18:8
  94:21
**outside** 24:13
  46:17
**overlapped**
  132:24 141:7
**owned** 32:22,23
**owner** 33:8
  104:7
**ownership**
  111:18
**owns** 39:1,6

———————
**P**
———————
**p.m** 143:20
**package** 30:7
  93:10,12
**page** 45:15
  47:14 48:19
  49:2,5,21 52:5
  54:2 55:21
  56:2,3,5,6,19
  56:19 57:20
  64:3 65:18,22
  65:23,23 66:2
  66:4 69:9
  72:16 75:7,13

75:22 76:5
77:24 89:2,11
105:11 106:23
107:2 114:4,5
115:11 116:18
121:1 126:24
130:13,24
**paid** 22:16,17
  135:11,12,13
**pandemic** 58:9
**paperwork** 23:1
**paragraph** 65:2
  65:5 89:15
  106:6 116:23
  121:7,8 131:18
**paragraphs**
  89:21
**part** 16:1 18:7
  21:11 22:21
  23:3 24:15
  30:6,7 33:22
  35:13 44:3,8
  51:11 55:9
  57:3 59:13
  61:6 70:9 79:7
  81:6 93:4,10
  93:12 98:18
  99:6 100:9
  114:17 127:7
  127:10 133:2
  134:8 138:14
**participants**
  9:16
**participate** 9:14
  83:10
**participated**
  7:15 12:1 83:7
**particular** 34:15
  37:24 41:7
  43:12,24 44:11
  48:14 49:2
  50:2 51:11
  58:20,21,24
  62:3,5 71:14
  72:3 73:9 87:6
  87:11 112:4
**parties** 4:3,11
  37:11 145:4
**partner** 33:17

**partnership**
  29:12 30:3,4
**partnerships**
  29:9
**parts** 20:15
  45:16 82:17,18
  82:19 96:10
**party** 13:6,7
  32:10 38:12
  39:2,3 82:5
  100:24 101:3
  114:13 115:6
**passed** 98:11
**password** 36:5
**Pat** 13:18,20,24
  14:9 15:18
  18:21,23,24
**Pat's** 13:24
  18:21
**pay** 18:4 20:20
  87:14
**paychecks** 87:6
**Paycor** 1:7 2:14
  4:18 5:12 7:1
  7:22 10:7,19
  11:18,21 14:5
  14:24 15:22
  16:21 19:9
  20:10 22:22
  25:9,10,11,12
  26:6,18,23
  27:3,5,23
  28:10,12 29:16
  30:20 31:2,3,4
  31:12 32:22,23
  33:10,15 34:22
  35:4,4,17 36:1
  36:5 37:12,14
  37:16,20 38:1
  38:13,21 39:1
  39:5,8,18
  44:12,16 45:2
  45:8,13 49:14
  50:8 53:8,9
  54:12,18,22
  55:1,3,4 57:14
  66:16 71:13
  72:13 75:19,23
  77:13 80:9,12

81:12 83:14,24
84:18 85:21,23
86:6,9,17 87:2
87:9,16,18
88:1,4,9,10,14
89:16 90:2,21
91:7,17,19
92:19,24 93:2
93:4 98:5 99:4
99:4,12,15
100:2,24 101:3
101:14 104:6
104:17,19
105:5 106:2,15
107:10,14
110:3,5,13
111:22,23
112:1,4 113:7
113:17,18
115:16 116:23
117:3,24
118:10,11,15
120:11 122:14
123:14 126:18
127:16,20
128:2,7,11
129:17,19,23
130:1,10
131:20,22
132:9,21 133:5
133:8,22
134:10,23
136:17 137:3,5
137:20 139:18
140:2,6,17
141:2 144:11
**Paycor's** 9:17
32:18 46:15
54:14 63:3
86:13 88:9
91:15 93:15
101:11 106:18
107:19 108:10
109:23 110:14
111:15,24
120:20 125:16
126:4 127:4
137:6
**Paycor-specific**

32:17
**Paycor.com**
56:1,11 118:6
118:8
**Paycor.com/p...**
118:4
**payroll** 19:10
22:9 30:6 87:2
87:4 131:14,21
**PDF** 143:16
**peers** 13:3
**penalties** 89:12
**penalty** 4:10
**pending** 6:12
144:7
**Pennsylvania**
8:21
**people** 9:12
10:16 13:20
15:23 18:1,3,4
22:5,7 27:2
52:14 83:20
84:11,15 128:4
134:12 138:15
139:23 140:8
140:19 141:3,5
141:9,10
**percent** 95:9,11
95:12
**perfect** 102:14
**perform** 19:3,5
19:13,15 31:9
31:10,11,23
32:6 44:3,6
57:2,24 58:1
62:24 66:14
69:1 70:9
107:12 110:4
116:24 138:10
139:3
**Performance**
138:9
**performed** 48:3
74:22
**performing**
97:21 131:22
**period** 18:2
**periodically**
133:14

**perjury** 4:10
89:12
**permit** 67:12
**permitted** 7:7
**Pershon** 18:14
18:16,17 24:21
**Pershon's** 18:15
**persisted** 133:23
**person** 4:8 7:11
12:22 16:2
21:20 26:15
36:16 37:10
38:3 43:14,19
48:3,11 50:1
53:1 58:21,24
60:11 66:10,21
67:5 75:1
124:19
**person's** 74:17
121:22
**personal** 109:2
132:4
**personally** 21:18
21:20 88:2
127:19
**perspective**
12:15 13:13
38:22 52:12,16
**pertaining** 1:13
**Philadelphia**
8:20 10:14
11:2,13
**Philadelphians**
8:22
**phone** 76:20
**phonetic** 7:18
18:14
**photographic...**
95:3
**physical** 17:9
24:18 50:23
52:20 55:11
75:1 76:4
78:13 92:12
94:17 98:6
114:3 122:17
**physically** 4:4
46:21 48:12
52:21 54:9

