# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KELLIN JOHNS and JUAN BARRON, Individually and on behalf of all others similarly situated, | ) |
| Plaintiffs, | ) |
| vs. | ) No. 3:20-cv-00264-DWD |
| PAYCOR, INC., | ) |
| Defendants. | ) |

The deposition of MITRI DAHDALY, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken remotely in the above-entitled cause via Zoom electronic videoconferencing platform by Andrew R. Pitts, Certified Shorthand Reporter, on January 14, 2021, at the hour of 11:30 a.m. EST.

REPORTED BY: Andrew R. Pitts, CSR, RPR
LICENSE NO.: 084-4575

APPEARANCES:

STEPHAN ZOURAS, LLP, by
MR. RYAN F. STEPHAN, Esquire
MS. CATHERINE T. MITCHELL, Esquire
100 North Riverside Plaza
Suite 2150
Chicago, Illinois 60606
(312) 233-1550
rstephan@stephanzouras.com

Representing the Plaintiffs;

SHOOK, HARDY & BACON L.L.P., by
MR. MATTHEW C. WOLFE, Esquire
111 South Wacker Drive
Suite 4700
Chicago, Illinois 60606
(312)704-7700
mwolfe@shb.com

Representing the Defendant.

ALSO PRESENT:

MS. ELIZABETH FREDERIC, Paycor In-house Counsel



I N D E X


| WITNESS | EXAMINATION |
| --- | --- |
| MITRI DAHDALY (via videoconference) | |
| By Mr. Stephan | 5 |
| By Mr. Wolfe | 142 |


E X H I B I T S


| PLAINTIFFS' | PRESENTED |
| --- | --- |
| Exhibit A Johns/Paycor 1-11 | 41 |
| Exhibit B Johns/Paycor 19-26 | 68 |
| Exhibit C Affidavit of Eric Schreimann | 88 |
| Exhibit D Johns/Paycor 32-35 | 102 |
| Exhibit E Johns/Paycor 53-55 | 118 |
| Exhibit F Johns/Paycor 41-46 | 126 |
| Exhibit G Johns/Paycor 118-126 | 129 |




(Whereupon, the following proceedings took place remotely:)

THE REPORTER: The parties in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely pursuant to Federal Rule of Civil Procedure 29. They further acknowledge that in lieu of an oath administered in person, the witness will verbally declare his testimony under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting. Please indicate your agreement by stating your name and your agreement on the record, beginning with Plaintiffs' Counsel.

MR. STEPHAN: Thank you, Andrew. Plaintiffs' counsel Ryan Stephan agrees.

MR. WOLFE: Matt Wolfe for Paycor, we agree.

(Whereupon, the witness was administered an oath.)



MITRI DAHDALY,

called as a witness herein, having been first administered an oath, was examined and testified remotely via videoconference as follows:

EXAMINATION

BY MR. STEPHAN:

Q. Good morning, Mr. Dahdaly. Is it okay if I call you by your first name today?

**A. Sure.**

Q. Well, it's nice to meet you. My name is Ryan Stephan. I represent the Plaintiffs in this case, Johns v Paycor.

Have you ever been deposed before?

**A. No, I have not.**

Q. Okay. So let's go over a couple ground rules just so things go as smoothly as possible today. Okay?

**A. Sure.**

Q. The first is please try and wait until I finish asking my question before you answer. That way Andrew, the court reporter, has a clear record of my question and your answer. Okay?

**A. Okay.**

Q. Similarly, please do your best to give clear

**14,000 total people over the course of a five-year period.**
Q. Okay. 14,000 people in Illinois for whom --
**A. 14,000 people who pay taxes in Illinois and also had a finger scan template.**
Q. Okay. And was a written report generated as part of these queries?
**A. No. We got some tabular output in Excel. So it's not on what I would call a typical report. Just data --**
Q. Was that actually sent to you via e-mail?
**A. It was.**
Q. Do you remember who sent that to you?
**A. I believe it was Pershon (phonetic) -- I don't recall Pershon's last name.**
Q. First name is Pershon?
**A. Pershon.**
Q. Okay. And do you know what his title is or where he works, what group?
**A. He is a software developer. I believe he works or reports to Pat or -- I know he's in Pat's orb, I should say. I don't know if he reports directly to Pat or if he reports to a manager who reports to Pat.**

Q. And these queries that were run against these databases, what databases are we talking about?
**A. Perform Time databases.**
Q. What are those?
**A. Or Perform Suite database. I should rephrase.**
Q. It's okay. And what are those?
**A. Those are the data storage locations for software that is developed by Paycor. So that would encompass payroll time primarily but other HR type functions.**
Q. Okay. And are there names for those databases, or are they just referred to as Perform Suite databases?
**A. Perform Suite databases. There's probably some more technical nomenclature that those are referred to, but that's colloquially what we would refer to them as.**
Q. Do you know the geographic location of those actual servers that would host those databases?
**A. They are in our data center, which I believe is in Cincinnati. There is a portion of data that is stored in Azur, which is a cloud service provided by Microsoft.**

