## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KELLIN JOHNS and JUAN BARRON, individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>            v.<br><br>PAYCOR, INC.,<br><br>                            Defendant. | Case No. 3:20-cv-00264-DWD<br><br>Hon. David W. Dugan |

## DEFENDANT'S MOTION FOR
## <u>SUMMARY JUDGMENT</u>

Melissa A. Siebert
Christopher S. Hennessy
COZEN O'CONNOR
123 N. Wacker Drive, Suite 1800
Chicago, Illinois  60606
(312) 474-7900
msiebert@cozen.com
chennessy@cozen.com

*Attorneys for Defendant*

# TABLE OF CONTENTS

**Page**

LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS ........................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENTS ............................................................ 9

APPLICABLE STANDARD ........................................................................................................ 12

ARGUMENT ................................................................................................................................ 13

I.      Summary Judgment Should Be Granted Against Plaintiff Johns Because He
Never Used a Timeclock Provided by Paycor in Illinois ................................................. 13

II.     Summary Judgment Should Be Granted On All Claims Because The Timeclocks
Do Not Implicate Biometric Information Under BIPA ................................................... 14

III.    Plaintiffs Cannot Establish Any of Their BIPA Claims as a Matter of Law ................... 17

        a.      Plaintiffs Lack Standing to Assert Claims Under Section 15(a) Because
Their Templates Were Destroyed Within Three Years ........................................ 17

        b.      Plaintiffs Cannot Establish That Paycor Collected, Captured or Otherwise
Obtained Their Biometric Data Pursuant to Section 15(b) ................................... 18

        c.      Plaintiffs Cannot Establish that Paycor Possessed their Biometric Data
Pursuant to Section 15(a) or Section 15(d) .......................................................... 20

        d.      Plaintiffs Cannot Establish that Paycor Disclosed, Redisclosed, or
Otherwise Disseminated Their Biometric Data Pursuant to Section 15(d) .......... 23

IV.    Plaintiffs' Claims Are Moot Because they Already Recovered From the Club
Fitness Entities, the Sole Parties that Conceivably Violated BIPA ................................. 24

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................................................................12

*Barnett v. Apple*,
2022 IL App (1st) 220187................................................................................20, 21

*Bernal v. ADP, LLC*,
No. 2017-CH-12364, 2019 WL 5028609 (Ill. Cir. Ct. Aug. 23, 2019) ...................23

*Castelaz v. Estee Lauder Cos.*,
No. 22-5713, 2024 WL 136872 (N.D. Ill. Jan. 10, 2024).......................................14

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).........................................................................................12, 25

*Clarke v. Aveda Corp.*,
No. 21-4185, 2023 WL 9119927 (N.D. Ill. Dec. 1, 2023).....................................14

*David v. Ridgely-Farmers Safe Deposit Co.*,
342 Ill. App. 96 (3d Dist. 1950).............................................................................23

*Fleury v. Union Pac. R.R. Co.*,
20 C 390, 2024 WL 1555848 (N.D. Ill. Apr. 10, 2024) .........................................17

*Fleury v. Union Pac. R.R. Co.*,
No. 20 C 390, 2023 WL 4549668 (N.D. Ill. July 14, 2023) ...................................13

*G.T. v. Samsung Electronics America Inc.*,
21 CV 4976, 2024 WL 3520026, *8 (N.D. Ill. July 24, 2024)...................... *passim*

*Heard v. Becton, Dickson & Co.*,
440 F. Supp. 3d 960 (N.D. Ill. 2020) ................................................................19, 22

*Heard v. Becton, Dickson & Co.*,
524 F. Supp. 3d 831 (N.D. Ill. 2021) ......................................................................22

*Hernandez v. Omnitracs, LLC*,
No. 22-0109, 2024 WL 1376352 (N.D. Ill. Mar. 31, 2024) ..................................13

*Horn v. Method Products, PBC*,
21 C 5621, 2022 WL 1090887 (N.D. Ill. Apr. 12, 2022) .......................................17

*Jacobs v. Hanwha Techwin America, Inc.*,
  2021 WL 3172967 (N.D. Ill. July 27, 2021)......................................................19, 21, 22, 23

*Jones v. Microsoft Corp.*,
  649 F. Supp. 3d 679 (N.D. Ill. 2023) ...............................................................19, 22

*Kellin Johns, et al. v. Club Fitness of Alton, LLC, et al.*,
  Case No. 2018 L 000080 (Madison Cty., Illinois).........................................7, 9, 27

*Klier v. Siegel*,
  200 Ill. App. 3d 121 (2d Dist. 1990) ("Illinois has a strong public policy
  against a plaintiff's double recovery for the same injury") ..................................25

*Kloss v. Acuant, Inc.*,
  462 F. Supp. 3d 873 (N.D. Ill. 2021) .......................................................................19

*Namuwonge v. Kronos, Inc.*,
  418 F. Supp. 3d 279 (N.D. Ill. 2019) .......................................................................19

*Neals v. PAR Tech. Corp.*,
  419 F. Supp. 3d 1088 (N.D. Ill. 2019) .....................................................................13

*PMT Mach. Sales, Inc. v. Yama Seiki USA, Inc.*,
  941 F.3d 325 (7th Cir. 2019) ....................................................................................12

*Ragsdale, et al. v. Paycor, Inc.*,
  Case No. 2017 CH 13911 (Cir. Ct. Cook Cty.) ....................................................9, 19, 21, 22

*Rivera v. Google Inc.*,
  238 F. Supp. 3d 1088 (N.D. Ill. 2017) ...............................................................13, 15

*Stauffer v. Innovative Heights Fairview Heights, LLC*,
  No. 20-cv-00046, 2022 WL 3139507 (S.D. Ill. Aug. 5, 2022)................................19

*Wilk v. Brainshark, Inc.*,
  631 F. Supp. 3d 522 (N.D. Ill. 2022) .......................................................................13

*Zellmer v. Meta Platforms, Inc.*,
  104 F.4th 1117 (9th Cir. 2024) ........................................................14, 15, 16, 17

**Statutes**

740 ILCS 14/10..............................................................................................................14

740 ILCS 14/15(a) .........................................................................................................20

BIPA ....................................................................................................... *passim*

**Other Authorities**

Federal Rules of Civil Procedure Rule 56 ...................................................................1, 12

Southern District of Illinois Local Rule 56.1 .................................................................1

Defendant, Paycor Inc. ("Paycor"), by its undersigned counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Southern District of Illinois Local Rules, hereby moves for summary judgment on the First Amended Class Action Complaint ("Complaint") filed by Plaintiffs, Kellin Johns ("Plaintiff Johns") and Juan Barron ("Plaintiff Barron") (collectively, "Plaintiffs"), and in support thereof, states as follows:

### LOCAL RULE 56.1 STATEMENT OF MATERIAL FACTS

1.      Paycor is in the business of providing recruiting, human resources, and payroll solutions to clients throughout the United States. (Goodwin Decl., Ex. A, ¶ 1).

