# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **Kellin Johns and Juan Barron**, individually and on behalf of all others similarly situated, | ) ) |
| | ) Case No. 3:20-cv-00264-DWD |
| *Plaintiffs*, | ) |
| v. | ) Judge David W. Dugan |
| | ) |
| **Paycor, Inc.,** | ) |
| | ) |
| *Defendant.* | ) |

## DECLARATION OF DAVID GOODWIN

I, David Goodwin, declare as follows:

1.      I have been employed at Paycor, Inc. ("Paycor"), a company that offers recruiting, human resources, and payroll solutions to clients throughout the country, for over eight years. Currently, I serve as Paycor's Senior Portfolio Product Manager. In this capacity, my job duties and responsibilities include the management of the time-keeping portfolio of products.

2.      In connection with my employment at Paycor, I have personal knowledge of the products and services provided to Paycor's clients. I also have knowledge of the written agreements entered into between Paycor and its clients, including Club Fitness, Inc. and the various, individual Club Fitness locations.

3.      I am generally aware of several class action lawsuits filed against Paycor under the Illinois Biometric Information Privacy Act ("BIPA"), including this lawsuit.

4.      As part of reviewing and editing this declaration, I have reviewed the lawsuit allegations of Plaintiffs Kellin Johns and Juan Barron, contained in the First Amended Class Action Complaint, including their contention that they worked at various Club Fitness locations in Illinois. (Ex. 1). I have also reviewed the affidavit of Eric Schreimann, the Chief Financial Officer

of Customer Service CF, LLC, which I understand was provided by Plaintiffs' counsel in this lawsuit. (Ex. 2). I have further reviewed Paycor's agreements with the companies where Plaintiffs worked while these companies were Paycor clients. (Exs. 3 and 4).

5.       In addition to reviewing the above documents, I also reviewed "lost" customer data related to the Club Fitness entities where Plaintiffs Kellin Johns and Juan Barron worked while these companies were Paycor clients, which was gathered using SQL queries of relevant database archives. I reviewed "lost customer" data because all Club Fitness entities in Illinois and Missouri ceased being Paycor clients as of June 1, 2016. Screenshots of the some of the data retrieved are attached to this Declaration as Ex. 5.

6.       In August 2015, Paycor and Club Fitness entered into individual Agreements with Club Fitness companies in Illinois and Missouri whereby Paycor would provide payroll and related services to these Club Fitness companies, including leasing them timeclocks. Each of these contracts were terminated effective June 1, 2016, when all Club Fitness entities ceased being Paycor clients.

7.       With respect to these Agreements and the services Paycor provided, each Club Fitness entity was organized by location. Each location had its own timekeeping and payroll set-up, including its own timeclock, using data specific to that location. Club Fitness locations were not set up to share, and did not share, payroll or timekeeping data. In fact, it was not possible for any Club Fitness location to share payroll or timekeeping data with any other location, because each had its own federal employer identification number ("FEIN"). As a result, Club Fitness employees could only record time at, and be paid by, their specific work location.

8.       Paycor's records show that during the timeframe October 2, 2015 – April 26, 2016, Kellin Johns punched in and out for work at and was paid from a Club Fitness location known as

Aphel Bill Serv LC, located in Chesterfield, Missouri. The location is also known within Paycor's systems as Client 78890.

9.      A copy of Paycor's Terms and Conditions ("T&C's") and Customer Service Agreement ("CSA") between Paycor and Aphel Bill Serv LC/Client 78890 (referred to in the CSA as "Alpha Bill Serv LC"), which includes Paycor's Supplemental Agreement for the Purchase and Rental of Time Clocks ("TC Rental") is attached to this Declaration as Ex. 3. Collectively, I refer to these documents as the "Missouri Agreement."

10.     According to the Missouri Agreement, Aphel Bill Serv LC/Client 78890 leased one Perform Time 100 ("PT100") timeclock from Paycor to use at its sole location in Chesterfield, Missouri. Once that timeclock was delivered to Aphel Bill Serv LC/Client 78890, it was used, operated, managed and overseen exclusively by employees of Aphel Bill Serv LC/Client 78890 in Chesterfield, Missouri. The location chose how to use its timeclock, including whether to use finger-sensor or proximity badging or employee ID numbers as part of the clocking in and out process (also called "punching" in or out). Payroll and timekeeping data were confined to the Aphel Bill Serv LC/Client 78890 in Chesterfield, Missouri, and could not be shared with any other Club Fitness locations.

11.     In addition, Aphel Bill Serv LC/Client 78890 also handled employee enrollment in the PT 100 timeclock – Paycor had no involvement in employee enrollment. Paycor was not involved in the daily operation and use of the timeclock at all.

12.     Paycor's records show that Plaintiff Kellin Johns only and ever punched in and out using a PT 100 timeclock leased by Aphel Bill Serv LC/Client 78890 in Chesterfield, Missouri.

13.     **Paycor has no records indicating that Kellin Johns punched in or out using a timeclock leased or purchased from Paycor in Illinois at any time. Paycor has no records**

**indicating that Kellin Johns ever punched in and out in Illinois at all.** Had Mr. Johns used a timeclock at any Club Fitness company in Illinois covered by any Agreement between Paycor and a Club Fitness company, Paycor's records would indicate he had done so.

14.     Paycor's records show that during the timeframe October 2, 2015 – April 30, 2016, Plaintiff Juan Barron punched in and out from work at and was paid by a Club Fitness entity and Paycor customer called CF Collinsville LLC, located in Collinsville, Illinois.  This location is also known as Client 78986.

15.     In August 2015, CF Collinsville LLC/Client 78986 entered into its own Agreement with Paycor consisting of Paycor's Terms and Conditions ("T&C's") and Customer Service Agreement ("CSA"), including Paycor's Supplemental Agreement for the Purchase and Rental of Time Clocks ("TC Rental"), which is attached to this Declaration as Ex. 4.  Collectively, I refer to these documents as the "Illinois Agreement."

16.     According to the Illinois Agreement, CF Collinsville LLC/Client 78986 leased one Perform Time 100 ("PT100") timeclock from Paycor to use at its sole location in Collinsville, Illinois.  Once that timeclock was delivered to CF Collinsville LLC/Client 78986, the timeclock was used, operated, managed and overseen exclusively by employees of CF Collinsville LLC/Client 78986 in Collinsville, Illinois.  The location chose how to use its timeclock, including whether to use finger-sensor or proximity badging or employee ID numbers. Payroll and timekeeping data were confined to CF Collinsville LLC/Client 78986 in Collinsville, Illinois, and could not be shared with any other Club Fitness locations.

17.     In addition, CF Collinsville LLC/Client 78986 also handled employee enrollment in the PT 100 timeclock – Paycor had no involvement in employee enrollment. Paycor was not involved in the daily operation and use of the timeclock at all.

4

18.    I have read portions of Mitri Dahdaly's deposition testimony and agree with his description of the process by which finger-sensor templates are created and stored by Paycor's clients, including the Club Fitness entities where Plaintiffs worked.  My Declaration expands upon the aspect of storage discussed by Mr. Dahdaly to further clarify that clients control template storage and access, not Paycor.

19.    Since Mr. Barron is the only named Plaintiff to have used a timeclock leased from Paycor to clock in and out from work in Illinois, my Declaration will specifically focus on CF Collinsville LLC/Client 78986, but my statements in this Declaration apply equally to the other Club Fitness locations and other Paycor clients.

20.    Assuming that  CF Collinsville LLC/Client 78986 elected to utilize the finger-sensor capabilities of its PT 100 timeclock and enrolled employees in the timeclock, creating templates, those templates were stored by CF Collinsville LLC/Client 78986 in two places, both of which were under its sole control: (1) it stored enrolled templates on its timeclock, and (2) it stored templates in its dedicated environment in a tenant-segregated database hosted on a cloud server, for CF Collinsville LLC/Client 78986's use and access.

21.    Templates stored on the dedicated environment in a tenant-segregated database, such as those stored by CF Collinsville LLC/ Client 78986, are not stored with any personally identifying information, such as employee names, addresses, email addresses, phone numbers, birthdates or social security numbers. My statements are true for all Paycor clients storing templates in their dedicated environments in the tenant-segregated database.

22.    Paycor does not access clients' dedicated environments without express client permission.  Paycor specifically does not access templates because they are encrypted strings of numbers that have no meaning or use outside of clients' internal timekeeping processes. This

statement is true for all Paycor clients storing templates in their dedicated environments in the tenant-segregated database, including the Club Fitness locations.

23.    Paycor did not access any Club Fitness templates or view them. There are no Club-Fitness work orders requesting that Paycor access any Club Fitness location's templates, nor are such work orders likely to exist for any other Paycor clients, since there is no business purpose for Paycor to access or view templates.

24.    Additionally, at each of the entities where Plaintiffs worked - Aphel Bill Serv LC/Client 78890 and CF Collinsville LLC/Client 78986 – there was only one timeclock at each location.  Paycor's software can be used by clients to replicate templates on multiple clocks within the customer's environment, or to replicate templates when the customer replaces an existing timeclock or purchases an additional timeclock. Neither circumstance existed here, so no template replication occurred.

25.    When templates are replicated by clients using Paycor's software, the process is automated via a series of "gets" and "posts" between the clients' timeclocks and the tenant-segregated database. No templates are disseminated or disclosed. Any template replication occurs within the clients' own dedicated environments, and does not require or involve any action by Paycor.

26.    Paycor does not disclose or disseminate clients' templates, and did not disseminate or disclose any Club Fitness employee templates, to any entity.

27.    Paycor implemented BIPA-compliant embedded consent on its Perform Time timeclocks beginning in April 2021, and fully completed the process as of October 18, 2021. A copy of the embedded consent is attached as Ex. 8 to this Declaration. During the implementation process, some Paycor customers advised Paycor that they were already BIPA compliant.

28.    Some Paycor customers also have advised Paycor that they implemented BIPA-compliant consents that expressly included Paycor.  A copy of one such consent, with the client's identifying information redacted, is attached as Ex. 6 to this Declaration.

29.    Paycor's records reveal that over 1,000 putative class members had pay records during the relevant time frame indicating that a pay deduction was applied pursuant to one of several, standardized union deduction codes.  Additionally, many Paycor clients who used Perform Time timeclocks in Illinois during the time frame January 17, 2015 – October 18, 2021 used custom deduction codes, or would not use any deduction codes, for their unionized employees.

30.    Some Paycor customers have also advised Paycor that they had Collective Bargaining Agreements that were applicable to their employees using PT 100 and PT 150 timeclocks. A copy of one such Collective Bargaining Agreement, with the client's name redacted, is attached as Ex. 7 to this Declaration.

31.    "Lost" clients are clients, like Club Fitness, who end their business relationship with Paycor, and terminate their contracts.  Effective August 22, 2018, a triggering command was executed whereby all clients previously marked as "Lost" in Paycor's systems had any employee templates automatically and permanently deleted from the client's dedicated environment. Leased timeclocks that are returned to Paycor have always been wiped of any remaining data, by pressing the factory re-set button, which automatically wipes the clock clean.

32.    Club Fitness corporate and individual Club Fitness locations, including CF Collinsville LLC/Client 78986 and Aphel Bill Serv/Client 78890 in Chesterfield, Missouri, ceased being Paycor clients effective June 1, 2016.  No later than August 22, 2018, any finger-sensor templates of employees of all Club Fitness clients, including CF Collinsville LLC/Client 78986 and Aphel Bill Serv/Client 78890 in Chesterfield, Missouri, were permanently destroyed in

accordance with Paycor's practices. Paycor did not retain templates in any form, in any location.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _09/17/24 | 8:22 PM EDT_____.

DocuSigned by:

*David Goodwin*

_58B1A5F10F16466..._     _____

David Goodwin

# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

KELLIN JOHNS and JUAN BARRON,
individually and on behalf of all others
similarly situated,

       *Plaintiffs,*

v.

PAYCOR, INC.,

       *Defendant.*

Case No. 3:20-cv-00264-DWD
Judge David W. Dugan

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Kellin Johns ("Johns") and Juan Barron ("Barron") (together, "Plaintiffs"), by and through their attorneys, bring this First Amended Class Action Complaint ("FAC") individually and on behalf of all others similarly situated (the "Class") pursuant to Rule 23 of the Federal Rules of Civil Procedure against Defendant Paycor, Inc. ("Paycor" or "Defendant") to redress and curtail Defendant's unlawful collection, use, storage, and disclosure of Plaintiffs' and the proposed Class' sensitive and proprietary biometric data. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

### NATURE OF THE ACTION

1. Defendant Paycor, Inc. designs and manufactures fully-integrated time and attendance products and services for businesses ranging from small service companies to global corporations.

2. Chief among the products Defendant manufactures are biometric solutions such as biometric time keeping devices, which feature fingerprint readers, hand geometry readers, and

1

other similar devices (collectively referred to as "Biometric Time Clocks"), which require scans of users' biometric data[1] in order for those users to clock in and out of work.

3.      Defendant's systems and software require users to scan their biometric identifiers, namely their fingerprints or hand geometry, when using Biometric Time Clocks as an authorization method to track their time worked. The Biometric Time Clock scans the worker's fingerprints or hand geometry to clock in and out of work shifts and meal breaks. Upon information and belief, once a user has registered his or her fingerprint or hand geometry with a Biometric Time Clock, that biometric identifier and related biometric information is enrolled and stored in Defendant's database(s).

4.      While there are benefits to using biometric time clocks in the workplace, there are also serious risks. Unlike key fobs or identification cards—which can be changed or replaced if stolen or compromised—fingerprints and handprints are unique, permanent biometric identifiers associated with the individual. This exposes individuals who use Paycor's Biometric Time Clocks to serious and irreversible privacy risks. For example, if a database containing fingerprints, hand geometry, or other sensitive, proprietary biometric data is hacked, breached, or otherwise exposed – like in the recent Equifax, Facebook/Cambridge Analytica, and Suprema data breaches or misuses – individuals have no means by which to prevent identity theft, unauthorized tracking or other unlawful or improper use of this highly personal and private information.

5.      Biometrics are not relegated to esoteric corners of commerce. Many businesses and financial institutions have incorporated biometric applications into their workplace in the form of biometric timeclocks or authenticators, and into consumer products, including such ubiquitous consumer products as checking accounts and cell phones.

---

[1]  The term "biometric data" collectively refers to and encompasses biometric identifiers and biometric information as defined in 740 ILCS 14/10.

6.  In 2015, a data breach at the United States Office of Personnel Management exposed the personal identification information, including biometric data, of over 21.5 million federal employees, contractors, and job applicants. U.S. Off. of Personnel Mgmt., *Cybersecurity Incidents* (2018), *available at* www.opm.gov/cybersecurity/cybersecurity-incidents.

7.  An illegal market already exists for biometric data. Hackers and identity thieves have targeted Aadhaar, the largest biometric database in the world, which contains the personal and biometric data – including fingerprints, iris scans, and facial photographs – of over a billion Indian citizens. *See* Vidhi Doshi, *A Security Breach in India Has Left a Billion People at Risk of Identity Theft*, The Washington Post (Jan. 4, 2018), *available at* https://www.washingtonpost.com/news/worldviews/wp/2018/01/04/a-security-breach-in-india-has-left-a-billion-people-at-risk-of-identity-theft/?utm_term=.b3c70259fl38.

8.  In January 2018, an Indian newspaper reported that the information housed in Aadhaar was available for purchase for less than $8 and in as little as 10 minutes. Rachna Khaira, *Rs 500, 10 Minutes, and You Have Access to Billion Aadhaar Details*, The Tribune (Jan. 4, 2018), *available at* http://www.tribuneindia.com/news/nation/rs-500-10-minutes-and-you-have-access-to-billion-aadhaar-details/523361.html.

9.  In August 2019, it was widely reported that Suprema, a security company responsible for a web-based biometrics lock system that uses fingerprints and facial geometry scans in 1.5 million locations around the world, maintained biometric data and other personal information on a publicly accessible, unencrypted database. Josh Taylor, *Major Breach Found in Biometrics System Used by Banks, UK police and Defence Firms*, The Guardian (Aug. 14, 2019), *available at* https://www.theguardian.com/technology/2019/aug/14/major-breach-found-in-biometrics-system-used-by-banks-uk-police-and-defence-firms.

10.     In the United States, law enforcement, including the Federal Bureau of Investigation and Immigration and Customs Enforcement, have attempted to turn states' Department of Motor Vehicles databases into biometric data goldmines, using facial recognition technology to scan the faces of thousands of citizens, all without their notice or consent. Drew Harwell, *FBI, ICE Find State Driver's License Photos Are a Gold Mine for Facial-Recognition Searches*, The Washington Post (July 7, 2019), *available at* https://www.washingtonpost.com/technology/2019/07/07/fbi-ice-find-state-drivers-license-photos-are-gold-mine-facial-recognition-searches/.

11.     This practice has been criticized by lawmakers. Some states, including Illinois, have refused to comply with law enforcement's invasive requests. *State Denying Facial Recognition Requests*, Jacksonville Journal-Courier (July 9, 2019), *available at* https://www.myjournalcourier.com/news/article/State-denying-facial-recognition-requests-14081967.php.

12.     Recognizing the need to protect its citizens from situations like these, Illinois enacted the Biometric Information Privacy Act ("BIPA"), 740 ILCS 14/1, *et seq.*, specifically to regulate companies that collect and store Illinois citizens' biometrics, such as fingerprints.

13.     Notwithstanding the clear and unequivocal requirements of the law, Paycor disregards Biometric Time Clock users' statutorily protected privacy rights and unlawfully collects, captures, otherwise obtains, stores, maintains, and uses their biometric data in violation of BIPA. Specifically, Paycor has violated and continues to violate BIPA because it did not and continues not to:

        a.     Properly inform Plaintiffs and others similarly situated in writing of the specific purpose and length of time for which their biometric data was being collected, captured, otherwise obtained, stored, maintained and used, as required by BIPA;

4

       b.     Receive a written release from Plaintiffs and others similarly situated to collect, capture, otherwise obtain, store, or use their biometric data, as required by BIPA;

       c.     Provide a publicly available retention schedule and guidelines for permanently destroying Plaintiffs' and other similarly-situated individuals' biometric data, as required by BIPA; and

       d.     Obtain consent from Plaintiffs and others similarly situated to disclose, redisclose, or otherwise disseminate their biometric data to a third party, as required by BIPA.

14.    Upon information and belief, Defendant improperly discloses its Biometric Time Clock users' fingerprint and hand geometry data to other, currently unknown, third parties, including but not limited to Defendant's clients and/or other third parties that host biometric data in their data center(s).

15.    Upon information and belief, Defendant lacks retention schedules and guidelines for permanently destroying Plaintiffs' and other similarly-situated individuals' biometric data and has not and will not destroy their biometric data, as required by BIPA.

16.    Biometric Time Clock users have a proprietary right to control their biometric identifiers and information. In failing to comply with the requirements of BIPA, Defendant intentionally interferes with each user's right of possession and control over their valuable, unique, and permanent biometric data.

17.    Defendant is directly liable for, and had actual knowledge of, the BIPA violations alleged herein.

18.    Accordingly, Plaintiffs seek an Order: (1) declaring that Defendant's conduct violates BIPA; (2) requiring Defendant to cease the unlawful activities discussed herein; and (3) awarding statutory damages to Plaintiffs and the proposed Class.

## PARTIES

19.     Plaintiff Kellin Johns is a natural person and a citizen of the State of Illinois.

20.     Plaintiff Juan Barron is a natural person and a citizen of the State of Illinois.

21.     Defendant Paycor, Inc. is a Delaware corporation that is registered to do business in Illinois.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2)(A), (d)(5)(B) because the proposed class has 100 or more members, the amount in controversy exceeds $5,000,000.00, and the parties are minimally diverse.

23.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this judicial district.

## FACTUAL BACKGROUND

### I.      The Biometric Information Privacy Act.

24.     In the early 2000s, major national corporations started using Chicago and other locations in Illinois to test "new applications of biometric-facilitated financial transactions, including finger-scan technologies at grocery stores, gas stations, and school cafeterias." 740 ILCS 14/5(c). Given its relative infancy, an overwhelming portion of the public became weary of this then-growing, yet unregulated, technology. *See* 740 ILCS 14/5.

