# EXHIBIT B

Page 1

```
            IN THE UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION

 KELLIN JOHNS and JUAN         )
 BARRON, Individually and on   )
 behalf of all others          )
 similarly situated,           )
                               )
          Plaintiffs,          )
                               )
     vs.                       ) No. 3:20-cv-00264-DWD
                               )
 PAYCOR, INC.,                 )
                               )
          Defendants.          )
```

       The deposition of MITRI DAHDALY, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken remotely in the above-entitled cause via Zoom electronic videoconferencing platform by Andrew R. Pitts, Certified Shorthand Reporter, on January 14, 2021, at the hour of 11:30 a.m. EST.

REPORTED BY:  Andrew R. Pitts, CSR, RPR
LICENSE NO.:  084-4575

```
 1   APPEARANCES:
 2        STEPHAN ZOURAS, LLP, by
             MR. RYAN F. STEPHAN, Esquire
 3           MS. CATHERINE T. MITCHELL, Esquire
             100 North Riverside Plaza
 4           Suite 2150
             Chicago, Illinois  60606
 5           (312) 233-1550
             rstephan@stephanzouras.com
 6
             Representing the Plaintiffs;
 7
        SHOOK, HARDY & BACON L.L.P., by
 8           MR. MATTHEW C. WOLFE, Esquire
             111 South Wacker Drive
 9           Suite 4700
             Chicago, Illinois  60606
10           (312)704-7700
             mwolfe@shb.com
11
             Representing the Defendant.
12
13   ALSO PRESENT:
14
        MS. ELIZABETH FREDERIC, Paycor In-house Counsel
15
16
17
18
19
20
21
22
23
24
                                                 Page 2
```

```
 1                I N D E X
 2   WITNESS                             EXAMINATION
 3   MITRI DAHDALY (via videoconference)
 4      By Mr. Stephan                        5
 5      By Mr. Wolfe                        142
 6
 7              E X H I B I T S
 8   PLAINTIFFS'                         PRESENTED
 9   Exhibit A  Johns/Paycor 1-11             41
10   Exhibit B  Johns/Paycor 19-26            68
11   Exhibit C  Affidavit of Eric Schreimann  88
12   Exhibit D  Johns/Paycor 32-35           102
13   Exhibit E  Johns/Paycor 53-55           118
14   Exhibit F  Johns/Paycor 41-46           126
15   Exhibit G  Johns/Paycor 118-126         129
16
17
18
19
20
21
22
23
24
                                                 Page 3
```

```
 1              (Whereupon, the following
 2           proceedings took place remotely:)
 3           THE REPORTER:  The parties in this
 4   deposition acknowledge that I am not physically
 5   present in the deposition room and that I will be
 6   reporting this deposition remotely pursuant to Federal
 7   Rule of Civil Procedure 29.  They further acknowledge
 8   that in lieu of an oath administered in person, the
 9   witness will verbally declare his testimony under
10   penalty of perjury.
11           The parties and their counsel consent
12   to this arrangement and waive any objections to this
13   manner of reporting.  Please indicate your agreement
14   by stating your name and your agreement on the record,
15   beginning with Plaintiffs' Counsel.
16           MR. STEPHAN:  Thank you, Andrew.
17   Plaintiffs' counsel Ryan Stephan agrees.
18           MR. WOLFE:  Matt Wolfe for Paycor, we agree.
19              (Whereupon, the witness was
20              administered an oath.)
21
22
23
24
                                                 Page 4
```

```
 1             MITRI DAHDALY,
 2   called as a witness herein, having been first
 3   administered an oath, was examined and testified
 4   remotely via videoconference as follows:
 5               EXAMINATION
 6   BY MR. STEPHAN:
 7       Q.  Good morning, Mr. Dahdaly.  Is it okay if
 8   I call you by your first name today?
 9       A.  Sure.
10       Q.  Well, it's nice to meet you.  My name is
11   Ryan Stephan.  I represent the Plaintiffs in this
12   case, Johns v Paycor.
13           Have you ever been deposed before?
14       A.  No, I have not.
15       Q.  Okay.  So let's go over a couple ground
16   rules just so things go as smoothly as possible
17   today.  Okay?
18       A.  Sure.
19       Q.  The first is please try and wait until
20   I finish asking my question before you answer.  That
21   way Andrew, the court reporter, has a clear record of
22   my question and your answer.  Okay?
23       A.  Okay.
24       Q.  Similarly, please do your best to give clear
                                                 Page 5
```

```
 1    14,000 total people over the course of a five-year
 2    period.
 3        Q.  Okay.  14,000 people in Illinois for whom --
 4        A.  14,000 people who pay taxes in Illinois and
 5    also had a finger scan template.
 6        Q.  Okay.  And was a written report generated as
 7    part of these queries?
 8        A.  No.  We got some tabular output in Excel.
 9    So it's not on what I would call a typical report.
10    Just data --
11        Q.  Was that actually sent to you via e-mail?
12        A.  It was.
13        Q.  Do you remember who sent that to you?
14        A.  I believe it was Pershon (phonetic) --
15    I don't recall Pershon's last name.
16        Q.  First name is Pershon?
17        A.  Pershon.
18        Q.  Okay.  And do you know what his title is or
19    where he works, what group?
20        A.  He is a software developer.  I believe he
21    works or reports to Pat or -- I know he's in Pat's
22    orb, I should say.  I don't know if he reports
23    directly to Pat or if he reports to a manager who
24    reports to Pat.
                                                Page 18
```

```
 1        Q.  And these queries that were run against
 2    these databases, what databases are we talking about?
 3        A.  Perform Time databases.
 4        Q.  What are those?
 5        A.  Or Perform Suite database.  I should
 6    rephrase.
 7        Q.  It's okay.  And what are those?
 8        A.  Those are the data storage locations for
 9    software that is developed by Paycor.  So that would
10    encompass payroll time primarily but other HR type
11    functions.
12        Q.  Okay.  And are there names for those
13    databases, or are they just referred to as Perform
14    Suite databases?
15        A.  Perform Suite databases.  There's probably
16    some more technical nomenclature that those are
17    referred to, but that's colloquially what we would
18    refer to them as.
19        Q.  Do you know the geographic location of those
20    actual servers that would host those databases?
21        A.  They are in our data center, which I believe
22    is in Cincinnati.  There is a portion of data that is
23    stored in Azur, which is a cloud service provided by
24    Microsoft.
                                                Page 19
```

```
 1        Q.  And, I'm sorry, what was that?
 2        A.  A cloud storage service that is provided by
 3    Microsoft, and it's a multi-region setup, so it would
 4    probably be in a couple of data centers across the
 5    country.  But it's all within the U.S.
 6        Q.  And do you know where those data centers are
 7    located?
 8        A.  I do not know the specifics of where the
 9    Microsoft data centers are.
10        Q.  So just to kind of summarize, Paycor hosts
11    some of its own databases in Cincinnati, Ohio in its
12    data center there, correct?
13        A.  Correct.
14        Q.  It also hosts some of its data on Microsoft
15    servers located in different parts of the country; is
16    that right?
17        A.  Correct.
18        Q.  And would that include the same data that
19    we're talking about here, the employees in Illinois
20    for -- employees that pay taxes in Illinois and
21    whether or not they had a finger scan profile?
22        A.  So the data for taxation is held within our
23    data center.  The data relative to a finger scan
24    template is held in Azur.
                                                Page 20
```

```
 1        Q.  I'm sorry, what's -- I don't understand the
 2    word that you're saying there.  Held in --
 3        A.  Azur.  It's Micro- -- it's the name of
 4    Microsoft's that we leverage for cloud compute and
 5    storage.
 6        Q.  Thank you.  I was not familiar with that.
 7    Could you spell it for us?
 8        A.  A-Z-U-R.
 9        Q.  Got it.  And how long has that been the
10    case?
11        A.  Azur has been leveraged for the better part
12    of five or six years.  And specifically for our data
13    communication with time collection devices and storage
14    of templates, it's always been the case.  So that's
15    since 2014.
16        Q.  Got it.  Do you have a point of contact at
17    Microsoft --
18        A.  I personally do not --
19        Q.  -- regarding this information?
20        A.  I personally do not have a contact person.
21    Again, that would be something that our engineering
22    organization would maintain, and most likely it's a
23    support engineering e-mail or a sales contact rather
24    than, you know, anybody specific within Microsoft's
                                                Page 21
```