60:18 81:8
82:10 90:20
94:24 96:23
97:2 122:23
**picture** 48:18,20
49:7 69:24
70:2 78:12
96:23 97:2
**pictured** 70:2
**pictures** 76:3
97:1
**piece** 61:13
**pieces** 133:18
**PII** 83:11
**Pitts** 1:16,23
144:3 145:10
**place** 4:2 8:5
46:2 47:23
55:5 61:5,6,7
78:4 82:7
133:15
**placed** 65:19
**places** 82:22,23
**placing** 73:10
**Plaintiffs** 1:5 2:6
5:11 88:14
144:11
**Plaintiffs'** 3:8
4:15,17 41:11
68:6 88:22
102:20 118:23
126:21 129:13
**platform** 1:16
55:20
**play** 29:8
**Plaza** 2:3
**please** 4:13 5:19
5:24 14:17
36:22 41:3,13
44:22 65:22
67:22 68:5
119:6
**point** 21:16
30:13 44:19
51:5,8 64:5
71:19 81:5
86:24 108:22
115:1 119:9
125:5,6 133:17

**points** 37:22
97:15 108:21
123:1 124:2
**policies** 15:11
79:22 99:7
104:20
**policy** 99:6,11
99:16,17,18,20
99:21,23 100:4
100:10,11,13
100:16 101:6
101:10,21
103:2,4,8,15
103:16 104:7
104:13,16,23
106:10,18,18
107:4,19
108:14 109:23
113:8,11,13,15
113:16 115:12
115:15 116:17
117:23 118:1,3
118:11,13,14
118:15 120:20
120:22 122:14
123:14 126:4,6
127:8,10,12
128:8 132:12
133:6,20
**portfolio** 27:8
31:7
**portion** 19:22
51:19 57:12
59:16 85:12
96:1,14 98:9
108:16
**portions** 92:10
132:11,13
**position** 10:12
10:16 16:14
25:20 30:18
36:24 49:24
65:20 80:4
**positive** 95:4,10
**positives** 17:15
**possession** 90:1
**possible** 5:16
73:21
**possibly** 7:14

**posted** 99:6
  101:16,24
**potential** 77:16
**practice** 132:22
  135:14
**practices** 127:4
**pre-stored** 61:18
**predates** 106:1
**predecessor**
  10:23
**preferred** 71:16
**prepare** 6:16
  7:10 12:2 43:9
**prepared** 6:20
  43:5 130:2
**preparing** 12:7
  12:9
**prerequisite**
  135:7 136:1
**presence** 125:9
  144:18
**present** 2:13 4:5
  79:17 145:1
**PRESENTED**
  3:8
**presenting**
  48:12
**pressing** 59:23
**presume** 36:4
**pretty** 9:16
  67:19 80:11
  119:16
**previous** 11:9
  120:15
**primarily** 6:24
  19:10 34:5
  112:6
**primary** 30:13
  31:1,3 71:17
  103:19
**print** 105:19
  122:22 125:6
**prior** 10:20
  11:11,14 27:17
  38:13 68:16
  128:17
**privacy** 39:19
  39:23 78:16
  83:10 113:11

113:15 118:1,3
  118:11,12,13
  127:4,10
**privacy@Pay...**
  127:5
**privacy@payc...**
  126:14
**privately** 82:4
**privileged** 50:22
  84:21
**privileges** 15:18
  66:9
**privy** 84:5 100:8
  132:23
**probably** 9:9
  19:15 20:4
  53:20,21 83:2
  91:3 100:3
  103:17 111:8
**problem** 9:2
  29:14 58:8
  116:13
**procedural** 6:20
**procedure** 1:12
  4:7 64:16
**proceed** 29:1
  77:11,18 109:1
**proceedings** 4:2
**process** 13:17
  50:18,20 56:15
  56:17 65:14,15
  65:18 79:13
  80:6,11,20
  87:4 92:24,24
  93:2 98:15,17
  110:14 125:15
  133:10,12
**processed** 111:2
  111:6
**processes** 87:2
  94:20 133:14
**processing**
  110:14 131:14
**procure** 53:13
  53:24
**procures** 54:1
**produce** 53:21
**produced** 76:3
**produces** 98:12

**product** 6:18
  13:2,9,13 14:1
  25:21 26:5
  27:7 28:4,5,6
  28:11 32:18,24
  33:8 34:19
  35:15 37:5,6,8
  38:8,20 39:9
  40:5,10 44:8,9
  57:3 71:14
  80:5 83:18
  84:8 137:7,11
**products** 31:4,5
  40:20 131:23
  137:6
**profile** 17:1
  20:21 67:10,13
  80:21 112:16
**profiles** 36:9
  58:15 80:8
**program** 34:15
  35:19 76:17,19
**programs** 28:17
**progress** 40:24
  84:3
**proprietary**
  98:4
**prospects** 42:21
**protection** 83:11
  99:20 113:12
**provide** 33:19
  34:5 35:4
  57:17 58:18
  61:12 76:10
  85:9 87:20,21
  92:21 112:21
  113:23 140:7
**provided** 13:21
  19:23 20:2
  39:2 53:6
  79:22 80:18
  81:9,10 109:3
  130:10 137:8
**provider** 32:19
  82:9
**provides** 33:23
  35:3 75:21
  86:6 120:20
**providing** 60:13

**provision**
  111:17
**provisioned**
  35:21
**proximity** 47:5
  47:23 48:23
  50:7 56:17
  69:22 70:3
**PT** 32:2,2 42:15
  43:24 44:1,5
  49:16,16 69:11
  69:12,12 70:14
  72:2,4,8
  130:15
**PTX** 143:16
**public** 43:3
  103:2,4
**publicly** 115:12
  115:22 116:9
  127:8 128:8
**publishing**
  115:21
**pull** 58:12
**punch** 59:22
  72:18 136:7
**Punching** 77:21
**purchase** 44:16
  111:12,14
**purge** 15:12
  133:3 134:2
**purged** 132:13
  132:16,17
  133:24 134:5
**purging** 15:11
**purpose** 42:16
  45:23 104:13
  104:15 106:10
  117:9 127:23
**purposes** 41:8
  42:5 91:18,23
  120:22 122:14
  123:13 131:21
  131:22 132:4
**pursuant** 1:12
  4:6 107:18
  144:24
**put** 36:14 37:6
  41:4 68:1
  74:23 94:2