Q. And, I'm sorry, what was that?
**A. A cloud storage service that is provided by Microsoft, and it's a multi-region setup, so it would probably be in a couple of data centers across the country. But it's all within the U.S.**
Q. And do you know where those data centers are located?
**A. I do not know the specifics of where the Microsoft data centers are.**
Q. So just to kind of summarize, Paycor hosts some of its own databases in Cincinnati, Ohio in its data center there, correct?
**A. Correct.**
Q. It also hosts some of its data on Microsoft servers located in different parts of the country; is that right?
**A. Correct.**
Q. And would that include the same data that we're talking about here, the employees in Illinois for -- employees that pay taxes in Illinois and whether or not they had a finger scan profile?
**A. So the data for taxation is held within our data center. The data relative to a finger scan template is held in Azur.**

Q. I'm sorry, what's -- I don't understand the word that you're saying there. Held in --
**A. Azur. It's Micro- -- it's the name of Microsoft's that we leverage for cloud compute and storage.**
Q. Thank you. I was not familiar with that. Could you spell it for us?
**A. A-Z-U-R.**
Q. Got it. And how long has that been the case?
**A. Azur has been leveraged for the better part of five or six years. And specifically for our data communication with time collection devices and storage of templates, it's always been the case. So that's since 2014.**
Q. Got it. Do you have a point of contact at Microsoft --
**A. I personally do not --**
Q. -- regarding this information?
**A. I personally do not have a contact person. Again, that would be something that our engineering organization would maintain, and most likely it's a support engineering e-mail or a sales contact rather than, you know, anybody specific within Microsoft's**

BY MR. STEPHAN:
Q. And just briefly, Mitri, can you tell us what the partnership was between ADP and Kronos?
**A. The partnership was one where we, as ADP, white-labeled Kronos' solution, integrated it into our payroll and HR solutions, and resold it as part of that package. And, of course, as part of that, we sold data collection devices that were manufactured by Kronos.**
Q. Okay. Would those include devices that took a finger scan, for example?
**A. Yes.**
Q. Did you have a primary point of contact at Kronos?
**A. I did.**
Q. Who was that?
**A. Bob Ledbetter.**
Q. And what was his position at Kronos?
**A. He was a channel manager.**
Q. Okay. At Paycor --
**A. Yes.**
Q. -- do you have a written job description?
**A. Yes.**
Q. And could you give just generally -- I know

we kind of covered some of this, but your primary duties at Paycor?
**A. My primary duties at Paycor are to determine the strategic direction for Paycor products.**
Q. Okay. And which products would that include?
**A. I own our Workforce Management portfolio, which today is comprised of three separate solutions: Perform Time, Time On Demand, and Ready Clock.**
Q. Okay. And Perform Time, what is that?
**A. Perform Time is a collection of features that have been developed by Paycor to track time worked by employees.**
Q. Does that include hardware?
**A. That would include hardware.**
Q. Does it also include software?
**A. Yes, it does.**
Q. And when you reference hardware, does it include biometric time clocks?
**A. It includes time clocks that can take a fingerprint scan or finger scan.**
Q. Can it also take a scan of a hand?
**A. Not for Perform Time.**
Q. Okay. And can you tell us the names of

those clocks that capture finger scans?
**A. We call them the PT 100 and the PT 150.**
Q. Okay. And then the affiliated software, is there a name for that?
**A. There is not.**
Q. Just Perform Time software?
**A. Correct.**
Q. Okay. The next one you mentioned was Time On Demand. What is that?
**A. Time On Demand is a third party Workforce Management solution that we white-label and resell.**
Q. When you say white-label, I think I understand what you mean, but could you explain?
**A. It means that the vendor who developed the software has had all of their branding and trademarks removed from the application and replaced with Paycor-specific branding such that the customer would understand the product to be Paycor's.**
Q. Okay. And the actual provider of those devices is called Time On Demand?
**A. No. Time On Demand is a brand name that's owned by Paycor.**
Q. Okay. How long has it been owned by Paycor?
**A. Since the inception of the product, or the**

**inception of the relationship with Attendance On Demand.**
Q. Okay.
**A. I don't recall the exact date.**
Q. Okay. And Attendance On Demand, is that a separate company?
**A. Attendance on Demand/Infotronics is the owner of the Attendance On Demand product that we resell as Time On Demand.**
Q. Okay. And how long has Paycor been doing business with Attendance On Demand?
**A. To the best of my recollection, the relationship is five years or six years old.**
Q. Okay. And just so I understand and I'm clear about this, is Paycor a client of Attendance On Demand?
**A. We would be considered a partner of Attendance On Demand, client in the sense that we leverage their service to provide services to our customers, but we would not be the intended end-user of the service.**
Q. Okay. And as part of that relationship, Attendance On Demand provides the actual hardware, the biometric time keeping devices?

**A. These are installed into businesses. The business choose where to place these devices, and they choose the means by which they want to connect these devices to a network, and that Wifi is there to facilitate that connectivity.**

Q. Got it. Do you know if these devices would have an IP address?

**A. They would most definitely have an IP address.**

Q. Would that help tell us where they are located?

**A. No.**

Q. Why not?

**A. Because if I'm on a corporate network -- so, for example, if you log in to Paycor's network in Dallas, because the main switches are in Ohio, to an outside user, you will appear as if you are in Ohio.**

**And similarly, depending on where that network IP address is being issued from will determine where that device shows up in space. So while a device may be physically in one location, its IP address may be registered virtually anywhere in the world.**

Q. So there should be some location associated

with the IP address, but that may not tell us where the device is actually geographically located?