2.      In August 2015, Paycor entered into separate contracts with individual Club Fitness companies ("Club Fitness") in Illinois and Missouri to provide payroll and related services, including leasing them timeclocks (the "Club Fitness Agreements"). (Goodwin Decl., Ex. A, ¶ 6, and Club Fitness Agreements, Exs. 3-4 thereto).

3.      All Club Fitness entities in Illinois and Missouri ceased being Paycor clients as of June 1, 2016, and are considered "lost" clients. (Goodwin Decl., Ex. A, ¶ 5).

4.      During the timeframe October 2, 2015 – April 26, 2016, Plaintiff Johns was paid from and worked for one of the aforementioned Club Fitness companies, Aphel Bill Serv LC (Client 78890), located in Chesterfield, Missouri. (Goodwin Decl., Ex. A, ¶ 8).

5.      Plaintiff Johns' employer, Aphel Bill Serv LC (Client 78890), located in Chesterfield, Missouri, had its own agreement with Paycor for Paycor to provide payroll and related services (the "Missouri Agreement"). (Goodwin Decl., Ex. A, ¶ 9, and Missouri Agreement, Ex. 3 thereto).

6.      During the timeframe October 2, 2015 – April 30, 2016, Plaintiff Barron was paid from and worked for another of the aforementioned Club Fitness companies, CF Collinsville LLC (Client 78986), located in Collinsville, Illinois.  (Goodwin Decl., Ex. A, ¶ 14).

7.      Plaintiff Barron's employer, CF Collinsville LLC (Client 78986), located in Collinsville, Illinois, had its own agreement with Paycor for Paycor to provide payroll and related services (the "Illinois Agreement"). (Goodwin Decl., Ex. A, ¶ 15, and Illinois Agreement, Ex. 4 thereto).

8.      Each Club Fitness location was organized as a separate Paycor client, with its own timekeeping and payroll set-up. (Goodwin Decl., Ex. A, ¶ 7).

9.      Club Fitness entities, including the Missouri and Illinois clients where Plaintiffs respectively worked, were not set up to, and did not share, timekeeping or payroll data, nor was it possible for the Club Fitness entities to share payroll or timekeeping data because each had its own federal employer identification number ("FEIN"). (Goodwin Decl., Ex. A, ¶¶ 7, 10, 16; Dahdaly Dep., Ex. B, 134:17-135:13).

10.     As part of the Agreements, the Missouri and Illinois clients where Plaintiffs respectively worked each leased one PT 100 timeclock, manufactured by ZK Technology, for use solely at their respective work locations. (Goodwin Decl., Ex. A, ¶¶ 10, 16; Dahdaly Dep., Ex. B, 31:24-32:2, 44:11-18).

11.     All of Paycor's clients, including Illinois Client 78986, where Plaintiff Barron worked and used its sole PT 100 timeclock, and Missouri Client 78890, where Plaintiff Johns worked and used its sole PT 100 timeclock, individually choose whether to use finger-sensors, proximity badges, or employee IDs as part of the process of clocking in and out of work.  (Goodwin Decl., Ex. A, ¶¶ 10, 16; Dahdaly Dep., Ex. B, 47:5-48:17).

12.     Once timeclocks were delivered to each individual Club Fitness entity, including Illinois Client 78986, where Plaintiff Barron worked, and Missouri Client 78890, where Plaintiff Johns worked, Paycor had no involvement in the daily operation and use of the timeclocks – they

were used, operated, managed, and overseen exclusively by each individual Club Fitness entity. (Goodwin Decl., Ex. A, ¶¶ 10, 16; Dahdaly Dep., Ex. B, 90:13-91:13).

13.     Upon first using a timeclock at a Club Fitness location, the location's employees were enrolled by Club Fitness into the timeclock, using their unique Club Fitness badge ID number. (Dahdaly Dep., Ex. B, 50:13-51:10).

14.     Club Fitness entities, including Illinois Client 78986, where Plaintiff Barron worked, and Missouri Client 78890, where Plaintiff Johns worked, were responsible for enrolling their own employees in the timeclocks; Paycor had no involvement in employee enrollment. (Goodwin Decl., Ex. A, ¶¶ 11, 17; Dahdaly Dep., Ex. B, 50:20-51:10, 92:16-22).

15.     To enroll, an employee places the central portion of the tip of their finger on the scanner, and the timeclock immediately generates a "template" based on the landmarks of the fingertip. (Dahdaly Dep., Ex. B, 51:11-53:6, 52:13-53:6, 93:18-94:11; ██████████, Ex. C, ██████ ████████████████████████).

16.     A "template" is an encrypted hash of numbers, letters, and symbols that is generated using an algorithm proprietary to the manufacturer of the timeclock.  (Dahdaly Dep., Ex. B, 51:11-53:6, 93:18-96:18, 98:2-13, 124:21-125:15; █████████, Ex. C, ████████████████████ ████████████████).

17.     Paycor's former Director of Product Management, Mitri Dahdaly, testified:

[I]t is not a fingerprint. We do not capture – we do not believe we capture fingerprints. We take the scan of the finger. A fingerprint is physical. It can be reproduced. I can physically view it and see it. And what we have is a template that is based on an algorithm that uses specific landmarks on the tip of the finger to calculate a value that represents a person.

(Dahdaly Dep., Ex. B, 52:13-53:6).

18.     Mr. Dahdaly testified:

… [A] template is comprised of essentially coordinates for landmarks on a subset of a finger, in this case with this device, and then those coordinates are put into an algorithm, and a numeric representation is created. And that's what we store is the numeric representation of a collection of landmarks from a finger. There is no way to reverse-engineer that back into a fingerprint. There is essentially no use – I would never even be able to tell you who that template belonged to . . . in isolation, that template, it has no value or meaning. It can't be used for anything.

(Dahdaly Dep., Ex. B, 93:18-94:11).

19.    Mr. Dahdaly testified:

What we get out of or put into a template is a hash of numbers that's created based on a scan of the finger, but at no point could we take that and recreate the print from it. At no point could we do anything other than try and create the template again to see if we can match it with an existing template. So just having the presence of the finger there without the algorithm and that specific scanner, I would have no recourse to know whose it is or what it is exactly.

(Dahdaly Dep., Ex. B, 124:21-125:15).

20.



(Dahdaly Dep., Ex. B, 50:20-51:10, 94:12-23; ▮▮▮▮, Ex. C, ▮▮▮▮▮▮▮▮▮▮).

21.    A template cannot be used to identify any individual. (Dahdaly Dep., Ex. B, 93:18-94:11, 124:21-125:15; ▮▮▮▮ Ex. C, ▮▮▮▮▮▮▮▮▮▮▮ ▮).

22.    A template cannot be reverse engineered into a fingerprint, finger geometry, an illustration or depiction of a person's finger, or any form of biometric identifier or biometric information. (Dahdaly Dep., Ex. B, 93:18-94:11, 124:21-125:15; ▮▮▮▮ Ex. C, ▮▮▮▮). It is *impossible*. (*Id.*).

23.    The timeclock does not collect or store, and is therefore not capable of creating or producing, an image of a user's fingerprint or finger geometry, or any other depiction or illustration of a person's finger. The only information generated by and stored by the timeclock is a user's template.  (Dahdaly Dep., Ex. B, 51:11-53:6, 52:13-53:6, 93:18-97:4, 124:21-125:15; ███████, Ex. C, ████████████████████████████████████████).