25.     In late 2007, a biometrics company called Pay by Touch, which provided major retailers throughout the State of Illinois with fingerprint scanners to facilitate consumer transactions, filed for bankruptcy. That bankruptcy was alarming to the Illinois Legislature because suddenly there was a serious risk that millions of fingerprint records – which, like other unique biometric identifiers, can be linked to people's sensitive financial and personal data – could now

be sold, distributed, or otherwise shared through the bankruptcy proceedings without adequate protections for Illinois citizens. The bankruptcy also highlighted the fact that most consumers who had used that company's fingerprint scanners were completely unaware that the scanners were not actually transmitting fingerprint data to the retailer who deployed the scanner, but rather to the now-bankrupt company, and that their unique biometric identifiers could now be sold to unknown third parties.

26.     Recognizing the "very serious need [for] protections for the citizens of Illinois when it [came to their] biometric information," Illinois enacted BIPA in 2008. *See* Illinois House Transcript, 2008 Reg. Sess. No. 276; 740 ILCS 14/5.

27.     Additionally, to ensure compliance, BIPA provides that, for each violation, the prevailing party may recover $1,000 or actual damages, whichever is greater, for negligent violations and $5,000, or actual damages, whichever is greater, for intentional or reckless violations. 740 ILCS 14/20.

28.     BIPA is an informed consent statute which achieves its goal by making it unlawful for a company to, among other things, collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information, unless it first:

   a.     Informs the subject in writing that a biometric identifier or biometric information is being collected or stored;

   b.     Informs the subject in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; and

   c.     Receives a written release executed by the subject of the biometric identifier or biometric information.

*See* 740 ILCS 14/15(b).

7

29.     BIPA specifically applies to individuals who work or reside in the State of Illinois.

30.     Biometric identifiers include retina and iris scans, voiceprints, scans of face geometry, and – most importantly here – scans of fingerprints and hand geometry. *See* 740 ILCS 14/10. Biometric information is separately defined to include any information based on an individual's biometric identifier that is used to identify an individual. *Id.*

31.     BIPA also establishes standards for how entities must handle Illinois citizens' biometric identifiers and biometric information. *See, e.g.,* 740 ILCS 14/15(c)-(d). For example, BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for that disclosure. *See* 740 ILCS 14/15(d)(1).

32.     BIPA also prohibits selling, leasing, trading, or otherwise profiting from a person's biometric identifiers or biometric information (740 ILCS 14/15(c)) and requires companies to develop and comply with a written, publicly-available policy establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting such identifiers or information has been satisfied, or within three years of the individual's last interaction with the company, whichever occurs first. 740 ILCS 14/15(a).

33.     The Illinois legislature enacted BIPA due to the increasing use of biometric data in financial and security settings, the general public's hesitation to use biometric information, and – most significantly – the unknown ramifications of biometric technology. Biometrics are biologically unique to the individual and, once compromised, an individual is at heightened risk for identity theft and left without any recourse.

34.     BIPA provides individuals with a private right of action, protecting their right to privacy regarding their biometric data. BIPA also protects individuals' rights to know the precise nature for which their biometric identifiers and information are being obtained and used, how they are being stored and ultimately destroyed, allowing individuals to make a truly informed choice. Unlike other statutes that only create a right of action if there is a qualifying data breach, BIPA strictly regulates the manner in which entities may collect, store, use, and disseminate biometrics and creates a private right of action for lack of statutory compliance.

35.     Plaintiffs, like the Illinois legislature, recognize how imperative it is to keep biometric identifiers and biometric information secure. Biometric data, unlike other personal identifiers such as a social security number, cannot be changed or replaced if hacked or stolen.

## II.     Defendant Violates the Biometric Information Privacy Act.

36.     By the time BIPA passed through the Illinois legislature in mid-2008, most companies who had experimented with using individuals' biometric data stopped doing so.

37.     However, Defendant failed to take note of the shift in Illinois law governing the collection, obtainment, storage, use and dissemination of biometric data. As a result, Defendant continues to collect, obtain, store, use and disseminate Illinois citizens' biometric data in violation of BIPA.

38.     Specifically, when individuals first use Defendant's Biometric Time Clock, they are required to have their fingerprint or hand geometry scanned in order to enroll them in the Paycor database(s).

39.     Unfortunately, Defendant fails to inform these individuals that they are collecting, capturing, obtaining, storing or using their sensitive biometric data, the extent of the purposes for which they do so, or to whom the data is disclosed, if at all.

40.     Defendant fails to maintain a written, publicly available policy identifying its retention schedule and guidelines for permanently destroying individuals' biometric identifiers and information when the initial purpose for collecting, capturing or obtaining their biometric data is no longer relevant, as required by BIPA.

41.     In addition, Defendant profits from the use of individuals' biometric data. For instance, Paycor markets its Biometric Time Clocks to employers as superior options to traditional time clocks, which can be deceived by "buddy punching" – where one employee punches in to or out of a time clock for another (absent) employee.[2] By marketing its clocks in this manner, Defendant obtains a competitive advantage over other biometric time clock companies and secure profits from their use of biometric data, all while failing to comply with the minimum requirements for handling users' biometric data established by BIPA.

42.     The Pay By Touch bankruptcy that catalyzed the passage of BIPA highlights why such conduct – where individuals are aware that they are providing biometric data but not aware to whom or for what purposes they are doing so – is dangerous. That bankruptcy spurred Illinois citizens and legislators into realizing that it is crucial for individuals to understand when providing biometric identifiers, such as fingerprints and hand geometry, who exactly is collecting or obtaining their biometric data, where it will be transmitted and for what purposes, and for how long. Defendant disregards these obligations and these individuals' statutory rights, and instead unlawfully collects, captures, obtains, stores, uses and disseminates their biometric identifiers and information, without ever receiving the individual's informed written consent required by BIPA.

---

[2] Paycor, *Don't Fall Victim to Time Theft*, available at https://www.paycor.com/resource-center/dont-fall-victim-to-time-theft (listing "biometric time clocks that read employee fingerprints or handprints to prevent buddy punching" as a way to minimize time theft).

43.     Remarkably, Defendant has created the same situation that Pay By Touch did by assembling a database of biometric data through broadly deployed fingerprint and hand geometry readers, but failed to comply with the law specifically designed to protect individuals whose biometrics are collected in these circumstances. Defendant disregards these obligations and Illinois citizens' statutory rights and instead unlawfully collects, captures, obtains, stores, uses, and disseminates individuals' biometric identifiers and information without ever receiving the individual's informed written consent as required by BIPA.

44.     Plaintiffs and others similarly situated are not told what might happen to their biometric data if and when Defendant merges with another company or worse, if and when Defendant's business folds, or when any other third-party entity, that has received their biometric data, folds.

45.     Because Defendant neither publishes a BIPA-mandated data retention policy nor discloses the purposes for its collection or obtainment of biometric data, individuals are left in the dark regarding the extent to which Defendant stores, uses, sells, discloses, re-discloses, or otherwise disseminates their biometric data to whom and when. Moreover, Plaintiffs and others similarly situated are not told to whom Defendant currently discloses their biometric data, or what might happen to their biometric data in the event of a merger or a bankruptcy.

46.     These violations have raised a material risk that Plaintiffs' and other similarly-situated individuals' biometric data will be unlawfully accessed by third parties.

47.     By and through the actions detailed above, Defendant disregarded Plaintiffs' and other similarly-situated individuals' legal rights in violation of BIPA.

## III.   Plaintiffs' Experiences

48.   Plaintiff Kellin Johns worked for Club Fitness, Inc. from 2013 to 2017 in six Illinois locations: Alton, Wood River, Granite City, Collinsville, Fairview Heights, and Belleville.

49.   <u>Plaintiff Juan Barron worked for Club Fitness, Inc. from 2013 to 2020 in five Illinois locations: O'Fallon, Granite City, Collinsville, Fairview Heights, and Belleville.</u>

50.   From approximately September 2015 through April of 2016, Paycor provided Club Fitness with time and attendance hardware and software, including Biometric Time Clocks.  As part of its services, Paycor collected and managed the biometric data of Mr. Johns, Mr. Barron, and other Club Fitness employees.

51.   Plaintiffs were required to scan their fingerprints on Paycor's Biometric Time Clock at Club Fitness so they could be used as an authentication method to track their time worked.

52.   Defendant subsequently stored Plaintiffs' fingerprint biometric data in its databases.

53.   Plaintiffs have never been informed of the specific limited purposes or length of time for which Defendant collects, captures, obtains, stores, and/or uses their biometric data.

54.   Plaintiffs have never been informed of any written, publicly available biometric data retention policy developed by Defendant, nor have they ever been informed of whether Defendant will ever permanently delete their biometric data.

55.   Plaintiffs have never been provided with, nor ever signed, a written release allowing Defendant to collect, capture, obtain, store, use and/or disseminate their biometric data.

56.   Plaintiffs have continuously and repeatedly been exposed to the risks and harmful conditions created by Defendant's violations of BIPA alleged herein.

57.     No amount of time or money can compensate Plaintiffs if their biometric data is compromised by the lax procedures through which Defendant collected, captured, obtained, stored, and/or used their and other similarly-situated individuals' biometrics. Moreover, Plaintiffs would not have provided their biometric data to Defendant if they had known that Defendant would retain such information for an indefinite period of time without their consent.

58.     A showing of actual damages is not necessary in order to state a claim under BIPA. *See Rosenbach v. Six Flags Ent. Corp.*, 2019 IL 123186, ¶ 40 ("[A]n individual need not allege some actual injury or adverse effect, beyond violation of his or her rights under the Act, in order to qualify as an "aggrieved" person and be entitled to seek liquidated damages and injunctive relief pursuant to the Act").

59.     Nonetheless, Plaintiffs are aggrieved because they suffered an injury-in-fact based on Defendant's violations of their legal rights. Defendant has intentionally interfered with Plaintiffs' right to possess and control their own sensitive biometric data. Additionally, Plaintiffs suffered an invasion of a legally protected interest when Defendant secured their personal and private biometric data at a time when it had no right to do so, a gross invasion of their rights to privacy. BIPA protects individuals like Plaintiffs from this precise conduct. Defendant had no lawful right to obtain this data or share it with third parties absent a specific legislative license to do so.

60.     As Plaintiffs are not required to allege or prove actual damages in order to state a claim under BIPA, they seek statutory damages under BIPA as compensation for the injuries caused by Defendant. *Rosenbach*, 2019 IL 123186, ¶ 40.

## CLASS ALLEGATIONS

61.     Pursuant to Rule 23(a) and 23(b) of the Federal Rules of Civil Procedure, Plaintiffs

bring claims on their own behalf and as a representative of all other similarly situated individuals pursuant to BIPA, 740 ILCS 14/1, *et seq.*, to recover statutory penalties, prejudgment interest, attorneys' fees and costs, and other damages owed.

62.     As discussed *supra*, Section 14/15(b) of BIPA prohibits a company from, among other things, collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's or a customer's biometric identifiers or biometric information, unless it ***first*** (1) informs the individual in writing that a biometric identifier or biometric information is being collected, obtained or stored; (2) informs the individual in writing of the specific purpose and length of time for which a biometric identifier or biometric information is being collected, obtained, stored, and used; ***and*** (3) receives a written release executed by the subject of the biometric identifier or biometric information. 740 ILCS 14/15.

63.     Plaintiffs seek class certification for the following class of similarly situated individuals:

> All in individuals working in the State of Illinois who had their fingerprints, hand geometry, or other biometric data collected, captured, received, or otherwise obtained or disclosed by Defendant during the applicable statutory period.

64.     This action is properly maintained as a class action under Rule 23 because:

A.     The class is so numerous that joinder of all members is impracticable;

B.     There are questions of law or fact that are common to the class;

C.     Plaintiffs' claims are typical of the claims of the class; and,

D.     Plaintiffs will fairly and adequately protect the interests of the class.

**<u>Numerosity</u>**

65.     The total number of putative class members exceeds 100 individuals. The exact number of class members may easily be determined from Defendant's records.

## **Commonality**

66.     There is a well-defined commonality of interest in the substantial questions of law and fact concerning and affecting the Class in that Plaintiffs and all members of the Class have been harmed by Defendant's failure to comply with BIPA. The common questions of law and fact include, but are not limited to the following:

A.     Whether Defendant collected, captured, maintained, stored or otherwise obtained Plaintiffs' and the putative Class members' biometric identifiers or biometric information;

B.     Whether Defendant properly informed Plaintiffs and the Class members of its purposes for collecting, using and storing their biometric identifiers or biometric information;

C.     Whether Defendant obtained a written release (as defined in 740 ILCS 14/10) to collect, use and store Plaintiffs' and the putative Class members' biometric identifiers or biometric information;

D.     Whether Defendant has disclosed or re-disclosed Plaintiffs' and the putative Class members' biometric identifiers or biometric information;

E.     Whether Defendant has sold, leased, traded, or otherwise profited from Plaintiffs' and the putative Class members' biometric identifiers or biometric information;

F.     Whether Defendant developed a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied or within three years of their last interaction, whichever occurs first;

G.     Whether Defendant complies with any such written policy;

H.     Whether Defendant's violations of BIPA have raised a material risk that Plaintiffs' and the putative Class members' biometric data will be unlawfully accessed by third parties;

I.     Whether Defendant used Plaintiffs' and the putative Class members' fingerprints and hand geometry to identify them; and

J.     Whether Defendant's violations of BIPA were committed negligently; and

   K.  Whether Defendant's violations of BIPA were committed intentionally or recklessly.

67.  Plaintiffs anticipate that Defendant will raise defenses that are common to the class.

<b><u>Adequacy</u></b>

68.  Plaintiffs will fairly and adequately protect the interests of all members of the class, and there are no known conflicts of interest between Plaintiffs and class members. Plaintiffs, moreover, have retained experienced counsel that are competent in the prosecution of complex litigation and who have extensive experience acting as class counsel.

<b><u>Typicality</u></b>

69.  The claims asserted by Plaintiffs are typical of the class members they seek to represent. The Plaintiffs have the same interests and suffer from the same unlawful practices as the class members.

70.  Upon information and belief, there are no other class members who have an interest in individually controlling the prosecution of his or her individual claims, especially in light of the relatively small value of each claim and the difficulties involved in bringing individual litigation against one's employer. However, if any such class member should become known, he or she can "opt out" of this action pursuant to Rule 23(b)(3).

<b><u>Predominance and Superiority</u></b>

71.  The common questions identified above predominate over any individual issues, which will relate solely to the quantum of relief due to individual class members. A class action is superior to other available means for the fair and efficient adjudication of this controversy because individual joinder of the parties is impracticable. Class action treatment will allow a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously,

16

efficiently, and without the unnecessary duplication of effort and expense if these claims were brought individually. Moreover, as the damages suffered by each class member are relatively small in the sense pertinent to class action analysis, the expenses and burden of individual litigation would make it difficult for individual class members to vindicate their claims.

72.     Additionally, important public interests will be served by addressing the matter as a class action. The cost to the court system and the public for the adjudication of individual litigation and claims would be substantially more than if claims are treated as a class action. Prosecution of separate actions by individual class members would create a risk of inconsistent and varying adjudications, establish incompatible standards of conduct for Defendant and/or substantially impair or impede the ability of class members to protect their interests. The issues in this action can be decided by means of common, class-wide proof. In addition, if appropriate, the Court can and is empowered to, fashion methods to efficiently manage this action as a class action.

## FIRST CAUSE OF ACTION
### Violation of 740 ILCS § 14/15(a): Failure to Institute, Maintain and Adhere to Publicly-Available Retention Schedule

73.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

74.     BIPA mandates that companies that collect, capture or otherwise obtain biometric data establish and maintain a satisfactory biometric data retention – and, importantly, deletion – policy. Specifically, those companies must: (i) make publicly available a written policy establishing a retention schedule and guidelines for permanent deletion of biometric data (at most three years after the company's last interaction with the individual); and (ii) actually adhere to that retention schedule and actually delete the biometric information. *See* 740 ILCS 14/15(a).

75.     Defendant fails to comply with these BIPA mandates.

76.     Defendant Paycor, Inc. is a corporation registered to conduct business in Illinois and, therefore, qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

77.     Plaintiffs and the Class are individuals who have had their "biometric identifiers" collected by Defendant (in the form of their fingerprints or hand geometry), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS 14/10.

78.     Plaintiffs' and the Class members' biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS 14/10.

79.     Defendant failed to implement and maintain a publicly available retention schedule or guidelines for permanently destroying biometric identifiers and biometric information, as specified by BIPA. *See* 740 ILCS 14/15(a).

80.     Upon information and belief, Defendant lacks retention schedules and guidelines for permanently destroying Plaintiffs' and the Class members' biometric data, and have not and will not destroy their biometric data when the initial purpose for collecting or obtaining such data has been satisfied or within three years of an individual's last interaction with the company.

81.     On behalf of themselves and the Class, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

## SECOND CAUSE OF ACTION

**Violation of 740 ILCS § 14/15(b): Failure to Obtain Informed Written Consent and Release
Before Obtaining Biometric Identifiers or Information**

82.    Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

83.    BIPA requires companies to obtain informed written consent from individuals before collecting, capturing, or otherwise obtaining their biometric data. Specifically, BIPA makes it unlawful for any private entity to "collect, capture, purchase, receive through trade, or otherwise obtain a person's or a customer's biometric identifiers or biometric information unless [the entity] **first**: (1) informs the subject…in writing that a biometric identifier or biometric information is being collected or stored; (2) informs the subject…in writing of the specific purpose and length of term for which a biometric identifier or biometric information is being collected, stored, and used; **and** (3) receives a written release executed by the subject of the biometric identifier or biometric information…" 740 ILCS 14/15(b) (emphasis added).

84.    Defendant fails to comply with these BIPA mandates.

85.    Defendant Paycor, Inc. is a corporation registered to conduct business in Illinois and, therefore, qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

86.    Plaintiffs and the Class are individuals who have had their "biometric identifiers" collected by Defendant (in the form of their fingerprints or hand geometry), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS 14/10.

87.    Plaintiffs' and the Class members' biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS 14/10.

88.    Defendant systematically and automatically collected, used and stored Plaintiffs' and the Class members' biometric identifiers and/or biometric information without first obtaining the written release required by 740 ILCS 14/15(b)(3).

89.     Defendant never informed Plaintiffs and the Class in writing that their biometric identifiers and/or biometric information were being collected, stored, used, and disseminated nor did Defendant inform Plaintiffs and the Class members in writing of the specific purpose(s) and length of term for which their biometric identifiers and/or biometric information were being collected, stored, and used as required by 740 ILCS 14/15(b)(1)-(2).

90.     By collecting, capturing, obtaining, storing, using and/or disseminating Plaintiffs' and the Class members' biometric identifiers and biometric information as described herein, Defendant violated their rights to privacy in their biometric identifiers or biometric information, as set forth in BIPA. *See* 740 ILCS 14/1, *et seq*.

91.     On behalf of himself and the Class, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage, and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA  pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

### THIRD CAUSE OF ACTION
### Violation of 740 ILCS § 14/15(d): Disclosure of Biometric Identifiers and Information Before Obtaining Consent

92.     Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

93.     BIPA prohibits private entities from disclosing a person's or customer's biometric identifier or biometric information without first obtaining consent for that disclosure. *See* 740 ILCS 14/15(d)(1).

94.    Defendant fails to comply with this BIPA mandate.

95.    Defendant Paycor, Inc. is a corporation registered to conduct business in Illinois and, therefore, qualifies as a "private entity" under BIPA. *See* 740 ILCS 14/10.

96.    Plaintiffs and the Class are individuals who have had their "biometric identifiers" collected by Defendant (in the form of their fingerprints or hand geometry), as explained in detail in Sections II and III, *supra*. *See* 740 ILCS 14/10.

97.    Plaintiffs' and the Class members' biometric identifiers were used to identify them and, therefore, constitute "biometric information" as defined by BIPA. *See* 740 ILCS 14/10.

98.    Defendant systematically and automatically disclosed, redisclosed, or otherwise disseminated Plaintiffs' and the Class members' biometric identifiers and/or biometric information without first obtaining the consent required by 740 ILCS 14/15(d)(1).