BY MR. STEPHAN:
Q. And just briefly, Mitri, can you tell us what the partnership was between ADP and Kronos?
A. The partnership was one where we, as ADP, white-labeled Kronos' solution, integrated it into our payroll and HR solutions, and resold it as part of that package. And, of course, as part of that, we sold data collection devices that were manufactured by Kronos.
Q. Okay. Would those include devices that took a finger scan, for example?
A. Yes.
Q. Did you have a primary point of contact at Kronos?
A. I did.
Q. Who was that?
A. Bob Ledbetter.
Q. And what was his position at Kronos?
A. He was a channel manager.
Q. Okay. At Paycor --
A. Yes.
Q. -- do you have a written job description?
A. Yes.
Q. And could you give just generally -- I know

Page 30

we kind of covered some of this, but your primary duties at Paycor?
A. My primary duties at Paycor are to determine the strategic direction for Paycor products.
Q. Okay. And which products would that include?
A. I own our Workforce Management portfolio, which today is comprised of three separate solutions: Perform Time, Time On Demand, and Ready Clock.
Q. Okay. And Perform Time, what is that?
A. Perform Time is a collection of features that have been developed by Paycor to track time worked by employees.
Q. Does that include hardware?
A. That would include hardware.
Q. Does it also include software?
A. Yes, it does.
Q. And when you reference hardware, does it include biometric time clocks?
A. It includes time clocks that can take a fingerprint scan or finger scan.
Q. Can it also take a scan of a hand?
A. Not for Perform Time.
Q. Okay. And can you tell us the names of

Page 31

those clocks that capture finger scans?
A. We call them the PT 100 and the PT 150.
Q. Okay. And then the affiliated software, is there a name for that?
A. There is not.
Q. Just Perform Time software?
A. Correct.
Q. Okay. The next one you mentioned was Time On Demand. What is that?
A. Time On Demand is a third party Workforce Management solution that we white-label and resell.
Q. When you say white-label, I think I understand what you mean, but could you explain?
A. It means that the vendor who developed the software has had all of their branding and trademarks removed from the application and replaced with Paycor-specific branding such that the customer would understand the product to be Paycor's.
Q. Okay. And the actual provider of those devices is called Time On Demand?
A. No. Time On Demand is a brand name that's owned by Paycor.
Q. Okay. How long has it been owned by Paycor?
A. Since the inception of the product, or the

Page 32

inception of the relationship with Attendance On Demand.
Q. Okay.
A. I don't recall the exact date.
Q. Okay. And Attendance On Demand, is that a separate company?
A. Attendance on Demand/Infotronics is the owner of the Attendance On Demand product that we resell as Time On Demand.
Q. Okay. And how long has Paycor been doing business with Attendance On Demand?
A. To the best of my recollection, the relationship is five years or six years old.
Q. Okay. And just so I understand and I'm clear about this, is Paycor a client of Attendance On Demand?
A. We would be considered a partner of Attendance On Demand, client in the sense that we leverage their service to provide services to our customers, but we would not be the intended end-user of the service.
Q. Okay. And as part of that relationship, Attendance On Demand provides the actual hardware, the biometric time keeping devices?