96:4 111:7,8
  119:5 125:3

---

**Q**
**queries** 15:3,13
  15:14,17,20
  16:23 18:7
  19:1
**query** 35:13
  59:13
**question** 5:20,22
  6:5,12 60:17
  98:24 117:22
  123:12
**questions** 7:8
  28:23 29:2,15
  43:16 127:4
  142:4
**quick** 67:19
  117:22
**quickly** 77:19

---

**R**
**R** 1:16,23 144:3
  145:10
**R-I-E-D-M-E-R**
  36:23
**radio** 47:7 69:20
**ran** 15:14
**range** 142:21
**rate** 95:4
**rationale** 132:23
**re-enroll** 92:2
**read** 47:11
  82:14,15,17,20
  82:21 99:17
  109:5 119:13
  128:19
**read-only** 58:18
**reader** 47:5,14
  48:7,8,8,9,9,23
  49:15,23 52:3
  69:20,20,23,23
  70:18 130:20
**readers** 69:16
  70:6,10 86:4
  87:19
**reading** 89:19
  90:4 109:9
**Ready** 31:9 38:9

38:11,12,15,17
39:1,3,5,9 68:9
**real** 77:19
126:17
**reality** 53:11
91:8
**really** 6:19
23:11 24:5
65:22 77:16
84:4,5,7 85:11
85:13 92:20
114:1 121:15
**reason** 52:9
63:23 71:13
87:18 115:23
123:23 126:10
**reasons** 85:4,19
86:16
**recall** 7:19 10:22
18:15 23:1,6
23:15 26:21
33:4 78:23
100:15 110:24
113:1,3 115:10
**receive** 90:17
**received** 23:8
**receiving** 128:2
**reciprocity**
17:14 138:19
**recognition**
96:22
**recollection**
33:12 136:23
**reconvene**
117:16
**record** 4:14 5:21
17:20 41:18
49:18 50:2
51:8 62:21
67:21 111:1
117:21 135:8
136:4
**recorded** 133:12
**recourse** 125:11
**recreate** 125:6
**redistribute**
17:8
**reduced** 144:19
**refer** 19:18 79:1

118:10
**reference** 31:18
**referenced**
73:15
**references** 56:23
69:11
**referred** 19:13
19:17 28:24
48:7
**referring** 6:23
11:12 66:8,16
107:3 112:2
121:15
**reflected** 104:20
**refresh** 9:19
**refusing** 66:7
**regarding** 21:19
58:19 63:9
84:11 88:1,5
93:19 101:4
127:4 128:4
140:7,19
**regardless** 63:10
105:17 109:12
**regards** 29:9
53:8 81:1,3
86:24
**register** 59:23
92:11,13 135:4
**registered** 46:22
59:6
**related** 15:1
54:10 79:11
83:8 100:21
101:7 134:3
145:4
**relation** 100:17
**relationship**
33:1,13,22
35:2 85:4,24
87:1 90:19
110:12 128:23
132:8,14 133:3
133:13,21
134:21 140:15
**relative** 13:7
20:23 84:8,9
97:9
**release** 128:3

**reluctant** 126:5
**remained** 90:1
**remaining** 9:15
**remark** 41:9
**remember** 9:8
10:15,24 18:13
24:19 34:4
78:20 79:4,24
82:24 98:21,23
100:12 142:12
**remote** 76:15
144:18
**remotely** 1:14
4:2,6 5:4 7:12
8:14 9:10,11
76:14 144:5,14
**remove** 133:18
**removed** 32:16
111:22 141:8
**rental** 130:15
**repeat** 131:3
**rephrase** 6:6
19:6
**replace** 10:11
16:16,18 45:7
72:9
**replaced** 10:9
32:16
**replacement**
91:24
**replicate** 91:17
92:14 125:1
**report** 16:6 18:6
18:9 25:18
26:2 114:20
**reported** 1:23
25:22,24 26:8
26:17 27:1
144:17
**reporter** 1:17
4:3 5:21 6:1
73:19,24
128:18 143:12
143:17 144:4
**REPORTER'S**
144:1
**reporting** 4:6,13
22:11
**reports** 17:16

18:21,22,23,24
26:11 40:4
79:18
**represent** 5:11
**representation**
94:3,5 108:20
121:22
**representations**
106:8
**representative**
130:8
**representatives**
37:21
**Representing**
2:6,11
**represents** 52:24
120:2,3
**reproduced**
52:21
**request** 36:14,17
77:9 78:23,24
79:5 111:7
**requested** 13:5
**require** 87:19
91:12
**requirement**
85:11
**requirements**
49:13 51:14
**requiring** 85:5
92:11
**research** 12:12
13:9,23 14:5
79:20 83:18
126:9 134:9
136:20
**researching**
12:10
**resell** 32:11 33:9
**reside** 8:20
82:10
**residency** 22:18
**resides** 71:9
91:9
**resistance** 97:8
97:10
**resold** 30:6 39:6
**resolution** 143:1
143:5