**A. That is absolutely correct.**

Q. Got it. Okay.

It talks about a proximity badge reader. What is that?

**A. It is a badge that leverages radio frequencies to transmit data.**

Q. Okay. So does that mean that the user could use the badge as long as it is close to the clock and it would read it?

**A. That's correct.**

Q. And then it also mentions a biometric fingerprint reader here on Page 1 of Exhibit A.

Do you see that?

**A. Yes.**

Q. And what is that?

**A. That is a scanner that is capable of looking at a fingerprint and creating measurements or taking measurements.**

Q. Okay. And that would be -- what would that be used for?

**A. In place of a proximity badge. So, essentially, a user needs to be able to identify who**

**they are, or we need a means of identifying who a user is because we need to associate the transactions performed at the clock with a specific person so that we can determine when they arrive to work or leave work or stop a specific job and start another job.**

**Then to facilitate that, most clocks will have what is referred to in the industry as a reader. An RF badge reader would be one type of reader, a badge reader would be another type of reader, and there is a collection of different ways that a customer could elect to identify who the person presenting themselves at the clock physically is.**

Q. Okay. But the way for a user to clock in and out on these particular clocks is by using their fingerprint, correct?

**A. Not specifically. That is an elected option from our customers.**

**So if you look at the picture on that Page 1, if you notice where the number 3 is on the hardware clock, on the picture of the clock.**

Q. Yes.

**A. If you go back and look at the legend, there it actually says there is a proximity badge reader. This device would have no capability of scanning a**

**fingerprint.**

Q. This particular catalog on Page 1; is that right?

**A. That is correct.**

Q. Okay. Now, if we look at Page 2.

**A. Yes.**

Q. There is a picture of a slightly different clock; is that right?

**A. That is correct.**

Q. Okay. And why is it different?

**A. So these devices are a module. Our customer can elect to configure them in the means that suit their business requirements.**

Q. Okay. So a customer could tell Paycor that they actually want the biometric reader installed on its PT 100 or PT 100W clocks; is that right?

**A. That's correct, sir.**

Q. And there would be a record of that, correct?

**A. We would have an order for that, yes.**

Q. And on Page 2, if we look at the image of the clock here, could you tell us where we would find that biometric reader?

**A. It would be position 5.**

Q. Got it. So for a person who is using this particular clock to record their time by clocking in and out, those users would actually use their fingerprint, correct?

**A. Well, on this specific device, they would have the ability to choose whether they wanted to use a proximity badge or their fingerprint. And, again, that's defined by the customer, not by Paycor.**

Q. Okay. So one way for the users to clock in and out, if the customer so chooses, is to use his or her fingerprint?

**A. That is correct.**

Q. And for an employee to use his or her fingerprint, do they first have to be enrolled in the clock?

**A. They would have to enroll in the device to use a finger scan.**

Q. And are you familiar with that process?

**A. I am.**

Q. What is the enrollment process?

**A. A supervisor or manager or someone privileged to enroll employees to create a template would go to the physical device with the employee. The manager/supervisor/privileged user would validate**

**themselves on the clock, and the menu options on the device will change for that supervisor/manager/privileged user such that they will have an option to enroll another employee, at which point the manager will input what we call a badge number. It is a number that the customer assigns to the employee to identify and associate that employee with an employee record, at which point once the employee has been identified, the manager will ask the employee to submit their finger for scanning.**

Q. Okay. Is there a particular part of their finger that they use for scanning?

**A. It's the central tip of the finger. And, again, depending on customers' requirements, customers' configuration, it could be one or more fingers. But it's not the entirety of the finger; it's a subset of the finger that the scanner in this case looks at.**

Q. And the portion of the finger that is used is actually where the fingerprint is located, correct?

**A. I'm not an expert on fingerprints, but it's a subset of the tip of the finger. And if I look at my finger, I can see that I've got what I would**

**consider to be a fingerprint that goes beyond that.**

Q. Okay. But this document actually talks about it being a fingerprint reader, correct?

**A. It scans the finger.**

Q. Right, but if we actually look at Page 1 of this Exhibit A, do you see where it talks about a fingerprint?

**A. Yes.**

Q. Okay. Is there a reason why you don't want to use that word?

**A. That's our marketing terminology. From a technical perspective, it's a finger scan.**

Q. Okay. And what's the difference?

**A. Colloquially people understand what biometric fingerprint means, but from a technical perspective, it is not a fingerprint. We do not capture -- we do not believe we capture fingerprints. We take the scan of a finger.**

Q. What is the basis for that answer?

**A. A fingerprint is physical. It can be reproduced. I can physically view it and see it. And what we have is a template that is based on an algorithm that uses specific landmarks on the tip of the finger to calculate a value that represents a**

**person.**

Q. How did you gain that understanding?

**A. I've been working with biometrics for 16 years or what we colloquially call biometrics for 16 years. That's always been the distinction that the vendors have provided to us.**

Q. Okay. Has that specifically happened with regards to these devices since you've been a Paycor?

**A. I have worked with the vendors that Paycor uses and other organizations in the past. And the reality is that the scanners themselves that these vendors supply, there is only a handful of vendors that these manufacturers procure those sensors from, and all of them, whether -- you know, they will all claim the same or inform you that the means by which they obtain a finger scan is virtually the same. It's very similar technology across all the vendors.**