24.    ██████████████████████████████████████████████████████████████████████████████████████████████████████████████

25.    It is _impossible_ to identify a person using any information collected, generated or stored by the timeclock, _i.e._, a template. (Dahdaly Dep., Ex. B, 93:18-94:11, 124:21-125:15; ██████████., Ex. C, ██████████████████████████████████).

26.    Clients control their employees' templates, as they are stored on their own timeclocks – here, at each Club Fitness entity, including the locations where Plaintiffs worked. (Goodwin Decl., Ex. A, ¶ 20; Dahdaly Dep., Ex. B, 20:18-24, 55:15-20).

27.    Each client has a dedicated environment. Encrypted templates are also automatically transmitted upon enrollment to a tenant-segregated database for storage, in the client's dedicated environment. (Goodwin Decl., Ex. A, ¶ 20; Dahdaly Dep., Ex. B, 20:18-24, 55:15-20; ██████████., Ex. C, ██████████████████████████████████).

28.    Mr. Dahdaly testified regarding the lack of control Paycor has over template data at all stages of the process, testifying as follows:

> [T]he customer is in complete control of when a template is created, when a template is completed, and whether an employee has to use a template or not. Paycor does not control that… the reality is control of the template still resides with the customer. The customer has the ability to create it, the customer has the ability to delete it, and the customer has the ability to require an employee to create one. We have no say in any of those activities.

(Dahdaly Dep, Ex. B, 92:16-19; 91:8-13; ███████, Ex. C, ████████████████████████ ████████████).

29.    Templates stored on the dedicated environment in the tenant-segregated database, such as those stored by Illinois Client 78986 where Plaintiff Barron worked, are not stored with any personally identifying information, such as employee names, addresses, email addresses, phone numbers, birthdates, or social security numbers. (Goodwin Decl., Ex. A, ¶ 21; ██████., Ex. C, ████████████████████████████████████).

30.    Template data that was stored within each Club Fitness entity's dedicated environment in the tenant-segregated database was controlled by and accessible to each such Club Fitness entity at all times, remaining at all times within each Club Fitness entity's dedicated environment. (Goodwin Decl., Ex. A, ¶¶ 20, 22; Dahdaly Dep., Ex. B, 55:1-20, 91:5-92:22; ████, Ex. C, ██████████████████████████████████).

31.    The template data stored in a client's dedicated environment in the tenant-segregated database may be accessed by that client, for example, in the event that they need to use Paycor's software to: (i) replicate templates on multiple timeclocks at a location within the same dedicated environment; or (ii) replicate templates on an additional or replacement timeclock within the same dedicated environment. (Goodwin Decl., Ex. A, ¶¶ 24-25; Dahdaly Dep., Ex. B, 91:19-92:22).

32.    When templates are replicated by clients using Paycor's software, the process involves no action by Paycor and occurs entirely within the clients' own dedicated environment via an automated series of "gets" and "posts" between the clients' timeclocks and a tenant-segregated database. (Goodwin Decl., Ex. A, ¶ 25).

33.     No templates are disseminated or disclosed when templates are replicated. (Goodwin Decl., Ex. A, ¶ 25).

34.     At each of the entities where Plaintiffs worked - Missouri Client 78890 and Illinois Client 78986 – there was only one timeclock at each location, and there were no additional or replacement timeclocks installed, so no template replication ever occurred. (Goodwin Decl., Ex. A, ¶ 24).

35.     Mr. Dahdaly described Paycor's storage of template data as akin to a "safety deposit box that a bank would provide to a customer" where Club Fitness was "in complete control" of that template data. (Dahdaly Dep., Ex. B, 92:16-22).

36.     Paycor does not access clients' dedicated environments without express client permission. (Goodwin Decl., Ex. A, ¶ ¶ 22-23; Dahdaly Dep., Ex. B, 55:1-20, 91:5-92:22).

37.     At no time did any Club Fitness entity ever access template data from the tenant-segregated database or request that Paycor access or provide template data. (Goodwin Decl., Ex. A, ¶¶ 23-25; Schreimann Decl. in *Johns v. Club Fitness*, Ex. D ¶ 9).

38.     At no time did Paycor ever view or access any Club Fitness employee template data, nor would Paycor have any reason to do so, given that the data consisted only of templates, *i.e.* encrypted strings of numbers that have no meaning outside of each client's own internal timekeeping processes. (Goodwin Decl., Ex. A, ¶¶ 23-25; Dahdaly Dep., Ex. B, 93:18-94:11).

39.     There are no Club Fitness work orders requesting that Paycor access any Club Fitness location's templates, nor are such work orders likely to exist for other Paycor clients as there is no business purpose for Paycor to access or view templates. (Goodwin Decl., Ex. A, ¶ 23).

40.     Paycor did not disseminate or disclose any Club Fitness employee templates, or any other clients' templates, to any person or entity. (Goodwin Decl., Ex. A, ¶ 26).

41.     Each Club Fitness location had its own dedicated timeclock, and employees could only record time at, and be paid by, their specific work location. (Goodwin Decl., Ex. A, ¶ 7; Dahdaly Dep., Ex. B, 134:17-135:13, 136:13-19).

42.     Plaintiff Johns *never* used a timeclock provided by Paycor at any Illinois Club Fitness location. (Goodwin Decl., Ex. A, ¶¶ 8, 12-13; Dahdaly Dep., Ex. B, 134:8-16, 135:2-13, 136:2-12).

43.     Paycor has no records indicating that Plaintiff Johns ever clocked in or out using a timeclock leased or purchased from Paycor in Illinois at any time, and no records indicating that Plaintiff Johns ever clocked in and out in Illinois at all – records that would exist had he done so. (Goodwin Decl., Ex. A, ¶¶ 8, 12-13).

44.     Plaintiff Johns only and ever clocked in and out using a PT 100 timeclock leased by Paycor to Aphel Bill Serv (Client 78890), which is located in Chesterfield, Missouri. (Goodwin Decl., Ex. A, ¶¶ 8, 12-13).

45.     Plaintiff Johns clocked in and out of work using this leased PT 100 timeclock in Chesterfield, Missouri from October 2, 2015 until April 26, 2016. (Goodwin Decl., Ex. A, ¶ 8).

46.     During the timeframe October 2, 2015 until April 30, 2016, Plaintiff Barron clocked in and out of work using a PT 100 timeclock leased by Paycor to CF Collinsville LLC (Client 78986), which is located in Collinsville, Illinois. (Goodwin Decl., Ex. A, ¶ 14).

47.     Effective August 22, 2018, a triggering command was executed whereby all clients previously marked as "lost" in Paycor's systems had any template data automatically and permanently deleted from the client's dedicated environment. Leased timeclocks that are returned to Paycor have always been wiped of any remaining data, by pressing the factory re-set button,

which automatically wipes the clock clean. (Goodwin Decl., Ex. A, ¶ 31; Dahdaly Dep., Ex. B, 110:8-17, 132:15-20).