99.    By disclosing, redisclosing, or otherwise disseminating Plaintiffs' and the Class members' biometric identifiers and biometric information as described herein, Defendant violated their rights to privacy in their biometric identifiers or biometric information, as set forth in BIPA. *See* 740 ILCS 14/1, *et seq.*

100.    On behalf of themselves and the Class, Plaintiffs seek: (1) declaratory relief; (2) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring Defendant to comply with BIPA's requirements for the collection, storage and use of biometric identifiers and biometric information as described herein; (3) statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1); and (4) reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3).

# PRAYER FOR RELIEF

Wherefore, Plaintiffs Kellin Johns and Juan Barron respectfully request that this Court enter an Order:

A.    Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiffs Kellin Johns and Juan Barron as Class Representatives, and appointing Stephan Zouras, LLP, as Class Counsel;

B.    Declaring that Defendant's actions, as set forth above, violate BIPA;

C.    Awarding statutory damages of $5,000 for each intentional and/or reckless violation of BIPA pursuant to 740 ILCS 14/20(2) or, in the alternative, statutory damages of $1,000 for each negligent violation of BIPA pursuant to 740 ILCS 14/20(1);

D.    Declaring that Defendant's actions, as forth out above, were intentional and/or reckless;

E.    Awarding injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class, including an Order requiring Defendant to collect, store and use biometric identifiers or biometric information in compliance with BIPA;

F.    Awarding Plaintiffs and the Class their reasonable attorneys' fees and costs and other litigation expenses pursuant to 740 ILCS 14/20(3);

G.    Awarding Plaintiffs and the Class pre- and post-judgment interest, to the extent allowable; and

H.    Awarding such other and further relief as equity and justice may require.

Date:  October 29, 2020                         Respectfully Submitted,

                                                By: */s/ Ryan F. Stephan*
                                                Ryan F. Stephan
                                                James B. Zouras
                                                Megan E. Shannon
                                                **STEPHAN ZOURAS, LLP**
                                                100 N. Riverside Plaza
                                                Suite 2150
                                                Chicago, Illinois 60606
                                                312.233.1550
                                                312.233.1560 *f*

rstephan@stephanzouras.com
jzouras@stephanzouras.com
cmitchell@stephanzouras.com
mshannon@stephanzouras.com

Brandon M. Wise
**PEIFFER WOLF CARR & KANE, APLC**
818 Lafayette Ave., Floor 2
St. Louis, MO 63104
314-833-4825
bwise@pwcklegal.com

**ATTORNEYS FOR PLAINTIFFS
AND THE PUTATIVE CLASS**

## CERTIFICATE OF SERVICE

I, the attorney, hereby certify that on October 29, 2020, I filed the attached with the Clerk

of the Court using the ECF system, which will send such filing to all attorneys of record.

_/s/ Ryan F. Stephan_

# EXHIBIT 2

IN THE CIRCUIT COURT OF THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

KELLIN JOHNS, individually and on )
behalf of all others similarly situated, )
                       )
           Plaintiff, )
                       )
       v.                   )     No. 2018 L 000080
                       )
CLUB FITNESS OF ALTON, LLC, )
                       )
           Defendant. )

## AFFIDAVIT OF ERIC SCHREIMANN

ERIC SCHREIMANN, being first duly sworn on oath hereby state as follows:

1.     I am employed as the Chief Financial Officer (CFO) of Cust Serv CF, LLC, a limited liability company that is registered and incorporated in the State of Missouri, and have been so employed since June 2015. Cust Serv CF, LLC provides management services to various fitness clubs in Illinois and Missouri which operate under the "Club Fitness" trade name. Each of these facilities owned by a separate corporation or limited liability company.

2.     As the CFO of Cust Serv CF, LLC, I am responsible for the business development and financial operations and for monitoring the internal and external operations and expenditures, including contracts with third party service providers, of Cust Serv CF, LLC and the individual Club Fitness facilities.

3.     This Affidavit is based upon my personal knowledge, my review of court filings in the above-referenced lawsuit, and my review of business records maintained by Cust Serv CF, LLC and individual Club Fitness facilities, including Club Fitness of Alton, LLC, which owns and operates a fitness facility which is located at 1837 Homer Adams Parkway in Alton, Illinois. I could competently testify to the matters set forth herein if called as a witness in this lawsuit.

4.     The records of Cust Serv CF, LLC, which are created and maintained in the regular course of business to record the details concerning the employment of individuals at any Club Fitness facility, including the position and dates of employment and the identity of each facility or company by which the individual was employed. It is and all times has been part of the regular course of business of Cust Serv CF, LLC and the individual Club Fitness facilities to make and maintain such records.

1

**EXHIBIT**

*tabbies*

B

5.    The business records of Cust Serv CF, LLC and the Club Fitness facilities in Illinois and Missouri reflect that Kellin Johns was never employed by Club Fitness of Alton, LLC. Rather, these records reflect that Kellin Johns was employed by Club Fitness of Hampton, LLC, a Missouri limited liability company, from January 6, 2014 until March 16, 2014, by Grasso Plaza LLC, a Missouri limited liability company, from March 17, 2014 until June 30, 2014, by Club Fitness of Collinsville, LLC, from July 1, 2014 until June 30, 2015, and by Aphel Bill Serv, LLC, a Missouri limited liability company, from July 1, 2015 until August 31, 2016.

6.    From September 1, 2016 until July 20, 2017, Kellin Johns was employed by Cust Serv CF, LLC as a district manager. In this position, Kellin Johns was not required to use a fingerprint or any other type of scanner to clock in/clock out his time and attendance.

7.    During some of the times alleged in Mr. John's Complaint, Club Fitness contracted with a third party, Paycor, Inc. ("Paycor") for Paycor to provide payroll services, including employee time and attendance services, and to issue paychecks to employees of Cust Serv CF, LLC and to employees of each individual Club Fitness facility. A complete and accurate copy of the agreement dated October 10, 2015, for Paycor, Inc. to provide these services to Club Fitness, Inc., is attached to this Affidavit as Exhibit 1.

8.    From April 2016 to and including the last day of Mr. John's employment with CF List Serv, LLC, which was July 20, 2017, Club Fitness contracted with a third party, ADP, LLC, ("ADP") for ADP to provide payroll services, including employee time and attendance services, and to issue paychecks to employees of Cust Serv CF, LLC and to employees of each individual Club Fitness facility. A complete and accurate  copy of the Major Account Services – Master Services Agreement, dated February 3, 2016, for ADP, LLC to provide these services to Club Fitness, Inc., is attached to this Affidavit as Exhibit 2.

9.    At no time did Cust Serv CF, LLC, Club Fitness of Alton, LLC, Club Fitness, Inc., or any other company which owned and operated a Club Fitness facility receive, collect, store, use, posses, capture, obtain, or control the biometric information of Kellin Johns or of any other employee for payroll processing and timekeeping recording, or for any other purpose. Rather, any biometric information that was obtained of any employee was collected, stored, used, and at all times remained in the possession and control of either Paycor or ADP.

9.    At no time did any employee of Cust Serv CF, LLC, Club Fitness of Alton, LLC, Club Fitness, Inc., or any other company which owned and operated a Club Fitness facility have access to view, edit, modify, download, or otherwise copy any of this information; nor did we own or lease any fingerprint scanning equipment from either Paycor or ADP.  All equipment and technology that was used for the collection of any employee biometric information was supplied and controlled by either Paycor or ADP, and this information was retained by each of those companies on their own secure servers.

2

JOHNS_000010

Under penalties as provided by law pursuant to Section 1-109 of the Illinois Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: May 22, 2018

Eric Schreimann

3

JOHNS_000011

# EXHIBIT 3

**PAYCOR SERVICES TERMS AND CONDITIONS (February 2, 2015)**

Subject to the following terms and conditions, Paycor, Inc. ("Paycor") shall provide Client with such payroll, HR and payroll related services as Client may request from time to time ("Paycor Services"). All references hereunder to "Client" shall refer to Client and its affiliates that are receiving Paycor Services. Certain Paycor Services, such as PayOptions (including, but not limited to, direct deposit, Paycor Official Check ("POC") and/or paycard) and tax filing services, are subject to credit approval and are available only for as long as Client meets Paycor's credit eligibility requirements. All services utilizing electronic funds transfers ("EFTs") shall be provided to Client in accordance with the operating rules of the National Automated Clearing House Association ("NACHA") and the Office of Foreign Asset Control ("OFAC").

Paycor will perform the Paycor Services in a professional manner, using personnel having a level of skill in the area commensurate with the requirements of the Paycor Services to be performed. Paycor reserves the right to modify, enhance or terminate any of the Paycor Services from time to time. Paycor shall provide reasonable advance notice to Client in the event of any material modifications to the Paycor Services being provided to Client. Paycor shall provide reasonable advance notice to Client in the event of termination for convenience of any Paycor Services being provided to Client.

Provided that Client is not in default of any of its obligations under this Agreement or any Supplemental Agreement (as defined below in Section 1), Paycor will, based on services subscribed to and information provided by Client, timely (i) remit all applicable tax filings and related payments to the appropriate taxing authorities or third parties; and (ii) remit applicable payroll amounts in the manner designated by Client.

**1. SUPPLEMENTAL AGREEMENTS.** Client will execute any other agreements, addendums or other applicable documents Paycor deems necessary in order for Paycor to perform Paycor Services or any other service(s) requested by Client (collectively referred to as "Supplemental Agreements"), including, without limitation, any and all documentation needed by Paycor to originate EFT transactions on the Client's Demand Deposit Account(s) ("DDA") referenced in Bank Authorization(s) executed by Client, and any and all documentation, including powers of attorney, requested by any federal, state, or local governmental agency or taxing authority to evidence the appointment of Paycor as its reporting agent as contemplated in Section 4 below. Supplemental Agreements terminate concurrently with termination of this Agreement for any reason. However, any Supplemental Agreement may be separately terminated according to its terms. This Agreement and all Supplemental Agreements will collectively be referred to herein as the "Paycor Service Agreements". Notwithstanding the foregoing, the term "Supplemental Agreement" does not include either the Terms & Conditions for Use of Time and Attendance Services or the Newton Terms of Service Agreement, each of which is a distinct and separate agreement governing the provision of the services described therein.

**2. CLIENT ACKNOWLEDGEMENTS.** Client acknowledges and agrees that: (i) Paycor is not rendering legal, tax benefits, accounting or investment advice in connection with providing any of the Paycor Services; (ii) Paycor shall not be deemed to be a fiduciary of Client for any purpose; and (iii) Paycor shall not be deemed the employer or a joint employer of Client's employees for any purpose.

Paycor Services are designed to assist Client in complying with its applicable legal and regulatory responsibilities. Nevertheless, Client, and not Paycor, will be responsible for (i) compliance by Client with all laws and governmental regulations affecting its business; and (ii) any use Client may make of the Paycor Services to assist in complying with such laws and regulations. Client will use the Paycor Services only for internal business purposes of the Client.

**3. NACHA COMPLIANCE.** Client will not provide funding sourced from a non-U.S. bank account, nor shall Client's funding cause any employee direct deposit of wages to be subject to NACHA's International ACH Transactions rules ("IAT"). If Client's funding method results in any employee direct deposit of wages being subject to IAT, then Client must change the payment method to live check prior to running the payroll. Client accepts and acknowledges that Paycor has no way to identify which fundings or payments would cause it to become subject to IAT; therefore, Client shall be responsible to promptly inform Paycor if its payroll becomes subject to IAT, and Client will indemnify Paycor from all liability it may incur for processing transactions that will cause it to be subject to IAT.

Client certifies and warrants that it has not been suspended and does not appear on a National Association list of suspended originators ("National List"), and that Client will immediately notify Paycor if it becomes suspended or subsequently appears on a National List.

Notwithstanding anything to the contrary set forth herein or in any other writing between Paycor and Client, Client (and not Paycor) shall be considered the originator in connection with any EFTs made by Paycor for or on behalf of Client ("Originator") (including, without limitation, any direct deposit payments) under all applicable NACHA and OFAC rules. As the Originator, (i) Client authorizes Paycor and the Originating Depository Financial Institution ("ODFI") to originate ACH debits and credits ("Entries") to Client's accounts, Client's employees' accounts, and third party accounts authorized by Client (collectively, "Receivers") on Client's behalf; (ii) Client agrees to be bound by the NACHA Rules ("Rules"); (iii) Client agrees to not originate Entries that violate the laws of the United States; (iv) Client agrees that if Client breaches the Rules, the ODFI and Paycor have the right to terminate or suspend the Client's ability to originate entries in a manner that permits the ODFI and Paycor to comply with the Rules; (v) Client grants the ODFI the right to audit Client's compliance with the Rules; and (vi) Client (and not Paycor) shall be solely liable to the bank with respect to any representations or other obligations or liabilities whatsoever relating to any such EFTs.

**4. CLIENT DATA.** Client will timely supply to Paycor accurate and complete data necessary for the performance of the Paycor Services including, without limitation; (i) accurate and complete payroll and tax information at least two banking days prior to each Payday ("Payday" is defined as the pay date/check date of the applicable payroll); (ii) copies of all federal, state, and local tax forms, documents and other related employment tax information; and (iii) copies of any notices or correspondence received from any federal, state, or local authority with respect to any tax return or deposit made by Paycor. Failure to promptly provide all such information may result in additional fees as well as late deposits to employee accounts and/or late payments or deposits of required taxes. Paycor uses information supplied by Client, including payroll data and federal, state and local deposit frequencies and identification numbers, to perform the Paycor Services, and Client accepts responsibility for the verification, accuracy, and timely input of this information. Paycor does not accept responsibility for failure to make deposits or filings if the failure is due to Client not providing accurate, adequate or timely information or sufficient funds.

All Paycor Services are dependent upon information provided to Paycor by Client. Client will promptly review and verify, for each pay period, the accuracy of all Client data supplied to Paycor and the accuracy of all paychecks, disbursements, payroll registers, and/or reports produced for Client by Paycor or Paycor's third party providers. Client agrees to promptly notify Paycor of any errors, omissions or discrepancies, and Client releases Paycor from any liability due to errors resulting from inaccurate or incomplete data supplied by Client. Furthermore, Client releases Paycor from any and all liability for the use of inaccurate or incomplete data supplied by Client in connection with performance of the Paycor Services. If Paycor notices any potential inaccuracy, Paycor will use commercially reasonable efforts to advise Client of the same; however, Paycor is not liable for any failure to provide notice and/or advise Client of inaccuracies. In the event of any discrepancies, Client must promptly inform Paycor of the correct information. Client will be responsible for the consequences of any instructions Client provides to Paycor.

Client grants Paycor the right to use Client's payroll data for purposes of performing the Paycor Services, and for purposes of developing and marketing new products and services. Upon the termination of the parties' business relationship for any reason, Paycor shall be permitted to retain a copy of such payroll data for purposes of responding to regulatory inquiries. Client acknowledges and agrees that it is the Client's and its employees' responsibility to store and update records relating to Client's payroll account. Furthermore, Client acknowledges and agrees that Paycor shall not be Client's or Client's employees' official record keeper, and that Paycor archives various reports (based on information supplied and/or input by Client) only as a convenience to Client. Client shall, to the extent it deems necessary, keep copies of all source documents, records and other information delivered to Paycor.

**5. TAX FILING SERVICES; DESIGNATION AS REPORTING AGENT.** If Client subscribes to Tax Filing Services, Client hereby appoints Paycor as its Reporting Agent for the limited purposes of permitting Paycor to represent Client and/or act on behalf of Client with all persons (including, without limitation, third-party vendors and federal, state and local governmental agencies and taxing authorities including the Internal Revenue Service) for all employment tax matters and in all other matters reasonably related to Paycor's performance of the Paycor Services. In furtherance of the foregoing, the completion of Internal Revenue Service Form 8655 by Client shall appoint Paycor as the Reporting Agent with authority to sign and file employment tax returns and make tax deposits on behalf of Client to federal, state and local taxing authorities.

Paycor is authorized as a designee of Client to receive returns and copies of notices, correspondence and transcripts with respect to employment tax returns filed and deposits made by the designee. This authorization shall include the appropriate federal, state and local forms beginning with the tax period indicated on the Form 8655 and

remaining in effect through subsequent tax periods until Client or Paycor notifies the Internal Revenue Service of termination or revocation of this authorization.

Paycor, as the Reporting Agent for Client, is authorized to sign and file federal, state and local employment tax forms and reports either electronically or on paper and/or to make federal, state and local tax deposits and other federal, state or local tax payments for Client.

This authorization does not absolve Client of the responsibility to ensure that all returns are timely filed and the related taxes are paid on time. If as a result of an error or omission made by Paycor in performing the Tax Filing Services hereunder, an applicable taxing authority imposes a penalty on or assesses interest against Client, Paycor will (i) pay all penalties resulting from Paycor's error or omission; and (ii) pay any interest charges imposed on Client for the failure to pay any funds to the extent and for the period that such funds were held by Paycor. In any such case, Client shall be responsible for all additional taxes and any other interest charges.

6. **FUNDING OF OBLIGATIONS.** Client's payment obligations for certain Paycor Services, including, but not limited to, Tax Filing Services and PayOptions, must be funded using the Client's DDA. Client agrees to maintain sufficient available funds in its DDA at least one banking day prior to each Payday to cover all of Client's payment obligations. Client agrees to indemnify and hold Paycor harmless from any and all liability resulting from any lack of sufficient funds in Client's DDA; provided, however, that Client will have no obligation to indemnify Paycor if the liability arises solely and exclusively from Paycor's negligence or error.

If so authorized by Client, Paycor may debit the Client's DDA or other Client bank account in order to collect Service Fees and any other fees and expenses invoiced under the Paycor Service Agreements, and Client shall maintain sufficient available funds in said account to cover the aforementioned fees.
Client requests for refunds or adjustments will not be processed until Paycor verifies that sufficient funds were received by Paycor from Client to cover all payments made by, or fees due to, Paycor.

7. **WIRE TRANSFERS.** If Client is subject to the Federal $100,000 Next-Day Rule as specified in Internal Revenue Service Publication 15 (Circular E, Employer's Tax Guide), Client agrees that funds representing the total tax liability will be wire transferred at the request of Paycor from the Client's DDA to Paycor's account at least one day prior to Payday for the applicable payroll. In consideration for the cost of this wire service, Client agrees to pay Paycor a fee of $25.00 (subject to adjustment as set forth in Section 11 below) for each wire transfer.

In lieu of Paycor initiating an ACH debit against Client's DDA, Paycor reserves the right, based on Client's DDA funding history, Client's payment history, Paycor's internal risk policies, and other factors, to require Client to fund any or all future payment obligations via direct wire transfer or reverse wire transfer prior to disbursing any funds to any third party. Client agrees to pay a $25.00 (subject to adjustment as set forth in Section 11 below) wire transfer fee for each such transfer.

8. **INSUFFICIENT OR NON-CONFIRMED FUNDS.** In the event sufficient funds are not available in Client's DDA to cover Client's payment obligations as defined in Section 6 (an "NSF Event"), Paycor may deem Client to be in breach of this Agreement and Paycor may assess an NSF charge of $110.00 (subject to adjustment as set forth in Section 11 below). Upon any NSF Event, Paycor will work with Client to resolve the NSF Event; however, Paycor and Client agree that, upon any NSF Event: (i) Paycor will use commercially reasonable efforts to promptly notify Client of the NSF Event and will provide Client with the opportunity to timely cure the NSF Event; (ii) Paycor may, in its sole discretion, indefinitely suspend any payrolls in process, future payrolls and/or any and all Services under this Agreement and/or related agreements, whether provided by Paycor or a third party; (iii) Client, and not Paycor, shall be immediately responsible for remitting all tax deposits and filings, all employee wages, all wage garnishments, and all related penalties and interest due then and thereafter during any suspension or resulting from any suspension or termination; (iv) Paycor may require that future fundings and/or payment obligations by Client be made via wire transfer, and Client agrees to pay Paycor's then current wire transfer fee for each transfer; (v) Paycor may elect to terminate certain PayOptions services subscribed to by Client and require Client to issue corporate checks to its employees in lieu of termination; and/or (vi) Paycor may, upon any subsequent NSF Event occurring after the first NSF Event, immediately terminate this Agreement should Paycor, in its sole discretion, determine the Client to be a credit risk.

In the event that Paycor's EFT transactions on Client's DDA are returned due to insufficient funds or for any other reason, Client may request Paycor to reissue the EFT transaction. If so, Paycor will charge Client a reissuance fee of $25.00 (subject to adjustment as set forth in Section 11 below).