Page 33

at 1.
    THE WITNESS: So I have the 00001 document open currently.
BY MR. STEPHAN:
    Q. Yeah, and for purposes of today's dep, can we all agree that we will just go from the last handful of numbers so we don't have to say zero 15 times today?
    A. Sure.
    Q. Thanks. Mitri, are you familiar with what we have shown you as Exhibit A?
    A. Yes.
    Q. Can you tell us what it is?
    A. It is a document that describes the capabilities of our PT 100 series devices.
    Q. Okay. And is there a purpose to this document? Can you tell us what it is used for?
    A. It's a sheet that we use internally to help our sellers and our support team learn about the device, and it may be a document that we share with clients or prospects.
    Q. Okay. Do you know if it's available online anywhere?
    A. I believe it would be within our document

Page 42

management solution available online.
    Q. Okay. And would that be available to the public or only customers?
    A. It would be customers.
    Q. Okay. And do you know who prepared this document?
    A. I would assume that this would come from our marketing team. They're responsible. Marketing or marketing communications would prepare these documents.
    Q. Okay. And currently, is there a head of that particular team?
    A. There is.
    Q. See, when you're the first person to be deposed in the case, you get the benefit of all of these background questions.
    A. I'm sure I will, yes.
    Q. I'm sorry, did I miss something? Did you identify the person in charge of marketing?
    A. Katy Bunn, I believe.
    Q. Katy Burn?
    A. Bunn.
    Q. Oh, Bunn. Okay. And it identifies at the top here two particular clocks: The PT 100 and the

Page 43

PT 100W. Do you see that?
    A. I do.
    Q. Okay. Would that be part of that Perform Time?
    A. Correct, that's what the PT would signify is Perform Time.
    Q. Got it. So when we're talking about the three product lines, this would be part of that first product line you mentioned?
    A. Correct.
    Q. Got it. And with these particular clocks, does Paycor actually manufacture them?
    A. No, we do not.
    Q. Do you know who does?
    A. A company by the name of ZK Technology.
    Q. So does Paycor purchase the clocks from ZK Technology?
    A. Yes, we do.
    Q. Do you have a point of contact at ZK Technology?
    A. Jaimin Sing.
    Q. Would you spell that for us, please?
    A. J-A-I-M-I-N, and his last name is Sing, S-I-N-G, I believe.

Page 44

    Q. Okay. And I think you may have mentioned this earlier, but how long has Paycor been using these types of clocks?
    A. Since 2014, if I'm not mistaken.
    Q. Okay. Before your time?
    A. Before my time, correct.
    Q. Okay. By the way, did you replace someone at Paycor?
    A. I believe I did.
    Q. Do you know who that was?
    A. I believe his first name was Jeff. I do not know his last name.
    Q. Do you know if Jeff is still with Paycor?
    A. He is not.
    Q. Okay. Okay. If we look at the first page of this exhibit, it goes through the different parts of this clock.
    Do you see that?
    A. Yes, I do.
    Q. And it also talks about Wifi capability.
    Do you see that?
    A. Yes, it does.
    Q. And for what purpose do these clocks have Wifi capability?

Page 45

**Page 46**

A. These are installed into businesses. The business choose where to place these devices, and they choose the means by which they want to connect these devices to a network, and that Wifi is there to facilitate that connectivity.

Q. Got it. Do you know if these devices would have an IP address?

A. They would most definitely have an IP address.

Q. Would that help tell us where they are located?

A. No.

Q. Why not?

A. Because if I'm on a corporate network -- so, for example, if you log in to Paycor's network in Dallas, because the main switches are in Ohio, to an outside user, you will appear as if you are in Ohio.

And similarly, depending on where that network IP address is being issued from will determine where that device shows up in space. So while a device may be physically in one location, its IP address may be registered virtually anywhere in the world.

Q. So there should be some location associated

**Page 47**

with the IP address, but that may not tell us where the device is actually geographically located?

A. That is absolutely correct.

Q. Got it. Okay.

It talks about a proximity badge reader. What is that?

A. It is a badge that leverages radio frequencies to transmit data.

Q. Okay. So does that mean that the user could use the badge as long as it is close to the clock and it would read it?

A. That's correct.

Q. And then it also mentions a biometric fingerprint reader here on Page 1 of Exhibit A.

Do you see that?

A. Yes.

Q. And what is that?

A. That is a scanner that is capable of looking at a fingerprint and creating measurements or taking measurements.

Q. Okay. And that would be -- what would that be used for?

A. In place of a proximity badge. So, essentially, a user needs to be able to identify who

**Page 48**

they are, or we need a means of identifying who a user is because we need to associate the transactions performed at the clock with a specific person so that we can determine when they arrive to work or leave work or stop a specific job and start another job.

Then to facilitate that, most clocks will have what is referred to in the industry as a reader. An RF badge reader would be one type of reader, a badge reader would be another type of reader, and there is a collection of different ways that a customer could elect to identify who the person presenting themselves at the clock physically is.

Q. Okay. But the way for a user to clock in and out on these particular clocks is by using their fingerprint, correct?

A. Not specifically. That is an elected option from our customers.

So if you look at the picture on that Page 1, if you notice where the number 3 is on the hardware clock, on the picture of the clock.

Q. Yes.

A. If you go back and look at the legend, there it actually says there is a proximity badge reader. This device would have no capability of scanning a

**Page 49**

fingerprint.

Q. This particular catalog on Page 1; is that right?

A. That is correct.

Q. Okay. Now, if we look at Page 2.

A. Yes.

Q. There is a picture of a slightly different clock; is that right?

A. That is correct.

Q. Okay. And why is it different?

A. So these devices are a module. Our customer can elect to configure them in the means that suit their business requirements.

Q. Okay. So a customer could tell Paycor that they actually want the biometric reader installed on its PT 100 or PT 100W clocks; is that right?

A. That's correct, sir.

Q. And there would be a record of that, correct?

A. We would have an order for that, yes.

Q. And on Page 2, if we look at the image of the clock here, could you tell us where we would find that biometric reader?