**resolved** 141:21
**resources** 13:14
16:6
**respond** 11:7
**responses** 6:1,2
13:6
**responsibilities**
39:17
**responsibility**
39:19
**responsible**
15:23 16:5
27:7 37:10
39:22 43:8
57:12 69:1
110:18,23
133:8
**restore** 112:22
**result** 97:18
**results** 55:5
**retain** 111:18
**retained** 121:4,9
121:15
**retention** 132:12
**retina** 105:19
109:18
**retrieve** 61:17
**retroactively**
134:5
**return** 111:16
**returned** 111:2
111:5 132:11
**reveal** 84:21
**reverse-engin...**
94:6
**reviewed** 6:17
100:10
**reviewing** 77:20
**revision** 73:3
101:19,20
114:6
**revisions** 34:7
**RF** 48:8 56:17
69:12,19
**Riedmer** 36:20
**right** 8:15 20:16
23:17 24:16
27:12 28:9
35:15 37:14

38:9 49:3,8,16
52:5 56:1 57:7
58:6 60:17
61:9 65:10
77:7 86:1 87:5
96:7,20 101:23
106:3 111:10
121:12 124:7
127:9,11 128:9
128:10 130:2
131:21 134:1
135:12 138:4
**rights** 57:17
**Riverside** 2:3
**Rob** 26:14 84:15
**Robert** 13:11
26:16
**role** 29:8 39:17
66:13 104:10
**roles** 66:12
**room** 4:5
**Roughly** 16:15
**RPR** 1:23
145:10
**rstephan@ste...**
2:5
**Rule** 4:7
**rules** 1:12 5:16
**run** 15:3,16,18
15:20 19:1
123:5 133:12
**running** 76:17
76:19 133:15
**Ryan** 2:2 4:17
5:11 26:3,9
28:19 29:6,13
40:4,12 64:5
84:14 100:14
102:5 129:7

————————
**S**
**S** 3:7
**S-A-U-R** 40:8
**S-I-N-G** 44:24
**safety** 92:21
**SAITH** 143:18
**salaried** 113:22
135:9,10,22
**sales** 21:23 37:7

130:7
**salespeople** 37:8
**salesperson**
78:23
**Sally** 11:11,14
11:20 84:14
100:15 104:4,9
**Saur** 40:6,15
**save** 92:1
**saw** 82:12,19
**saying** 10:22
21:2 123:21
**says** 48:23 56:5
65:1 69:22
72:18,22 74:12
74:18 75:23
89:23 103:7,19
104:7 105:1,16
106:7 107:6
108:9,12
118:10 120:9
121:4 125:21
127:3,12 130:2
131:5,20
**scan** 17:20 18:5
20:21,23 28:18
30:11 31:21,21
31:22 36:11
38:18 50:17
52:12,18 53:16
60:12 61:14,19
63:20 74:6,21
75:1,2 78:13
80:11 85:6
90:16,22 94:19
105:19,20
106:16 108:16
109:18,19
123:9 124:1
125:4 136:12
139:24
**scanned** 60:4
63:21
**scanner** 47:18
51:17 54:1
70:19 71:8,14
71:16,16 73:14
125:10 138:1,2
139:5,6,20

**scanners** 15:5
53:11
**scanning** 48:24
51:10,12 59:7
61:17 70:12,24
71:6,7 75:1
94:19
**scans** 15:9 32:1
52:4 119:11
120:7,11,13
123:8,15
**scenario** 60:7,8
**scenarios** 60:7
**Schlage** 137:4,5
137:6,7,23
**Schreimann**
3:11 89:4
**scope** 77:9 84:4
85:8
**screen** 57:21,24
58:1,11 75:12
75:17,20 76:4
76:13
**scroll** 118:13
**seal** 145:7
**search** 22:21
63:8 138:14
**searching** 63:18
**second** 9:6 25:17
26:15 41:5
58:7 61:8 65:5
66:1 68:1,4
69:4 86:3
87:18 119:6
126:19 129:9
137:11
**Secondarily**
85:15
**secrets** 98:19
**section** 56:7,24
57:6,7 58:3,14
59:19 65:24
66:7,8 73:9
75:14 77:20
104:13,22
105:13 107:2,4
109:7,7,10,22
111:20 114:4,5
116:16 117:7

127:3 131:16
131:17,17,18
**security** 22:11
57:7 87:10
**see** 43:14 44:1
45:18,21 47:15
51:24 52:6,21
54:5 55:7,13
56:8,12,13,21
57:22 58:14
59:19,24 64:14
64:18,21,22
65:3,6,11 66:5
66:18 69:13
72:18,22 73:12
74:9,18 76:24
78:2 89:3,5,9
89:13,18 90:3
90:4 103:9,12
104:14 105:3
105:14,15,16
105:22,23
106:7,12,13,21
106:24 107:2,5
107:8,16
108:23 112:10
112:14 114:7
114:10,11
115:7,8,13
117:4 118:14
119:14,24
120:1,17,23
121:3 124:24
125:8 127:3,18
127:19 130:4,5
130:15,23
131:8,10,20,24
132:1
**seeing** 129:8
**seeks** 90:8
107:21 121:17
123:16 128:15
140:9
**seen** 82:18 88:16
88:18 98:5
103:1
**select** 63:23
**selected** 71:18
**sell** 37:5,11

**sellers** 42:19
**selling** 37:8
38:14
**sends** 87:5
**sense** 33:18 95:1
**sensor** 65:20,20
73:11 78:4
97:8
**sensors** 53:13
97:11,12
**sent** 18:11,13
91:24 110:13
**sentence** 89:22
**separate** 31:8
33:6 134:20,22
136:4
**separately** 135:5
135:7 136:14
**September**
100:4,9 113:9
128:9
**sequence** 67:23
**series** 34:5 42:15
97:1
**servers** 19:20
20:15 91:20
**service** 19:23
20:2 33:19,21
39:2 89:8 93:9
104:19,21
**services** 33:19
38:2 82:22
90:21 93:4,7,8
110:22 111:16
112:6,20
130:14 131:22
131:23
**set** 38:19,21,24
96:3 99:7
108:20 126:4
145:6
**sets** 66:13
**settled** 141:22
142:1
**settlement**
141:23
**setup** 20:3
**seven** 132:12
**share** 42:20