Q. And who are those few vendors?

**A. Suprema would be one of them, Lumadime, Silk ID probably are the three biggest vendors. There are probably some smaller vendors that produce them, but if you go look at the majority of vendors in the space, those will be the three vendors that they would procure their hardware from. So even someone like**

**Kronos, you know, procures their scanner from Suprema.**
Q. Okay. And moving on to Page 3 of this document.
**A. Yes.**
Q. Do you see where it talks about connecting to the internet?
**A. Yes.**
Q. And why is that necessary?
**A. Because the device is physically in the hands of the customer, and the data related that is collected by that device needs to be transmitted back to Paycor, and today, you know, typical for any data transmission to occur over a network connection.**
Q. Okay. So it connects the clocks to Paycor's software, correct?
**A. That is correct.**
Q. And that software, as we've discussed, is actually hosted by either Paycor or Microsoft, correct?
**A. Yeah, in this specific case, these devices would connect directly to the software that's been developed by Paycor and hosted in Azur.**
Q. Okay. By Microsoft?
**A. By Microsoft, yes.**

Q. Okay. And then for Paycor customers to access this data, they would actually have to log on to the Paycor website; is that correct?
**A. They would log onto the Paycor website to access the results of an action that took place at the clock. The administrators at a client can log onto a clock and see a history of transactions that have occurred on the clock as well.**
Q. I'm sorry, I missed that last part. Can you say it again?
**A. A customer administrator that has physical access to the device can log in with their account information on the clock itself and see a brief history of transactions that occurred on the device.**
Q. Okay. So the actual fingerprint template is stored on the device itself and also on the software; is that correct?
**A. The finger template is stored on the device itself, as well as in our software that's hosted on the Microsoft Azur platform.**
Q. Okay. If we move on to Page 6 of this exhibit.
**A. Yes.**
Q. I think that's talking about what we just

discussed, the Paycor.com website; is that right?
**A. Page 6, can you clarify what is the title of the page?**
Q. Sure. I'm just looking at the bottom left where it says Page 6.
**A. Yes. Okay. I'm on that page.**
Q. Under the Enrolling Employees section, do you see that?
**A. Yes, I do.**
Q. And it looks like it allows clients to log in through Paycor.com.
Do you see that?
**A. That is correct. I see that now.**
Q. And then it talks about the enrollment process?
**A. In this case, it's talking about the proximity badge or RF badge enrollment process.**
Q. Got it. And then it starts with step 1 on Page 6, and if we continue on to Page 7, it goes to step 2.
Do you see that?
**A. Yes.**
Q. Okay. Step 2 references a time and attendance section. What is that?

**A. That would be what we would market as Perform Time.**
Q. Okay. So part of that first product line that we've already discussed?
**A. Correct.**
Q. And then within that section, there is an employee security section; is that right?
**A. That would be correct.**
Q. Okay. And would the clients have access to this information?
**A. This is client-specific information, yes. Clients are responsible for administering this portion of the application.**
Q. And Paycor would also have access to this information?
**A. We would have access to this information when our clients provide us the rights to access it, yes.**
Q. Okay. If we then continue on, about two-thirds of the way down on this page, there is like a screen shot.
Do you see that?
**A. Yes.**
Q. Is that a screen shot of Perform Time?

different way.
Both methods are being used to identify the particular user, correct?
**A. No. One method is being used to identify the particular user. The other method is being used to validate who you are.**
Q. Okay. So --
**A. So --**
Q. -- which one is identifying the user?
**A. The first method, what they call one-to-many, is used to identify who you are. The one-to-one is used to validate who you are, because if you notice, you must first enter your assigned badge number.**
Q. Okay.
**A. So that's how we would know who you are is based on your badge number.**
Q. Do the customers make the determination on which method to use?
**A. Yes, they do.**
Q. And is there a record of that?
**A. Yes, there is.**
Q. Where would that be?
**A. In the Perform application clock**

**configuration.**
Q. Is one method more common than another?
**A. Within Paycor's customer base, yes.**
Q. Which one?
**A. Identify, or the one-to-many.**
Q. The one-to-many.
**A. Yes.**
Q. Okay. And the search you conducted that we discussed earlier regarding the 14,000 employees, would that capture all employees regardless of which method they use, or is it only capturing one method?
**A. We did not want to filter by method used.**
Q. Got it. Would you consider one method more accurate than another?
**A. I would consider one-to-one being more accurate than one-to-many.**
Q. Why is that?
**A. Because I'm not searching for templates that may or may not be similar. I'm actually explicitly asking for validation that the finger scan matches the finger that had been scanned on file.**
Q. So if that's the case, do you have any reason why most customers select the one-to-many?
**A. Yes. Convenience. It's much simpler to do**