48.     No later than August 22, 2018, any template data for employees of all Club Fitness clients, including Illinois Client 78986 and Missouri Client 78890, was permanently deleted (Goodwin Decl., Ex. A, ¶ 32). Paycor did not retain this information in any form, in any location. (*Id.*).

49.     Paycor recently obtained summary judgment in a similar case, with that court holding that Paycor did not possess, collect, obtain, or disclose template data. (*Ragsdale, et al. v. Paycor, Inc.*, Case No. 2017 CH 13911 (Cir. Ct. Cook Cty.), Ex. E). Exhibit E is publicly available on that Court's docket.

50.     Copies of Plaintiff Johns' Second Amended Complaint ("SAC") and Plaintiff's Unopposed Motion and Memorandum in Support of Preliminary Approval of Class Action Settlement in the matter of *Kellin Johns, et al. v. Club Fitness of Alton, LLC, et al.*, Case No. 2018 L 000080 (Madison Cty., Illinois), which are part of the filings available to the public on that Court's docket, are attached as Exs. F and G, respectively.

## <u>INTRODUCTION AND SUMMARY OF ARGUMENTS</u>

This case is just another attempt by Plaintiffs who suffered no actual injury to weaponize the Illinois Biometric Information Privacy Act ("BIPA") to extract money from as many different parties as possible, including third-parties such as Paycor with whom they have no relationship. Plaintiffs are two former employees of Club Fitness gyms, which are operated as separate companies, in Illinois and Missouri. Having already sued several Club Fitness entities under BIPA and reaching a $750,000 class settlement that included both Plaintiffs here, Plaintiff Johns and his counsel were unsatisfied. Wanting more, they filed the instant action against Paycor, who merely provides timeclocks and payroll services to customers such as Club Fitness, asserting the exact

same claims under BIPA. Plaintiffs allege that, by providing Club Fitness with the timeclocks used by Club Fitness to track its employees' time, Paycor is somehow liable for "collecting" and "disclosing" biometric information. Summary judgment should be granted on all of Plaintiffs' claims.

As an initial matter (and as an illustration of the "money-grab" nature of this case), **_Plaintiff Johns never even used a timeclock provided by Paycor in Illinois_**. Paycor's records establish that Plaintiff Johns only used a timeclock when he was an hourly Club Fitness employee at a Club Fitness entity in Missouri. BIPA does not apply extraterritoriality. Summary judgment should be granted as to Plaintiff Johns.

More fundamentally, all of Plaintiffs' asserted BIPA claims fail, as a matter of law, because the timeclocks at issue **_do not even collect biometric information_**. Recent case law has made clear that BIPA does not apply unless a device implicates biometric information as defined by BIPA, *i.e.* information that is actually capable of identifying a person. A device that merely generates "templates" does not implicate biometric information because a template is merely an encrypted hash of numbers that is incapable of identifying an individual and is incapable of being reverse-engineered into a fingerprint or any other form of biometric information. The timeclocks provided by Paycor fall squarely within this case law. The timeclocks do not collect fingerprints or take images. Rather, the proprietary algorithm in the timeclocks use the landmarks of a user's fingertip to generate a "template," an encrypted hash of letters, numbers, and symbols. A template cannot be used to identify an individual, and cannot be reverse-engineered into a fingerprint, finger geometry, or any other form of biometric information. **_It is impossible_**. BIPA does not apply.

Moreover, even if Plaintiffs' templates were somehow deemed to be biometric information under BIPA, each of Plaintiffs' BIPA claims *still* fail as a matter of law. Plaintiffs lack standing to

-10-

assert Section 15(a) claims because their template data was permanently destroyed by Paycor within three (3) years of their last interaction, when Club Fitness ceased being a Paycor client.

Plaintiffs also cannot establish a Section 15(a) or Section 15(d) claim because Paycor did not "possess" any biometric information. Possession requires control. Paycor merely provided each Club Fitness entity a dedicated environment with a tenant-segregated database, where templates were stored. Paycor cannot access a client's environment without express permission. Both Club Fitness and Paycor have unequivocally stated that Club Fitness never asked Paycor to access templates, and that Paycor never viewed or accessed Club Fitness templates. Paycor has no control over these templates and has zero reason to access template files containing meaningless strings of numbers that serve no business purpose for Paycor. Paycor has no control over any biometric information and therefore "possession" cannot be satisfied.

Plaintiffs additionally cannot establish a Section 15(b) claim because they cannot show that Paycor "collected" or "obtained" their biometric information. Paycor merely leased the timeclocks to the Club Fitness entities, and any collection of data was done exclusively by Club Fitness. Paycor provided a dedicated environment, including a tenant-segregated database where template data was passively transmitted and stored, accessible only by each Club Fitness entity. Paycor took no acts that could qualify as actively collecting or obtaining biometric information.

Plaintiffs also cannot establish a Section 15(d) claim because there is absolutely no evidence of any dissemination or disclosure of biometric information. Grasping at straws, Plaintiffs will assert that Paycor providing each client with a dedicated environment where clients can store templates already stored on their own timeclocks, somehow constitutes a "disclosure" under Section 15(d). Plaintiffs' claims lack any merit. There has been no disclosure – the templates were collected by individual Club Fitness clients using their own timeclocks, and then separately

-11-

stored within each Club Fitness entity's dedicated environment, on the timeclocks and on a tenant-segregated database. Nothing was disclosed or disseminated, because the templates always remained within the individual Club Fitness client environments. There is also zero evidence that any template replication, disclosure, or dissemination occurred.

Finally, Plaintiffs' claims here are mooted by their settlement with Club Fitness. They have already recovered a generous settlement from the Club Fitness entities they sued for identical BIPA claims, asserting that those employers possessed, collected and disclosed their templates. The actual evidence indisputably shows that Paycor played no role in the collection of templates, and did not possess or disclose any of Plaintiffs' purported biometric data.

This case is an exercise in greed. The Court should put a stop to Plaintiffs' attempt to exploit the law in ways that were never intended. All of Plaintiffs' claims are meritless. Summary judgment should be granted as to all claims in the Complaint.

## APPLICABLE STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A plaintiff must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *PMT Mach. Sales, Inc. v. Yama Seiki USA, Inc.*, 941 F.3d 325, 328 (7th Cir. 2019).

## ARGUMENT

### I.   Summary Judgment Should Be Granted Against Plaintiff Johns Because He Never Used a Timeclock Provided by Paycor in Illinois

"BIPA does not apply extraterritorially." *Hernandez v. Omnitracs, LLC*, No. 22-0109, 2024 WL 1376352, at *6 (N.D. Ill. Mar. 31, 2024) (citation omitted). Under Illinois law, a statute is without extraterritorial effect "unless a clear intent in this respect appears from the express provisions of the statute." *Id.* (citation omitted). BIPA lacks such clear intent. *See, e.g., Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1104 (N.D. Ill. 2017) (BIPA "was not intended to and does not have extraterritorial application"); *Fleury v. Union Pac. R.R. Co.*, No. 20 C 390, 2023 WL 4549668, at *3 (N.D. Ill. July 14, 2023) ("There is no indication that [BIPA] was intended to have extra-territorial application."); *Wilk v. Brainshark, Inc.*, 631 F. Supp. 3d 522, 527 (N.D. Ill. 2022) ("BIPA does not include language to suggest that the Illinois legislature intended for it to have an extraterritorial effect.").