Client shall be liable for all debits initiated by Paycor hereunder. Client unconditionally promises to pay to Paycor the amount of any unfunded payroll liabilities (including any debit which is returned to Paycor because of insufficient or uncollected funds or for any other reason) upon demand, together with interest thereon at the lesser of one and one-half percent (1.5%) per month or the maximum permitted by law. Also, if any debit to an employee or other payee's account reversing or correcting a previously submitted credit(s) is returned for any reason, Client unconditionally promises to pay the amount of such debit upon demand and interest thereon at the rate set forth in this Section 8. Client agrees to cooperate with Paycor and any other parties involved in processing any transactions hereunder to recover funds credited to any employee as a result of an error made by Paycor or another party processing a transaction on behalf of Paycor. Client further agrees that Paycor may charge back any amount that Paycor advanced and which Client failed to have available for Paycor.

9. **RETIREMENT PLAN DATA FILE SERVICE.** If Client has requested and Paycor has agreed to submit retirement plan data files to Client's retirement plan administrator electronically, Paycor shall use commercially reasonable efforts to submit said files timely and accurately. It is Client's responsibility to verify that the data files are received by the Client's retirement plan administrator. Furthermore, Client understands and agrees that all funds associated with said data files shall be remitted directly by the Client to the retirement plan administrator and shall not be Paycor's responsibility. Paycor is not responsible for transmission failures or errors in the data beyond ensuring that the file meets the specifications provided by the Client's retirement plan administrator. Client shall indemnify and hold Paycor harmless from all loss of any kind arising as a result of any action taken by Paycor, its agents and employees in connection with this service.

10. **CARRIER CONNECT SERVICE.** If Client subscribes to Paycor's Carrier Connect service, Client shall be responsible for complying with the rules and requirements of all health care plans, flexible spending accounts, health savings accounts and other benefit plans offered by Client to its employees. Client agrees to: (i) review any and all reports received from Client's health insurance carriers and fund managers including, without limitation, error reports; (ii) fully cooperate with Paycor and Client's health insurance carriers and fund managers to resolve all error reports; and (iii) use HR Performer to document, update and correct health information of Client's employees as the sole source of data transmitted by Paycor in connection with this service. It is Client's responsibility to verify the accuracy and completeness of all health information maintained in HR Performer and supplied to Paycor in connection with the Carrier Connect service. Client will indemnify and hold Paycor harmless from any and all liability resulting from Client's failure to comply with the provisions contained in this paragraph; provided, however, that Client will have no obligation to indemnify Paycor if the liability arises solely and exclusively from Paycor's negligence or error.

11. **SERVICE FEES.** Client will pay service fees to Paycor for services provided by Paycor and/or its third party providers at the rates set forth in the Client Services Agreement, or if no such rates are set forth, at Paycor's standard rates for such services ("Service Fees"). Upon acceptance of this Agreement by Paycor, and in consideration of Client's agreement to pay Service Fees to Paycor, Paycor will perform the Paycor Services, and Paycor's third party providers will provide any other applicable services that Client has elected to receive, such as time and attendance and applicant tracking. Unless otherwise set forth in the Agreement, Paycor has the right to change the Service Fees and any other charges, fees and any expenses contemplated herein from time to time upon thirty (30) days' prior written notice to Client. Paycor may charge additional fees for services not enumerated in this Agreement if such additional services are requested by Client. Service Fees are subject to change in the event of a change in processing method and/or processing frequency by Client (for example, changing from bi-weekly to semi-monthly payroll processing). AS ADDITIONAL CONSIDERATION, PAYCOR MAY INVEST CLIENT'S FUNDS AS PAYCOR DEEMS APPROPRIATE; ANY AND ALL PROFITS, ACCUMULATIONS, AND ANY OTHER FORMS OF GAIN RESULTING FROM SUCH INVESTMENTS SHALL ACCRUE FOR THE BENEFIT OF AND SHALL BE THE SOLE PROPERTY OF PAYCOR, AND CLIENT HEREBY ASSIGNS TO PAYCOR ALL BENEFITS DERIVED ON CLIENT FUNDS HELD BY PAYCOR.

Service Fees and any other fees not paid by direct debit of the Client's DDA are due within ten (10) days of the invoice date. Undisputed amounts not paid in full may be subject to a late payment fee in addition to interest charges at the rate set forth in Section 8.

12. **NO WARRANTY.** Paycor represents and warrants that: (a) it shall provide the Paycor Services in a good and workmanlike manner, consistent with industry standards, using personnel with the appropriate degree of skill (b) the functionality of the Paycor Services will not be materially decreased during the term of this Agreement, subject to Paycor's right to modify, enhance or terminate any of the

Paycor Services from time to time upon notice as set forth above; (c) it shall utilize software and other security means to prevent the Paycor Services from containing or transmitting malicious code; (d) the Paycor Services will perform in accordance with user documentation; and (e) to its knowledge, it owns or otherwise has sufficient rights in the Paycor Services and/or the user documentation granted herein. WITH THE EXCEPTION OF ANY WARRANTY EXPRESSLY SET FORTH HEREIN OR IN A SUPPLEMENTAL AGREEMENT, PAYCOR MAKES NO WARRANTIES, AND SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO ANY PAYCOR SERVICES OR PAYCOR PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY WARRANTY OF NON-INFRINGEMENT, NON-INTERRUPTION OF USE OR FREEDOM FROM ERRORS.

**13. LIMITATION OF LIABILITY.** EXCEPT FOR (1) INTEREST CHARGES AND/OR PENALTIES IMPOSED BY TAXING AUTHORITIES THAT ARE THE DIRECT RESULT OF PAYCOR'S NEGLIGENCE; AND (2) THIRD PARTY CLAIMS AS DESCRIBED IN SECTION 17(D) BELOW, THE CUMULATIVE LIABILITY OF PAYCOR TO CLIENT FOR ALL CLAIMS RELATING TO OR ARISING FROM THE PAYCOR SERVICES OR THE PAYCOR SERVICE AGREEMENTS, IN CONTRACT, TORT, OR OTHERWISE, IS THE TOTAL SERVICE FEES PAID BY CLIENT TO PAYCOR FOR ONLY THE PAY PERIOD(S) FROM WHICH SUCH LIABILITY ARISES.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL OR OTHER DAMAGES OF ANY SORT (INCLUDING LOST PROFITS, LOST REVENUE, LOST INCOME, OR ANY REVENUE ARISING FROM LOSS OF ANTICIPATED BUSINESS) NOT SPECIFICALLY PROVIDED FOR HEREIN AS A RESULT OF THE PERFORMANCE OR NON-PERFORMANCE OF ANY OBLIGATION UNDER ANY PAYCOR SERVICE AGREEMENT, EVEN IF A PARTY HAS ADVISED THE OTHER PARTY OF THE POSSIBILITY OF SUCH POTENTIAL LOSS OR DAMAGE, AND EVEN IF SUCH DAMAGES WERE OR SHOULD HAVE BEEN FORESEEABLE.  FURTHERMORE, UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY WITH RESPECT TO ACTIONS, FACTS OR CIRCUMSTANCES OCCURRING OR EXISTING PRIOR TO THE DATE OF THIS AGREEMENT.   THE FOREGOING LIMITATION OF LIABILITY AND EXCLUSION OF DAMAGES APPLIES REGARDLESS OF ANY OTHER REMEDIES A PARTY MAY HAVE.  CLIENT ACKNOWLEDGES THAT THIS SECTION 13 IS AN INTEGRAL PART OF THE AGREEMENT THAT HAS BEEN BARGAINED FOR BY THE PARTIES, AND THAT THIS SECTION 13 WILL REMAIN IN EFFECT EVEN IF ANY OTHER PROVISION OF THIS AGREEMENT FAILS OF ITS ESSENTIAL PURPOSE.

**14. TERM AND TERMINATION.**

    **A. Term.** This Agreement shall commence on the date of written acceptance by Paycor, and shall continue until terminated in accordance with the provisions of this Agreement.

    **B. Termination for Convenience.** After the first ninety (90) days commencing on the date of written acceptance by Paycor, either party may terminate this Agreement at any time by providing thirty (30) days' advance written notice to the other party.  Until execution of this Agreement by Client, and after termination of this Agreement for any reason, Paycor has no obligation to perform any services on Client's behalf.

    **C. Termination for Cause.** Paycor may, in its sole discretion, immediately terminate the Paycor Service Agreements without notice should Client not remedy any suspension of Paycor Services (as set forth above in Section 8) within a reasonable time as determined by Paycor or if Paycor suspends the Paycor Services more than once within a twelve (12) month period.

    Should Client fail to pay any Service Fees, fail to maintain sufficient funds in its DDA, become the subject of a proceeding under the Bankruptcy Code, seek appointment of a trustee, receiver or custodian, seek liquidation, dissolution reorganization or the like, fail to maintain a credit rating reasonably acceptable to Paycor, or fail to perform any other obligation under the Paycor Service Agreements, Paycor may, at its option, in addition to other available remedies, take any and all actions it deems appropriate to secure payment of all amounts owed to Paycor by Client under this Agreement and/or terminate the Paycor Service Agreements immediately and without notice.  In addition to and not in limitation of any of Paycor's remedies, Client grants Paycor the right to offset for any amounts owed by Client to Paycor in any Paycor account.  Client agrees to pay for all collection costs, including reasonable attorney's fees,

which Paycor may incur as a result of Client's failure to perform any obligation under the Paycor Service Agreements.

    **D. Effects of Termination.**  If either party terminates this Agreement for any reason, Paycor shall not be responsible for making any further payroll tax deposits or filings, and Paycor may retain deposits to offset any amounts owed from Client. Notwithstanding the foregoing, if this Agreement is terminated for other than Client's breach or default, (i) Paycor will, at Client's request, prepare and file any outstanding employment tax forms and reports, prepare employee W2s and perform other reasonable and customary actions related to the terminated Paycor Services provided that Client has paid for said services; (ii) Client will remit any and all tax and third party payments beginning with the date of termination; and (iii) Paycor will return to Client any uncommitted Client funds held in any Paycor account net of all payment obligations and fees for services performed through the date of termination.

    **E. Data Access Upon Termination.** Upon termination of this Agreement for any reason other than Client's breach or default hereunder, Client shall, for up to thirty (30) days after the date of termination, be provided with access to online reports and custom reporting as previously subscribed to by Client, for the sole purpose of obtaining an electronic copy of its Client payroll data.   Paycor assumes no responsibility for Client's failure to obtain an electronic copy of its payroll data within such thirty (30) day period, and Client releases Paycor from any and all claims resulting therefrom.  Client acknowledges and agrees that Paycor shall have no obligation to provide Client with access to its payroll data in the event (i) Client is in breach or default hereunder, or (ii) Client fails to obtain a copy during the thirty (30) day period referenced herein.

**15. INTELLECTUAL PROPERTY.** All software programs, tutorials and related documentation ("Paycor Products") made available, directly or indirectly, by Paycor to Client as part of the Paycor Services are the exclusive property of Paycor or the third parties from whom Paycor has secured the rights to license.  Client is being granted a limited, non-exclusive, non-transferable, non-sublicensable, revocable right to access and use the Paycor Products solely for purposes of inputting and providing certain data in order for Paycor to provide the Paycor Services. The Paycor Products are provided "AS IS" and no warranty of any kind, including, but not limited to, any warranty of merchantability or fitness for a particular purpose, is made by or authorized to be made on behalf of Paycor. All rights, title and interest in or to any copyright, trademark, service mark, trade secret, and any other proprietary right relating to the Paycor Products and the related logos, product names, etc. are reserved by Paycor. Client agrees that it shall not remove, obscure, or alter any proprietary rights notices (including copyright and trademark notices) which may be affixed to or contained within the Paycor Products. Client shall not use Paycor trademarks in any manner without Paycor's advance written consent   Client shall not change, modify, adapt, disassemble, recompile, reverse engineer or enhance any of the Paycor Products being provided to Client hereunder, and any attempt to do so (whether by Client or a third party directed by Client) shall be deemed a breach of this Agreement.

**16. SECURITY AND CONFIDENTIALITY.**

    **A. Personally Identifiable Information.** Paycor agrees to treat all nonpublic personally identifiable information that Client discloses to Paycor (including but not limited to employee pay rates, employee names, addresses, social security numbers, telephone numbers, e-mail addresses, credit information, account numbers, account balances or other account information) in accordance with applicable privacy laws, rules, and regulations.  Paycor will use such information solely for the purpose of performing the Paycor Services. Paycor will not disclose such information to anyone other than: (i) to Paycor's employees in the ordinary course of Paycor's business; (ii) to non-affiliated third parties who need access in order for Paycor to carry out the Paycor Services or any  other services requested by Client; (iii) to employees, agents, affiliates, or contractors of Client that supplied such information to Paycor or that Client has authorized to receive such information from Paycor; or (iv) as is otherwise permitted by applicable law (including but not limited to complying with subpoenas, investigations by government regulatory authorities, and disclosing such information to Paycor's attorneys, auditors, and accountants).  Paycor shall take appropriate measures to maintain the security and confidentiality of any such information that Client discloses to Paycor, treating such confidential information in a manner similar to which Paycor treats its own confidential information.

    **B. Online Access.** Certain Paycor Products or Paycor Services may be accessed by Client and its authorized employees through the Internet at a website provided by Paycor or on behalf of Paycor, including those hosted by Paycor on behalf of Client. In addition, and notwithstanding anything to the contrary contained herein, Client acknowledges that security of transmissions over the

Internet cannot be guaranteed. Paycor is not responsible for (i) Client's access to the Internet, (ii) interception or interruptions of communications through the Internet, or (iii) changes or losses of data through the Internet, in each case other than to the extent caused solely by Paycor.

**C. Password Protection.** Client agrees to maintain the privacy of usernames and passwords associated with Paycor Services provided through the Internet. Client is fully responsible for all activities that occur under Client's password or Internet account. Client agrees to (i) immediately notify Paycor of any unauthorized use of Client's password or Internet account or any other breach of security; and (ii) ensure that Client exits from Client's Internet account at the end of each session. Paycor shall not be liable for any damages incurred by Client or any third party arising from Client's failure to comply with this section.

**D. Client Data Protection.** In order to protect Client's data, Paycor may suspend immediately and without prior notice, Client's and/or Client's employees' use of Paycor Services provided through the Internet if any breach of security is suspected.

**E.  Paycor's Pricing.** Client acknowledges and agrees that the pricing set forth in this Agreement (the "Pricing") is proprietary to Paycor, that Paycor takes reasonable measures to maintain the confidentiality of the Pricing, and that Paycor derives value from the Pricing not being generally known to the public. Accordingly, Client acknowledges and agrees that, during the term, it will not disclose the Pricing to any third party (other than to Client's employees and advisors who have a need to know the Pricing in connection with Client's legitimate business purposes), and that Client will use commercially reasonable efforts, consistent with how Client treats its own confidential and proprietary information, to maintain the confidentiality of the Pricing.

**17.  INDEMNIFICATION**

**A. Fraudulent/Criminal Acts.**   Each party shall indemnify the other party against any loss, liability, cost, damage or expense (each a "Loss") arising from, or in connection with, any fraudulent or criminal acts of said party or said party's employees, representatives or agents.

**B. Client's Breach.** Client shall indemnify and hold Paycor harmless from and against any Loss arising from or otherwise relating to: (i) Client's breach of any representation or warranty set forth in any Paycor Service Agreement; (ii) Client's failure to perform any covenant or other obligation set forth in any Paycor Service Agreement; (iii) the timeliness or accuracy of information supplied by Client to Paycor; or (iv) actions taken by Paycor pursuant to instructions provided by the Client. Paycor may terminate any or all of the Paycor Services without notice in the event of Client Breach.

**C. Paycor's Breach.** Subject to the limitation of liability contained in Section 13, Paycor shall indemnify and hold Client harmless from and against any Loss arising from or otherwise relating to: (i) Paycor's breach of any representation or warranty set forth in any Paycor Service Agreement; and (ii) Paycor's failure to perform any covenant or other obligation set forth in any Paycor Service Agreement.

**D. Third-Party Claims of Infringement.**   Paycor shall indemnify and hold harmless Client from and against any Loss directly arising from a claim that Client's use of any of the Paycor Products infringes the intellectual property rights of a third party; provided, however, that: (a) Client has not modified or otherwise altered any of the intellectual property comprising or contained in the Paycor Products; (b) Client shall give prompt written notice to Paycor of the third-party claim (except that the failure to provide prompt notice will only limit the indemnification obligations to the extent Paycor is prejudiced by the delay or failure); (c) Paycor has full and complete control over the defense and settlement of the third-party claim; and (d) Client shall assist Paycor in connection with the defense and settlement of the third-party claim as reasonably requested by Paycor. If Client is enjoined or otherwise prohibited from using any of the Paycor Products or a portion thereof based on a claim that such Paycor Products infringe the intellectual property rights of a third party, then Paycor may, at its sole expense and at its option, either: (a) obtain for Client the right to use the allegedly infringing portions of the Paycor Products; (b) modify the allegedly infringing portions of the Paycor Products so as to render them non-infringing without substantially diminishing or impairing their functionality; or (c) replace the allegedly infringing portions of the Paycor Products with non-infringing items of substantially similar functionality.   If Paycor determines that the foregoing options are not commercially possibly, Paycor may terminate the Agreement upon thirty (30)

days advance written notice to Client. Without limiting Paycor's obligation to indemnify Client as set forth above, the remedy set out in this Section 17(E) is Client's sole and exclusive remedy for any actual or alleged infringement by Paycor of any third-party intellectual property rights in the event that Client is enjoined or otherwise prohibited from using any such Paycor Products.

**18.  GENERAL PROVISIONS.**

**A. Independent Contractor.**   This Agreement establishes an independent contractor relationship only, by which Paycor will perform the Paycor Services for Client.  It is not intended as, and may not be construed to establish, a partnership, joint venture, agency or master/servant relationship between Paycor and Client.

**B. Agent.** Paycor is not an agent of Client except where required for federal, state and local payroll tax deposits, filings and correspondence and except for purposes of any unclaimed property act.  For the purpose of any unclaimed property act, Paycor shall be deemed to hold property as Client's agent for Client alone and Client shall be deemed to be the holder of property insofar as the interest of any other person and the property is concerned.  Should an agency relationship be found to exist, it will automatically terminate (except for the purpose of any unclaimed property act) upon return to Paycor of any check or pre-authorized charge of Client for insufficient or uncollected funds.

**C. Severability.** If any provision of the Paycor Service Agreements or any portion thereof is held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remainder of the Paycor Service Agreements will not in any way be affected or impaired.

**D. Assignment.** No Paycor Service Agreement may be assigned by Client without prior written consent of Paycor, and any assignment made without such consent is null and void.

**E. Governing Law and Inducement.** The Paycor Service Agreements shall be construed in accordance with and governed by the law of the State of Ohio (without regard to principles of conflict of laws), including the application of any applicable statutes of limitations.  Any action, suit or proceeding brought by any party with respect to, or to enforce the terms of, any of the Paycor Service Agreements, shall be brought by such party exclusively in the courts of the State of Ohio located in Hamilton County, Ohio, or in the courts of the United States for the Southern District of Ohio, Western Division.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH ANY PAYCOR SERVICES AGREEMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO EACH PAYCOR SERVICE AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.

**F. Waiver.** A waiver by either party of its rights hereunder is not binding unless contained in a writing signed by an authorized representative of the party waiving its rights.  The non-enforcement or waiver of any provision on one occasion does not constitute a waiver of such provision on any other occasions unless expressly so agreed in writing.

**G. Amendment.** This Agreement may not be modified except by a writing signed by the authorized representatives of Paycor and Client. For purposes of this Section 18(G), Paycor's "authorized representatives" shall consist of its CEO, CFO, VP of Treasury and Risk, VP of Financial Planning and Analysis and VP & Controller

**H. Entire Agreement.** The Paycor Service Agreements constitute the entire understanding of the parties, and supersede all prior agreements between the parties, whether oral or written.

**I. Non-Hire.** During the term of this Agreement, Client shall not solicit the employment of any Paycor employee who has been involved in furnishing Paycor Services hereunder.  Nothing contained in this section, however, shall prohibit Client from hiring any Paycor employee who responds to a general advertisement for employment, provided Client did not initiate contact with the employee or otherwise alert the employee to the advertisement.