A. It would be position 5.

### Page 50

1    Q. Got it. So for a person who is using this
2    particular clock to record their time by clocking in
3    and out, those users would actually use their
4    fingerprint, correct?
5    A. Well, on this specific device, they would
6    have the ability to choose whether they wanted to use
7    a proximity badge or their fingerprint. And, again,
8    that's defined by the customer, not by Paycor.
9    Q. Okay. So one way for the users to clock in
10   and out, if the customer so chooses, is to use his or
11   her fingerprint?
12   A. That is correct.
13   Q. And for an employee to use his or her
14   fingerprint, do they first have to be enrolled in the
15   clock?
16   A. They would have to enroll in the device to
17   use a finger scan.
18   Q. And are you familiar with that process?
19   A. I am.
20   Q. What is the enrollment process?
21   A. A supervisor or manager or someone
22   privileged to enroll employees to create a template
23   would go to the physical device with the employee.
24   The manager/supervisor/privileged user would validate

### Page 51

1    themselves on the clock, and the menu options on
2    the device will change for that
3    supervisor/manager/privileged user such that they
4    will have an option to enroll another employee, at
5    which point the manager will input what we call a
6    badge number. It is a number that the customer
7    assigns to the employee to identify and associate that
8    employee with an employee record, at which point once
9    the employee has been identified, the manager will
10   ask the employee to submit their finger for scanning.
11   Q. Okay. Is there a particular part of their
12   finger that they use for scanning?
13   A. It's the central tip of the finger. And,
14   again, depending on customers' requirements,
15   customers' configuration, it could be one or more
16   fingers. But it's not the entirety of the finger;
17   it's a subset of the finger that the scanner in this
18   case looks at.
19   Q. And the portion of the finger that is used
20   is actually where the fingerprint is located,
21   correct?
22   A. I'm not an expert on fingerprints, but it's
23   a subset of the tip of the finger. And if I look at
24   my finger, I can see that I've got what I would

### Page 52

1    consider to be a fingerprint that goes beyond that.
2    Q. Okay. But this document actually talks
3    about it being a fingerprint reader, correct?
4    A. It scans the finger.
5    Q. Right, but if we actually look at Page 1 of
6    this Exhibit A, do you see where it talks about a
7    fingerprint?
8    A. Yes.
9    Q. Okay. Is there a reason why you don't want
10   to use that word?
11   A. That's our marketing terminology. From a
12   technical perspective, it's a finger scan.
13   Q. Okay. And what's the difference?
14   A. Colloquially people understand what
15   biometric fingerprint means, but from a technical
16   perspective, it is not a fingerprint. We do not
17   capture -- we do not believe we capture fingerprints.
18   We take the scan of a finger.
19   Q. What is the basis for that answer?
20   A. A fingerprint is physical. It can be
21   reproduced. I can physically view it and see it. And
22   what we have is a template that is based on an
23   algorithm that uses specific landmarks on the tip of
24   the finger to calculate a value that represents a

### Page 53

1    person.
2    Q. How did you gain that understanding?
3    A. I've been working with biometrics for
4    16 years or what we colloquially call biometrics for
5    16 years. That's always been the distinction that the
6    vendors have provided to us.
7    Q. Okay. Has that specifically happened with
8    regards to these devices since you've been a Paycor?
9    A. I have worked with the vendors that Paycor
10   uses and other organizations in the past. And the
11   reality is that the scanners themselves that these
12   vendors supply, there is only a handful of vendors
13   that these manufacturers procure those sensors from,
14   and all of them, whether -- you know, they will all
15   claim the same or inform you that the means by which
16   they obtain a finger scan is virtually the same. It's
17   very similar technology across all the vendors.
18   Q. And who are those few vendors?
19   A. Suprema would be one of them, Lumadime,
20   Silk ID probably are the three biggest vendors. There
21   are probably some smaller vendors that produce them,
22   but if you go look at the majority of vendors in the
23   space, those will be the three vendors that they would
24   procure their hardware from. So even someone like

### Page 54

1   Kronos, you know, procures their scanner from Suprema.
2       Q. Okay. And moving on to Page 3 of this
3   document.
4       A. Yes.
5       Q. Do you see where it talks about connecting
6   to the internet?
7       A. Yes.
8       Q. And why is that necessary?
9       A. Because the device is physically in the
10  hands of the customer, and the data related that is
11  collected by that device needs to be transmitted back
12  to Paycor, and today, you know, typical for any data
13  transmission to occur over a network connection.
14      Q. Okay. So it connects the clocks to Paycor's
15  software, correct?
16      A. That is correct.
17      Q. And that software, as we've discussed, is
18  actually hosted by either Paycor or Microsoft,
19  correct?
20      A. Yeah, in this specific case, these devices
21  would connect directly to the software that's been
22  developed by Paycor and hosted in Azur.
23      Q. Okay. By Microsoft?
24      A. By Microsoft, yes.

### Page 55

1       Q. Okay. And then for Paycor customers to
2   access this data, they would actually have to log on
3   to the Paycor website; is that correct?
4       A. They would log onto the Paycor website to
5   access the results of an action that took place at the
6   clock. The administrators at a client can log onto a
7   clock and see a history of transactions that have
8   occurred on the clock as well.
9       Q. I'm sorry, I missed that last part. Can you
10  say it again?
11      A. A customer administrator that has physical
12  access to the device can log in with their account
13  information on the clock itself and see a brief
14  history of transactions that occurred on the device.
15      Q. Okay. So the actual fingerprint template is
16  stored on the device itself and also on the software;
17  is that correct?
18      A. The finger template is stored on the device
19  itself, as well as in our software that's hosted on
20  the Microsoft Azur platform.
21      Q. Okay. If we move on to Page 6 of this
22  exhibit.
23      A. Yes.
24      Q. I think that's talking about what we just

### Page 56

1   discussed, the Paycor.com website; is that right?
2       A. Page 6, can you clarify what is the title of
3   the page?
4       Q. Sure. I'm just looking at the bottom left
5   where it says Page 6.
6       A. Yes. Okay. I'm on that page.
7       Q. Under the Enrolling Employees section, do
8   you see that?
9       A. Yes, I do.
10      Q. And it looks like it allows clients to log
11  in through Paycor.com.
12         Do you see that?
13      A. That is correct. I see that now.
14      Q. And then it talks about the enrollment
15  process?
16      A. In this case, it's talking about the
17  proximity badge or RF badge enrollment process.
18      Q. Got it. And then it starts with step 1 on
19  Page 6, and if we continue on to Page 7, it goes to
20  step 2.
21         Do you see that?
22      A. Yes.
23      Q. Okay. Step 2 references a time and
24  attendance section. What is that?