**shared** 104:17
  104:18 105:18
  109:13 134:23
**sheet** 42:18
**ship** 17:7
**shipping/recei...**
  110:20
**SHOOK** 2:7
**Shorthand** 1:17
  144:3
**shortly** 79:12
  100:2
**shot** 57:21,24
  58:1,11
**show** 17:23,24
  67:22 75:11
  118:18
**showed** 68:16
  101:20
**showing** 68:11
**shown** 42:11
  76:13 78:12
**shows** 46:20
**side** 13:4 14:5
  119:5,5,12
**signature** 97:10
**signed** 89:12
**signify** 44:5
**Silk** 53:20
**similar** 38:19
  53:17 63:19
  80:8 81:12
  109:24 119:17
  119:19
**similarly** 1:4
  5:24 46:18
  97:5 120:19
  144:10
**simpler** 63:24
  139:1
**simply** 59:22
**Sing** 44:21,23
**single** 95:1 96:5
  143:2
**sir** 49:17
**Siro** 7:18
**sit** 108:13 124:6
**sites** 82:21
**situated** 1:4

144:11
**six** 10:8 12:4,8
  21:12 33:13
**size** 142:19
**skeptical** 126:11
**skepticism**
  126:7
**skin** 71:12 97:14
  97:15
**slightly** 49:7
  95:13
**smaller** 53:21
**Smith** 71:23
**smoothly** 5:16
**Sneed** 58:5
**social** 22:11
  87:10
**soft** 71:8
**software** 12:17
  12:18 18:20
  19:9 28:17
  31:16 32:3,6
  32:15 34:15,21
  34:23 35:9,18
  36:9 37:11,13
  39:6 54:15,17
  54:21 55:16,19
  59:10 61:6
  72:13 80:22
  81:9,10 82:22
  91:15 107:12
  107:13 111:24
  117:1,2 139:18
**sold** 14:24 30:8
  38:13 110:9
**solution** 15:4,12
  30:5 32:11
  38:12,17 43:1
**solutions** 30:6
  31:8 39:24
  82:2
**somebody** 15:15
  15:20 64:1
  83:4
**someone's** 58:4
  96:6
**soon** 92:4
**sorry** 10:1,13
  20:1 21:1

25:17 43:18
  55:9 60:21
  66:1 68:3
  69:20,24 73:19
  90:23 102:8
  122:4 129:7,11
  131:1 132:7
  138:18
**sort** 24:7 28:8
  36:4 38:15,22
  79:8 93:19
  98:19 110:23
  113:7 128:3
  129:18 131:14
  140:18
**sound** 27:12
**sounds** 102:17
  128:10
**South** 2:8
**space** 17:5 46:20
  53:23
**speaking** 119:16
**special** 15:17
**specific** 13:5
  15:21 21:24
  23:11 48:3,5
  50:5 52:23
  54:20 65:20
  66:10 95:23
  96:3 97:19
  98:8 99:9
  108:20 118:7
  123:1,3 125:10
  127:22 133:18
**specifically** 16:4
  21:12 24:1
  28:2 37:16
  48:16 53:7
  61:7 64:24
  80:1 81:20,23
  83:9 99:21
  108:8 116:21
  142:18
**specifics** 7:14
  20:8
**specifies** 119:13
**spell** 10:2 16:10
  21:7 36:21
  40:7 44:22

**spend** 29:19
**spent** 12:6
**spoke** 113:11
**spreadsheet**
  23:5,8 24:16
  24:18
**staff** 37:21
  113:22
**stamp** 73:6
  131:1,5
**standard** 80:11
  80:19 93:3
  129:18
**standing** 28:19
**star** 119:23,23
**start** 25:12 48:5
  104:5 137:9
**started** 8:10
  9:18 10:19
  26:18 132:21
  133:6
**starting** 65:24
  103:5 119:22
**starts** 41:21,22
  41:24 56:18
  66:3 69:4
**state** 82:20
  108:8 138:22
**state-specific**
  24:3
**statement** 60:2
  85:20 90:6
  91:5 117:11
**statements**
  108:15
**states** 1:1,13
  24:1 89:7
  107:10 109:23
  116:23 138:20
  144:7
**static** 9:16
**stating** 4:14
**status** 22:18
**statute** 78:21
  79:2,10,11
  82:14,15 109:5
  109:18
**stenographica...**
  144:17

**step** 56:18,20,23
  73:12,17 74:3
  74:5 75:7
  78:12
**Stephan** 2:2,2
  3:4 4:16,17 5:6
  5:11 10:1,4,5
  11:3,16 29:5,7
  29:17,23 30:1
  41:3,23 42:4
  64:7,10 67:15
  67:18,21 68:8
  74:2 85:18
  88:19 89:1
  90:12 102:7,17
  102:23 108:6
  116:7,14,15
  117:14,20
  118:17 119:1
  121:23 122:4,9
  123:22 124:20
  126:23 129:1,9
  129:15 140:16
  141:1,13,17
  142:3 143:9,14
**steps** 65:14
**Steve** 84:14
**stock** 78:12
**stop** 48:5
**stopped** 38:14
**storage** 19:8
  20:2 21:5,13
  91:18 92:14,20
  105:1 106:24
  107:6 112:8
  116:22 120:5
**store** 80:8 91:20
  93:23 94:4,16
  97:3 105:9
  107:20 117:8
  125:18 140:1
  142:24
**stored** 19:23
  36:11 55:16,18
  58:20 60:18
  80:11,21 87:16
  88:10 90:1
  93:22 94:21
  96:18 98:11