**one action than to train somebody on how to do two actions.**
Q. Got it. Okay. Moving on to Page 8 of Exhibit A?
MR. WOLFE: Ryan, is this a good point for a break?
MR. STEPHAN: Let me just wrap up this document and then take a break.
MR. WOLFE: Okay. That's fine.
BY MR. STEPHAN:
Q. Mitri, are you there yet?
**A. Yes, I am.**
Q. Okay. It talks about biometric enrollment. Do you see that there?
**A. Yes, I to.**
Q. And it talks about the procedure for employees to be enrolled in the clock.
Do you see that?
**A. Yes, I do.**
Q. Okay. And it uses the word fingerprint.
Do you see that?
**A. I see it.**
Q. Okay.
**A. What line are you looking at specifically?**

Q. Well, multiple times. It says it in the first paragraph.
Do you see it there?
**A. Sure.**
Q. And also uses it in the second paragraph?
**A. I see that as well.**
Q. And also uses it in line 7?
**A. Sure.**
Q. And then it also uses it in the image example below on the bottom right.
Do you see that?
**A. Sure.**
Q. Okay. Without going through each of these steps, are you familiar with this process, the enrollment process?
**A. Yes.**
Q. Is there anything inaccurate about the process as described here on Page 8 of Exhibit A?
**A. No. The finger needs to be placed in a specific position on the sensor for the sensor to be able to take the measurements it needs.**
Q. Okay. Going to Page 10, please, and really it's going to be Page 11, but if you look at Page 10, it's the section starting there Managing the Clock?

Q. It's okay.
**A. The picture -- the device pictured in the bottom is proximity with biometrics.**
Q. Okay. So all three of those clocks, the 100F, 100FW, and 150RF all have biometric fingerprint readers?
**A. Yes.**
Q. Are there any other types of clocks or models that are part of this Perform Time that have biometric fingerprint readers?
**A. We recently launched a new device with finger scanning abilities.**
Q. What is the name of that device?
**A. PT 400.**
Q. And what was the launched?
**A. December 15th.**
Q. Okay. And does that have a fingerprint reader just like these other three clocks?
**A. It has an option for a finger scanner, yes.**
Q. Are there any other differences between that clock and these three?
**A. Yes.**
Q. What else?
**A. The vendor is different, and the scanning**

**technology that is using it is different.**
Q. Who is the vendor?
**A. Grosvenor Technology.**
Q. Grosvenor with a G?
**A. Yes.**
Q. And how is a scanning technology different?
**A. It's using capillary vein scanning. So what it's actually doing is it's a soft dermal scanner. The dermis is what your fingerprint actually resides on, and what this is doing is it's actually looking for landmarks for your capillary veins underneath your finger skin.**
Q. Is there a reason why Paycor added this particular type of scanner to its product line?
**A. Because that's what the vendor offered by default. That's their preferred scanner. The scanner that they used was not the primary decision criteria for why we selected that device though.**
Q. Do you a point of contact at Grosvenor Technologies?
**A. Yes.**
Q. Who is that?
**A. Matthew Smith.**
Q. Do you have his e-mail address?

**A. I can find it, yes.**
Q. Okay. The PT 100F device, who is the vendor for that particular device?
**A. All of the PT 100, 150 devices are the same vendor. It's ZK Technology.**
Q. ZK?
**A. Yes.**
Q. Do you know, are the new clocks, the PT 400's, meant to replace the earlier biometric clocks, or are they in addition to those?
**A. In addition.**
Q. Okay. And does it connect the same way to Paycor software?
**A. Yeah, you need an internet connection to connect back to Azur.**
Q. Okay. If we go to Page 3 of this exhibit.
**A. Yes.**
Q. You will see where it says "Punch in with biometric/fingerprint entry"?
**A. Yes.**
Q. Okay. And if you actually look at the bottom here, do you see where it says it was updated June 26, 2020?
**A. Yes.**

Q. Do you know, what does that tell us?
**A. That's when we introduced this document revision.**
Q. Okay. Can you tell by looking at this or do you know who made the updates?
**A. Not based on that time stamp, no. But as I said, this is most likely updated by Lyle.**
Q. Lyle? Okay.
And here with this particular section, it talks about employees placing their finger on the sensor.
Do you see that in step 1?
**A. I do.**
Q. And that would be the biometric scanner there referenced as number 5?
**A. The fingerprint.**
Q. Okay. And then step number 2 there, can you tell us what that is an image of?
THE REPORTER: I'm sorry. Hold on. I'm getting a lot of feedback there from the witness. Is it possible for the witness to get a little closer to the microphone?
THE WITNESS: Yes.
THE REPORTER: Okay. That's great. Thank

stored, used, at all times remained in the possession and control of either Paycor or ADP."

Do you see that?

**A. I'm reading it. I see that.**

Q. Do you have any basis to dispute that statement?

**A. Yes.**

MR. WOLFE: Objection to the extent it seeks a legal conclusion.

You can answer it.

THE WITNESS: Thank you.

BY MR. STEPHAN:

Q. And what is that?

**A. We have no way of subjecting an employee of a customer to collect a fingerprint or, for that matter, a finger scan. We have -- you know, we would receive on behalf of the customer, but we have no way of collecting.**

**Again, we don't have a relationship. I can't physically walk over to every one of the, one, two million employees that Paycor services and ask them to scan their finger on a clock. So that --**

Q. So -- I'm sorry. I didn't mean to interrupt.

**A. Yeah, that would have to be conducted by our customer. And, as I said, you know, we offer this as one option among probably a dozen different options for employees of our customers to clock in and out.**

Q. Okay. I understand. So your statement is that the initial collection has to be done by the employer or the Paycor customer itself?