A plaintiff asserting BIPA claims arising out of the use of a timeclock must establish that they "scanned [their] fingerprints into [the timeclock] system in Illinois," and specifically that the "location of the [employer] at which [they] worked" was located in Illinois. *See Neals v. PAR Tech. Corp.*, 419 F. Supp. 3d 1088, 1091 (N.D. Ill. 2019).

Here, the evidence establishes, as a matter of law, that Plaintiff Johns never used a timeclock provided by Paycor at a Club Fitness location in Illinois. Paycor's records show that Plaintiff Johns used a timeclock at one Club Fitness location in Chesterfield, Missouri from October 2, 2015 until April 26, 2016. (Paycor's Statement of Material Facts ("SOF"), ¶ 4). ***There is no record of Plaintiff Johns ever using a timeclock provided by Paycor at a Club Fitness location in Illinois, and no record that Plaintiff Johns ever clocked in or out in Illinois at all – records that would exist had he done so.*** (SOF, ¶¶ 42-45). Each Club Fitness entity operates

separately, using its own payroll and timekeeping data. (SOF, ¶¶ 9, 41). Employees could only record time at, and be paid from, the Club Fitness location where they worked, using that location's particular timeclock. (SOF, ¶¶ 9, 41). Club Fitness locations did not share timekeeping or payroll data between them. (SOF, ¶¶ 9, 41).

The undisputed facts establish, as a matter of law, that Plaintiff Johns only and ever used a timeclock leased from Paycor at one Club Fitness entity located in Chesterfield, Missouri. (SOF, ¶¶ 42-45). As such, he cannot show that his biometric data was implicated in any way in Illinois. BIPA has no extraterritorial effect, and therefore summary judgment should be entered as to all claims asserted by Plaintiff Johns.

## II.   Summary Judgment Should Be Granted On All Claims Because The Timeclocks Do Not Implicate Biometric Information Under BIPA

BIPA regulates only two types of information: "biometric identifiers" and "biometric information." 740 ILCS 14/10. Both categories refer only to data that is "used to identify an individual." *Id.* If the data at issue does not have "the ability to identify" a plaintiff, BIPA does not apply. *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1121 (9th Cir. 2024).

For this reason, courts regularly dismiss BIPA claims where the plaintiff fails to allege— or ultimately establish—that the defendant's purported technology is capable of identifying an individual. *See, e.g.*, *G.T. v. Samsung Elecs. Am. Inc.*, 2024 WL 3520026 at *8 (N.D. Ill. July 24, 2024) (dismissing claims on the grounds that BIPA only regulates information "capable of identifying an individual," and therefore "the fact that the App performs face scans is not dispositive."); *Castelaz v. Estee Lauder Cos.*, No. 22-5713, 2024 WL 136872, at *6 (N.D. Ill. Jan. 10, 2024) (dismissing claim where the plaintiffs failed to allege the defendant "is capable of determining Plaintiffs' . . . identities by using the collected facial scans"); *Clarke v. Aveda Corp.*, No. 21-4185, 2023 WL 9119927, at *2 (N.D. Ill. Dec. 1, 2023) (dismissing claim as plaintiffs

"failed to plead the most foundational aspect of a BIPA claim," namely that the defendant can identify them via the collected data); *see also Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1094 (N.D. Ill. 2017) (describing biometric identifiers and biometric information as capable of identifying a person).

The Ninth Circuit's decision in *Zellmer v. Meta Platforms, Inc.* is instructive. 104 F.4th at 1121. There, the plaintiff alleged Meta collected his face geometry when it reduced his photo to a "face signature" comparable to similar face templates. *Id.* The plaintiff argued that these "face signatures" were "biometric identifiers" because they "include the geometric x and y coordinates within the photo where a person's face appears, thus calculating the dimensions of the person's face." *Id.* at 1226. The Ninth Circuit rejected this premise, finding the plaintiff ignored the word "identifier" in "biometric identifier." *Id.* at 1223, 1226. Instead, the Ninth Circuit adopted the "consensus" view that, under "a fair reading of the statute," "scans of face geometry" are "not covered by BIPA if they cannot identify a person." *Id.* at 1223, 1125 n. 2.

The Northern District of Illinois recently reached a similar conclusion in *G.T. v. Samsung Electronics America Inc.*, 21 CV 4976, 2024 WL 3520026, *8 (N.D. Ill. July 24, 2024). Like *Zellmer*, the plaintiff alleged that Samsung's "Gallery App" analyzes the "unique facial geometry" of users to "create a unique digital representation of the face, called a 'face template.'" 2024 WL 3520026 at *1. The Gallery App can then "extract key facial features from the face template and convert that information into numerical 'vectors' based on the facial feature" to group images of the same person together. *Id.* The plaintiff argued that, because this practice involved analyzing a person's "unique facial geometry," the resulting face template must qualify as a "biometric identifier" under BIPA. *Id.* at *7. The court disagreed, however, holding that BIPA only regulates information "capable of identifying an individual," and therefore "the fact that the App performs

-15-

face scans is not dispositive." *Id.* As the plaintiff had not alleged that the "App's technology is capable of identifying a person's identity," the court dismissed the complaint. *Id.*

Just as in the above cases, the word "identifier" in BIPA must be given its plain meaning. And under that plain meaning, "BIPA only covers those . . . 'fingerprint[s]' . . . that are capable of identifying an individual. Therefore, the fact that the [timeclocks] perform [finger] scans is not dispositive." *G.T.*, 2024 WL 3520026 at *7. The dispositive question instead is whether the use of the finger scanner on the timeclocks leased by Paycor results in the collection of a fingerprint or other biometric information that is capable of identifying an individual. The answer is a resounding "no." In fact, it is ***impossible*** for a template to identify an individual. (SOF, ¶¶ 21-25).

Just as in *G.T.* and *Zellmer*, the template generated by the use of the finger scanner on the timeclock creates only an encrypted hash of numbers, letters, and symbols. (SOF, ¶¶ 16-19). That template is meaningless other than being used to track time by comparing it to the template generated by an employee's subsequent use of the same finger scanner. (SOF, ¶¶ 16-19, 38). There is no way for a template to identify an individual, and there is no way that a template can be reverse-engineered into a fingerprint or any other form of biometric information. (SOF, ¶¶ 21-25). ***It is impossible***. (SOF. ¶¶ 21-25). The timeclock does not even take, collect, or store a fingerprint, an image of a user's fingerprint or finger geometry, or any other depiction or illustration of a person's finger. (SOF, ¶ 23). The second that a user's finger leaves the scanner, the only information that exists relating to that scan is the template that is generated. (SOF, ¶ 23). The timeclock is incapable of creating or producing a fingerprint, image of a user's fingerprint or finger geometry, or any other depiction or illustration of a person's finger. (SOF, ¶¶ 23-24). Further, the templates that are stored on the timeclocks and in the tenant-segregated database are not stored

with any personally identifying information, such as employee names, addresses, email addresses, phone numbers, birthdates or social security numbers. (SOF, ¶ 29).