**J.** **<u>Supplemental Agreements.</u>**    In the event of a conflict between any Supplemental Agreement and the Paycor Services Terms and Conditions, the Paycor Services Terms and Conditions shall prevail and govern.

**K.** **<u>Counterpart Execution.</u>** Any Paycor Service Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument. Facsimile signatures and/or electronically-captured signatures shall constitute original manual signatures on any and all such Paycor Service Agreements.

Revised 2-2-15

**Paycor**

**Alpha Bill Serv LC**
17017 North Outer 40 Road
Chesterfield, MO 63005
(636) 928-0968

Prepared by John Ortwerth
,

|  | Payrolls | Employees | Processings per Year |
|---|---|---|---|
| **Chesterfield Location** | **1** | **35** | **24** |
| *Chesterfield* | | *35* | *24* |
| | 1 | 35 | 24 |

**Chesterfield Location**
Per Payroll Processing Fees (Semi-monthly processing on Perform solution)

| Service | Unit | Qty | $ Cost Per | $ Total |
|---|---|---|---|---|
| Payroll & Tax Base Fee | Per Check | 1 | | |
| Payroll and Tax Service | Per Check | 35 | | |
| *Check Stuffing* | | | | |
| *Electronic GL Per Run* | | | | |
| *Online Check Stub* | | | | |
| *Online Reporting* | | | | |
| *Pay Options* | | | | |
| *Reporting Options* | | | | |
| Additional Tax Authorities | Each | 1 | | |
| Delivery(Courier STL Out of Town) | Per Delivery | 1 | | |
| Electronic Child Support | Per Payment | 1 | | |
| HR Support Ctr | Per User | 1 | | |
| | | | Subtotal: | |

**Chesterfield Location**
New Hire Filing Fees (Incurred per new employee)

| Service | Unit | Qty | $ Cost Per | $ Total |
|---|---|---|---|---|
| New Hire Filing EVS | Per New Hire | 1 | | |
| Onboarding | Per New Hire | 1 | | |
| | | | Subtotal: | |

**Chesterfield Location**
Monthly Fees

| Service | Unit | Qty | $ Cost Per | $ Total |
|---|---|---|---|---|
| ACA Per EE Fee | Each | 35 | | |
| Perform HR | Per Active Employee | 35 | | |
| Perform Time | Each | 35 | | |
| PT 100 FP WiFi Rental | Per Month | 1 | | |
| | | | Subtotal: | |



**Chesterfield Location**
Estimated Year End Fees (Actual value based on quantity of W2's processed. Amount varies by yearly number of employees)

| Service | Unit | Qty | $ Cost Per | $ Total |
|---|---|---|---|---|
| ACA YE 1094 Fee | Each | 1 | | |
| ACA YE 1095 Fee | Each | 35 | | |
| W2 Base Fee | Each | 1 | | |
| W2 Processing | Per W2 | 35 | | |
| | | | Subtotal: | |

**Chesterfield Location**
As-Incurred Fees (Billed as they are incurred)

| Service | Unit | Qty | $ Cost Per | $ Total |
|---|---|---|---|---|
| New Hire Minimum Fee | Each | 1 | | |
| | | | Subtotal: | |

**Alpha Bill Serv LC Implementation**

| Implementation Fees (all Implementation Fees will be billed on the first invoice) | Qty | $ Cost Per | $ Total |
|---|---|---|---|
| ACA Set Up Fee | 1 | | |
| Electronic GL Setup | 1 | | |
| Onboarding Setup | 1 | | |
| Payroll Setup | 35 | | |
| Perform HR Set Up | 35 | | |

4811 Montgomery Rd., Cincinnati, OH 45212 | 855.551.2013
*Quote valid through 09/03/2015*

**Paycor**

**Quote Summary** for **Alpha Bill Serv LC**
17017 North Outer 40 Road, Chesterfield, MO 63005
(636) 928-0968

**Chesterfield Location** (Semi-monthly processing on Franchise Pricing solution)

| | Occurrences | $ Cost Per | $ Total |
|---|---|---|---|
| Per Payroll Processing Fees | 24 | | |
| Monthly Fees | 12 | ■ | ■ |
| Estimated Year End Fees | 1 | | |
| | | **Annualized Total** | ■ |

**Alpha Bill Serv LC Total**

| | $ Total |
|---|---|
| Per Payroll Processing Fees | ■ |
| Monthly Fees | |
| Estimated Year End Fees | |
| **Annualized Total** | ■ |
| **Implementation Fees** | ■ |

**Agreement Regarding Provision of Services**
The undersigned client ("You" or "Your") has executed this Client Services Agreement (the "Agreement") as of the date set forth below. This Agreement and the Client's receipt of any services are governed by and subject to the (i) Paycor Services Terms and Conditions (the "Paycor Terms," a copy of which is attached); (ii) if applicable, the Time and Attendance Terms and Conditions of Use (the "Time and Attendance Terms," a copy of which, if applicable, is attached); (iii) if applicable, the Newton® Terms of Services Agreement (the "Newton Terms," a copy of which, if applicable, is attached); and/or (iv) if applicable, the Supplemental Agreement For The Purchase and Rental of Time Clocks. Prices set forth above are subject to change in accordance with the provisions of the applicable terms and conditions; prices are subject to change in the event of a change in processing method and/or processing frequency. You acknowledge and agree that Your signature below constitutes Your consent to be bound by the Paycor Terms and all other applicable terms for services You order.

**Client Acknowledgements; Representation**
You acknowledges and agree that: (i) this Agreement may be considered an application for credit; (ii) You authorize Paycor to investigate Your credit including vendor references, bank account status and history, and the personal credit of the owner(s) and/or principal(s); and (iii) Paycor may elect not to provide certain Paycor Services (as defined in the Paycor Terms) requested by You based upon factors determined to be relevant by Paycor in its sole discretion, including, without limitation, Paycor's review of Your credit history.

If You are subscribing to Paycor's payroll and Tax Filing Services beginning on a date other than Your first pay period of a calendar year, You hereby agree to and acknowledge the following: (i) You are responsible for providing to Paycor complete and accurate information regarding employment tax liabilities, payments and filings under Your federal EIN for the calendar year during which said services begin; (ii) Paycor will prepare tax returns, including applicable quarterly and annual filings beginning with the period in which You first subscribe to said services based on information provided by You; (iii) Paycor will remit to taxing authorities only those funds which Paycor has collected from You regardless of whether those funds represent Your entire tax liability for the period(s) for which they are remitted; and (iv) You shall be responsible for any penalties, interest, amended return fees and/or any other fees that may result from inaccurate, incomplete and/or late tax filings and/or tax payments caused by incomplete, inaccurate or missing tax liability and/or tax payment information provided by You.



Except for pass-through charges and miscellaneous fees, including but not limited to delivery fees, NSF fees, wire transfer fees and EFT reissue fees, the prices set forth in this Agreement are guaranteed for two (2) years from the date Your expected first payroll run date.

***This Agreement and/or any of the attached Terms and Conditions may be modified or amended only by a separate written amendment executed by authorized representatives of each party. Handwritten changes and modifications, even if initialed, are invalid and shall be of no force or effect.***

By signing below, the signatory represents that it is legally authorized to enter into this Agreement on behalf of the client and client agrees to be bound by all terms and conditions contained in this Agreement.

| Paycor | | | Client | | |
|---|---|---|---|---|---|
| By | | | By | | |
| Name | Paycor Signer | | Name | Eric Schreimann | |
| Title | gSr. Director of Accounting | | Title | CFO | |
| Date | 8/4/2015 | | Date | 8/4/2015 | |

**SUPPLEMENTAL AGREEMENT FOR THE PURCHASE AND RENTAL OF TIME CLOCKS (Revised 2/20/15)**

**IMPORTANT:** THIS IS A BINDING LEGAL AGREEMENT. READ IT CAREFULLY IN ITS ENTIRETY. IT SUPERSEDES ANY PREVIOUS AGREEMENT BETWEEN PAYCOR AND YOU REGARDING THE PURCHASE OR RENTAL OF TIME CLOCKS. IT CONTAINS IMPORTANT INFORMATION ABOUT YOUR RIGHTS AND OBLIGATIONS AS WELL AS LIMITATIONS AND EXCLUSIONS THAT MAY APPLY TO YOU.

This Agreement for the Purchase and Rental of Time Clocks (this "Agreement") is between Paycor, Inc., a Delaware corporation ("Paycor"), and You. The term "You" and "Your" means the person or entity identified as the customer on the Client Services Agreement (the "CSA") between You and Paycor. The term "Parties" refers collectively to both Paycor and You. Your signature on the CSA and/or Your acceptance and use of time clocks constitutes your agreement to be bound by this Agreement. This Agreement shall be construed in accordance with the laws of the State of Ohio (without regard to principles of conflict of laws). Any action brought by either party under this Agreement shall be brought exclusively in the state or federal courts located in Hamilton County, Ohio.

**Terms and Conditions Governing Your Rental of Clock(s).**

These Terms and Condition apply to You if You have agreed to rent from Paycor the quantity and model of time clocks (the "Clocks") noted on the CSA or in a supplemental agreement (each, an "Order"). The terms and conditions of this Agreement shall be effective during any and all times that You are receiving Perform Time (the "Rental Term"). Rental payments (each, a "Rental Payment," and collectively, the "Rental Payments") for the Clocks will be due monthly on the date and in the amount set forth on the Order. Paycor, at its cost, will be responsible for maintaining the Clocks during the Rental Term, including (a) repairing any defective Clock, and (b) if Paycor determines that a Clock cannot be reasonably repaired, replacing such Clock; provided, however, that You will be responsible for paying for the costs of any repairs or replacements that Paycor reasonably concludes occurred due to Your negligence, improper installation, or misuse, or that occurred due to repairs or alterations performed by others than authorized representatives of Paycor.  Upon termination of Your receiving Perform Time ("Termination Date"), You will be charged and debited the price of a new Clock for any and all Clock(s) in Your Possession (the "Security Charge"). However, for each Clock that You return to Paycor (i) within 30 days' of the Termination Date, and (ii) in good condition, reasonable wear and tear excepted, Paycor will refund the Security Charge. All Clocks must be returned in good condition, reasonable wear and tear excepted. If any Clock is damaged while in Your possession due to Your negligent, reckless, or intentional act, You shall be responsible for the cost of the repair, up to the then-current replacement value of the Clock. If any Clock is lost while in Your possession, you shall be responsible for paying the then-current replacement value of the lost Clock. Paycor warrants that the Clocks will be of good material and workmanship and will be free of defects if properly installed and operated during the Rental Term (the "Warranty"). Paycor shall have no obligation to maintain any clocks in Your possession after the expiration of the Rental Term. THE WARRANTY IS EXPRESSLY IN LIEU OF ALL WARRANTIES, EXPRESS OR IMPLIED, AND ALL OTHER WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTY OF MERCHANTABILITY, THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY OF NON-INFRINGEMENT, NON-INTERRUPTION OF USE AND FREEDOM OF ERRORS.  IN NO EVENT SHALL PAYCOR BE LIABLE TO YOU FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, OR OTHER DAMAGES OF ANY SORT. IN NO EVENT WILL PAYCOR'S CUMULATIVE LIABILITY EXCEED THE REPLACEMENT VALUE OF THE CLOCKS. You shall indemnify and hold Paycor harmless from and against any loss, liability, cost, damage, expense, or claim arising from Your use of the Clock(s).

**Terms and Conditions Governing Your Purchase of Clocks.**

These Terms and Condition apply to You if You have agreed to purchase from Paycor the quantity and model of time clocks (the "Clocks") noted on the CSA or in a supplemental agreement (each, an "Order"). The purchase price for the Clocks is the amount set forth on the Order, which amount is due and payable prior to Your taking possession of the Clocks. Paycor warrants that the Clocks will be of good material and workmanship and will be free of defects if properly installed and operated ("the Warranty") for as long as You subscribe to Perform Time (the "Warranty Period"). Paycor, at its cost, will be responsible for maintaining the Clocks during the Warranty Period, including (a) repairing any defective Clock, and (b) if Paycor determines that a Clock cannot be reasonably repaired, replacing such Clock with a comparable clock; provided, however, that (i)You may be charged a fee for examination of a Clock; and (ii)You will, at your option, be responsible for paying for the costs of any repairs or replacements that Paycor reasonably concludes occurred due to Your negligence, improper installation, or misuse, or that occurred due to repairs or alterations performed by others than authorized representatives of Paycor. Your remedy for breach of the Warranty is expressly limited to repair or replacement of the defective Clock(s) with Clock(s) of similar functionality in good working condition; any Clock which, under normal use and service, is proven to breach the Warranty will, upon examination by Paycor, and at Paycor's option, be repaired or replaced by Paycor with like or similar Clock(s).  Paycor reserves the right to replace any Clock with a used or refurbished Clock. In all cases, transportation costs and charges for any returned Clock(s) shall be paid by You. The Warranty will not be breached, and Paycor will give no credit for any Clock(s) that have (a) been damaged, tampered with, abused, improperly installed, or damaged in shipping, or (b) been repaired or altered by others than authorized representations of Paycor. THE WARRANTY IS EXPRESSLY IN LIEU OF ALL WARRANTIES, EXPRESS OR IMPLIED, AND ALL OTHER WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTY OF MERCHANTABILITY, THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY OF NON-INFRINGEMENT, NON-INTERRUPTION OF USE AND FREEDOM OF ERRORS.  IN NO EVENT SHALL PAYCOR BE LIABLE TO YOU FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, OR OTHER DAMAGES OF ANY SORT. IN NO EVENT WILL PAYCOR'S CUMULATIVE LIABILITY EXCEED THE AMOUNT OF THE PURCHASE PRICE OF THE CLOCKS AS SET FORTH ON THE ORDER.   You shall indemnify and hold Paycor harmless from and against any loss, liability, cost, damage, expense, or claim arising from Your use of the Clock(s).

# EXHIBIT 4

**PAYCOR SERVICES TERMS AND CONDITIONS (February 2, 2015)**

Subject to the following terms and conditions, Paycor, Inc. ("Paycor") shall provide Client with such payroll, HR and payroll related services as Client may request from time to time ("Paycor Services"). All references hereunder to "Client" shall refer to Client and its affiliates that are receiving Paycor Services. Certain Paycor Services, such as PayOptions (including, but not limited to, direct deposit, Paycor Official Check ("POC") and/or paycard) and tax filing services, are subject to credit approval and are available only for as long as Client meets Paycor's credit eligibility requirements. All services utilizing electronic funds transfers ("EFTs") shall be provided to Client in accordance with the operating rules of the National Automated Clearing House Association ("NACHA") and the Office of Foreign Asset Control ("OFAC").

Paycor will perform the Paycor Services in a professional manner, using personnel having a level of skill in the area commensurate with the requirements of the Paycor Services to be performed. Paycor reserves the right to modify, enhance or terminate any of the Paycor Services from time to time. Paycor shall provide reasonable advance notice to Client in the event of any material modifications to the Paycor Services being provided to Client. Paycor shall provide reasonable advance notice to Client in the event of termination for convenience of any Paycor Services being provided to Client.

Provided that Client is not in default of any of its obligations under this Agreement or any Supplemental Agreement (as defined below in Section 1), Paycor will, based on services subscribed to and information provided by Client, timely (i) remit all applicable tax filings and related payments to the appropriate taxing authorities or third parties; and (ii) remit applicable payroll amounts in the manner designated by Client.

**1. SUPPLEMENTAL AGREEMENTS.** Client will execute any other agreements, addendums or other applicable documents Paycor deems necessary in order for Paycor to perform Paycor Services or any other service(s) requested by Client (collectively referred to as "Supplemental Agreements"), including, without limitation, any and all documentation needed by Paycor to originate EFT transactions on the Client's Demand Deposit Account(s) ("DDA") referenced in Bank Authorization(s) executed by Client, and any and all documentation, including powers of attorney, requested by any federal, state, or local governmental agency or taxing authority to evidence the appointment of Paycor as its reporting agent as contemplated in Section 4 below. Supplemental Agreements terminate concurrently with termination of this Agreement for any reason. However, any Supplemental Agreement may be separately terminated according to its terms. This Agreement and all Supplemental Agreements will collectively be referred to herein as the "Paycor Service Agreements". Notwithstanding the foregoing, the term "Supplemental Agreement" does not include either the Terms & Conditions for Use of Time and Attendance Services or the Newton Terms of Service Agreement, each of which is a distinct and separate agreement governing the provision of the services described therein.

**2. CLIENT ACKNOWLEDGEMENTS.** Client acknowledges and agrees that: (i) Paycor is not rendering legal, tax benefits, accounting or investment advice in connection with providing any of the Paycor Services; (ii) Paycor shall not be deemed to be a fiduciary of Client for any purpose; and (iii) Paycor shall not be deemed the employer or a joint employer of Client's employees for any purpose.

Paycor Services are designed to assist Client in complying with its applicable legal and regulatory responsibilities. Nevertheless, Client, and not Paycor, will be responsible for (i) compliance by Client with all laws and governmental regulations affecting its business; and (ii) any use Client may make of the Paycor Services to assist in complying with such laws and regulations. Client will use the Paycor Services only for internal business purposes of the Client.

**3. NACHA COMPLIANCE.** Client will not provide funding sourced from a non-U.S. bank account, nor shall Client's funding cause any employee direct deposit of wages to be subject to NACHA's International ACH Transactions rules ("IAT"). If Client's funding method results in any employee direct deposit of wages being subject to IAT, then Client must change the payment method to live check prior to running the payroll. Client accepts and acknowledges that Paycor has no way to identify which fundings or payments would cause it to become subject to IAT; therefore, Client shall be responsible to promptly inform Paycor if its payroll becomes subject to IAT, and Client will indemnify Paycor from all liability it may incur for processing transactions that will cause it to be subject to IAT.

Client certifies and warrants that it has not been suspended and does not appear on a National Association list of suspended originators ("National List"), and that Client will immediately notify Paycor if it becomes suspended or subsequently appears on a National List.

Notwithstanding anything to the contrary set forth herein or in any other writing between Paycor and Client, Client (and not Paycor) shall be considered the originator in connection with any EFTs made by Paycor for or on behalf of Client ("Originator") (including, without limitation, any direct deposit payments) under all applicable NACHA and OFAC rules. As the Originator, (i) Client authorizes Paycor and the Originating Depository Financial Institution ("ODFI") to originate ACH debits and credits ("Entries") to Client's accounts, Client's employees' accounts, and third party accounts authorized by Client (collectively, "Receivers") on Client's behalf; (ii) Client agrees to be bound by the NACHA Rules ("Rules"); (iii) Client agrees to not originate Entries that violate the laws of the United States; (iv) Client agrees that if Client breaches the Rules, the ODFI and Paycor have the right to terminate or suspend the Client's ability to originate entries in a manner that permits the ODFI and Paycor to comply with the Rules; (v) Client grants the ODFI the right to audit Client's compliance with the Rules; and (vi) Client (and not Paycor) shall be solely liable to the bank with respect to any representations or other obligations or liabilities whatsoever relating to any such EFTs.

**4. CLIENT DATA.** Client will timely supply to Paycor accurate and complete data necessary for the performance of the Paycor Services including, without limitation; (i) accurate and complete payroll and tax information at least two banking days prior to each Payday ("Payday" is defined as the pay date/check date of the applicable payroll); (ii) copies of all federal, state, and local tax forms, documents and other related employment tax information; and (iii) copies of any notices or correspondence received from any federal, state, or local authority with respect to any tax return or deposit made by Paycor. Failure to promptly provide all such information may result in additional fees as well as late deposits to employee accounts and/or late payments or deposits of required taxes. Paycor uses information supplied by Client, including payroll data and federal, state and local deposit frequencies and identification numbers, to perform the Paycor Services, and Client accepts responsibility for the verification, accuracy, and timely input of this information. Paycor does not accept responsibility for failure to make deposits or filings if the failure is due to Client not providing accurate, adequate or timely information or sufficient funds.