### Page 57

1       A. That would be what we would market as
2   Perform Time.
3       Q. Okay. So part of that first product line
4   that we've already discussed?
5       A. Correct.
6       Q. And then within that section, there is an
7   employee security section; is that right?
8       A. That would be correct.
9       Q. Okay. And would the clients have access to
10  this information?
11      A. This is client-specific information, yes.
12  Clients are responsible for administering this portion
13  of the application.
14      Q. And Paycor would also have access to this
15  information?
16      A. We would have access to this information
17  when our clients provide us the rights to access it,
18  yes.
19      Q. Okay. If we then continue on, about
20  two-thirds of the way down on this page, there is
21  like a screen shot.
22         Do you see that?
23      A. Yes.
24      Q. Is that a screen shot of Perform Time?

**Page 90**

1  stored, used, at all times remained in the possession
2  and control of either Paycor or ADP."
3      Do you see that?
4  A. I'm reading it. I see that.
5  Q. Do you have any basis to dispute that
6  statement?
7  A. Yes.
8      MR. WOLFE: Objection to the extent it seeks
9  a legal conclusion.
10      You can answer it.
11      THE WITNESS: Thank you.
12  BY MR. STEPHAN:
13  Q. And what is that?
14  A. We have no way of subjecting an employee of
15  a customer to collect a fingerprint or, for that
16  matter, a finger scan. We have -- you know, we would
17  receive on behalf of the customer, but we have no way
18  of collecting.
19      Again, we don't have a relationship.
20  I can't physically walk over to every one of the, one,
21  two million employees that Paycor services and ask
22  them to scan their finger on a clock. So that --
23  Q. So -- I'm sorry. I didn't mean to
24  interrupt.

**Page 91**

1  A. Yeah, that would have to be conducted by our
2  customer. And, as I said, you know, we offer this as
3  one option among probably a dozen different options
4  for employees of our customers to clock in and out.
5  Q. Okay. I understand. So your statement is
6  that the initial collection has to be done by the
7  employer or the Paycor customer itself?
8  A. That is correct. And the reality is control
9  of the template still resides with the customer. The
10  customer has the ability to create it, the customer
11  has the ability to delete it, and the customer has the
12  ability to require an employee to create one. We have
13  no say in any of those activities.
14  Q. Well, correct me if I'm wrong, but isn't
15  Paycor's software designed to obtain that template
16  from the clocks?
17  A. The clock would replicate it back to Paycor
18  for storage purposes.
19  Q. And Paycor itself decided to obtain that
20  data and store it on its servers, correct?
21  A. We have chosen to do that as a convenience
22  for our customer. Essentially we use that template
23  for two purposes: One is in the event of a failure of
24  a device, a customer would be sent a replacement

**Page 92**

1  device, and to save them the effort of having to
2  re-enroll all of their employees, we can copy those
3  templates back down to the new device so that it would
4  be available for use as soon as it is essentially hung
5  up or within a few minutes of it being hung up on the
6  wall.
7      Additionally, you can imagine a facility
8  that has a very large footprint, like a Club Fitness
9  location may have, where there might be time clocks
10  that are hung in different portions of the facility,
11  and instead of requiring the employee to register
12  themselves on each physical device they would like to
13  use, they would register on one, and then we would
14  replicate those templates for storage on a local
15  device on an as-needed basis.
16      But the customer is in complete control of
17  when a template is created, when a template is
18  completed, and whether an employee has to use a
19  template or not. Paycor does not control that.
20      And, really, our storage is no different
21  than a safety deposit box that a bank would provide to
22  a customer.
23  Q. Well, the client didn't decide on that
24  process; that was a process that Paycor decided on,

**Page 93**

1  correct?
2  A. That's a process that was designed by Paycor
3  that is a standard approach in the industry.
4  Q. It's part of the services that Paycor offers
5  and contracts with its customers for?
6  A. Correct.
7  Q. And they charge for those services, correct?
8  A. We charge for our services. We don't
9  exclusively charge for that service, no.
10  Q. Okay. It's part of the package, though,
11  correct?
12  A. Part of the package.
13  Q. Going back to earlier testimony about no
14  obligation to comply, the last one I wanted to talk
15  about is Paycor's belief that it doesn't capture a
16  fingerprint.
17  A. Correct.
18  Q. And other than what you have testified
19  before regarding how that's sort of commonly known in
20  the industry, is there any other basis for your
21  testimony?
22  A. Because what is stored is not a capture of a
23  fingerprint; rather, we store a template, and a
24  template is comprised of essentially coordinates for

**Page 94**

```
 1   landmarks on a subset of a finger, in this case with
 2   this device, and then those coordinates are put into
 3   an algorithm, and a numeric representation is created.
 4          And that's what we store is the numeric
 5   representation of a collection of landmarks from a
 6   finger.  There is no way to reverse-engineer that back
 7   into a fingerprint.  There is essentially no use --
 8   I would never even be able to tell you who that
 9   template belonged to.  All I can do is -- you know, in
10   isolation, that template, it has no value or meaning.
11   It can't be used for anything.
12       Q.  Well, it's used for clocking in or out?
13       A.  It's used to clock in and out, and what we
14   have done is we have what we call a badge number,
15   which is essentially a numeric value that we assign to
16   an employee, and we store an association between the
17   physical template file and that badge number so that
18   when an employee comes to a device, they can submit
19   their finger for scanning.  The scan takes a
20   measurement.  It processes the calculation, creates a
21   template or creates the output of what is stored in
22   the template, and then looks at the available
23   templates to ensure that those two numbers match.
24          We're not physically matching fingerprints
```

**Page 95**

```
 1   in the sense of looking at every single, you know,
 2   groove and line within your finger to figure out
 3   whether the two things are photographically identical.
 4   There is a false positive rate on these devices
 5   that --
 6       Q.  What is it?
 7       A.  It depends on the device.  I believe that
 8   the device that we are using from ZK in the context of
 9   this case is somewhere around 1 percent false
10   positive.
11       Q.  It's less than a percent; isn't it?
12       A.  It's approximately a percent.  It could be
13   slightly less.
14       Q.  The template that we're talking about
15   here --
16       A.  Yes.
17       Q.  -- it's all based on the user's fingerprint,
18   correct?
19       A.  It's based on landmarks within their finger.
20       Q.  Okay.  So those landmarks are then converted
21   into a template?
22       A.  Those landmarks, essentially there's -- if
23   you think of it like a map, we have specific
24   coordinates or landmarks that we are looking for on
```