105:18 107:14
109:12 117:2
128:13 137:14
139:22 142:18
**stores** 105:5
**strategic** 31:4
**strictly** 69:19
**structure** 15:24
**subdivided** 24:8
**subject** 79:17
86:19
**subjecting** 90:14
**submit** 51:10
61:16 94:18
**submitted** 23:1
88:8,16 98:18
**subsequently**
100:10 141:11
**subset** 51:17,23
83:12 94:1
96:1 122:12
**success** 78:7,9
**sued** 133:5
**suit** 49:12 145:4
**Suite** 2:4,9 19:5
19:14,15
**summarize**
20:10
**summer** 101:17
102:1,2 132:20
132:22
**supervisor**
50:21
**supervisor/ma...**
51:3
**supply** 53:12
**support** 21:23
42:19 79:6
112:6 126:14
**suppose** 76:7,22
78:7 81:5
**Suprema** 53:19
54:1
**sure** 5:9,18 7:9
11:8 13:23
25:1,3 41:2,5
42:9 43:17
56:4 58:13
65:4,8,12

67:18 84:23
105:4 106:22
108:12 109:6
109:21 116:10
116:12 117:17
119:7,21 121:8
126:19 131:4
133:14,15
137:2 138:7
141:19 142:7
143:17
**surface** 96:1,13
**SwipeClock**
39:7
**switches** 46:16
**sworn** 144:14
**system** 61:17
76:21,23
103:18 111:23
112:1 120:5

---

**T**

**T** 2:3 3:7
**tabular** 18:8
**tagging** 120:4
**take** 6:1,11,12
8:5,12 31:20
31:22 38:17
52:18 61:5
64:8 65:21
67:16,18 96:23
102:13 117:14
123:4 125:5
141:13
**taken** 1:14 67:20
96:11 117:19
139:24 141:16
**takes** 61:4,7
94:19
**talk** 29:15 35:11
93:14 110:3
117:12
**talked** 106:14
114:24 120:10
120:14 124:10
131:13 138:6
**talking** 7:2 19:2
20:19 44:7
55:24 56:16

75:10 95:14
99:22 110:4
116:18 121:13
122:20
**talks** 45:20 47:5
52:2,6 54:5
56:14 59:21
60:6 64:13,16
73:10 89:15
105:13 111:21
112:1,8,12
115:11 131:9
**tasks** 15:19
97:21
**tax** 17:13,14,15
22:9
**taxation** 20:22
138:19
**taxes** 17:16 18:4
20:20 22:16,17
131:14
**team** 14:7 40:2,3
40:19 42:19
43:8,12 83:18
109:4 110:22
110:23 111:8
112:6 114:17
126:16
**teams** 22:1
**technical** 12:15
15:2,11 19:16
52:12,15
**technically**
27:19
**techniques**
97:16,18
**Technologies**
71:20 77:7
**technology**
12:16,20 13:7
15:1 28:24
34:8 38:22
44:15,17,20
53:17 71:1,3,6
72:5 80:16
97:6,20
**tell** 6:15 12:5
13:8 14:17,21
17:21 22:19

25:4 27:4
29:11 30:2
31:24 37:4
38:23 42:13,17
46:10 47:1
49:14,22 58:17
59:5 60:10
61:11 68:14
69:5 73:1,4,18
74:3 77:10
94:8 102:5
103:14 108:2
115:18 117:23
124:23 125:13
128:7 130:9,12
**tells** 103:15
**template** 18:5
20:24 38:18
50:22 52:22
55:15,18 60:15
60:24 61:18,19
67:8,14 75:3
78:6 91:9,15
91:22 92:17,17
92:19 93:23,24
94:9,10,17,21
94:22 95:14,21
96:7,12,16,18
106:16 117:8
121:5,10 123:6
125:3,7,8,18
134:10,12,13
134:15,18,24
136:11 139:19
139:21,22
140:1 142:16
142:20 143:5
**templates** 21:14
36:11 58:19,22
59:4 60:15,18
60:22 61:1
63:18 66:22
67:6 80:11
92:3,14 94:23
106:8,10,15,20
107:13 111:22
117:2 120:21
132:15,17
133:19 134:6

137:14 141:10
142:18,24
143:3
**term** 28:20 29:3
**termed** 106:4
**termination**
111:9 132:14
132:18 133:3
133:11,13
**terminology**
52:11 59:9
**terms** 9:16 15:7
84:3 104:19,21
**testified** 5:3
93:18 121:14
142:10
**testify** 144:14
**testifying** 103:3
**testimony** 4:9
93:13,21
128:17 136:13
144:16,21
145:6
**Texas** 11:11,15
14:3
**text** 75:21 76:5
76:12,16 77:3
**thank** 4:16
14:19 21:6
69:6 73:24
90:11 116:20
142:4,5 143:9
143:11,12
**Thanks** 29:6
42:10 143:17
**thereof** 96:14
145:5
**thing** 39:16
116:8 118:16
131:14 141:19
**things** 5:16
23:19 87:11
95:3 110:2
133:16 138:5
141:18
**think** 12:10 14:4
23:12 25:7
28:22 29:19
32:12 41:21

45:1 55:24
66:3 77:23
81:4 83:9
84:13 85:19
86:21,23 88:20
95:23 98:16
102:7 108:22
114:24 115:23
117:6,12 118:3
118:18 119:4
121:14 122:11
128:6 137:10
141:14 143:1
143:10
**thinking** 85:14
**third** 6:4 13:6,7
32:10 37:11
38:8,12 39:2,3
82:5 86:6
**third-party**
128:13
**thought** 99:22
**thousand** 60:18
142:22
**three** 10:8 31:8
44:8 53:20,23
69:11,22 70:4
70:18,21
**ticket** 15:20
**tie** 17:4
**tight** 137:1
**time** 10:13 12:6
12:20 14:23
19:3,10 21:13
28:15 29:19
31:9,9,10,11
31:12,19,20,23
32:6,8,10,20
32:21 33:9,24
44:4,6 45:5,6
50:2 56:23
57:2,24 58:1
69:2 70:9 73:6
79:14,20 83:6
86:22 92:9
100:11 101:23
104:2,10
107:12,13,14
110:4 114:21