**A. That is correct. And the reality is control of the template still resides with the customer. The customer has the ability to create it, the customer has the ability to delete it, and the customer has the ability to require an employee to create one. We have no say in any of those activities.**

Q. Well, correct me if I'm wrong, but isn't Paycor's software designed to obtain that template from the clocks?

**A. The clock would replicate it back to Paycor for storage purposes.**

Q. And Paycor itself decided to obtain that data and store it on its servers, correct?

**A. We have chosen to do that as a convenience for our customer. Essentially we use that template for two purposes: One is in the event of a failure of a device, a customer would be sent a replacement**

**device, and to save them the effort of having to re-enroll all of their employees, we can copy those templates back down to the new device so that it would be available for use as soon as it is essentially hung up or within a few minutes of it being hung up on the wall.**

**Additionally, you can imagine a facility that has a very large footprint, like a Club Fitness location may have, where there might be time clocks that are hung in different portions of the facility, and instead of requiring the employee to register themselves on each physical device they would like to use, they would register on one, and then we would replicate those templates for storage on a local device on an as-needed basis.**

**But the customer is in complete control of when a template is created, when a template is completed, and whether an employee has to use a template or not. Paycor does not control that.**

**And, really, our storage is no different than a safety deposit box that a bank would provide to a customer.**

Q. Well, the client didn't decide on that process; that was a process that Paycor decided on,

correct?

**A. That's a process that was designed by Paycor that is a standard approach in the industry.**

Q. It's part of the services that Paycor offers and contracts with its customers for?

**A. Correct.**

Q. And they charge for those services, correct?

**A. We charge for our services. We don't exclusively charge for that service, no.**

Q. Okay. It's part of the package, though, correct?

**A. Part of the package.**

Q. Going back to earlier testimony about no obligation to comply, the last one I wanted to talk about is Paycor's belief that it doesn't capture a fingerprint.

**A. Correct.**

Q. And other than what you have testified before regarding how that's sort of commonly known in the industry, is there any other basis for your testimony?

**A. Because what is stored is not a capture of a fingerprint; rather, we store a template, and a template is comprised of essentially coordinates for**

**landmarks on a subset of a finger, in this case with this device, and then those coordinates are put into an algorithm, and a numeric representation is created.**

**And that's what we store is the numeric representation of a collection of landmarks from a finger. There is no way to reverse-engineer that back into a fingerprint. There is essentially no use -- I would never even be able to tell you who that template belonged to. All I can do is -- you know, in isolation, that template, it has no value or meaning. It can't be used for anything.**

Q. Well, it's used for clocking in or out?

**A. It's used to clock in and out, and what we have done is we have what we call a badge number, which is essentially a numeric value that we assign to an employee, and we store an association between the physical template file and that badge number so that when an employee comes to a device, they can submit their finger for scanning. The scan takes a measurement. It processes the calculation, creates a template or creates the output of what is stored in the template, and then looks at the available templates to ensure that those two numbers match.**

**We're not physically matching fingerprints**

**in the sense of looking at every single, you know, groove and line within your finger to figure out whether the two things are photographically identical. There is a false positive rate on these devices that --**

Q. What is it?

**A. It depends on the device. I believe that the device that we are using from ZK in the context of this case is somewhere around 1 percent false positive.**

Q. It's less than a percent; isn't it?

**A. It's approximately a percent. It could be slightly less.**

Q. The template that we're talking about here --

**A. Yes.**

Q. -- it's all based on the user's fingerprint, correct?

**A. It's based on landmarks within their finger.**

Q. Okay. So those landmarks are then converted into a template?

**A. Those landmarks, essentially there's -- if you think of it like a map, we have specific coordinates or landmarks that we are looking for on**

**the surface of a portion or subset of the finger, and we can map the geography of those locations, and each of those will have a specific set of coordinates. Those get put into a mathematical calculation where we get a single number out the other end.**

Q. So measurements of someone's finger are converted into a numerical template; is that right?

**A. We don't measure the whole finger. We measure --**

Q. I didn't say you did, but there's parts of measurements of the finger that are taken and then converted into a numerical template, correct?

**A. There are measurements of the surface of the finger or a portion thereof.**

Q. And then they are converted into a numerical template, correct?

**A. They are converted into a numerical value, yes, which is stored in what we would cal a template.**

Q. And that is because that's how computers function, right?

**A. No. You can use other means to compare data. So, you know, you can do image recognition and physically take a picture of a fingerprint and, leveraging computer vision, compare that to another**

**series of pictures to find a match. That's not how we operate because we don't physically capture a picture of the fingerprint. We don't store a fingerprint of the fingerprint.**

**Similarly, you could do that with video technology and computers. There is a number of different ways. In fact, you know, you could use a capacitive sensor to look at the resistance that the finger creates relative to an electric current, and everybody has a unique signature of resistance in their finger. So some of the sensors look at that.**

**Other sensors will look at, like I said before, the capillary veins, basically looking underneath the skin to determine who you are based on, again, landmark points underneath your skin.**

**So there are different techniques to obtaining with some degree of certainty uniqueness, and all of those techniques essentially result in some number, because that's the way this specific technology has been designed. That's not to say that there aren't other means of performing the same tasks that may be more or less invasive.**

Q. Well, these will all be fun topics for the experts in this case.

Q. Okay. I just want to confirm a couple things on this document. I won't belabor it.

When we talk about the Paycor database, we're talking about the Perform Time database that's either hosted on Paycor databases in Cincinnati or with Microsoft?