Just as in *G.T.* and *Zellmer*, merely because the timeclock scans a portion of a person's finger does not mean that the timeclock is collecting biometric information for purposes of BIPA – the timeclock must collect some information that is actually capable of identifying an individual. That is simply not how *any* biometric timekeeping technology works. The templates generated by the timeclocks are merely encrypted strings of numbers that *cannot possibly* identify a person or be reverse-engineered into a fingerprint or any other form of biometric information. No fingerprint or biometric information is collected or stored by the timeclock. Pursuant to the plain language of BIPA, as confirmed by *G.T.*, *Zellmer* and their progeny, BIPA does not apply because the timeclocks do not implicate "biometric information" or "biometric identifiers." Accordingly, Plaintiffs are entitled to summary judgment on all claims.

## III.    Plaintiffs Cannot Establish Any of Their BIPA Claims as a Matter of Law

### a.    Plaintiffs Lack Standing to Assert Claims Under Section 15(a) Because Their Templates Were Destroyed Within Three Years

BIPA Section 15(a) "requires private entities to destroy biometrics 'when the initial purpose for collecting or obtaining [the biometrics] has been satisfied or within 3 years of the individual's last interaction with the private entity, whichever occurs first." *Fleury v. Union Pac. R.R. Co.*, 20 C 390, 2024 WL 1555848, at *5 (N.D. Ill. Apr. 10, 2024) (citing 740 ILCS 14/15(a)). Thus, "***if [a plaintiff's] biometrics were properly destroyed within the timeframe established by the statute, he would not have standing to sue.***" *Id.* at *6 (emphasis added); *see also Horn v. Method Products, PBC*, 21 C 5621, 2022 WL 1090887, at *4 (N.D. Ill. Apr. 12, 2022) (holding that Section 15(a) claims are not ripe until three years after a plaintiff's biometric information was

allegedly collected, and that even where such a claim is ripe a plaintiff lacks standing to pursue it without establishing that biometric data was "unlawfully retained" beyond the statutory period).

Here, Plaintiff Johns only and ever clocked in and out in Missouri on a timeclock his employer, Club Fitness company Aphel Bill Serv LC (Client 78890), leased from Paycor, and he did so only from October 2, 2015 until April 26, 2016. (SOF, ¶¶ 4, 42-45). Plaintiff Barron's employer, Club Fitness company CF Collinsville LLC/Client 78986, in turn had him clock in and out from October 2015 until April 30, 2016, on a clock it leased from Paycor. (SOF, ¶ 46). On June 1, 2016, Club Fitness became a "lost" customer, *i.e.* the contractual relationship between Paycor and the Club Fitness entities ended. (SOF, ¶ 3). Effective August 22, 2018, a triggering command was executed by Paycor whereby all clients previously marked as "lost" in Paycor's systems, including the Club Fitness entities, had any template data automatically and permanently deleted from the client's dedicated environment. Leased timeclocks that are returned to Paycor have always been wiped of any remaining data, by pressing the factory re-set button, which automatically wipes the clock clean. (SOF, ¶¶ 47-48). Paycor does not retain this information in any form, in any location. (SOF, ¶ 48).

Accordingly, because Plaintiffs' template data was deleted no later than August 22, 2018, well within three (3) years after Plaintiffs' last interaction with the timeclocks, Plaintiffs lack standing to pursue claims under Section 15(a). (SOF, ¶ 48). Summary judgment should therefore be granted as to Plaintiffs' Section 15(a) claims.

### b.    Plaintiffs Cannot Establish That Paycor Collected, Captured or Otherwise Obtained Their Biometric Data Pursuant to Section 15(b)

The plain language of Section 15(b) consists of verbs (collect, capture, obtain) that, to apply, would require a defendant to take some active step or "do something." Numerous courts have held that Section 15(b) does not apply to entities who are merely "in possession" of biometric

information, but rather "an entity must, at a minimum, take an *active* step to collect, capture, purchase, or otherwise obtain biometric data." *Jacobs v. Hanwha Techwin America, Inc.*, 2021 WL 3172967, at *2 (N.D. Ill. July 27, 2021); *see also G.T. v. Samsung Elecs. Am. Inc.*, 21 CV 4976, 2024 WL 3520026, at *5 (N.D. Ill. July 24, 2024) ("Collectively, ***all these verbs 'mean to gain control' of Biometrics. This requires the defendant to make an affirmative effort***—to take an 'active step'—towards receiving the Biometrics." (emphasis added)); *Jones v. Microsoft Corp.*, 649 F. Supp. 3d 679, 683 (N.D. Ill. 2023) ("***Although BIPA does not say the words 'active step,' this concept simply describes the unifying characteristic among the verbs in the statute***." (emphasis added)); *Stauffer v. Innovative Heights Fairview Heights, LLC*, No. 20-cv-00046, 2022 WL 3139507 (S.D. Ill. Aug. 5, 2022) (requiring active step by defendant under §15(b)); *Kloss v. Acuant, Inc.*, 462 F. Supp. 3d 873, 877 (N.D. Ill. 2021); *Heard*, 440 F. Supp. 3d at 966 ("[A]ffirmative act" required to state a claim under Section 15(b)); *Namuwonge v. Kronos, Inc.*, 418 F. Supp. 3d 279, 286 (N.D. Ill. 2019) ("Brookdale collected the fingerprints using a system that Kronos supplied to Brookdale. Together, these allegations do not plausibly allege that Kronos collected, captured, or otherwise obtained Namuwonge's biometric information.").

Paycor was recently granted summary judgment in a similar case on the grounds that it did not collect or obtain biometric information. (*Ragsdale, et al. v. Paycor, Inc.*, Case No. 2017 CH 13911 (Cir. Ct. Cook Cty., Ex. E to SOF). In *Ragsdale*, Paycor also leased timeclocks to the plaintiffs' employers, and the Court found the employer, not Paycor, was the party "collecting" the alleged biometric information. (*Id.* at pp. 4-6). As the Court reasoned, "it is clear that Paycor did not actively seek out or collect the biometric data," and there is no evidence that Paycor "actively enrolled plaintiffs in purported biometric technology" or exercised a "high level of control . . . over the biometric time clock." (*Id.* at p. 6).

The same reasoning applies here. Paycor had absolutely no involvement in the actual collection or obtaining of Plaintiffs' alleged biometric information. Quite the contrary, after delivering the timeclocks, each Club Fitness entity exclusively controlled and oversaw the use of the timeclocks – Paycor had no further involvement and was not involved in enrolling employee templates. (SOF, ¶¶ 12-14). On a location-by-location basis, Club Fitness decided whether to even use finger-sensors at all in the timekeeping process, versus the many other available timekeeping options. (SOF, ¶ 11). Club Fitness had full control over the timeclocks. (SOF, ¶ 12). After a new user was enrolled, their template continuously remained within each Club Fitness location's dedicated environment, on the location's timeclock and in the tenant-segregated database for that Club Fitness entity's exclusive use. (SOF, ¶¶ 27-31). At no point in the process did Paycor collect or obtain any purported biometric information, much less actively so. The client is enrolling, registering, and scanning new user's fingers and then that data is being passively transmitted within the client's own dedicated environment. Paycor took no steps at all, much less any "active step," to collect Plaintiffs' templates. Summary judgment should be granted on Plaintiffs' Section 15(b) claim.