All Paycor Services are dependent upon information provided to Paycor by Client. Client will promptly review and verify, for each pay period, the accuracy of all Client data supplied to Paycor and the accuracy of all paychecks, disbursements, payroll registers, and/or reports produced for Client by Paycor or Paycor's third party providers. Client agrees to promptly notify Paycor of any errors, omissions or discrepancies, and Client releases Paycor from any liability due to errors resulting from inaccurate or incomplete data supplied by Client. Furthermore, Client releases Paycor from any and all liability for the use of inaccurate or incomplete data supplied by Client in connection with performance of the Paycor Services. If Paycor notices any potential inaccuracy, Paycor will use commercially reasonable efforts to advise Client of the same; however, Paycor is not liable for any failure to provide notice and/or advise Client of inaccuracies. In the event of any discrepancies, Client must promptly inform Paycor of the correct information. Client will be responsible for the consequences of any instructions Client provides to Paycor.

Client grants Paycor the right to use Client's payroll data for purposes of performing the Paycor Services, and for purposes of developing and marketing new products and services. Upon the termination of the parties' business relationship for any reason, Paycor shall be permitted to retain a copy of such payroll data for purposes of responding to regulatory inquiries. Client acknowledges and agrees that it is the Client's and its employees' responsibility to store and update records relating to Client's payroll account. Furthermore, Client acknowledges and agrees that Paycor shall not be Client's or Client's employees' official record keeper, and that Paycor archives various reports (based on information supplied and/or input by Client) only as a convenience to Client. Client shall, to the extent it deems necessary, keep copies of all source documents, records and other information delivered to Paycor.

**5. TAX FILING SERVICES; DESIGNATION AS REPORTING AGENT.** If Client subscribes to Tax Filing Services, Client hereby appoints Paycor as its Reporting Agent for the limited purposes of permitting Paycor to represent Client and/or act on behalf of Client with all persons (including, without limitation, third-party vendors and federal, state and local governmental agencies and taxing authorities including the Internal Revenue Service) for all employment tax matters and in all other matters reasonably related to Paycor's performance of the Paycor Services. In furtherance of the foregoing, the completion of Internal Revenue Service Form 8655 by Client shall appoint Paycor as the Reporting Agent with authority to sign and file employment tax returns and make tax deposits on behalf of Client to federal, state and local taxing authorities.

Paycor is authorized as a designee of Client to receive returns and copies of notices, correspondence and transcripts with respect to employment tax returns filed and deposits made by the designee. This authorization shall include the appropriate federal, state and local forms beginning with the tax period indicated on the Form 8655 and

remaining in effect through subsequent tax periods until Client or Paycor notifies the Internal Revenue Service of termination or revocation of this authorization.

Paycor, as the Reporting Agent for Client, is authorized to sign and file federal, state and local employment tax forms and reports either electronically or on paper and/or to make federal, state and local tax deposits and other federal, state or local tax payments for Client.

This authorization does not absolve Client of the responsibility to ensure that all returns are timely filed and the related taxes are paid on time. If as a result of an error or omission made by Paycor in performing the Tax Filing Services hereunder, an applicable taxing authority imposes a penalty on or assesses interest against Client, Paycor will (i) pay all penalties resulting from Paycor's error or omission; and (ii) pay any interest charges imposed on Client for the failure to pay any funds to the extent and for the period that such funds were held by Paycor. In any such case, Client shall be responsible for all additional taxes and any other interest charges.

**6. FUNDING OF OBLIGATIONS.** Client's payment obligations for certain Paycor Services, including, but not limited to, Tax Filing Services and PayOptions, must be funded using the Client's DDA. Client agrees to maintain sufficient available funds in its DDA at least one banking day prior to each Payday to cover all of Client's payment obligations. Client agrees to indemnify and hold Paycor harmless from any and all liability resulting from any lack of sufficient funds in Client's DDA; provided, however, that Client will have no obligation to indemnify Paycor if the liability arises solely and exclusively from Paycor's negligence or error.

If so authorized by Client, Paycor may debit the Client's DDA or other Client bank account in order to collect Service Fees and any other fees and expenses invoiced under the Paycor Service Agreements, and Client shall maintain sufficient available funds in said account to cover the aforementioned fees.
Client requests for refunds or adjustments will not be processed until Paycor verifies that sufficient funds were received by Paycor from Client to cover all payments made by, or fees due to, Paycor.

**7. WIRE TRANSFERS.** If Client is subject to the Federal $100,000 Next-Day Rule as specified in Internal Revenue Service Publication 15 (Circular E, Employer's Tax Guide), Client agrees that funds representing the total tax liability will be wire transferred at the request of Paycor from the Client's DDA to Paycor's account at least one day prior to Payday for the applicable payroll. In consideration for the cost of this wire service, Client agrees to pay Paycor a fee of $25.00 (subject to adjustment as set forth in Section 11 below) for each wire transfer.

In lieu of Paycor initiating an ACH debit against Client's DDA, Paycor reserves the right, based on Client's DDA funding history, Client's payment history, Paycor's internal risk policies, and other factors, to require Client to fund any or all future payment obligations via direct wire transfer or reverse wire transfer prior to disbursing any funds to any third party. Client agrees to pay a $25.00 (subject to adjustment as set forth in Section 11 below) wire transfer fee for each such transfer.

**8. INSUFFICIENT OR NON-CONFIRMED FUNDS.** In the event sufficient funds are not available in Client's DDA to cover Client's payment obligations as defined in Section 6 (an "NSF Event"), Paycor may deem Client to be in breach of this Agreement and Paycor may assess an NSF charge of $110.00 (subject to adjustment as set forth in Section 11 below). Upon any NSF Event, Paycor will work with Client to resolve the NSF Event; however, Paycor and Client agree that, upon any NSF Event: (i) Paycor will use commercially reasonable efforts to promptly notify Client of the NSF Event and will provide Client with the opportunity to timely cure the NSF Event; (ii) Paycor may, in its sole discretion, indefinitely suspend any payrolls in process, future payrolls and/or any and all Services under this Agreement and/or related agreements, whether provided by Paycor or a third party; (iii) Client, and not Paycor, shall be immediately responsible for remitting all tax deposits and filings, all employee wages, all wage garnishments, and all related penalties and interest due then and thereafter during any suspension or resulting from any suspension or termination; (iv) Paycor may require that future fundings and/or payment obligations by Client be made via wire transfer, and Client agrees to pay Paycor's then current wire transfer fee for each transfer; (v) Paycor may elect to terminate certain PayOptions services subscribed to by Client and require Client to issue corporate checks to its employees in lieu of termination; and/or (vi) Paycor may, upon any subsequent NSF Event occurring after the first NSF Event, immediately terminate this Agreement should Paycor, in its sole discretion, determine the Client to be a credit risk.

In the event that Paycor's EFT transactions on Client's DDA are returned due to insufficient funds or for any other reason, Client may request Paycor to reissue the EFT transaction. If so, Paycor will charge Client a reissuance fee of $25.00 (subject to adjustment as set forth in Section 11 below).

Client shall be liable for all debits initiated by Paycor hereunder. Client unconditionally promises to pay to Paycor the amount of any unfunded payroll liabilities (including any debit which is returned to Paycor because of insufficient or uncollected funds or for any other reason) upon demand, together with interest thereon at the lesser of one and one-half percent (1.5%) per month or the maximum permitted by law. Also, if any debit to an employee or other payee's account reversing or correcting a previously submitted credit(s) is returned for any reason, Client unconditionally promises to pay the amount of such debit upon demand and interest thereon at the rate set forth in this Section 8. Client agrees to cooperate with Paycor and any other parties involved in processing any transactions hereunder to recover funds credited to any employee as a result of an error made by Paycor or another party processing a transaction on behalf of Paycor. Client further agrees that Paycor may charge back any amount that Paycor advanced and which Client failed to have available for Paycor.

**9. RETIREMENT PLAN DATA FILE SERVICE.** If Client has requested and Paycor has agreed to submit retirement plan data files to Client's retirement plan administrator electronically, Paycor shall use commercially reasonable efforts to submit said files timely and accurately. It is Client's responsibility to verify that the data files are received by the Client's retirement plan administrator. Furthermore, Client understands and agrees that all funds associated with said data files must be remitted directly by the Client to the retirement plan administrator and shall not be Paycor's responsibility. Paycor is not responsible for transmission failures or errors in the data beyond ensuring that the file meets the specifications provided by the Client's retirement plan administrator. Client shall indemnify and hold Paycor harmless from all loss of any kind arising as a result of any action taken by Paycor, its agents and employees in connection with this service.

**10. CARRIER CONNECT SERVICE.** If Client subscribes to Paycor's Carrier Connect service, Client shall be responsible for complying with the rules and requirements of all health care plans, flexible spending accounts, health savings accounts and other benefit plans offered by Client to its employees. Client agrees to: (i) review any and all reports received from Client's health insurance carriers and fund managers including, without limitation, error reports; (ii) fully cooperate with Paycor and Client's health insurance carriers and fund managers to resolve all error reports; and (iii) use HR Performer to document, update and correct health information of Client's employees as the sole source of data transmitted by Paycor in connection with this service. It is Client's responsibility to verify the accuracy and completeness of all health information maintained in HR Performer and supplied to Paycor in connection with the Carrier Connect service. Client will indemnify and hold Paycor harmless from any and all liability resulting from Client's failure to comply with the provisions contained in this paragraph; provided, however, that Client will have no obligation to indemnify Paycor if the liability arises solely and exclusively from Paycor's negligence or error.

**11. SERVICE FEES.** Client will pay service fees to Paycor for services provided by Paycor and/or its third party providers at the rates set forth in the Client Services Agreement, or if no such rates are set forth, at Paycor's standard rates for such services ("Service Fees"). Upon acceptance of this Agreement by Paycor, and in consideration of Client's agreement to pay Service Fees to Paycor, Paycor will perform the Paycor Services, and Paycor's third party providers will provide any other applicable services that Client has elected to receive, such as time and attendance and applicant tracking. Unless otherwise set forth in the Agreement, Paycor has the right to change the Service Fees and any other charges, fees and any expenses contemplated herein from time to time upon thirty (30) days' prior written notice to Client. Paycor may charge additional fees for services not enumerated in this Agreement if such additional services are requested by Client. Service Fees are subject to change in the event of a change in processing method and/or processing frequency by Client (for example, changing from bi-weekly to semi-monthly payroll processing). AS ADDITIONAL CONSIDERATION, PAYCOR MAY INVEST CLIENT'S FUNDS AS PAYCOR DEEMS APPROPRIATE; ANY AND ALL PROFITS, ACCUMULATIONS, AND ANY OTHER FORMS OF GAIN RESULTING FROM SUCH INVESTMENTS SHALL ACCRUE FOR THE BENEFIT OF AND SHALL BE THE SOLE PROPERTY OF PAYCOR, AND CLIENT HEREBY ASSIGNS TO PAYCOR ALL BENEFITS DERIVED ON CLIENT FUNDS HELD BY PAYCOR.

Service Fees and any other fees not paid by direct debit of the Client's DDA are due within ten (10) days of the invoice date. Undisputed amounts not paid in full may be subject to a late payment fee in addition to interest charges at the rate set forth in Section 8.

**12. NO WARRANTY.** Paycor represents and warrants that: (a) it shall provide the Paycor Services in a good and workmanlike manner, consistent with industry standards, using personnel with the appropriate degree of skill (b) the functionality of the Paycor Services will not be materially decreased during the term of this Agreement, subject to Paycor's right to modify, enhance or terminate any of the

Paycor Services from time to time upon notice as set forth above; (c) it shall utilize software and other security means to prevent the Paycor Services from containing or transmitting malicious code; (d) the Paycor Services will perform in accordance with user documentation; and (e) to its knowledge, it owns or otherwise has sufficient rights in the Paycor Services and/or the user documentation granted herein. WITH THE EXCEPTION OF ANY WARRANTY EXPRESSLY SET FORTH HEREIN OR IN A SUPPLEMENTAL AGREEMENT, PAYCOR MAKES NO WARRANTIES, AND SPECIFICALLY DISCLAIMS ANY AND ALL WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO ANY PAYCOR SERVICES OR PAYCOR PRODUCTS, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR ANY WARRANTY OF NON-INFRINGEMENT, NON-INTERRUPTION OF USE OR FREEDOM FROM ERRORS.

**13. LIMITATION OF LIABILITY.** EXCEPT FOR (1) INTEREST CHARGES AND/OR PENALTIES IMPOSED BY TAXING AUTHORITIES THAT ARE THE DIRECT RESULT OF PAYCOR'S NEGLIGENCE; AND (2) THIRD PARTY CLAIMS AS DESCRIBED IN SECTION 17(D) BELOW, THE CUMULATIVE LIABILITY OF PAYCOR TO CLIENT FOR ALL CLAIMS RELATING TO OR ARISING FROM THE PAYCOR SERVICES OR THE PAYCOR SERVICE AGREEMENTS, IN CONTRACT, TORT, OR OTHERWISE, IS THE TOTAL SERVICE FEES PAID BY CLIENT TO PAYCOR FOR ONLY THE PAY PERIOD(S) FROM WHICH SUCH LIABILITY ARISES.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY THIRD PARTY FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL OR OTHER DAMAGES OF ANY SORT (INCLUDING LOST PROFITS, LOST REVENUE, LOST INCOME, OR ANY REVENUE ARISING FROM LOSS OF ANTICIPATED BUSINESS) NOT SPECIFICALLY PROVIDED FOR HEREIN AS A RESULT OF THE PERFORMANCE OR NON-PERFORMANCE OF ANY OBLIGATION UNDER ANY PAYCOR SERVICE AGREEMENT, EVEN IF A PARTY HAS ADVISED THE OTHER PARTY OF THE POSSIBILITY OF SUCH POTENTIAL LOSS OR DAMAGE, AND EVEN IF SUCH DAMAGES WERE OR SHOULD HAVE BEEN FORESEEABLE.  FURTHERMORE, UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY OR ANY THIRD PARTY WITH RESPECT TO ACTIONS, FACTS OR CIRCUMSTANCES OCCURRING OR EXISTING PRIOR TO THE DATE OF THIS AGREEMENT.  THE FOREGOING LIMITATION OF LIABILITY AND EXCLUSION OF DAMAGES APPLIES REGARDLESS OF ANY OTHER REMEDIES A PARTY MAY HAVE.  CLIENT ACKNOWLEDGES THAT THIS SECTION 13 IS AN INTEGRAL PART OF THE AGREEMENT THAT HAS BEEN BARGAINED FOR BY THE PARTIES, AND THAT THIS SECTION 13 WILL REMAIN IN EFFECT EVEN IF ANY OTHER PROVISION OF THIS AGREEMENT FAILS OF ITS ESSENTIAL PURPOSE.

**14. TERM AND TERMINATION.**

    **A. Term.** This Agreement shall commence on the date of written acceptance by Paycor, and shall continue until terminated in accordance with the provisions of this Agreement.

    **B. Termination for Convenience.** After the first ninety (90) days commencing on the date of written acceptance by Paycor, either party may terminate this Agreement at any time by providing thirty (30) days' advance written notice to the other party.  Until execution of this Agreement by Client, and after termination of this Agreement for any reason, Paycor has no obligation to perform any services on Client's behalf.

    **C. Termination for Cause.** Paycor may, in its sole discretion, immediately terminate the Paycor Service Agreements without notice should Client not remedy any suspension of Paycor Services (as set forth above in Section 8) within a reasonable time as determined by Paycor or if Paycor suspends the Paycor Services more than once within a twelve (12) month period.

    Should Client fail to pay any Service Fees, fail to maintain sufficient funds in its DDA, become the subject of a proceeding under the Bankruptcy Code, seek appointment of a trustee, receiver or custodian, seek liquidation, dissolution reorganization or the like, fail to maintain a credit rating reasonably acceptable to Paycor, or fail to perform any other obligation under the Paycor Service Agreements, Paycor may, at its option, in addition to other available remedies, take any and all actions it deems appropriate to secure payment of all amounts owed to Paycor by Client under this Agreement and/or terminate the Paycor Service Agreements immediately and without notice.  In addition to and not in limitation of any of Paycor's remedies, Client grants Paycor the right to offset for any amounts owed by Client to Paycor in any Paycor account.  Client agrees to pay for all collection costs, including reasonable attorney's fees,

which Paycor may incur as a result of Client's failure to perform any obligation under the Paycor Service Agreements.

    **D. Effects of Termination.** If either party terminates this Agreement for any reason, Paycor shall not be responsible for making any further payroll tax deposits or filings, and Paycor may retain deposits to offset any amounts owed from Client. Notwithstanding the foregoing, if this Agreement is terminated for other than Client's breach or default, (i) Paycor will, at Client's request, prepare and file any outstanding employment tax forms and reports, prepare employee W2s and perform other reasonable and customary actions related to the terminated Paycor Services provided that Client has paid for said services; (ii) Client will remit any and all tax and third party payments beginning with the date of termination; and (iii) Paycor will return to Client any uncommitted Client funds held in any Paycor account net of all payment obligations and fees for services performed through the date of termination.

    **E. Data Access Upon Termination.** Upon termination of this Agreement for any reason other than Client's breach or default hereunder, Client shall, for up to thirty (30) days after the date of termination, be provided with access to online reports and custom reporting as previously subscribed to by Client, for the sole purpose of obtaining an electronic copy of its Client payroll data.  Paycor assumes no responsibility for Client's failure to obtain an electronic copy of its payroll data within such thirty (30) day period, and Client releases Paycor from any and all claims resulting therefrom.  Client acknowledges and agrees that Paycor shall have no obligation to provide Client with access to its payroll data in the event (i) Client is in breach or default hereunder, or (ii) Client fails to obtain a copy during the thirty (30) day period referenced herein.

**15. INTELLECTUAL PROPERTY.** All software programs, tutorials and related documentation ("Paycor Products") made available, directly or indirectly, by Paycor to Client as part of the Paycor Services are the exclusive property of Paycor or the third parties from whom Paycor has secured the rights to license.  Client is being granted a limited, non-exclusive, non-transferable, non-sublicensable, revocable right to access and use the Paycor Products solely for purposes of inputting and providing certain data in order for Paycor to provide the Paycor Services.  The Paycor Products are provided "AS IS" and no warranty of any kind, including, but not limited to, any warranty of merchantability or fitness for a particular purpose, is made by or authorized to be made on behalf of Paycor. All rights, title and interest in or to any copyright, trademark, service mark, trade secret, and any other proprietary right relating to the Paycor Products and the related logos, product names, etc. are reserved by Paycor. Client agrees that it shall not remove, obscure, or alter any proprietary rights notices (including copyright and trademark notices) which may be affixed to or contained within the Paycor Products. Client shall not use Paycor trademarks in any manner without Paycor's advance written consent   Client shall not change, modify, adapt, disassemble, recompile, reverse engineer or enhance any of the Paycor Products being provided to Client hereunder, and any attempt to do so (whether by Client or a third party directed by Client) shall be deemed a breach of this Agreement.

**16. SECURITY AND CONFIDENTIALITY.**

    **A. Personally Identifiable Information.** Paycor agrees to treat all nonpublic personally identifiable information that Client discloses to Paycor (including but not limited to employee pay rates, employee names, addresses, social security numbers, telephone numbers, e-mail addresses, credit information, account numbers, account balances or other account information) in accordance with applicable privacy laws, rules, and regulations.  Paycor will use such information solely for the purpose of performing the Paycor Services.  Paycor will not disclose such information to anyone other than: (i) to Paycor's employees in the ordinary course of Paycor's business; (ii) to non-affiliated third parties who need access in order for Paycor to carry out the Paycor Services or any  other services requested by Client; (iii) to employees, agents, affiliates, or contractors of Client that supplied such information to Paycor or that Client has authorized to receive such information from Paycor; or (iv) as is otherwise permitted by applicable law (including but not limited to complying with subpoenas, investigations by government regulatory authorities, and disclosing such information to Paycor's attorneys, auditors, and accountants).  Paycor shall take appropriate measures to maintain the security and confidentiality of any such information that Client discloses to Paycor, treating such confidential information in a manner similar to which Paycor treats its own confidential information.

    **B. Online Access.** Certain Paycor Products or Paycor Services may be accessed by Client and its authorized employees through the Internet at a website provided by Paycor or on behalf of Paycor, including those hosted by Paycor on behalf of Client. In addition, and notwithstanding anything to the contrary contained herein, Client acknowledges that security of transmissions over the

Internet cannot be guaranteed. Paycor is not responsible for (i) Client's access to the Internet, (ii) interception or interruptions of communications through the Internet, or (iii) changes or losses of data through the Internet, in each case other than to the extent caused solely by Paycor.