**Page 96**

```
 1   the surface of a portion or subset of the finger, and
 2   we can map the geography of those locations, and each
 3   of those will have a specific set of coordinates.
 4   Those get put into a mathematical calculation where we
 5   get a single number out the other end.
 6       Q.  So measurements of someone's finger are
 7   converted into a numerical template; is that right?
 8       A.  We don't measure the whole finger.  We
 9   measure --
10       Q.  I didn't say you did, but there's parts of
11   measurements of the finger that are taken and then
12   converted into a numerical template, correct?
13       A.  There are measurements of the surface of the
14   finger or a portion thereof.
15       Q.  And then they are converted into a numerical
16   template, correct?
17       A.  They are converted into a numerical value,
18   yes, which is stored in what we would cal a template.
19       Q.  And that is because that's how computers
20   function, right?
21       A.  No.  You can use other means to compare
22   data.  So, you know, you can do image recognition and
23   physically take a picture of a fingerprint and,
24   leveraging computer vision, compare that to another
```

**Page 97**

```
 1   series of pictures to find a match.  That's not how we
 2   operate because we don't physically capture a picture
 3   of the fingerprint.  We don't store a fingerprint of
 4   the fingerprint.
 5          Similarly, you could do that with video
 6   technology and computers.  There is a number of
 7   different ways.  In fact, you know, you could use a
 8   capacitive sensor to look at the resistance that the
 9   finger creates relative to an electric current, and
10   everybody has a unique signature of resistance in
11   their finger.  So some of the sensors look at that.
12          Other sensors will look at, like I said
13   before, the capillary veins, basically looking
14   underneath the skin to determine who you are based on,
15   again, landmark points underneath your skin.
16          So there are different techniques to
17   obtaining with some degree of certainty uniqueness,
18   and all of those techniques essentially result in some
19   number, because that's the way this specific
20   technology has been designed.  That's not to say that
21   there aren't other means of performing the same tasks
22   that may be more or less invasive.
23       Q.  Well, these will all be fun topics for the
24   experts in this case.
```

**Page 98**

1  A. They will be.
2  Q. The algorithm you mentioned, how does that
3  work?
4  A. Those are proprietary. They're a black box
5  to Paycor. We have not ever seen or inspected the
6  physical algorithms.
7  Q. Okay. So do you know how they function?
8  A. They essentially, as I said, have specific
9  landmarks within the finger tip or portion of the
10  fingerprint that they are looking at. Those landmark
11  coordinates are stored or passed into an algorithm.
12  That algorithm produces a number that is encrypted out
13  the other end.
14  Q. Are there any documents that you are aware
15  of that describe that process?
16  A. I think at a high level, there are documents
17  that describe that process that, I believe, have been
18  submitted as part of this case. I don't know that
19  they get into the exact sort of trade secrets or IP
20  behind how those algorithms completely work.
21  Q. Do you remember any of those documents by
22  name or title?
23  A. I don't remember them by name or title.
24  Q. Okay. Going back to my initial question

**Page 99**

1  about compliance with BIPA.
2  A. Yes.
3  Q. Are you aware of any efforts, for example,
4  by anyone at Paycor to communicate with Paycor
5  customers to notify them of BIPA?
6  A. We have a BIPA policy that is posted as part
7  of our set of policies on our website.
8  Q. Okay. Anything else?
9  A. I'm not aware of anything specific around
10  BIPA communications.
11  Q. Okay. Other than having a BIPA policy, are
12  you aware of any other efforts by Paycor to comply
13  with BIPA?
14  A. I'm not aware of any.
15  Q. Okay. What do you know about the Paycor
16  biometric information policy?
17  A. I know that there's a policy. I have read
18  the policy in the past.
19  Q. When did you first learn about it?
20  A. The general information protection policy?
21  Which policy specifically are you asking about?
22  Q. I'm talking about the -- I thought you
23  mentioned a biometric information policy.
24  A. Yes.

**Page 100**

1  Q. When did you first learn about that?
2  A. Shortly after I joined Paycor. So I joined
3  in August of 2018. I would say probably by the middle
4  of September, I had learned about that policy.
5  Q. And how did you learn about it?
6  A. I want to say that we -- there was some
7  degree of litigation that was occurring when I joined,
8  and I was made privy to that somewhere around the
9  middle of September 2018. And as part of that, I was
10  informed of the policy and subsequently reviewed the
11  policy at the time.
12  Q. Do you remember who it was that informed you
13  about the policy?
14  A. I would assume that it would have been Ryan
15  Bergstrom or Sally. I don't recall exactly who told
16  me about the policy.
17  Q. And was this in relation to this lawsuit or
18  another one?
19  A. I do not believe it was from this
20  litigation.
21  Q. Do you know which litigation it was related
22  to?
23  A. I want to say Boyd.
24  Q. Is Paycor a party in that case?

**Page 101**

1  A. I do not know who created that.
2  Q. Are you aware of any other cases besides
3  this one or Boyd involved with Paycor as a party
4  regarding BIPA?
5  A. I believe there was one other.
6  Q. Okay. So you learned about this policy in
7  some way related to ongoing litigation; is that fair
8  to say?
9  A. That is correct.
10  Q. Okay. Where is the policy kept?
11  A. On Paycor's website.
12  Q. Could I access it now?
13  A. Yes, you could.
14  Q. Do you know how long it's been on the Paycor
15  website?
16  A. I believe it was initially posted in the
17  summer of 2017.
18  Q. How do you know that?
19  A. Because we have revision histories, and
20  that's what the revision showed us.
21  Q. Do you know when that policy was first
22  created?
23  A. I would assume right around the time it was
24  posted.