115:20 116:24
117:1,3 121:4
121:9 127:23
128:7 133:9,17
133:23 135:23
137:4,6,7,8
138:9,10 139:3
142:11,14
**timed** 143:10
**times** 42:8 65:1
82:6 84:3 90:1
**tip** 51:13,23
52:23 98:9
**title** 13:24 18:18
26:4 37:3 40:9
40:11 56:2
98:22,23
**to-wit** 144:4
**today** 5:8,17 6:5
6:10 12:2
26:22 31:8
42:8 54:12
79:2 108:13
137:10 141:8
143:10
**today's** 6:16
7:11 12:7,9
42:5
**told** 100:15
**top** 23:2 43:24
103:6,6 130:2
**topics** 97:23
**Toronto** 8:18
**total** 12:3 18:1
**track** 31:12
**trade** 98:19
**trademarks**
32:15
**train** 64:1
**training** 83:11
**trainings** 83:8
**transaction**
135:24
**transactions**
48:2 55:7,14
**transcript**
143:13 144:21
**Transcription**
144:20

**transited** 23:7
**transmission**
54:13
**transmit** 47:8
**transmitted**
54:11
**treating** 15:24
16:1
**trick** 6:4
**true** 80:24 81:3
81:18 144:20
**truth** 144:14,15
144:15
**try** 5:19 6:7
125:7 138:24
**trying** 6:4 15:7
23:6 121:12
122:7 126:2
**Turtola** 80:3,3
**two** 27:10 37:6
43:24 60:6
64:1 89:20
90:21 91:23
94:23 95:3
141:18
**two-minute**
141:14
**two-thirds** 57:20
**type** 12:20 19:10
48:8,9 71:14
83:11
**types** 45:3 69:11
70:8 130:10
**typewriting**
144:19
**typical** 18:9
54:12

**U**

**U.S** 20:5
**Uh-huh** 109:16
**Ultimately** 40:4
**underneath**
69:21 71:11
97:14,15
107:10
**understand** 6:6
21:1 24:5
29:17 32:13,18

33:14 52:14
91:5 121:24
124:4,12 126:1
126:2 134:3
**understanding**
29:1 53:2
127:15,17
**undetermined**
144:7
**unique** 97:10
**uniqueness**
97:17
**unit** 111:11
**United** 1:1,13
144:7
**universe** 142:15
**update** 76:21,22
77:3
**updated** 68:15
68:17,18,20,21
72:22 73:7
**updates** 73:5
76:18
**upper** 142:23
**URL** 36:3 118:7
**usage** 138:13
**use** 12:20 13:7
15:5 29:2 39:9
42:18 47:10
50:3,6,10,13
50:17 51:12
52:10 62:19
63:11 85:6,12
86:3 87:19,23
91:22 92:4,13
92:18 94:7
96:21 97:7
103:17 107:11
107:12 113:18
116:24 117:1
122:19 124:14
124:18 131:21
135:3 139:11
140:19
**user** 14:22 46:17
47:9,24 48:1
48:13 50:24
51:3 62:3,5,9
74:6 75:4

76:24 105:5
128:23 135:20
95:17
**user's** 74:15
95:17
**users** 50:3,9
111:23 112:2
127:21 128:12
128:12 132:2
140:14
**users'** 67:5
107:20 133:20
**uses** 52:23 53:10
64:20 65:5,7,9
111:15 129:19
**utilizing** 111:23

**V**

**v** 5:12
**vacant** 10:12
**validate** 50:24
60:4 62:6,12
**validation** 63:20
**value** 52:24
94:10,15 96:17
**various** 14:23
24:1 84:3
104:20
**vast** 80:14
**vein** 71:7
**veins** 71:11
97:13
**vendor** 28:3
32:14 70:24
71:2,15 72:2,5
75:18,21 76:1
76:6,7 77:6
**vendors** 13:6
53:6,9,12,12
53:17,18,20,21
53:22,23 77:15
80:12 123:2
141:24
**verbal** 6:1
**verbally** 4:9
14:13
**verbatim** 23:2
109:24
**Verify** 74:18
**version** 68:15

115:12 119:3
**versus** 24:2,13
**video** 97:5
**videoconference**
3:3 5:4 144:6
144:22 145:1
**videoconferen...**
1:16
**view** 41:14
52:21 116:3,4
116:4
**virtually** 46:22
53:16
**vision** 96:24
**voice** 105:19
**voiceprint**
109:19
**VP** 25:21 27:6
**vs** 1:6

**W**

**W** 69:4
**Wacker** 2:8
**wait** 5:19
**waive** 4:12
**walk** 60:3 90:20
**walking** 59:22
**wall** 92:6
**want** 7:6 10:8
40:22 46:3
49:15 52:9
63:12 100:6,23
102:3 110:1
116:7 117:10
117:15 131:6
**wanted** 24:5
36:12 39:13
50:6 77:11
82:7 89:22
93:14 111:4
135:3
**Warcop** 38:7
**wasn't** 13:22
**way** 5:21 28:14
38:24 45:7
48:13 50:9
57:20 59:2
62:1 72:12
75:5 80:7

90:14,17 94:6
97:19 101:7
110:8 118:5
122:10 134:21
145:4,5
**ways** 48:10 97:7
**we'll** 6:12 40:24
138:24
**we're** 20:19
40:23 41:8
44:7 61:14
67:21 78:7
87:14 94:24
95:14 110:4
117:21 122:22
123:1 143:10
**we've** 8:10 54:17
57:4 86:23
133:12,15
**Web** 36:3
**website** 38:23
55:3,4 56:1
99:7 101:11,15
113:17 115:16
115:18 117:24
118:6,8 120:7
127:10
**week** 9:9
**weekly** 112:13
**Weissinger** 69:7
**welcome** 143:11
**went** 134:5
**Wentworth**
13:11 26:14,16
**WHEREOF**
145:6
**white-label**
32:11,12 35:4
**white-labeled**
30:5
**Wifi** 45:20,24
46:4 130:15
**William** 58:5
115:5,9,10
**wiped** 110:16
**wires** 87:6
**Wisconsin** 17:17
**withholding**
17:13