**A. That would be correct.**

Q. By the way, the actual clocks themselves, are they sold to the customers, or are they leased?

**A. There's an option for both.**

Q. Okay. And when they're leased, what happens to the clocks at the end of the relationship?

**A. They would be sent back to Paycor.**

Q. What is Paycor's process for processing those clocks?

**A. Those clocks would essentially be wiped and then destroyed.**

Q. And who is responsible for that?

**A. We have a group that manages inventory shipping/receiving of those devices.**

Q. And which group is that?

**A. They're in our services team. I believe the employee who is sort of responsible for the team is Hewey. I don't recall Hewey's last name.**

Q. Do you know if there's a record of those clocks that are returned and then processed?

**A. There would be.**

Q. And if you wanted to find out how many clocks in the last five years have been returned and processed, what would you do?

**A. I would put in a request to Hewey, and I'd probably put in a why to our billing team, because while a termination may be ended with a customer, a customer does have the right to acquire their leased unit.**

**So essentially all -- we have a purchase option on our lease where we can have our customers purchase them. So just because a customer that was leasing a device has left and no longer uses Paycor's services does not mean that they return their clock. We can provision a buyout of those devices, in which case the customer would retain ownership of that device.**

Q. Okay. If we look at Exhibit D, section 2 again, in the middle, it talks about, "Biometric templates can be removed from the client's Paycor database by authorized Paycor system users utilizing Paycor's software."

When it talks about authorized Paycor system users, who is that referring to?

**A. Either our client or ourselves.**

Q. Is there a particular group at Paycor that is authorized to do that?

**A. Our services support team primarily.**

Q. Okay. If we go down a little further, it talks about maintenance and storage of backups and archives.

Do you see that?

**A. I do.**

Q. And it talks about backups being made on a daily and weekly basis.

Do you see that?

**A. Yes.**

Q. Would that include the fingerprint profile information?

**A. No.**

Q. Why not?

**A. Because it's immaterial to the services we provide, and it's not data that we need to be able to restore.**

Q. Do you know when BIPA was first enacted as law?

**A. I do not recall. I know it's been -- I've been informed of when it was enacted, but I do not recall the exact date.**

Q. That's okay. It was back at the end of 2008.

**A. Okay.**

Q. Are you aware of Paycor having any sort of biometric information policy between 2008 and September of 2017?

**A. I am not aware of one. I believe we had a general policy that spoke about data privacy and information protection.**

Q. What was the name of that policy?

**A. I believe it would have been the general privacy policy.**

Q. And where could we find that policy?

**A. On the Paycor website.**

Q. Does Paycor use any biometric clocks for its own employees?

**A. No.**

Q. Do you know why?

**A. Most of our staff are salaried, and the few that are hourly, we provide them with computers so they have the ability to clock in from their desk. So**

**A. This is between Paycor and Club Fitness.**
Q. And at the top right, it says, "Prepared by John Ortworth."
Do you see that?
**A. I see that.**
Q. Do you know who that is?
**A. I would assume that John is their sales representative.**
Q. Can you tell by looking at this document what types of clocks Paycor provided to Club Fitness?
**A. Yes.**
Q. And how could you tell that?
**A. If you look under on the first page, under Club Fitness Monthly Fees, under Services, you will see a PT 100FP Wifi rental.**
Q. Great. And that would be one of the clocks that we looked at earlier on Exhibit A, correct?
**A. I believe so.**
Q. Okay. And those clocks have the biometric fingerprint reader, correct?
**A. That is correct.**
Q. Okay. So if we look at this, under Form of Client Data, do you see that there?
**A. What page am I looking for?**

Q. I'm sorry. It's ending with Bates stamp 122.
**A. Can you repeat that?**
Q. Sure. If you look at the very bottom, there's a bates stamp. It says Johns_000122.
**A. Yes. 122 is what you want me to look for?**
Q. If you could.
**A. 122. Yes, I see 122 now.**
Q. Okay. And it talks about client data there.
Do you see that?
**A. Yes, I do.**
Q. And that would include some of the data that we talked about before that would be necessary for processing payroll and taxes and that sort of thing?
**A. Yes.**
Q. And then the next section -- actually, not the next section, same section, if you go down to the last paragraph under the Client Data section there.
**A. Yes.**
Q. Do you see it says, "Client grants Paycor the right to use client's payroll data for purposes of performing the Paycor services and for purposes of developing and marketing new products and services."
Do you see that?