### c.    Plaintiffs Cannot Establish that Paycor Possessed their Biometric Data Pursuant to Section 15(a) or Section 15(d)

In order to maintain claims under Section 15(a) and (d), Plaintiffs must be able to demonstrate that Paycor "possessed" their biometric data. *See* 740 ILCS 14/15(a) (requiring entities in "*possession*" of biometric information to develop a retention schedule and destruction policy for the data and to timely destroy the data); 15(d) ("No private entity *in possession* of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information. . . ." (emphasis added)).

-20-

Possession means "the act of having or taking control." *Barnett v. Apple*, 2022 IL App (1st) 220187 at ¶¶ 41-42. In a precedential decision, *Barnett* applied common dictionary definitions to conclude that Apple did not "have control" of plaintiffs' data sufficient to constitute "possession" under BIPA. *Id.* Federal courts have similarly held that possession under BIPA exists only where a defendant "exercised control over plaintiff's data or otherwise held plaintiff's data at its disposal." *See*, *e.g. Jacobs*, 2021 WL 3172967, at *3 (N.D. Ill. July 27, 2021) (dismissing Section 15(a) and (d) claims where the plaintiff failed to allege "whether defendant could freely access the data, or even how defendant allegedly received it.").

Paycor was recently granted summary judgment in a similar case on the grounds that it did not "possess" biometric information, applying *Barnett's* precedential definition of possession as "control." (*Ragsdale, et al. v. Paycor, Inc.*, Case No. 2017 CH 13911, Ex. E to SOF). The *Ragsdale* opinion rejected the plaintiffs' claims that Paycor "possessed" the data simply because Paycor theoretically could access the plaintiffs' template data, but had never done so, noting: "[w]hile Plaintiffs would have the Court believe possession is broad and encompasses the possibility of possession, the Court declines to apply that broad definition." (*Id.* at p. 3). *Ragsdale* required a showing of actual "control" of data, particularly at the summary judgment stage, where "plaintiffs are required to put forth evidence, not theories and potentialities." (*Id*. at p. 4).

Plaintiffs cannot prove "possession" and thus are unable to withstand summary judgment. The template data for Plaintiffs was stored solely within each Club Fitness client's dedicated environment, on the timeclock itself and in a tenant-segregated database. (SOF, ¶¶ 26-31). Both Paycor and Club Fitness have provided sworn testimony that templates were accessible only by Club Fitness and at Club Fitness' direction, and that neither Club Fitness nor Paycor ever accessed

the templates. (SOF, ¶¶ 34-39). Theoretical access is not sufficient to establish possession under BIPA to state Section 15(a) or Section 15(d) claims. (*See Ragsdale*, Ex. E to SOF).

Nor does providing a client with its own, restricted storage space convert Paycor into a "possessor" of templates or any other biometric data. Courts have repeatedly found that passive storage is insufficient to meet the "possession" requirement. *See Heard*, 440 F. Supp. 3d at 968 ("Only one paragraph of the Complaint provides more detail: it states that…BD subsequently stored [Heard's] fingerprint data in their systems. This allegation does not plead that BD exercised any form of control over the data or that it held the data at [its] disposal."); *Jones*, 649 F. Supp. 3d at 684 (merely providing a "cloud computing storage platform" did "not constitute an active step or affirmative act"); *Jacobs*, No. 21 C 866, 2021 WL 3172967 at *3 (dismissing Section 15(b) claim where the defendant was not the "active collector" but rather "merely provided the cameras" that another entity allegedly used to collect biometric data).

Providing customers with their own passive storage space does not equate to Paycor having "control" of the purported biometric information or holding it at its disposal because Paycor ***did not do anything with that information.*** *Compare Heard v. Becton, Dickson & Co.,* 440 F. Supp. 3d 960, 968 (N.D. Ill. 2020) (finding allegations that defendant stored biometric information on its servers did not allege possession because it did not show that defendant "exercised any form of control over the data or that it held the data at its disposal" (internal quotation marks and citations omitted) *with Heard v. Becton, Dickson & Co.,* 524 F. Supp. 3d 831, 840 (N.D. Ill. 2021) (finding amended allegations that "users' biometric data flows back to [defendant's] servers (and potentially third-party data centers …***for analysis and support service***s" was sufficient to plead "possession" under BIPA) (emphasis added). Paycor did not perform any "analysis and support services" on the template data – rather, it is undisputed that Paycor did ***nothing*** with the data and

never even accessed it, and it would have no reason to do so given it consists of meaningless strings of numbers that serve no business purpose for Paycor. (SOF, ¶¶ 38-39).

Here, the Club Fitness entities' storage of their own template data on a tenant-segregated database is akin to a bank safety deposit box. (SOF, ¶ 35). The bank does not have ready access to or control over what is stored inside a safety deposit box – only the customer does. *See David v. Ridgely-Farmers Safe Deposit Co.*, 342 Ill. App. 96, 114 (3d Dist. 1950) (noting that a bank does not have the right to transfer the title to property in a safety deposit box). Similarly here, only Club Fitness had access and control over the template data stored in the tenant-segregated database. (SOF, ¶¶ 36-39). Plaintiffs cannot establish that Paycor "possessed" the template data, and therefore summary judgment should be granted as to Plaintiffs' Section 15(a) and (d) claims.

### d.    Plaintiffs Cannot Establish that Paycor Disclosed, Redisclosed, or Otherwise Disseminated Their Biometric Data Pursuant to Section 15(d)

Plaintiffs' Section 15(d) claim also fails because there is absolutely no evidence that Paycor ever disclosed or disseminated Plaintiffs' alleged biometric information to any third party.

Plaintiffs must allege that Paycor disclosed – meaning actually "revealed" or "exposed" (*Merriam-Webster* (2018)) – their data to a third party. It is insufficient to allege that Paycor "allowed" biometric information to be sent to "vendors for timekeeping, data storage, and payroll purposes" because these are "form[s] of mere transmission" that fall under the ambit of section 15(e), not section 15(d). *See Jacobs v. Hanwha Techwin Am., Inc.,* No. 21 C 866, 2021 WL 3172967, at \*4 (N.D. Ill. July 27, 2021) (dismissing a Section 15(d) claim because plaintiff had not presented "any legitimate reason to suspect that defendant disclosed his biometric data*"); see also Bernal v. ADP, LLC*, No. 2017-CH-12364, 2019 WL 5028609 (Ill. Cir. Ct. Aug. 23, 2019) (dismissing Section 15(d) claim against payroll and timekeeping provider ADP because allowing

biometric data to be sent to "vendors for timekeeping, data storage, and payroll purposes" is not disclosure, but is simply a "form of mere transmission.")