C. **Password Protection.** Client agrees to maintain the privacy of usernames and passwords associated with Paycor Services provided through the Internet. Client is fully responsible for all activities that occur under Client's password or Internet account. Client agrees to (i) immediately notify Paycor of any unauthorized use of Client's password or Internet account or any other breach of security; and (ii) ensure that Client exits from Client's Internet account at the end of each session. Paycor shall not be liable for any damages incurred by Client or any third party arising from Client's failure to comply with this section.

D. **Client Data Protection.** In order to protect Client's data, Paycor may suspend immediately and without prior notice, Client's and/or Client's employees' use of Paycor Services provided through the Internet if any breach of security is suspected.

E. **Paycor's Pricing.** Client acknowledges and agrees that the pricing set forth in this Agreement (the "Pricing") is proprietary to Paycor, that Paycor takes reasonable measures to maintain the confidentiality of the Pricing, and that Paycor derives value from the Pricing not being generally known to the public. Accordingly, Client acknowledges and agrees that, during the term, it will not disclose the Pricing to any third party (other than to Client's employees and advisors who have a need to know the Pricing in connection with Client's legitimate business purposes), and that Client will use commercially reasonable efforts, consistent with how Client treats its own confidential and proprietary information, to maintain the confidentiality of the Pricing.

17. **INDEMNIFICATION**

A. **Fraudulent/Criminal Acts.** Each party shall indemnify the other party against any loss, liability, cost, damage or expense (each a "Loss") arising from, or in connection with, any fraudulent or criminal acts of said party or said party's employees, representatives or agents.

B. **Client's Breach.** Client shall indemnify and hold Paycor harmless from and against any Loss arising from or otherwise relating to: (i) Client's breach of any representation or warranty set forth in any Paycor Service Agreement; (ii) Client's failure to perform any covenant or other obligation set forth in any Paycor Service Agreement; (iii) the timeliness or accuracy of information supplied by Client to Paycor; or (iv) actions taken by Paycor pursuant to instructions provided by the Client. Paycor may terminate any or all of the Paycor Services without notice in the event of Client Breach.

C. **Paycor's Breach.** Subject to the limitation of liability contained in Section 13, Paycor shall indemnify and hold Client harmless from and against any Loss arising from or otherwise relating to: (i) Paycor's breach of any representation or warranty set forth in any Paycor Service Agreement; and (ii) Paycor's failure to perform any covenant or other obligation set forth in any Paycor Service Agreement.

D. **Third-Party Claims of Infringement.** Paycor shall indemnify and hold harmless Client from and against any Loss directly arising from a claim that Client's use of any of the Paycor Products infringes the intellectual property rights of a third party; provided, however, that: (a) Client has not modified or otherwise altered any of the intellectual property comprising or contained in the Paycor Products; (b) Client shall give prompt written notice to Paycor of the third-party claim (except that the failure to provide prompt notice will only limit the indemnification obligations to the extent Paycor is prejudiced by the delay or failure); (c) Paycor has full and complete control over the defense and settlement of the third-party claim; and (d) Client shall assist Paycor in connection with the defense and settlement of the third-party claim as reasonably requested by Paycor. If Client is enjoined or otherwise prohibited from using any of the Paycor Products or a portion thereof based on a claim that such Paycor Products infringe the intellectual property rights of a third party, then Paycor may, at its sole expense and at its option, either: (a) obtain for Client the right to use the allegedly infringing portions of the Paycor Products; (b) modify the allegedly infringing portions of the Paycor Products so as to render them non-infringing without substantially diminishing or impairing their functionality; or (c) replace the allegedly infringing portions of the Paycor Products with non-infringing items of substantially similar functionality. If Paycor determines that the foregoing options are not commercially possibly, Paycor may terminate the Agreement upon thirty (30)

days advance written notice to Client. Without limiting Paycor's obligation to indemnify Client as set forth above, the remedy set out in this Section 17(E) is Client's sole and exclusive remedy for any actual or alleged infringement by Paycor of any third-party intellectual property rights in the event that Client is enjoined or otherwise prohibited from using any such Paycor Products.

18. **GENERAL PROVISIONS.**

A. **Independent Contractor.** This Agreement establishes an independent contractor relationship only, by which Paycor will perform the Paycor Services for Client. It is not intended as, and may not be construed to establish, a partnership, joint venture, agency or master/servant relationship between Paycor and Client.

B. **Agent.** Paycor is not an agent of Client except where required for federal, state and local payroll tax deposits, filings and correspondence and except for purposes of any unclaimed property act. For the purpose of any unclaimed property act, Paycor shall be deemed to hold property as Client's agent for Client alone and Client shall be deemed to be the holder of property insofar as the interest of any other person and the property is concerned. Should an agency relationship be found to exist, it will automatically terminate (except for the purpose of any unclaimed property act) upon return to Paycor of any check or pre-authorized charge of Client for insufficient or uncollected funds.

C. **Severability.** If any provision of the Paycor Service Agreements or any portion thereof is held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remainder of the Paycor Service Agreements will not in any way be affected or impaired.

D. **Assignment.** No Paycor Service Agreement may be assigned by Client without prior written consent of Paycor, and any assignment made without such consent is null and void.

E. **Governing Law and Inducement.** The Paycor Service Agreements shall be construed in accordance with and governed by the law of the State of Ohio (without regard to principles of conflict of laws), including the application of any applicable statutes of limitations. Any action, suit or proceeding brought by any party with respect to, or to enforce the terms of, any of the Paycor Service Agreements, shall be brought by such party exclusively in the courts of the State of Ohio located in Hamilton County, Ohio, or in the courts of the United States for the Southern District of Ohio, Western Division. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH ANY PAYCOR SERVICES AGREEMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO EACH PAYCOR SERVICE AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS CONTAINED HEREIN.

F. **Waiver.** A waiver by either party of its rights hereunder is not binding unless contained in a writing signed by an authorized representative of the party waiving its rights. The non-enforcement or waiver of any provision on one occasion does not constitute a waiver of such provision on any other occasions unless expressly so agreed in writing.

G. **Amendment.** This Agreement may not be modified except by a writing signed by the authorized representatives of Paycor and Client. For purposes of this Section 18(G), Paycor's "authorized representatives" shall consist of its CEO, CFO, VP of Treasury and Risk, VP of Financial Planning and Analysis and VP & Controller

H. **Entire Agreement.** The Paycor Service Agreements constitute the entire understanding of the parties, and supersede all prior agreements between the parties, whether oral or written.

I. **Non-Hire.** During the term of this Agreement, Client shall not solicit the employment of any Paycor employee who has been involved in furnishing Paycor Services hereunder. Nothing contained in this section, however, shall prohibit Client from hiring any Paycor employee who responds to a general advertisement for employment, provided Client did not initiate contact with the employee or otherwise alert the employee to the advertisement.

**J.** **<u>Supplemental Agreements.</u>**   In the event of a conflict between any Supplemental Agreement and the Paycor Services Terms and Conditions, the Paycor Services Terms and Conditions shall prevail and govern.

**K.** **<u>Counterpart Execution.</u>**  Any Paycor Service Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute but one and the same instrument.  Facsimile signatures and/or electronically-captured signatures shall constitute original manual signatures on any and all such Paycor Service Agreements.

Revised 2-2-15



**CF of Collinsville LLC**
571 Beltline Road Ste 20 H
Collinsville, IL 62234

Prepared by John Ortwerth

| | Payrolls | Employees | Processings per Year |
|---|---|---|---|
| **CF of Collinsville** | **1** | **26** | **24** |
| *Collinsville* | | *26* | *24* |
| | **1** | **26** | **24** |

**CF of Collinsville**
Per Payroll Processing Fees (Semi-monthly processing on Perform solution)

| Service | Unit | Qty | $ Cost Per | $ Total |
|---|---|---|---|---|
| Payroll & Tax Base Fee | Per Check | 1 | ■ | ■ |
| Payroll and Tax Service | Per Check | 26 | | |
| *Check Stuffing* | | | | |
| *Electronic GL Per Run* | | | | |
| *Online Check Stub* | | | | |
| *Online Reporting* | | | | |
| *Pay Options* | | | | |
| *Reporting Options* | | | | |
| Additional Tax Authorities | Each | 1 | | ■ |
| Delivery(Courier STL Out of Town) | Per Delivery | 1 | | |
| Electronic Child Support | Per Payment | 1 | | |
| HR Support Ctr | Per User | 1 | | |
| | | | **Subtotal:** | |

**CF of Collinsville**
New Hire Filing Fees (Incurred per new employee)

| Service | Unit | Qty | $ Cost Per | $ Total |
|---|---|---|---|---|
| New Hire Filing EVS | Per New Hire | 1 | ■ | ■ |
| Onboarding | Per New Hire | 1 | | |
| | | | **Subtotal:** | |

**CF of Collinsville**
Monthly Fees

| Service | Unit | Qty | $ Cost Per | $ Total |
|---|---|---|---|---|
| ACA Per EE Fee | Each | 26 | ■ | ■ |
| Perform HR | Per Active Employee | 26 | | |
| Perform Time | Each | 26 | | |
| PT 100 FP WiFi Rental | Per Month | 1 | | |
| | | | **Subtotal:** | |

4811 Montgomery Rd., Cincinnati, OH 45212 | 855.551.2013
*Quote valid through 09/09/2015*



**CF of Collinsville**
Estimated Year End Fees (Actual value based on quantity of W2's processed. Amount varies by yearly number of employees)

| Service | Unit | Qty | $ Cost Per | $ Total |
|---|---|---|---|---|
| ACA YE 1094 Fee | Each | 1 | | |
| ACA YE 1095 Fee | Each | 26 | | |
| W2 Base Fee | Each | 1 | | |
| W2 Processing | Per W2 | 26 | | |
| | | | Subtotal: | |

**CF of Collinsville**
As-Incurred Fees (Billed as they are incurred)

| Service | Unit | Qty | $ Cost Per | $ Total |
|---|---|---|---|---|
| New Hire Minimum Fee | Each | 1 | | |
| | | | Subtotal: | |

**CF of Collinsville LLC Implementation**

| Implementation Fees (all Implementation Fees will be billed on the first invoice) | Qty | $ Cost Per | $ Total |
|---|---|---|---|
| ACA Set Up Fee | 1 | | |
| Onboarding Setup | 1 | | |
| Payroll Setup | 26 | | |
| Perform HR Set Up | 26 | | |

**Paycor**

**Quote Summary** for **CF of Collinsville LLC**
571 Beltline Road Ste 20 H, Collinsville, IL 62234

**CF of Collinsville** (Semi-monthly processing on Franchise Pricing solution)



| | Occurrences | $ Cost Per | $ Total |
|---|---|---|---|
| Per Payroll Processing Fees | 24 | ■ | ■ |
| Monthly Fees | 12 | | |
| Estimated Year End Fees | 1 | | |
| | | **Annualized Total** | ■ |

**CF of Collinsville LLC Total**

| | $ Total |
|---|---|
| Per Payroll Processing Fees | ■ |
| Monthly Fees | |
| Estimated Year End Fees | |
| **Annualized Total** | ■ |
| **Implementation Fees** | ■ |

**Agreement Regarding Provision of Services**
The undersigned client ("You" or "Your") has executed this Client Services Agreement (the "Agreement") as of the date set forth below. This Agreement and the Client's receipt of any services are governed by and subject to the (i) Paycor Services Terms and Conditions (the "Paycor Terms," a copy of which is attached); (ii) if applicable, the Time and Attendance Terms and Conditions of Use (the "Time and Attendance Terms," a copy of which, if applicable, is attached); (iii) if applicable, the Newton® Terms of Services Agreement (the "Newton Terms," a copy of which, if applicable, is attached); and/or (iv) if applicable, the Supplemental Agreement For The Purchase and Rental of Time Clocks. Prices set forth above are subject to change in accordance with the provisions of the applicable terms and conditions; prices are subject to change in the event of a change in processing method and/or processing frequency. You acknowledge and agree that Your signature below constitutes Your consent to be bound by the Paycor Terms and all other applicable terms for services You order.

**Client Acknowledgements; Representation**
You acknowledges and agree that: (i) this Agreement may be considered an application for credit; (ii) You authorize Paycor to investigate Your credit including vendor references, bank account status and history, and the personal credit of the owner(s) and/or principal(s); and (iii) Paycor may elect not to provide certain Paycor Services (as defined in the Paycor Terms) requested by You based upon factors determined to be relevant by Paycor in its sole discretion, including, without limitation, Paycor's review of Your credit history.

If You are subscribing to Paycor's payroll and Tax Filing Services beginning on a date other than Your first pay period of a calendar year, You hereby agree to and acknowledge the following: (i) You are responsible for providing to Paycor complete and accurate information regarding employment tax liabilities, payments and filings under Your federal EIN for the calendar year during which said services begin; (ii) Paycor will prepare tax returns, including applicable quarterly and annual filings beginning with the period in which You first subscribe to said services based on information provided by You; (iii) Paycor will remit to taxing authorities only those funds which Paycor has collected from You regardless of whether those funds represent Your entire tax liability for the period(s) for which they are remitted; and (iv) You shall be responsible for any penalties, interest, amended return fees and/or any other fees that may result from inaccurate, incomplete and/or late tax filings and/or tax payments caused by incomplete, inaccurate or missing tax liability and/or tax payment information provided by You.



Except for pass-through charges and miscellaneous fees, including but not limited to delivery fees, NSF fees, wire transfer fees and EFT reissue fees, the prices set forth in this Agreement are guaranteed for two (2) years from the date Your expected first payroll run date.

*__This Agreement and/or any of the attached Terms and Conditions may be modified or amended only by a separate written amendment executed by authorized representatives of each party. Handwritten changes and modifications, even if initialed, are invalid and shall be of no force or effect.__*

By signing below, the signatory represents that it is legally authorized to enter into this Agreement on behalf of the client and client agrees to be bound by all terms and conditions contained in this Agreement.

| Paycor | | | Client | | |
|---|---|---|---|---|---|
| By | *Chatsworth Jacobs* | | By | *Eric Schreimann* | |
| Name | Paycor Signer | | Name | Eric Schreimann | |
| Title | Sr. Manager of Pricing and Billing | | Title | CFO | |
| Date | 8/10/2015 | | Date | 8/10/2015 | |

**SUPPLEMENTAL AGREEMENT FOR THE PURCHASE AND RENTAL OF TIME CLOCKS (Revised 2/20/15)**

**IMPORTANT:** THIS IS A BINDING LEGAL AGREEMENT. READ IT CAREFULLY IN ITS ENTIRETY. IT SUPERSEDES ANY PREVIOUS AGREEMENT BETWEEN PAYCOR AND YOU REGARDING THE PURCHASE OR RENTAL OF TIME CLOCKS. IT CONTAINS IMPORTANT INFORMATION ABOUT YOUR RIGHTS AND OBLIGATIONS AS WELL AS LIMITATIONS AND EXCLUSIONS THAT MAY APPLY TO YOU.

This Agreement for the Purchase and Rental of Time Clocks (this "Agreement") is between Paycor, Inc., a Delaware corporation ("Paycor"), and You. The term "You" and "Your" means the person or entity identified as the customer on the Client Services Agreement (the "CSA") between You and Paycor. The term "Parties" refers collectively to both Paycor and You. Your signature on the CSA and/or Your acceptance and use of time clocks constitutes your agreement to be bound by this Agreement. This Agreement shall be construed in accordance with the laws of the State of Ohio (without regard to principles of conflict of laws). Any action brought by either party under this Agreement shall be brought exclusively in the state or federal courts located in Hamilton County, Ohio.

**Terms and Conditions Governing Your Rental of Clock(s).**

These Terms and Condition apply to You if You have agreed to rent from Paycor the quantity and model of time clocks (the "Clocks") noted on the CSA or in a supplemental agreement (each, an "Order"). The terms and conditions of this Agreement shall be effective during any and all times that You are receiving Perform Time (the "Rental Term"). Rental payments (each, a "Rental Payment," and collectively, the "Rental Payments") for the Clocks will be due monthly on the date and in the amount set forth on the Order. Paycor, at its cost, will be responsible for maintaining the Clocks during the Rental Term, including (a) repairing any defective Clock, and (b) if Paycor determines that a Clock cannot be reasonably repaired, replacing such Clock; provided, however, that You will be responsible for paying for the costs of any repairs or replacements that Paycor reasonably concludes occurred due to Your negligence, improper installation, or misuse, or that occurred due to repairs or alterations performed by others than authorized representatives of Paycor. Upon termination of Your receiving Perform Time ("Termination Date"), You will be charged and debited the price of a new Clock for any and all Clock(s) in Your Possession (the "Security Charge"). However, for each Clock that You return to Paycor (i) within 30 days' of the Termination Date, and (ii) in good condition, reasonable wear and tear excepted, Paycor will refund the Security Charge. All Clocks must be returned in good condition, reasonable wear and tear excepted. If any Clock is damaged while in Your possession due to Your negligent, reckless, or intentional act, You shall be responsible for the cost of the repair, up to the then-current replacement value of the Clock. If any Clock is lost while in Your possession, you shall be responsible for paying the then-current replacement value of the lost Clock. Paycor warrants that the Clocks will be of good material and workmanship and will be free of defects if properly installed and operated during the Rental Term (the "Warranty"). Paycor shall have no obligation to maintain any clocks in Your possession after the expiration of the Rental Term. THE WARRANTY IS EXPRESSLY IN LIEU OF ALL WARRANTIES, EXPRESS OR IMPLIED, AND ALL OTHER WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTY OF MERCHANTABILITY, THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY OF NON-INFRINGEMENT, NON-INTERRUPTION OF USE AND FREEDOM OF ERRORS. IN NO EVENT SHALL PAYCOR BE LIABLE TO YOU FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, OR OTHER DAMAGES OF ANY SORT. IN NO EVENT WILL PAYCOR'S CUMULATIVE LIABILITY EXCEED THE REPLACEMENT VALUE OF THE CLOCKS. You shall indemnify and hold Paycor harmless from and against any loss, liability, cost, damage, expense, or claim arising from Your use of the Clock(s).

**Terms and Conditions Governing Your Purchase of Clocks.**

These Terms and Condition apply to You if You have agreed to purchase from Paycor the quantity and model of time clocks (the "Clocks") noted on the CSA or in a supplemental agreement (each, an "Order"). The purchase price for the Clocks is the amount set forth on the Order, which amount is due and payable prior to Your taking possession of the Clocks. Paycor warrants that the Clocks will be of good material and workmanship and will be free of defects if properly installed and operated ("the Warranty") for as long as You subscribe to Perform Time (the "Warranty Period"). Paycor, at its cost, will be responsible for maintaining the Clocks during the Warranty Period, including (a) repairing any defective Clock, and (b) if Paycor determines that a Clock cannot be reasonably repaired, replacing such Clock with a comparable clock; provided, however, that (i)You may be charged a fee for examination of a Clock; and (ii)You will, at your option, be responsible for paying for the costs of any repairs or replacements that Paycor reasonably concludes occurred due to Your negligence, improper installation, or misuse, or that occurred due to repairs or alterations performed by others than authorized representatives of Paycor. Your remedy for breach of the Warranty is expressly limited to repair or replacement of the defective Clock(s) with Clock(s) of similar functionality in good working condition; any Clock which, under normal use and service, is proven to breach the Warranty will, upon examination by Paycor, and at Paycor's option, be repaired or replaced by Paycor with like or similar Clock(s). Paycor reserves the right to replace any Clock with a used or refurbished Clock. In all cases, transportation costs and charges for any returned Clock(s) shall be paid by You. The Warranty will not be breached, and Paycor will give no credit for any Clock(s) that have (a) been damaged, tampered with, abused, improperly installed, or damaged in shipping, or (b) been repaired or altered by others than authorized representations of Paycor. THE WARRANTY IS EXPRESSLY IN LIEU OF ALL WARRANTIES, EXPRESS OR IMPLIED, AND ALL OTHER WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTY OF MERCHANTABILITY, THE IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE, AND ANY WARRANTY OF NON-INFRINGEMENT, NON-INTERRUPTION OF USE AND FREEDOM OF ERRORS. IN NO EVENT SHALL PAYCOR BE LIABLE TO YOU FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, OR OTHER DAMAGES OF ANY SORT. IN NO EVENT WILL PAYCOR'S CUMULATIVE LIABILITY EXCEED THE AMOUNT OF THE PURCHASE PRICE OF THE CLOCKS AS SET FORTH ON THE ORDER. You shall indemnify and hold Paycor harmless from and against any loss, liability, cost, damage, expense, or claim arising from Your use of the Clock(s).