## Page 122

```
 1   difference between biometric identifiers and
 2   biometric information?
 3        MR. WOLFE: Same objection.
 4        MR. STEPHAN: Mitri, I'm sorry, I couldn't
 5   hear you.
 6   BY THE WITNESS:
 7      A.  I'm trying to correlate the distinction
 8   between the identifiers and information.
 9   BY MR. STEPHAN:
10      Q.  Well, let me just ask it a different way.
11        Do you think there is a difference?
12      A.  Identifiers would be a subset of information
13   that could be considered biometric.
14      Q.  So for purposes of the Paycor policy, what
15   would you consider to be included in biometric
16   identifiers?
17      A.  Biometric identifiers are the physical
18   locations of the individual elements or landmarks that
19   we use on a finger.
20      Q.  So you're talking about the actual
21   fingerprint?
22      A.  It's not a print because we're not
23   physically capturing the entirety of the finger.
24      Q.  Okay.
```

## Page 123

```
 1      A.  We're looking for specific points of
 2   interest on the finger, or the vendors, as it's been
 3   described to us, look for specific landmarks on the
 4   finger, they take the coordinates of those landmarks,
 5   and then run those through an algorithm to generate a
 6   template.
 7      Q.  Okay. But you would agree that biometric
 8   identifiers include finger scans, correct?
 9      A.  A finger scan could have some biometric
10   information in it.
11      Q.  Okay. But it's a little different from my
12   question.
13        Would you agree that, at least for purposes
14   of the Paycor biometric information policy, biometric
15   identifiers include finger scans?
16        MR. WOLFE: Object to the extent it seeks a
17   legal conclusion.
18        You can answer.
19   BY THE WITNESS:
20      A.  I believe that's what the document is
21   saying, but --
22   BY MR. STEPHAN:
23      Q.  Okay. Do you have any reason to disagree
24   with that?
```

## Page 124

```
 1      A.  As I said, you know, the scan is collecting
 2   information about points on a finger. Whether that is
 3   interpreted as a biometric identifier or not, you
 4   know, I'm not a lawyer to understand those
 5   distinctions.
 6      Q.  Okay. So as you sit here, you don't have
 7   any basis to disagree; is that right?
 8      A.  I don't have a basis to disagree, I guess,
 9   if that's what you would like to hear.
10      Q.  Okay. And so we have talked about the
11   identifiers now.
12        What do you understand biometric information
13   to include?
14      A.  Any information that I can use to --
15        MR. WOLFE: Same objection.
16        Go ahead.
17   BY THE WITNESS:
18      A.  It's information that I can use to identify
19   a person based on that information alone.
20   BY MR. STEPHAN:
21      Q.  What do you mean that information alone?
22      A.  Meaning that if I had, for example, a copy
23   of the fingerprint, I would be able to tell whose
24   fingerprint it was. I could see that fingerprint.
```

## Page 125

```
 1   I could replicate that fingerprint. That, to me, is
 2   biometric information.
 3        What we get out of or put into a template is
 4   a hash of numbers that's created based on a scan of
 5   the finger, but at no point could we take that and
 6   recreate the print from it. At no point could we do
 7   anything other than try and create the template again
 8   to see if we can match it with an existing template.
 9        So just having the presence of the finger
10   there without the algorithm and that specific scanner,
11   I would have no recourse to know whose it is or what
12   it is exactly. If you look at the data, you wouldn't
13   be able to tell whether it was originated from a
14   finger, whether it originated from Microsoft Word or
15   Excel or any other process on any other computer.
16      Q.  So would that be included in Paycor's
17   definition of biometric information on Exhibit E?
18      A.  I believe the template that we store would
19   be covered under this document.
20      Q.  As biometric information?
21      A.  I believe that's what the document says.
22      Q.  Okay. And do you have any basis to disagree
23   with that?
24      A.  Again, it's based on my interpretation of
```

**Page 130**

| | |
|---|---|
| 1 | A. This is between Paycor and Club Fitness. |
| 2 | Q. And at the top right, it says, "Prepared by |
| 3 | John Ortworth." |
| 4 | Do you see that? |
| 5 | A. I see that. |
| 6 | Q. Do you know who that is? |
| 7 | A. I would assume that John is their sales |
| 8 | representative. |
| 9 | Q. Can you tell by looking at this document |
| 10 | what types of clocks Paycor provided to Club Fitness? |
| 11 | A. Yes. |
| 12 | Q. And how could you tell that? |
| 13 | A. If you look under on the first page, under |
| 14 | Club Fitness Monthly Fees, under Services, you will |
| 15 | see a PT 100FP Wifi rental. |
| 16 | Q. Great. And that would be one of the clocks |
| 17 | that we looked at earlier on Exhibit A, correct? |
| 18 | A. I believe so. |
| 19 | Q. Okay. And those clocks have the biometric |
| 20 | fingerprint reader, correct? |
| 21 | A. That is correct. |
| 22 | Q. Okay. So if we look at this, under Form of |
| 23 | Client Data, do you see that there? |
| 24 | A. What page am I looking for? |

**Page 131**

1  Q. I'm sorry. It's ending with Bates stamp
2  122.
3  A. Can you repeat that?
4  Q. Sure. If you look at the very bottom,
5  there's a bates stamp. It says Johns_000122.
6  A. Yes. 122 is what you want me to look for?
7  Q. If you could.
8  A. 122. Yes, I see 122 now.
9  Q. Okay. And it talks about client data there.
10  Do you see that?
11  A. Yes, I do.
12  Q. And that would include some of the data that
13  we talked about before that would be necessary for
14  processing payroll and taxes and that sort of thing?
15  A. Yes.
16  Q. And then the next section -- actually, not
17  the next section, same section, if you go down to the
18  last paragraph under the Client Data section there.
19  A. Yes.
20  Q. Do you see it says, "Client grants Paycor
21  the right to use client's payroll data for purposes
22  of performing the Paycor services and for purposes of
23  developing and marketing new products and services."
24  Do you see that?