**witness** 3:2 4:9
4:19 5:2 9:19
9:23 41:16
42:2 68:4
73:20,21,23
84:23 85:1
88:24 90:11
102:11,14,22
108:1 118:19
121:20 122:6
123:19 124:17
128:20 140:12
140:22 142:5,7
143:8,11
144:13,17,18
144:21
**Wolfe** 2:8 3:5
4:18,18 7:3 8:6
9:21 10:3 11:5
11:8 28:19
29:6,13,21
41:13,17,21
64:5,9 67:17
84:20 90:8
102:9,12,16
107:21 116:12
117:17 121:17
122:3 123:16
124:15 128:15
140:9,21
141:15 142:6,9
143:7,15
**woman** 10:24
11:1
**Woodson** 11:14
11:23 114:21
114:24 115:3
**word** 21:2 52:10
59:9 64:20
125:14
**work** 7:24 13:3
13:21,22 14:15
25:5,10,11
27:9,14,16
38:1 48:4,5
98:3,20 128:22
133:1 135:12
**Workbrain**
27:18

**worked** 22:15
24:13 25:14
27:6,15,17
28:8 31:13
53:9 134:21
**worker** 136:6
**workers** 59:15
**workers'** 66:22
**Workforce** 27:7
28:7 29:18
31:7 32:10
**working** 25:12
53:3 133:16
138:20,21
**works** 14:2
17:17 18:19,21
68:24
**world** 46:23
**wouldn't** 36:10
125:12 132:6
**wrap** 64:7
**write** 126:6
**writing** 127:22
**written** 18:6
30:22 128:3
140:7,18
**wrong** 91:14

**X**

**X** 3:1,7

**Y**

**yeah** 11:6 29:5
29:21 41:23
42:5 54:20
58:5 67:17
72:14 84:2
91:1 105:23
118:12 120:1
132:1 138:3
141:18 143:15
**year** 8:10 16:15
26:1 141:8
**years** 21:12
27:10 33:13,13
53:4,5 111:5
132:13 139:8
139:10 141:8
141:11

**Z**

**Zachary** 114:12
114:17
**zero** 42:7 58:22
**ZK** 44:15,17,20
72:5,6 77:7,8
95:8
**Zoom** 1:15
**ZOURAS** 2:2

**0**

**0** 67:23
**00000002** 41:19
**00001** 42:2
**0001** 41:4
**00011** 41:9
**084-4575** 1:23

**1**

**1** 41:21,22 42:1
47:14 48:19
49:2 52:5
56:18 61:16,18
61:21,22 69:9
73:12 74:12,23
75:4,13 89:2
95:9 106:23
107:2 119:23
119:23
**1-11** 3:9
**10** 65:22,23 66:2
109:7
**10,000** 143:3
**100** 2:3 32:2
42:15 43:24
49:16 72:4
**1000** 34:6
**100F** 69:12 70:5
72:2
**100FP** 130:15
**100FW** 69:12
70:5
**100W** 44:1
49:16
**102** 3:12
**11** 41:20,20
65:23 66:4
**11:30** 1:18
**111** 2:8

**118** 3:13 129:6,8
**118-126** 3:15
**122** 131:2,6,8,8
**126** 3:14 129:6
**129** 3:15
**13** 118:20
**14** 1:17
**14,000** 18:1,3,4
  22:2,14 35:12
  63:9 127:21
  128:3,12 129:3
  132:2 138:5
  139:2,23 140:8
  140:14,18
  141:3,5,9
**14,000-or-so**
  59:14
**14/15** 109:7
**142** 3:5
**14th** 144:5
**15** 42:7
**150** 32:2 69:12
  72:4
**150RF** 70:5
**15th** 70:16
**16** 53:4,5
**18** 88:20
**19** 67:23
**19-26** 3:10

**2**
**2** 49:5,21 56:20
  56:23 68:2
  73:17 74:3,5
  74:11 75:7,7
  78:12 104:22
  105:11 107:4
  111:20 114:4,5
  116:16 121:1
  126:24
**2:29** 143:20
**20-30** 102:12
**2000** 34:6
**2004** 27:21
**2007** 27:19
**2008** 113:5,8
**2014** 21:15
  38:13,14 45:4
**2015** 89:17

**2016** 27:11,19
  141:7
**2017** 78:19 83:2
  101:17 102:1,2
  103:5 113:9
  114:9 128:9
**2018** 10:19
  25:13 27:11
  100:3,9 132:20
  132:22
**2019** 68:18
  115:6
**2020** 72:23
**2021** 1:17
  118:10 144:5
  145:8
**21** 115:6
**2150** 2:4
**233-1550** 2:5
**24-72** 133:11
**26** 67:24 72:23
**29** 4:7
**2nd** 145:7

**3**
**3** 48:19 54:2
  72:16 75:7
  116:18
**3:20-cv-00264...**
  1:6
**30** 8:13
**30-minute**
  117:15
**30(b)(6)** 29:13
  29:16
**3000** 34:6
**31** 114:9
**312** 2:5
**312)704-7700**
  2:10
**32** 102:4,6
**32-35** 3:12
**35** 102:4,6

**4**
**4** 75:14
**400** 70:14
**400's** 72:9
**4000** 34:6
**41** 3:9 126:18

**41-46** 3:14
**46** 126:18
**4700** 2:9

**5**
**5** 3:4 49:24
  73:15 105:13
  109:10,22
**53** 118:19
**53-55** 3:13
**55** 118:19

**6**
**6** 41:8 55:21
  56:2,5,19
**60** 8:13
**60606** 2:4,9
**68** 3:10

**7**
**7** 56:19 65:7
  89:15
**70** 28:4
**740** 109:7

**8**
**8** 64:3 65:18
  114:4,5
**85** 39:10
**88** 3:11

**9**
**9** 89:21 102:7