**A. I do see that, yeah.**
Q. Do you know if any of the 14,000 or so users that you have identified in this case had any of their personal data used for marketing purposes?
**A. I would not assume they would, but I don't know for certain. Now, we wouldn't market directly to a client or -- to, sorry, an employee of a client.**
Q. What happens at the end of a relationship between Paycor and a customer? What happens to the data?
**A. Portions of the data are returned based on our data retention policy. I believe it's seven years. Some portions of the date are purged at termination of the relationship with the client.**
Q. What about the biometric templates? Do you know if those are purged?
**A. Biometric templates are purged at the termination of an agreement with a client.**
Q. And how long has that been the case?
**A. Since the summer of 2018.**
Q. And do you know why Paycor started that practice in the summer of 2018?
**A. I was not privy to the rationale behind doing that, no. I assume that overlapped with some**

**work that was being done for GRP compliance. So it may very well have been part of the GRP initiative to purge that data upon termination of the relationship with a client.**
Q. Do you know if Paycor had been sued before it started that policy?
**A. I do not believe so.**
Q. Which group at Paycor is responsible for deleting biometric at that time?
**A. It's an automated process. So upon termination of a client agreement, within 24-72 hours that process will run once we've recorded the termination of that relationship, and then we periodically audit to make sure that the processes are running, we've got monitoring in place to make sure those things are working appropriately.**
**And then at any point in time, a client can call in and ask us to remove specific pieces of data, biometric templates being one of them.**
Q. Before that policy, what happened to users' biometric data at the end of a relationship between Paycor and its customers?
**A. They would be persisted until such time as we purged them.**

Q. Okay. They would be kept; is that right?
**A. They would be kept until we would purge the data related to that customer. Now, as I understand it, when that functionality was added to our capabilities, we retroactively went back and purged all biometric templates for non-active customers and non-active employees.**
Q. Okay. Do you know -- as part of the research you have done in this case, do you know if Paycor had biometric template information for Kellin Johns or Juan Barron?
**A. We had a template for each of those people. Kellin Johns' template was associated with a Club Fitness location in Missouri, and Juan, I believe we also had a template for him or her in, I would assume, Illinois.**
Q. Okay. And how are you able to determine that Kellin's template was associated with a Missouri location?
**A. Because we have separate databases for -- the way that the Club Fitness relationship worked is each facility had its own separate contract with Paycor, and data is not shared between clients. And the data for which we have a template for Kellin Johns**

**was a client that operated one location in Missouri.**
Q. Okay. So would that mean that if Kellin wanted to use a Club Fitness clock in Illinois, it would not register; he would have to enroll in that clock separately?
**A. He would have to enroll in that clock separately, but as a prerequisite to that, he would have to have been assigned a badge. And his record of employment in Illinois was actually as a salaried employee, and generally salaried employees don't get badges because they get paid whether they -- they get paid, right? Unless they are absent from work, they are going to be paid.**
Q. Do you know if that was a practice at Club Fitness?
**A. Yes.**
Q. How do you know that?
**A. Because Kellin Johns in the Illinois location never had a badge number assigned to their user account.**
Q. Do you know if he is still clocked in or out as a salaried employee?
**A. We do not. We cannot facilitate a time clock transaction without a badge number. It's a**

**prerequisite.**
Q. So why would they have collected his fingerprint?
**A. Because he had a separate record of employment at the Missouri location where he was am hourly non-exempt worker, in which case he did have to punch a clock there.**
Q. So he would have had a badge for that location?
**A. He would have had a badge number assigned to him and a fingerprint template created for a finger scan.**
Q. Your testimony is that each of those locations operated separately and distinct from each other and were not in one database?
**A. That is correct. Each location operated under its own contract with Paycor.**
Q. Okay.
**A. Yes.**
Q. And the research also confirmed that Juan Barron did enroll in an Illinois location, he did have a badge at the Illinois location?
**A. That is my recollection, yes.**
Q. Okay. Let me ask you -- we are getting

close. Just hang tight with me. We are almost done.
**A. Sure.**
Q. Do you know if Paycor has ever used a Schlage time clock?
**A. Schlage? No, Paycor has never used a Schlage time clock with Paycor's products. The Schlage time clock is used with the AOD product provided by Time On Demand/Infotronics.**
Q. Got it. So going back to the start of your deposition today, that would have been, I think, the second product line that you mentioned?
**A. Yes.**
Q. Okay. And in that case, any of the biometric templates would be stored on an Attendance On Demand database?
**A. That is correct.**
Q. That would be accessible to the client, in that case Corcentric and Attendance On Demand?
**A. Correct.**
Q. Would Paycor be able to access that information?
**A. We are not able to access that information.**
Q. Okay. And that Schlage clock, do you know if it has any biometric capabilities?

REPORTER'S CERTIFICATE

I, ANDREW R. PITTS, a Certified Shorthand Reporter, do hereby certify that heretofore, to-wit, on the 14th day of January, 2021, appeared remotely via videoconference, MITRI DAHDALY, in a cause now pending and undetermined In the United States District Court, Northern District of Illinois, Eastern Division, wherein KELLIN JOHNS and JUAN BARRON, Individually and on behalf of all others similarly situated, are the Plaintiffs, and PAYCOR, INC. is the Defendant.

I further certify that the said witness was first remotely duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the remote presence of the said witness, and afterwards reduced to typewriting by Computer-Aided Transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness via videoconference as aforesaid.

I further certify that the taking of this deposition was pursuant to Notice, and that there were

present via videoconference at the deposition the attorneys hereinbefore mentioned.

I further certify that I am not counsel for nor in any way related to the parties to this suit, nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF: I have hereunto set my hand and affixed my seal this 2nd day of February, 2021.

Andrew R. Pitts, CSR, RPR