Recognizing that they have no evidence of any disclosure to a third party, Plaintiffs will argue that Paycor violated Section 15(d) by sending the template data – data that the Club Fitness entities already collected and possessed – back to Club Fitness from the tenant-segregated database. Plaintiffs' claim is nonsensical. First, Paycor cannot "disclose" information if the recipient of that data already possesses it. Club Fitness enrolled its own employees, and the template data is generated immediately upon enrollment and stored locally on the timeclock. (SOF, ¶¶ 23, 26). Such information cannot be "revealed" or "exposed" to the Club Fitness entities by Paycor when those Club Fitness entities already possessed that very same information.

Second, *no such disclosure ever occurred*, according to the record evidence. Each Club Fitness' template data remained within its own dedicated environment, in the tenant-segregated database, and on each location's timeclock. (SOF, ¶¶ 26-27). There is no evidence that any outside disclosure ever took place and in fact, much evidence that it did not. Club Fitness' CEO averred that Club Fitness never accessed or received any biometric data from Paycor, or asked Paycor to access templates. (SOF, ¶ 37). Paycor never accessed any Club Fitness templates. (SOF, ¶¶ 36-38). Paycor software was never used to replicate templates. (SOF, ¶¶ 34, 39). It is also undisputed that Paycor never provided template data from the Club Fitness entities' tenant-segregated database to Club Fitness or to any other third party. (SOF, ¶ 40). Summary judgment should be granted on Plaintiffs' Section 15(d) claim.

## IV. Plaintiffs' Claims Are Moot Because they Already Recovered From the Club Fitness Entities, the Sole Parties that Conceivably Violated BIPA

While it is true that a plaintiff may assert separate BIPA claims against multiple parties, at the summary judgment stage a plaintiff must put forth actual evidence that each of those parties

*separately* violated BIPA. *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (summary judgment should be granted where "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, on which that party will bear the burden of proof at trial."); *see also Klier v. Siegel*, 200 Ill. App. 3d 121, 127 (2d Dist. 1990) ("Illinois has a strong public policy against a plaintiff's double recovery for the same injury"). Discovery has established, beyond any doubt, that the Club Fitness entities are the sole parties here that conceivably violated BIPA. And Plaintiffs have already recovered a generous settlement from Club Fitness. Absent any evidence that Paycor separately violated BIPA, Plaintiffs should not be permitted to a windfall, double-recovery for their identical BIPA claims.

Plaintiff Johns was the named plaintiff in a separate BIPA lawsuit that was filed against the Club Fitness entities. (SOF, ¶ 50). Plaintiff Johns' case against Club Fitness asserted, in allegations nearly identical to those put forth here, that his former Club Fitness entity employer violated the same BIPA provisions that are at issue in this case. (*Id.*). On October 14, 2020, Plaintiff Johns' case against Club Fitness received final approval for a class action settlement. The settlement included a payment to each member of the following class:

> All individuals who worked or are currently working for any [Club Fitness entity] in the State of Illinois who had their fingerprint data and/or any other biometric identifier collected, captured, received, stored or otherwise obtained, retained, disseminated, or disclosed by any [Club Fitness entity] at any time within the five-year period preceding the date the Complaint was filed to the date of Preliminary Approval and who do not timely opt-out of the settlement.

(*Id.*). Both Plaintiffs are members of this class – Plaintiff Johns as the named plaintiff, and Plaintiff Barron as an unnamed individual who, per his allegations in this case, worked at certain Club Fitness locations during the relevant time period. (*Id.*) Consequently, each has already recovered for the alleged BIPA violations that they now purport to bring.

Despite already alleging that their former Club Fitness entity employers improperly collected their alleged biometric data through the use of the timeclocks in question here, Plaintiffs simultaneously allege in this case that the same actions magically resulted in Paycor committing the same violations. Plaintiffs will predictably assert that BIPA obligations are not limited to an employer and that BIPA claims may be asserted against multiple parties. The problem for Plaintiffs is that ***there is absolutely no evidence that Paycor was involved in any way in the alleged conduct giving rise to their BIPA claims.*** Rather, the Club Fitness entities are the only parties that conceivably violated BIPA here, and Plaintiffs have recovered already from Club Fitness.

As discussed throughout this brief, Paycor's only involvement here was providing the timeclocks and associated payroll services to the Club Fitness entities. (SOF, ¶ 12). After delivering the timeclocks, each Club Fitness entity exclusively controlled and oversaw the use of the timeclocks – Paycor had no further involvement and was not involved in enrolling employee templates. (SOF, ¶¶ 12-14). On a location-by-location basis, Club Fitness decided whether to even use finger-sensors at all in the timekeeping process, versus the many other available timekeeping options. (SOF, ¶ 11). Club Fitness had full control over the timeclocks. (SOF, ¶¶ 12-14). After a new user was enrolled, their template continuously remained within each Club Fitness location's dedicated environment, on the location's timeclock and in the tenant-segregated database, for each Club Fitness entity's exclusive use. (SOF, ¶¶ 27-31). Paycor never accessed any Club Fitness template data. (SOF, ¶¶ 36-40). Nor did Paycor ever disclose or disseminate Club Fitness template data to any Club Fitness entity or other third party. (SOF, ¶¶ 36-40).

Paycor simply had no role, whatsoever, in any alleged acts involving biometric data. To the extent templates are deemed to be biometric data, Club Fitness is the only party that could have collected the templates given the Club Fitness entities' exclusive control over the timeclocks. Club Fitness is the only party that could have disclosed the templates given that the templates were immediately created upon enrollment and always in the possession of the Club Fitness entities on the timeclocks and in the tenant-segregated database. Club Fitness is the only party that was responsible for and allegedly failed to have a BIPA-compliant policy.

Plaintiffs have already recovered from the only parties responsible for the identical BIPA violations they have asserted in *Johns v. Club Fitness* and in this case. The Club Fitness entities' alleged misconduct is not attributable to Paycor merely because Paycor leased the timeclocks to the Club Fitness entities. There is no evidence, whatsoever, of any involvement by Paycor in the handling of biometric data, let alone any BIPA violation. Plaintiffs' claims are therefore moot, and fail as a matter of law. This Court should grant summary judgment and put a stop to Plaintiffs' not-so-veiled attempt to weaponize BIPA and obtain a windfall, double recovery.

**WHEREFORE**, for the forgoing reasons, Defendant, Paycor, Inc., respectfully requests that the Court grant its Motion, enter judgment in its favor on all counts of Plaintiffs Kellin Johns and Juan Barron's First Amended Class Action Complaint, and grant Defendant such other and further relief that the Court deems equitable and just.

Dated: September 17, 2024                          Respectfully Submitted,

                                                                          **PAYCOR, INC.**

                                                                          */s/ Melissa A. Siebert*

                                                                          Melissa A. Siebert
                                                                          Christopher S. Hennessy
                                                                          COZEN O'CONNOR
                                                                          123 N. Wacker Dr., Suite 1800

Chicago, IL 60606
(312)-474-7900
msiebert@cozen.com
chennessy@cozen.com

*Attorneys for Defendant Paycor, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 17, 2024, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk via the Court's CM/ECF system, which will notify all counsel of record.

*/s/ Melissa A. Siebert*