# EXHIBIT 5

 Account
**Aphel Bill Serv, LC**

| Client ID | Type | Company ID | Loss Effective Date | Future Responsibility | Year Responsibility |
|---|---|---|---|---|---|
| 78890 | Lost Client | 140059 | 6/1/2016 | 1st Quarter Resp. | 2016 |

 Account
**CF of Collinsville LLC**

| Client ID | Type | Company ID | Loss Effective Date | Future Responsibility | Year Responsibility |
|-----------|------|------------|---------------------|----------------------|---------------------|
| 78986 | Lost Client | 140059 | 6/1/2016 | 1st Quarter Resp. | 2016 |

# EXHIBIT 6

## RELEASE OF AND CONSENT TO COLLECTION OF BIOMETRIC DATA

The individual named below has been advised and understands that ▮▮▮▮▮▮▮ (the "Company") and/or Paycor, or any other licensor of the Company's time and attendance software ("Licensor"), collects, uses and stores biometric data, as defined by the Illinois Biometric Information Privacy Act, and as restated in the Company's Biometric Information Privacy Policy (the "Policy"). This biometric data is collected with the help of biometric timeclocks to identify individuals, record their respective time entries and determine the amount of wages due to each individual.

The individual named below understands that unless the Company is prevented by a warrant, subpoena, or other legal directive, the Company will destroy the individual's biometric data upon the termination of the individual's employment with the Company, or within three (3) years of the individual's last interaction with the Company, whichever occurs first.

The individual named below also understands that unless the Licensor is prevented by a warrant, subpoena, or other legal directive, the Licensor will destroy the individual's biometric data within one (1) year of obtaining the biometric data.

The individual may revoke this Release and Consent at any time by notifying the Company in writing.

The undersigned individual acknowledges that he/she has received a copy of the Company's Biometric Information Privacy Policy (the "Policy"), voluntarily releases his or her biometric data to the Company and consents to the Company's collection, use and storage of such biometric data, solely for the purpose identified in the Policy and restated herein. Further, the undersigned individual voluntarily consents to further disclosure of such biometric data to the Licensor, solely for determining wages due to the individual.


_____

Employee Signature


_____

Employee Printed Name


_____

Date


1383529.4

# EXHIBIT 7

# AGREEMENT

### Between

## UNITED FOOD & COMMERCIAL WORKERS INTERNATIONAL UNION LOCAL 1546

### And

██████████████████

**June 1, 2014 - May 31, 2017**

# AGREEMENT

THIS AGREEMENT is made and entered into as of the 1st day of June 2014 by and between Local 1546, United Food & Commercial Workers International Union, ("the Union") and ███████████████ "the Employer") ████████████

## ARTICLE 1. UNION SHOP PROVISION

1.1   All employees who are covered by this Agreement will be informed by their Employer of the Union Shop provisions, and a check-off authorization will be presented to them for execution. All present employees who are or become members of the Union shall remain members in good standing as a condition of their employment. All present employees who are not members of the Union and all employees who are hired hereafter shall, after thirty (30) days following the beginning of their employment or the effective date of this Agreement, whichever is the later, become and remain members in good standing of the Union as a condition of their employment.

1.2   The Employer shall notify the Union when new employees are hired, but during the first sixty (60) calendar days of employment, a new employee shall be on a trial basis and may be discharged at the sole discretion of the Employer.

1.3   The Union shall be the sole representative of the classifications of employees covered by this Agreement as set forth in Article 10 hereof.

## ARTICLE 2. DUES/FEES CHECK OFF AND NOTIFICATION

2.1   The Employer agrees to deduct Union dues and fees upon written authorization by an employee, in accordance with the provisions of the Labor Management Relations Act of 1947, and remit the same to the Union along with a list of individuals for whom the deductions were made. Dues will be checked off on a monthly basis in advance. The Employer agrees to notify the Local Union when new employees are hired.

1

## ARTICLE 3.  ACTIVE BALLOT CLUB (A.B.C.)

3.1    The Employer agrees to honor and transmit to the Union, contribution deductions to the United Food & Commercial Workers International Union Active Ballot Club from employees who are union members and who sign deduction authorization cards.  The deductions shall be in the amounts and with the frequency specified on the political contribution authorization cards; however, such deductions shall be remitted in conjunction with regular monthly dues deductions.  While the deductions will be remitted at the same time of the regular monthly dues deductions, such payment shall be in the form of a separate check from the regular monthly dues deductions.  When the Employer remits the deduction to the United Food & Commercial Workers International Union Active Ballot Club the Employer shall include a list of individuals for whom the deductions were made.

## ARTICLE 4.  NO DISCRIMINATION

4.1    There shall be no coercion of or discrimination against any employee because of his membership in the Union, or because of race, religion, color, age, sex or national origin.

## ARTICLE 5.  HOLIDAYS

5.1    The following days, except as hereafter provided, shall be non-working holidays:

- New Year's Day
- Memorial Day
- July 4th
- Labor Day
- Thanksgiving Day
- Christmas Eve
- Christmas Day
- New Year's Eve

and the employee's birthday, which "Birthday Holiday" may be celebrated any day mutually agreeable to the employee and Employer, within the current calendar month. After the current month, the birthday must be taken within the calendar year, but will be at the sole discretion of the Company.

2

5.2  All non-probationary employees shall receive one (1) personal day with pay. Each year of the contract; this personal day will not be granted in conjunction with any of the other paid holidays. If this personal day is not taken by December 15 of each year, the employee will be paid in the following pay period.

5.3  Employees shall be paid eight (8) hours at straight time pay for said holidays, and the work missed need not be made up at any later date.

5.4  Employees who fail or refuse to work on the regularly scheduled work day before or after each of said holidays shall not be paid holiday pay, except where absence from work is due to illness or unavoidable absence, either of which must be satisfactorily proven by the employee.

5.5  Except as hereinafter provided for the Birthday holiday, any work performed on any observed holiday shall be paid at twice the regular rate of pay and overtime will be paid to any worker who works in excess of thirty-two (32) hours in a holiday week.

5.6  Work may be performed on the Birthday Holiday at regular rates of pay provided, however, that the named holiday falls on a day other than Saturday or Sunday, and provided further that such employee is given time off with pay at the regular rate on another day or days (as the case may be) selected by mutual agreement of the Employer and the employee.

### ARTICLE 6. HOURS, OVERTIME AND PREMIUM PAY

6.1  The basic work week for all employees shall be forty (40) hours worked in five (5) days. Time and one-half shall be paid for all work in excess of forty (40) hours, not including the sixth and seventh scheduled day of the week, and for all work in excess of eight (8) hours in one day. There shall be no pyramiding of overtime.

6.2  All regular employees who report for work on time each day shall be given four (4) hours of work at the rates specified in Article 10, hereof, this four (4) hour work guarantee will not apply in case of a fire in the plant, flood, damage caused by a tornado or a shutdown of the plant due to causes beyond the employer's control.

3

6.3    No employee shall suffer any reduction in his wages, hours or working conditions because of any provision in this Agreement.

6.4    Four (4) hours shall be guaranteed if any employee is called to work on Saturday. Any work performed on Saturday of the week shall be paid at time and one-half (1½) the regular rate of pay, provided the employee has worked all scheduled hours. Overtime on Sunday of the week shall be voluntary provided sufficient qualified employees are available to perform the work. If sufficient qualified voluntary employees are not available, then qualified employees will be required, in inverse seniority order, to perform the overtime work.

6.5    All hours worked on Sunday will be paid at double time, provided the employee has worked their regularly scheduled forty (40) hours during the week. Any employee with an advanced excused absence will be paid double time. If not, all Sunday hours will be paid at time and one-half (1½) times their regular hourly rate.

6.6    Employees working on a second shift shall be paid at a rate of twenty-five cents (.25¢) per hour higher than his regular rate. A second shift shall be one which commences at any time after 3:00 p.m. All employees working third shift shall receive a premium of forty cents (.40¢) per hour.

6.7    Employees will not be required to work more than two (2) hours overtime in any given weekday, provided that sufficient qualified employees are available to perform additional required overtime work. If sufficient qualified voluntary employees are not available, then qualified employees will be required, in inverse seniority order, to perform the overtime work.

6.8    Split shifts will be avoided; if sufficient qualified voluntary clean up department employees are not available, then qualified employees will be required, in inverse seniority order, to perform the work.

6.9    Shift changes made by seniority will last a minimum of one (1) year.

6.10    If an employee is off on Friday, it is his/her responsibility to call in for weekend work.

4

## ARTICLE 7.  REST PERIODS, LAUNDRY AND TOOLS

7.1    All employees shall receive fifteen (15) minutes each morning and afternoon as a rest
period. An additional rest period of fifteen (15) minutes will be granted if more than ten
(10) hours are worked in a day and an additional twenty (20) minute unpaid lunch will be
granted after twelve (12) hours of work in a day.

7.2    All laundry, tools and sharpening tools shall be furnished free of cost by the Employer.

7.3    The Company shall provide up to One Hundred Twenty-Five Dollars ($125.00) per year
for safety shoes from an approved vendor.  Newly hired employees shall receive their
shoe allowance after the completion of the probationary period.

7.4    Locker inspections will be conducted with the employee present whenever practicable.  If
the employee is not present the Union Steward will be present, if available.

## ARTICLE 8.  SENIORITY

8.1    Plant seniority shall begin after 60 days of employment and shall revert back to the first
day of most recent employment with the employer.

8.2    In the event of a reduction in force of a particular department, department seniority shall
prevail among members and ability being equal, the last employee transferred into the
department shall be the first employee transferred out of the department.   Such
transferred employees shall be placed on open jobs, if available, in other departments
within the plant. If no open job is available, then only such displaced employees shall be
laid off in inverse order of their plant seniority.  No bumping is allowed.

8.3    Plant seniority rights shall continue for a period not to exceed one (1) year from the date
of layoff, after which employment shall terminate.  Management shall notify members of
recall to work and members shall notify management of any changes of address and
phone number.

5

8.4    Seniority shall be broken in the case of a proper discharge, voluntary quits, or failure to return to work within seventy-two (72) hours of recall. No member shall be discharged because of absence resulting from proven illness, nor without good and sufficient cause.

8.5    Department seniority will prevail for the regular work week, Monday through Friday. During this time there will be no bumping between departments. On weekends or holidays, plant seniority will be followed.

8.6    In the event two employees are hired on the same day, seniority will be determined by the employee's birthday.

**ARTICLE 9.  JOB VACANCIES**

9.1    All job vacancies will be posted. Qualified employees will be considered on a seniority basis to fill vacancies prior to hiring from the outside, provided however that Management has the sole discretion to decide whether an employee's qualified, which discretion could be subject to the grievance procedure.

**ARTICLE 10.  RATES OF PAY**

10.1   The rates of pay for all employees shall be based on the following job classifications:

Line Workers/Packers – One (1) Year or more

June 1, 2014 + .32¢ .................................................................................................$10.82

June 1, 2015 + .32¢ .................................................................................................$11.14    2nd

June 1, 2016 + .32¢ .................................................................................................$11.46    11.71

| NEW HIRES | 06/01/2014 | 06/01/2015 | 06/01/2016 | 2nd. |
|-----------|-----------|-----------|-----------|------|
| 0-6 Months | $9.00 | $9.32 | $9.64 | 9.89 |
| 6-12 Months | $9.25 | $9.57 | $9.96 | 10.21 |
| 12 Months | Scale | Scale | Scale | |

6

Sanitation

| | | |
|---|---|---|
| June 1, 2014 + .32¢ | $11.35 | 11.75 |
| June 1, 2015 + .32¢ | $11.67 | 12.07 |
| June 1, 2016 + .32¢ | $11.99 | 12.39 |

*2nd* handwritten notation above; *$* and *1¢* marks

Cook & Machine Operators

June 1, 2014 + .32¢ .................................................................................$12.47
June 1, 2015 + .32¢ .................................................................................$12.79
June 1, 2016 + .32¢ .................................................................................$13.11

Shipping & Receiving

June 1, 2014 + .32¢ .................................................................................~~$12.47~~   *3rd*
June 1, 2015 + .32¢ .................................................................................~~$12.79~~  13.19
June 1, 2016 + .32¢ .................................................................................$13.11

## ARTICLE 11.  VACATIONS

11.1  All full-time employees who have been in the continuous employment of the Employer for one year or more shall receive vacations in accordance with the following schedule:

| YEARS OF SERVICE | VACATION AT CURRENT WEEKLY BASE PAY |
|---|---|
| 1 | One Week |
| 2 | Two Weeks |
| 10 | Three Weeks |
| 18 | Four Weeks |

11.2  Any full-time employee who has been in continuous employment with the Company for five (5) years or more shall be able to request one (1) additional weeks vacation, without pay, once every four (4) years.

11.3  If a holiday occurs during an employee's vacation, that employee shall be paid an additional day's pay or receive an extra day off in addition to the vacation pay as the employer and the employee shall mutually agree.

11.4  Birthdays and holidays are not to be combined with vacations.

7

## ARTICLE 12.  FUNERAL LEAVE

12.1    Employer agrees to pay full-time employees for necessary absence on account of death in the immediate family up to and including a maximum of three (3) scheduled work days at straight time, provided the employee attends the funeral.

12.2    Saturday and Sunday shall not be paid days unless the employee was scheduled to work on one or more of those days.

12.3    The term "immediate family" shall mean spouse, parent, child, brother sister, grandchildren and grandparents, and a condition of payment shall be proof of death and of the relationship of employee to the deceased.

12.4    Family Leave:  An employee with one year of service may request a personal leave of absence without pay.  It is not to exceed ninety (90) days for a catastrophic or terminal illness of an immediate family member requiring full time care.  The need for such leave must be in writing and approved by the employer.  The leave shall be subject to the rules set forth by the Government Family Leave Act.

## ARTICLE 13.  JURY PAY

13.1    When any full-time employee who is covered by this Agreement is summoned for Jury Service, he shall be excused from work for the day on which he reports for jury service and/or serves.  He shall receive for each such day on which he so reports and/or serves, and on which he otherwise would have worked, the difference between eight (8) times his regular hourly rate of pay and the payment he receives for jury service, if any, after presenting to the Employer his proof of summons, time served and amount of pay receive therefore.

The provisions of this section shall not apply if an employee volunteers for Jury Service.

An employee shall report for work immediately upon being released from Jury Service.

8

## ARTICLE 14.  HEALTH AND WELFARE

14.1    Each employee, after sixty (60) days of employment, shall be covered by U.F.C.W. Local 1546, Food Handlers Health and Welfare Plan "QZ", including dental, at a cost to the Employer per month, per employee, during the term of the agreement:

Effective June 1, 2014 .............................................. cost of $750.00 per month, per employee
Effective June 1, 2015 .............................................. cost of $750.00 per month, per employee
Effective June 1, 2016  ............................................. cost of $788.00 per month, per employee

14.2    Contributions to the Health and Welfare Fund shall be made monthly by the Employer in accordance with the Rules governing the Funds as stated on the Contribution Report Forms.

14.3    The Company adopts and agrees to be bound by the terms and provisions of the Trust Agreement, creating the Fund, as amended from time to time, and hereby designates as its representatives on the Boards of Trustees of the Fund the respective Employer Trustees designated in accordance with said Trust Agreement and their successors selected in the manner provided therein.

14.4    Contributions to the funds for all eligible employees shall be made monthly by the company on or before the 15th day of the calendar month.  An eligible employee is defined as one who:

1.      has completed the probationary period and is covered by the agreement and who has worked eight or more days in the calendar month; or

2.      has been reinstated after an involuntary layoff or any company approved absence, and has worked eight or more days in the calendar month; or

3.      is off work due to an industrial accident which occurred on company premises during normal working hours resulting in disability or illness for which the employee may or may not be receiving compensation; or

4.      is absent because of personal disability, such eligibility to terminate after the company has made two monthly contributions for such employee.

9

14.5   In event the Employer fails to make timely contributions as herein provided to the Health and Welfare Fund, the Union may consider such action a material breach of this Agreement, and may take all lawful action to enforce the provisions hereof, including the right to strike, notwithstanding other provisions of this Agreement to the contrary.  The Union may, but is not obligated, to submit to arbitration any grievance arising out of the Company's failure to make contributions to the Health and Welfare Fund.

**ARTICLE 15.  UNION RIGHTS AND RESPONSIBILITIES**

15.1   An authorized representative or officer of the Union shall have access to the premises for the purpose of communicating with the employees, but such representatives or officers shall not unnecessarily interfere with the duties of said employees or the business of the Employer.

15.2   The Union shall use its best efforts as a labor organization to enhance the interest of the Employer as an employer of Union Labor.

**ARTICLE 16.  DISCHARGE FOR CAUSE**

16.1   No employee shall be discharged without good and sufficient cause.  Such cause to include, but not be limited to:  drunkenness, dishonesty, incompetence, incivility, insubordination and the possession or use of controlled substance on Company premises.

**ARTICLE 17.  RIGHTS OF THE EMPLOYER**

17.1   The Employer shall, at all times, subject to provisions of this Agreement, have full control of matters relative to the management, personnel and the conduct of its business.

    1.   The Employer shall control the plant and its operation, the direction of its working forces, the methods of production, wages, general management of its plants and buildings, care and use of its machinery and material, and the right to hire, promote, assign and transfer employees.

    2.   Any of the rights, powers, authority that the Employer had prior to the signing of this Agreement are retained by the Employer except those specifically abridged,

10

delegated, granted or modified by this Agreement or any supplementary agreements that may hereafter be made.

## ARTICLE 18.  PAST PRACTICES

18.1    No employee covered by this Agreement shall suffer a reduction in wages or other conditions or practices of employment as the result of this Agreement.  It is understood that any employee receiving rates of pay or other terms, conditions or practices of employment more favorable than those established herein shall continue to receive the same.  All generally recognized rules, requirements, conditions, privileges and benefits heretofore in effect, which are not specifically mentioned or changed by the provisions herein, shall remain unchanged during the tenure of this Agreement unless changed by the mutual consent of the authorized representatives of the parties hereto, and it is also agreed that changes in this Agreement mutually agreeable to the parties hereto may be made any time during the tenure of this Agreement.

## ARTICLE 19.  GRIEVANCE PROCEDURE

19.1    Should differences arise between the Company and the Union or any employee of the Company as to the meaning or application of the provisions of this Agreement, such differences shall be settled in the following manner with the provision that all grievances must be filed, in writing, with the Employer within ten (10) working days following the action complained of.

STEP ONE:          The aggrieved employee shall first take the matter up with his/her immediate supervisor.  The aggrieved employee may then have the Union Steward present in an effort to resolve the grievance.

STEP TWO:          If a satisfactory settlement is not effected in Step One, the grievance must then be reduced to writing and submitted to the plant manager who will resolve the grievance or meet with the Union representative within fifteen (15) working days following the action complained of to resolve the grievance.

11

# EXHIBIT 8

# IMPORTANT:

## Please be aware that in the next few days, you'll be seeing this notice when you punch into the time clock.

By using this clock, you consent, as of the date of your first use of the clock and a condition of continued employment, to your employer and Paycor collecting, capturing, storing, having access to, using, transmitting, obtaining, possessing and/or disclosing your finger scan (template) that may be considered biometric data for timekeeping purposes during your employment.



If you do not agree, see your manager or employer's administrator to obtain a badge number and clock password to clock in and out.

# IMPORTANTE:

**Tenga en cuenta que, en los próximos días, verá este aviso cuando marque en el reloj registrador.**

Al usar este reloj, usted otorga su consentimiento, a partir de la fecha de su primer uso del reloj y como una condición de empleo continuo, para que su empleador y Paycor recopilen, capturen, almacenen, tengan acceso, usen, transmitan, obtengan, posean y/o divulguen su huella dactilar (plantilla) que puede considerarse dato biométrico para fines de registro de horas durante su empleo.



Si no está de acuerdo, consulte a su gerente o al administrador de su empleador para obtener un número de credencial y una contraseña de reloj para registrar la entrada y la salida.