**Page 132**

1  A. I do see that, yeah.
2  Q. Do you know if any of the 14,000 or so users
3  that you have identified in this case had any of
4  their personal data used for marketing purposes?
5  A. I would not assume they would, but I don't
6  know for certain. Now, we wouldn't market directly to
7  a client or -- to, sorry, an employee of a client.
8  Q. What happens at the end of a relationship
9  between Paycor and a customer? What happens to the
10  data?
11  A. Portions of the data are returned based on
12  our data retention policy. I believe it's seven
13  years. Some portions of the date are purged at
14  termination of the relationship with the client.
15  Q. What about the biometric templates? Do you
16  know if those are purged?
17  A. Biometric templates are purged at the
18  termination of an agreement with a client.
19  Q. And how long has that been the case?
20  A. Since the summer of 2018.
21  Q. And do you know why Paycor started that
22  practice in the summer of 2018?
23  A. I was not privy to the rationale behind
24  doing that, no. I assume that overlapped with some

**Page 133**

1  work that was being done for GRP compliance. So it
2  may very well have been part of the GRP initiative to
3  purge that data upon termination of the relationship
4  with a client.
5  Q. Do you know if Paycor had been sued before
6  it started that policy?
7  A. I do not believe so.
8  Q. Which group at Paycor is responsible for
9  deleting biometric at that time?
10  A. It's an automated process. So upon
11  termination of a client agreement, within 24-72 hours
12  that process will run once we've recorded the
13  termination of that relationship, and then we
14  periodically audit to make sure that the processes are
15  running, we've got monitoring in place to make sure
16  those things are working appropriately.
17  And then at any point in time, a client can
18  call in and ask us to remove specific pieces of data,
19  biometric templates being one of them.
20  Q. Before that policy, what happened to users'
21  biometric data at the end of a relationship between
22  Paycor and its customers?
23  A. They would be persisted until such time as
24  we purged them.

**Page 134**

Q. Okay. They would be kept; is that right?

A. They would be kept until we would purge the data related to that customer. Now, as I understand it, when that functionality was added to our capabilities, we retroactively went back and purged all biometric templates for non-active customers and non-active employees.

Q. Okay. Do you know -- as part of the research you have done in this case, do you know if Paycor had biometric template information for Kellin Johns or Juan Barron?

A. We had a template for each of those people. Kellin Johns' template was associated with a Club Fitness location in Missouri, and Juan, I believe we also had a template for him or her in, I would assume, Illinois.

Q. Okay. And how are you able to determine that Kellin's template was associated with a Missouri location?

A. Because we have separate databases for -- the way that the Club Fitness relationship worked is each facility had its own separate contract with Paycor, and data is not shared between clients. And the data for which we have a template for Kellin Johns

**Page 135**

was a client that operated one location in Missouri.

Q. Okay. So would that mean that if Kellin wanted to use a Club Fitness clock in Illinois, it would not register; he would have to enroll in that clock separately?

A. He would have to enroll in that clock separately, but as a prerequisite to that, he would have to have been assigned a badge. And his record of employment in Illinois was actually as a salaried employee, and generally salaried employees don't get badges because they get paid whether they -- they get paid, right? Unless they are absent from work, they are going to be paid.

Q. Do you know if that was a practice at Club Fitness?

A. Yes.

Q. How do you know that?

A. Because Kellin Johns in the Illinois location never had a badge number assigned to their user account.

Q. Do you know if he is still clocked in or out as a salaried employee?

A. We do not. We cannot facilitate a time clock transaction without a badge number. It's a

**Page 136**

prerequisite.

Q. So why would they have collected his fingerprint?

A. Because he had a separate record of employment at the Missouri location where he was am hourly non-exempt worker, in which case he did have to punch a clock there.

Q. So he would have had a badge for that location?

A. He would have had a badge number assigned to him and a fingerprint template created for a finger scan.

Q. Your testimony is that each of those locations operated separately and distinct from each other and were not in one database?

A. That is correct. Each location operated under its own contract with Paycor.

Q. Okay.

A. Yes.

Q. And the research also confirmed that Juan Barron did enroll in an Illinois location, he did have a badge at the Illinois location?

A. That is my recollection, yes.

Q. Okay. Let me ask you -- we are getting

**Page 137**

close. Just hang tight with me. We are almost done.

A. Sure.

Q. Do you know if Paycor has ever used a Schlage time clock?

A. Schlage? No, Paycor has never used a Schlage time clock with Paycor's products. The Schlage time clock is used with the AOD product provided by Time On Demand/Infotronics.

Q. Got it. So going back to the start of your deposition today, that would have been, I think, the second product line that you mentioned?

A. Yes.

Q. Okay. And in that case, any of the biometric templates would be stored on an Attendance On Demand database?

A. That is correct.

Q. That would be accessible to the client, in that case Corcentric and Attendance On Demand?

A. Correct.

Q. Would Paycor be able to access that information?

A. We are not able to access that information.

Q. Okay. And that Schlage clock, do you know if it has any biometric capabilities?

1                REPORTER'S CERTIFICATE

2

3        I, ANDREW R. PITTS, a Certified Shorthand

4   Reporter, do hereby certify that heretofore, to-wit,

5   on the 14th day of January, 2021, appeared remotely

6   via videoconference, MITRI DAHDALY, in a cause now

7   pending and undetermined In the United States District

8   Court, Northern District of Illinois, Eastern

9   Division, wherein KELLIN JOHNS and JUAN BARRON,

10  Individually and on behalf of all others similarly

11  situated, are the Plaintiffs, and PAYCOR, INC. is the

12  Defendant.

13       I further certify that the said witness was

14  first remotely duly sworn to testify the truth, the

15  whole truth and nothing but the truth in the cause

16  aforesaid; that the testimony then given by said

17  witness was reported stenographically by me in the

18  remote presence of the said witness, and afterwards

19  reduced to typewriting by Computer-Aided

20  Transcription, and the foregoing is a true and correct

21  transcript of the testimony so given by said witness

22  via videoconference as aforesaid.

23       I further certify that the taking of this

24  deposition was pursuant to Notice, and that there were

Page 145

1  present via videoconference at the deposition the

2  attorneys hereinbefore mentioned.

3  I further certify that I am not counsel for nor

4  in any way related to the parties to this suit, nor am

5  I in any way interested in the outcome thereof.

6  IN TESTIMONY WHEREOF: I have hereunto set

7  my hand and affixed my seal this 2nd day of February,

8  2021.

9

10  _____
   Andrew R. Pitts, CSR, RPR

11

12

13

14

15

16

17

18

19

20

21

22

23

24